# EXHIBIT 10

```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS

  GABRIEL GARAVANIAN, ET AL.    )
                                )
              PLAINTIFFS,       )
                                )
  VS.                           )
                                )  CASE NO. 1:23-CV-10678-WGY
  JETBLUE AIRWAYS               )
  CORPORATION AND SPIRIT        )
  AIRLINES, INC.,               )
                                )
              DEFENDANTS.       )
```

REMOTE VIDEO DEPOSITION
OF KATHERINE ARCELL
TUESDAY, JUNE 13, 2023

Reported By:
Allison M. Hall, RDR, CRR, CSR

1        June 13, 2023

2        12:03 p.m.

3        Video deposition of KATHERINE

4    ARCELL, held remotely via Zoom before

5    Allison Hall, a Registered Diplomate

6    Reporter, Registered Merit Reporter,

7    Certified Realtime Reporter, and

8    Certified Shorthand Reporter and Notary

9    Public.

```
 1         A P P E A R A N C E S:

 2

 3          ON BEHALF OF PLAINTIFFS:

 4          BONSIGNORE TRIAL LAWYERS, PLLC
              ROBERT J. BONSIGNORE, ESQUIRE
 5            GEORGE OMAR KOURY, ESQUIRE
                23 Forest Street
 6              Medford, Massachusetts 02155
                Phone: 781-856-7650
 7              E-mail: rbonsignore@classactions.us

 8          ON BEHALF OF JETBLUE AIRWAYS CORPORATION:

 9          COOLEY LLP
                ZACH SISKO, ESQUIRE
10              500 Boylston Street
                Fourteenth Floor
11              Boston, Massachusetts  02116
                Phone: 617-937-2368
12              E-mail: zsisko@cooley.com

13
            COOLEY LLP
14              MATT NGUYEN, ESQUIRE
                1299 Pennsylvania Avenue NW
15              Suite 700
                Washington D.C.  20004
16              Phone: 202-728-7123
                E-mail: mnguyen@cooley.com
17
            ON BEHALF OF SPIRIT AIRLINES:
18
            PAUL WEISS
19              COLE A. RABINOWITZ, ESQUIRE
                535 Mission Street
20              Twenty-fourth Floor
                San Francisco, California  94105
21              Phone: 212-373-3956
                E-mail: crabinowitz@paulweiss.com
22
       ALSO PRESENT:
23
       Alex Held, Video Specialist
24

25
```

Page 13

Q. -- the substance of your conversations with counsel, okay?
A. Yes.
Q. And Mr. Bonsignore, obviously, should and will jump in if something toes the line.
So you met with counsel. Did you -- did you review any other documents other than the interrogatory responses --
A. No.
Q. -- that you referenced?
Okay. Did you review the Complaint in this case?
A. Yes.
Q. You read the Complaint in advance of this deposition?
A. Yes.
Q. Okay. Did those documents refresh your recollection about any of the issues in this case?
A. Yes.
Q. Okay. And how -- how did they refresh your recollection?
A. It just -- I mean, I knew what the case was about. I -- it just helped me

Page 14

familiarize me again --
Q. Okay.
A. -- as to what it said, with the wording.
Q. Fair enough.
All right. Could you briefly summarize your educational background after high school.
A. I went to Louisiana State University and Tulane University. I have not received my graduate degree yet, though. My undergraduate degree.
Q. Okay.
A. Still working on it.
Q. Understood. Are you currently employed?
A. No, I'm retired.
Q. Okay. Could you walk me through your work history just very briefly.
A. I worked for TWA in New York. Then I came back to New Orleans and worked for Pan American Life Insurance. And then I worked for National Airlines, which was then turned into Pan American Airlines, which then turned into Delta.

Page 15

I worked as a travel agent with Travel Consultants and then Thomas Cook Travel, then Travel Advisor, and then I became an independent agent working through my own -- through an S corporation so that -- with someone else so that I could share the software expenses and business expenses.
But I was basic -- I was not employed. I was only employed by the other three of everybody else. I was self-employed otherwise.
Q. Okay. So let's walk through those travel agent positions one by one.
So the first one you mentioned was Travel Consultants?
A. Yes.
Q. About when did you start working for Travel Consultants?
A. In the late '70s. I can't remember the exact date. I only worked there a year. I worked for National Airlines and then when I had a baby, I quit. And then I went back -- I worked for Travel Consultants until National Airlines was

Page 16

hiring again. I went back to work for the airlines then.
Q. Okay.
A. And I did not go -- go into the travel agency world again until I had to take the furlough when Delta bought out Pan American Airlines.
Q. And I probably should know this, but about when did Delta buy out Pan American?
A. In the early '80s. I want to say '80 -- '81, '80 -- 1980, '81, something like that.
Q. Okay. And so you leave Delta -- or, excuse me -- you're furloughed from Delta and then you get back into the travel agent business?
A. With Thomas Cook Travel.
Q. Okay. And how long were you at Thomas Cook Travel?
A. About a year and a half.
Q. Okay. What was your role at -- at Thomas Cook Travel?
A. I had handled corporate travel and did cruises --

Page 17

Q. Did --
A. -- and tours.
Q. And corporate travel included flights, I assume?
A. Yes.
Q. All right. And once you left Thomas Cook, you went to Travel Advisor; is that right?
A. I took a -- I was -- I took a year or two out because I had a baby, and then I went to work at Travel Advisor, but I wasn't really employed there. I was 1099ed.
Q. Okay. So you were a contractor?
A. I was paid simply on my productivity.
Q. I see. So tell me a little bit about that. What -- what was your role at Travel Advisor?
A. I did travel -- corporate -- business travel and vacation travel for all my clients. Most of my clients were doctors and lawyers or CPAs. They were all business -- professionals.
Q. Okay. And while at Travel Advisor, were you paid commissions?

Page 18

A. That's how I got -- I was paid based on the commissions. The airlines were still paying commissions.
Q. How -- how were those commissions calculated?
A. I had to split it with the agency that I was with, Travel Advisor.
Q. And -- and I think you said -- I may have missed it, but I think you said the airlines paid the commissions.
    Is that correct?
A. There was a time when airlines paid travel agencies 10 percent on the base fare. So that's how travel agencies made money --
Q. Uh-huh.
A. -- because they got commissions from the airlines, from tour operators, cruise companies, car rentals.
Q. Okay. And is it fair to say that you received a portion of that 10 percent commission that the agency took in?
A. Correct.
Q. Okay. About -- I'm not going to hold you to this, but about what percentage

Page 19

did you receive?
A. 50 percent.
Q. 50 percent of the 10 percent?
A. Correct.
Q. Okay. Great. Thank you.
    And then you said you started an independent travel agency after --
A. Correct.
Q. -- Travel Advisor.
    When did you found your independent travel agency?
A. 1998, I think.
Q. What's the name of that company?
A. A & W Travel.
Q. And describe the work you did while at A & W Travel.
A. Again, I worked mostly with professionals doing their business trips and also did all of their vacation travel, which involved tours and simply booking hotels, car rentals, what people do on vacation.
Q. Uh-huh. Did you work directly for individuals, or did you have corporate accounts?
A. Individuals.

Page 20

Q. And you didn't -- you didn't work for any -- or strike that.
    You didn't have any corporate accounts while at A & W Travel?
A. Define "corporate accounts."
Q. Like a company hiring you to book travel for their business.
A. No.
Q. Okay. Is A & W Travel still in operation?
A. No.
Q. And when was that -- was the company dissolved?
A. Yes.
Q. When did that occur?
A. 2020.
Q. So you worked for A & W Travel for about 22 years?
A. Yes.
Q. Okay. And what -- I may know the answer to this, but why did you dissolve the company?
A. Dissolved the company because when COVID hit and every -- all of the meetings that had been -- that I was booking for my

Page 21

clients to attend were being -- were canceled. So what started out to be a lucrative year became a year of loss.

And the -- my partner -- the person that I shared the expenses with and I decided that we could wait it out until the airlines -- every -- until people started having meetings again in person, but we were both in our 70s, and decided that we had been fighting, trying to make a living as travel agents for a very long time, and we made a decision that we were ready to retire.

Q. And --
A. We were tired of fighting all of the hoops that you have to jump through in order to make money.
Q. Okay. So that was my next question, actually.

What -- what were the sources of revenue for A & W Travel?
A. The sources of revenue were -- well, based on volume. We needed a lot of volume because we had to -- we -- we had charged -- since we no longer received

Page 22

commissions from the airlines, we had to charge service charges and -- per ticket.

We got -- we still got commissions from tour operators. So I had a fair amount of people that liked to take tours and cruises, so that helped me.

But other than that, that was it. Oh, you know, we -- if we ticketed through an air consolidator, we were able -- they -- a consolidator is a company that has contracts with the airlines to sell below what's published and, therefore, you can make up the difference because the client is still getting charged the same amount of money, but I got to keep a little bit of it.

Q. Okay. Let's unpack that just a little bit.

So you -- you said that you charged -- you had service charges per ticket --
A. Correct.
Q. -- for your customers. About how much was that service charge?
A. It started out $25 a ticket. Because of the -- because it was not very

Page 23

profitable, we raised it to 35. Other agencies were raising it -- they were charging for everything, faxing, everything. We didn't because we liked our -- we worked well with our clients.

Q. Okay. Were those service charges applied based on booking or based on the amount of tickets that a customer purchased?
A. Tickets purchased.
Q. So if someone had a connecting flight, I'm -- say I'm going from Boston to Dallas to Los Angeles, how many service charges would you apply in that scenario?
A. One.
Q. I see. So it's just per flight, that's the service charge?
A. Correct.
Q. I see. You mentioned --
A. Difficult to make money.
Q. You -- you mentioned consolidators. It sounds like, if I understand you correctly, consolidators would pay you the difference between the face value of the ticket and -- or, I'm sorry, just describe -- describe how you

Page 24

made money off of the consolidators.
A. If a consolidator had a -- a contract with the airline -- suppose the ticket was $2,000, and the consolidator agreed with the airline, I guess -- I don't know how they did their contracts, but they agreed to sell a certain amount of tickets for a lower fare, say, 1500. Now, that's, like -- more like it would only be -- you'd make, like, you know, 30 or $40 more to bring it up to the 2,000.

So, you know, I would get that back from the consolidator.

Q. Understood. Did consolidators -- did you work with consolidators for domestic flights?
A. No.
Q. It was only international flights?
A. Correct.
Q. Okay. So what was the total revenue of A & W Travel when you closed your doors in 2020?
A. I really don't know.
Q. Do you know what it was for 2019?
A. No.

Page 25

Q. Do you have an estimate?
A. I don't remember.
Q. Okay.
A. We had -- we had an office manager that handled all of that.
Q. So you don't know how much money the business made in 2019?
A. No.
Q. What percentage of your revenue was comprised of service charges for airline flights, if you know?
A. I would say 85 percent.
Q. 85 percent --
A. The rest would come from commissions from cruises or tours.
Q. Okay.
A. We had a lot of volume.
Q. Fair. Ms. Arcell, is it fair -- you said you retired now?
A. Yes.
Q. And it's fair to say you won't be working as a travel agent in the near future?
A. Correct.
Q. And you have no intentions to

Page 26

return to the industry?
A. Correct.
Q. Okay. About how many customers did A & W Travel work with in a typical year?
A. Seventy-five, maybe.
Q. Seventy-five total customers?
A. I guess. Higher, maybe, depending on -- depending, like -- I had lawyers that would -- that would travel to depositions. Sometimes they would travel -- they would bring the court reporters with them. Sometimes they were paying for witnesses to come to town because they were being deposed in New Orleans.
    Sometimes families would bring friends with the kids. It's hard to say exactly how many clients -- I mean, how much -- how many people were buying tickets. Sometimes people would come in and would call -- a cold call: Do you sell tickets? Yes, we do.
    I can't keep track. It was a -- it was a fair volume, but I can't -- I don't know.

Page 27

Q. Were most of your clients repeat customers?
A. Yes.
Q. Okay.
A. I had clients that I worked with from the very beginning -- from starting at Travel Advisor -- actually, some of them from Thomas Cook when I went back to work at Thomas -- when I went back to work as an independent contractor, I called all my old clients from Thomas Cook, and they came back. I had a very loyal following.
Q. Understood. So my next question was going to be, how did you generally procure clients.
A. Word of mouth.
Q. Word of mouth?
A. Yes.
Q. Were -- are most -- were most of your clients local?
A. No. I have some clients that I never met. Just word of mouth, and they tried me out through -- you know, because I had contacts -- clients that lived out of state that were friends of mine. And they

Page 28

would spread the word. And so there were some contacts -- clients that I never saw face-to-face.
Q. Understood. So it's fair to say that you worked primarily with business travelers?
A. Correct.
Q. What percentage of the total flights that you booked would you say were business flights?
A. 90 percent.
Q. And the remaining 10 percent was vacation?
A. Yes.
Q. Okay. While at A & W Travel, did you assist customers in booking their plane travel?
A. Yes.
Q. What percentage would you say -- what percentage of those flights would you say were domestic versus international?
A. I guess 60 percent.
Q. 60 percent domestic?
A. Yes.
Q. Okay. Were there particular

Page 29

international locations that you regularly booked to or was it -- or let me stop there.
    Were -- were there -- are there international locations you regularly booked for your clients?
    A.  Paris, London, Rome, places in Germany.
    Q.  And --
    A.  Asia.
    Q.  Okay.  As a travel agent, did you work with airlines directly?
    A.  We had an airline program, so I didn't have to work directly with the airlines, because that's what -- that's the software that we were splitting the cost of. It gave us access to direct availability to the seats that are available on the airlines.
    Q.  What was the name --
    A.  Sabre.
    Q.  Sabre is the name of the program?
    A.  Yes.  Yes.
    Q.  And I'm not sure I asked before. Who -- who is the name of the partner you keep referencing?

Page 30

    A.  Christine Whalen.
    Q.  Christine Whalen?  Got it.
        So describe -- describe for me what Sabre does.
    A.  Sabre is an airline -- is a company that has the software that the airlines load what their flights are, what's available -- what seats are available, at what cost.  And we had to be aware -- as when I worked for the airlines, you had to be aware of the costs of the different classes of service.
    Q.  Was -- is Sabre available to the public?
    A.  No.
    Q.  It's only used for airline -- or, excuse me -- travel agents?
    A.  Yes, to my knowledge.
    Q.  Do you know how regularly the flights on Sabre were updated?
    A.  I assume they were updated constantly, because we had the last-seat availability.
    Q.  When you say the last --
    A.  In other words, if it was not

Page 31

available, it was sold out at the airlines also.
    Q.  I see.
    A.  If someone called us and it was sold out, they would call the airline, it was also sold out.
    Q.  Were -- were prices similarly updated along with the flight availability?
    A.  Yes.
    Q.  So approximate -- strike that.
        How regularly were prices updated?
    A.  Overnight.
    Q.  They weren't --
    A.  It would be just like it was at the airlines.  If you called in and were shopping and they would quote a fare, if you didn't purchase it that day, it could very easily change, go up or down overnight.
    Q.  Understood.  While at A & W Travel, did you -- were you able to offer any customers flight discounts?
    A.  Not domestically.
    Q.  Internationally, were you?
    A.  If I worked with a consolidator, out of the kindness of my heart, I sometimes

Page 32

would not -- it depended on what I wanted to -- I would buy -- get the tickets for what the consolidator had, and I could -- I could up it to the -- up it to what the airlines charged.  Never more than what the airlines charged.
    Q.  Okay.  Are there any other perks that you were able to provide for your customers?
    A.  None.  I was simply working as an agent for the airlines.
    Q.  When did airlines stop providing commissions?
    A.  Sometime in the '80s.  I don't remember.  It went from 10 percent, I think to 7, to 5, and zero.
    Q.  Okay. One more quick point on Sabre.  Were the prices on Sabre the same as if -- as they would be if a customer booked directly with an airline?
    A.  Yes.
    Q.  There's no difference in those prices?
    A.  None.
    Q.  So the benefit of Sabre was

Page 53

total tickets -- well, strike that.
    In 2019, the last full year A & W Travel was in business, about how many tickets did you sell to customers?
    A.   That would be difficult for me to say because my husband was in treatment for cancer, and I -- although I -- I was usually pretty good at knowing exactly, you know, what my volume was, 2017, '18, '19 and '20 and '21 are kind of a fog to me.
    Q.   Understood.  And I'm sorry to hear that.
    A.   Because he -- he did die.  And that was a lot of our travel.
    Q.   That's terrible.  And I'm sorry to hear that.
    A.   Thank you.
    Q.   Now, at -- as in 2019, again, the last full year, do you know how much you charged as a service fee per ticket?
    A.   $35.
    Q.   Okay.  So, Ms. Arcell, you are no longer working as a travel agent, correct?
    A.   Correct.
    Q.   And you have no intention of

Page 54

working as a travel agent in the future, do you?
    A.   No.
    Q.   No interest in it at all?
    A.   Sure, I have an interest in it, but I'm -- I'm worn out.
    Q.   And you intend to stay retired, all things being equal?
        MR. BONSIGNORE:  Objection.
        THE WITNESS:  What was that question you asked?
    Q.   (By Mr. Sisko) Do you intend -- you're currently retired.
    A.   Yes.
    Q.   And you intend to stay retired for the foreseeable future?
    A.   For the foreseeable future, although my clients are not happy.  I get -- I get calls all the time from them.
    Q.   But your business is dissolved?
    A.   My business is dissolved.
    Q.   And you take no revenue -- you currently have no revenue from A & W Travel?
    A.   I do not.
    Q.   And no other revenue from any

Page 55

other travel agency --
    A.   I do not.
    Q.   -- for work?
        So how would the -- it's fair to say that the JetBlue-Spirit merger would not impact your business in any way, correct?
    A.   It would not impact my business, but it would impact me personally, and it would impact people in general because people in general want the availability of choices.  And if JetBlue were to succeed --
    Q.   Ms. Arcell, my question was: Is -- is there any way in which the JetBlue-Spirit proposed merger could impact your business?
    A.   My business?  No.  Myself, yes.
    Q.   And there's no way that that merger would impact --
        MR. BONSIGNORE:  Objection.
        THE WITNESS:  It doesn't have anything to do -- what does it matter? Personally, it matters to me whether or not they -- you merge.
    Q.   (By Mr. Sisko) Okay.  Well --
    A.   It has nothing to do with my

Page 56

business.  My business is gone.  This is a personal matter for me as -- as -- as a citizen of the United States.
    Q.   Well, we can talk a little bit about your personal travel history.  But I just want to be clear there's no -- well, I think we got it on the record.
        MR. BONSIGNORE:  Objection.  Asked and answered.
    Q.   (By Mr. Sisko) That's a good segue.  Let's talk about your own travel history, Ms. Arcell.
        How often do you travel by plane?
    A.   A couple of times a year.
    Q.   And what's the reason?  Is it business or personal?
    A.   Personal.
    Q.   Do you use any other modes of transportation other than planes?
    A.   I have driven.
    Q.   Do you ever use trains or --
    A.   The only time I took a train was when my husband was sick and he also had a broken rib, and the doctors said he couldn't fly.

Page 69

 1  customers?
 2      A.  Yes.
 3      Q.  So you have concern with their
 4  service, but you would still fly them?
 5      A.  Yes.
 6      Q.  But you've never -- Ms. Arcell,
 7  you've never taken a JetBlue flight --
 8      A.  I have never.
 9      Q.  Okay.
10      A.  My husband did.
11      Q.  But you have not?
12      A.  Correct.
13      Q.  And you have no tickets for any
14  JetBlue flights in the future?
15      A.  No.
16      Q.  Do you have any intentions of
17  taking a JetBlue flight in the future?
18      A.  No, because I only fly into Newark
19  or West Hartford.
20      Q.  So it's a question of routes and
21  service?
22      A.  Correct.
23      Q.  Does JetBlue fly from New Orleans
24  to Newark?
25      A.  Not to my knowledge.  They fly to

Page 70

 1  Kennedy.  They might through
 2  Ft. Lauderdale -- through a connecting
 3  route.  I'm not sure.  I hadn't looked at it
 4  lately.
 5          Usually when I travel, I go --
 6  travel, connect through Atlanta so that my
 7  children -- my grandchildren can meet me and
 8  we can go out to visit family.
 9      Q.  So you prefer direct flights to
10  connecting flights?
11      A.  Absolutely.
12      Q.  Okay.  Is that a factor when
13  you're purchasing a flight, whether it's
14  direct or not?
15      A.  Flight is -- cost is more of a
16  factor.
17      Q.  Okay.  What are the factors that
18  you use when booking a flight?
19      A.  I would say cost, cost, and cost.
20      Q.  Nothing else that impacts your
21  decision?
22      A.  Schedule if it -- if I'm trying to
23  meet with my daughter and granddaughter.
24      Q.  Okay.  And, presumably, service is
25  another thing that would impact it.

Page 71

 1      A.  Well, it used to be, but not
 2  anymore, because you really don't get any
 3  service, so it doesn't matter.  I would just
 4  as soon pay less and pay for service that I
 5  get.
 6      Q.  Your opinion is that airlines
 7  don't provide sufficient service any longer?
 8      A.  They do not.  They do not.
 9      Q.  Is there any airline that provides
10  service that you deem acceptable?
11      A.  Acceptable to pay more for?
12      Q.  Sure.
13      A.  I guess Emirates, if I were going
14  to go to Dubai.
15      Q.  And I know you said cost, cost,
16  cost, but we were just talking about nonstop
17  service -- flight service, that is.  That's
18  also an impact -- that also impacts your
19  decision, correct?
20      A.  Yes, but if it's going to cost
21  more to take a nonstop than it is to take a
22  connecting flight, then I'm going to take a
23  connecting flight.  But if I can take a
24  nonstop and get a less -- less expensive
25  fare, then that's the one I'm going to take.

Page 72

 1      Q.  Okay.  Is customer service a
 2  factor in your decision to fly?
 3      A.  It used to be.  Not anymore.
 4      Q.  No longer -- it's no longer -- why
 5  is it no longer a factor?
 6      A.  Because you don't get customer
 7  service anymore.
 8      Q.  No airline provides customer
 9  service to --
10      A.  Not really.
11      Q.  That's -- that's your view?
12      A.  That's my view.  I've flown --
13  I've used extra frequent flyer points to go
14  in first class domestically on Delta and
15  regretted it because you get the same snacks
16  and you get a slightly wider seat.  But I'm
17  a small person, so it wasn't worth the extra
18  that I -- and I've not done it again.
19      Q.  Okay.  So we -- we've been talking
20  a little bit about JetBlue and how you have
21  not flown JetBlue -- have you -- have you
22  ever flown JetBlue?  I should have asked
23  that.
24          MR. BONSIGNORE:  Objection.
25          THE WITNESS:  I answered that a

Page 73
few minutes ago, saying I have not ever flown JetBlue, but that my husband did.
Q. (By Mr. Sisko) Right. Okay. Have you ever flown Spirit?
A. I have not.
Q. Do you have any intention of flying Spirit in the future?
A. If it's --
MR. BONSIGNORE: Objection.
THE WITNESS: If it goes to the correct place, yes, if it helps me.
Q. (By Mr. Sisko) Do you have any tickets purchased on a Spirit flight --
A. I do not.
MR. BONSIGNORE: The -- the realtime didn't pick up my objection. It had that as an answer to the -- by the deponent.
THE COURT REPORTER: I'll make sure I correct that. Thank you.
MR. BONSIGNORE: Okay. Thank you.
MR. SISKO: Thank you.
Q. (By Mr. Sisko) You'd agree with me that Spirit offers lower cost flights than, say, American?

Page 74
A. Yes.
Q. As well as Delta?
A. Yes.
Q. And United?
A. Yes.
Q. And Southwest?
A. Yes.
Q. JetBlue -- does JetBlue offer lower -- generally offer lower fares than American?
MR. BONSIGNORE: Objection.
THE WITNESS: Not to my knowledge.
Q. (By Mr. Sisko) But you've never flown JetBlue?
A. Correct. I've never flown JetBlue.
Q. Do you have any -- strike that.
MR. SISKO: Let's look at -- please pull up Tab 4. You can take this down and pull up Tab 4. Great. Thank you.
For the record, this is document -- going to be marked as Exhibit 3.
(THEREUPON, Exhibit 3 was marked for identification.)

Page 75
Q. (By Mr. Sisko) Ms. Arcell, this is your responses and objections to defendants' first set of interrogatories.
A. Okay.
Q. So this is your initial responses and objections.
A. All right.
Q. Do you recognize this document?
A. I do.
Q. Okay. And if you scroll down all the way to the bottom again...
A. Yep.
Q. That's your signature, correct?
A. It is.
Q. And you verified these responses?
A. I did.
Q. Okay. Great. Let's look at page 7, I believe.
A. All right.
Q. Okay. And do you see that this interrogatory refers to any loyal -- airline loyalty programs that you were --
A. Correct.
Q. -- offering?
So if you scroll down a little

Page 76
further, we can look at your response to this interrogatory. A little bit further.
A. Okay.
Q. So this -- your response reads -- to my -- to my reading -- correct me if I'm wrong -- that you are part of loyalty programs for Delta Air Lines, Southwest Airlines, American Airlines and United Airlines?
A. Correct.
Q. That's correct?
A. Correct.
Q. Okay. Do you -- when you book flights, do you typically use these loyalty programs?
A. The only one I have enough miles -- you mean do I use those frequent flyer points --
Q. Um --
A. -- or do I -- does it affect whether I want to fly on that airline or not?
Q. Well, we'll get to that.
My question is a little bit simpler.

Page 105

1  A. I can't remember exactly.
2  Q. More than five?
3  A. No, not that I recall.
4  Q. Okay.
5     MR. SISKO: Can we please bring up
6  what's previously been marked as
7  Exhibit -- I believe it's Exhibit 2, but
8  it's Tab 3, Alex. Sorry. I've got my
9  numbers mixed up. I believe this is
10 correct. Thank you.
11 Q. (By Mr. Sisko) Ms. Arcell, I'm
12 going to scroll down to this chart here.
13 Can you see that okay?
14 A. Yes.
15 Q. I'll try and blow it up a little
16 bit.
17    Ms. Arcell, does this refresh your
18 recollection about which cases you have been
19 a plaintiff in that have --
20 A. Yes.
21 Q. -- been brought to block airline
22 mergers?
23 A. Yes.
24 Q. So it looks like there's five
25 cases that you've been involved with here;

Page 106

1  is that correct?
2  A. Correct. Correct.
3  Q. And this would be the sixth?
4  A. This would be the sixth.
5  Q. Are there any other merger
6  litigations that you have been a plaintiff
7  in that are not listed here?
8  A. Not that I recall.
9  Q. And I think you said you're --
10 well, strike that.
11    Do you have a reason why you
12 brought this litigation?
13    MR. BONSIGNORE: Objection.
14    THE WITNESS: Why I am opposed to
15 it happening?
16 Q. (By Mr. Sisko) That's correct.
17 A. Because I think that Spirit is --
18 from what I've read, Spirit is not in
19 financial trouble. And I feel that JetBlue
20 is trying to eliminate competition. And I
21 am opposed to that.
22    Pan Am had filed for bankruptcy,
23 so I was a victim of a merger there, but
24 they were -- they had filed for bankruptcy.
25 To my knowledge, Spirit has not filed for

Page 107

1  any financial problems.
2  Q. So you --
3  A. So I don't understand why JetBlue
4  would try to buy Spirit other than to
5  eliminate competition.
6  Q. Okay. Ms. Arcell, you've never
7  flown JetBlue, correct?
8  A. Correct.
9  Q. And you've never flown Spirit.
10 A. Correct.
11 Q. And it sounds like you have --
12 would you say you're opposed to mergers, in
13 part, because of your experience at Pan Am?
14    MR. BONSIGNORE: Objection.
15    THE WITNESS: It might have
16 something to do with it. But as I said,
17 Pan Am was in financial problem --
18 trouble.
19    When two companies are viable
20 companies and they're trying to -- one is
21 trying to buy out another --
22 Q. (By Mr. Sisko) Ms. Arcell,
23 that's --
24 A. -- to eliminate competition --
25 Q. Ms. Arcell, that is not the

Page 108

1  question that I've asked you. I asked you
2  whether you are opposed to mergers, in part,
3  because of your experience with Pan Am. And
4  I think you testified that it may have
5  something to do with it.
6     Is that correct?
7  A. Yes.
8  Q. Okay. Now, having never flown
9  JetBlue or Spirit, what impact will this
10 merger -- this proposed merger have on you
11 individually?
12 A. Future travel --
13    MR. BONSIGNORE: Objection.
14 Calls -- objection. This calls for a
15 expert opinion, it calls for a legal
16 conclusion, and there are various
17 other -- it calls for speculation.
18 Beyond her expertise.
19    You can answer.
20    THE WITNESS: Repeat the question,
21 please.
22 Q. (By Mr. Sisko) The question was:
23 Having never flown JetBlue or Spirit, what
24 impact will this proposed merger have on you
25 individually?

Page 109

1 MR. BONSIGNORE: Objection. Calls
2 for a legal conclusion, calls for an
3 expert opinion.
4     You can answer.
5     THE WITNESS: Should I be in
6 future travel, I would like to have the
7 ability -- the choice to choose a more
8 expensive as opposed to a less expensive
9 trip.
10 Q.  (By Mr. Sisko) Sitting here --
11 A.  I'd like to have that choice.
12 Q.  Sitting here today, you can't
13 identify any specific harm that this
14 proposed merger will have on you?
15 A.  Yes, financially. I --
16     MR. BONSIGNORE: Objection. Calls
17 for --
18     THE WITNESS: I mean --
19     MR. BONSIGNORE: -- a legal
20 conclusion and --
21     THE WITNESS: I don't --
22     MR. BONSIGNORE: -- calls for an
23 expert opinion.
24     THE WITNESS: I would like to be
25 able to have a choice.

Page 110

1     MR. BONSIGNORE: Calls for an
2 expert opinion.
3 Q.  (By Mr. Sisko) Ms. Arcell, I have
4 to ask you again, please wait for your
5 counsel to finish objecting before you
6 respond.
7 A.  Okay.
8 Q.  For the court reporter's benefit.
9 A.  I apologize.
10 Q.  No problem.
11     You testified a moment ago that
12 you would like the choice to choose a more
13 expensive as opposed to a less expensive
14 trip --
15 A.  I would like the choice to --
16     MR. BONSIGNORE: Objection.
17     THE WITNESS: Let me rephrase
18 that. I would like the choice of a less
19 expensive as opposed to a more expensive
20 ticket.
21 Q.  (By Mr. Sisko) Okay. If you --
22 strike that.
23     You've been a plaintiff in at
24 least five other lawsuits to prevent the
25 merger of airline companies, correct?

Page 111

1 A.  Correct.
2 Q.  Have any of those merger
3 litigations resulted in a settlement for the
4 plaintiffs?
5     MR. BONSIGNORE: Objection.
6     THE WITNESS: Yes. One.
7 Q.  (By Mr. Sisko) Which one was that?
8     MR. BONSIGNORE: Objection.
9     THE WITNESS: Alaska.
10 Q.  (By Mr. Sisko) I believe you said
11 the Grace v. Alaska case; is that correct?
12 A.  Yes.
13 Q.  What, if any, financial
14 compensation did you receive as a result of
15 that settlement?
16     MR. BONSIGNORE: Objection.
17 Instruct the witness not to answer. We
18 went through this before. It's the --
19 and we're just doing it again to create a
20 record.
21     It's my understanding that the
22 witness is unable to respond to that
23 agreement -- respond to that question
24 under order, and so we will hash that out
25 later.

Page 112

1     And we recognize that if my
2 understanding is wrong, the defense will
3 have the chance to ask her about it --
4     MR. SISKO: Thank you.
5     MR. BONSIGNORE: -- pursuant to
6 the protocol. Yeah.
7     MR. SISKO: And just for
8 clarification, you're instructing the
9 witness not to answer on privilege and
10 confidentiality grounds?
11     MR. BONSIGNORE: Yes.
12 Q.  (By Mr. Sisko) Ms. Arcell, have
13 you ever -- strike that.
14     Are there any other lawsuits that
15 you have considered bringing to block
16 mergers, but ultimately chose not to bring
17 those cases?
18     MR. BONSIGNORE: Objection.
19 Q.  (By Mr. Sisko) You can answer.
20 A.  Not that I know of.
21 Q.  Of all these cases listed here, do
22 you feel that any of them had a favorable
23 outcome for you?
24     MR. BONSIGNORE: Objection.
25 Q.  (By Mr. Sisko) You can answer.