# EXHIBIT 17

1

2  UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF MASSACHUSETTS
3  - - - - - - - - - - - - - - - - - - -x
   GABRIEL GARAVANIAN, et al.,
4
                    Plaintiffs,
5
   vs.                              Civil Action Number
6                                    1:23-cv-10678-WGY
   JETBLUE AIRWAYS CORPORATION
7  and SPIRIT AIRLINES, INC.,
8                    Defendants.
9  - - - - - - - - - - - - - - - - - - -x
10
11
12
13        REMOTE VIDEOTAPED DEPOSITION of JAN MARIE
14  BROWN, taken by Defendants on Wednesday, June 21,
15  2023, commencing at 2:02 p.m. (Pacific Time), before
16  Pamela Grimaldi (via Zoom), a Registered Merit
17  Reporter, Certified Realtime Reporter, and Notary
18  Public within and for the State of New York.
19
20
21
22
23
24
25

Deposition of Jan Marie Brown

```
 1

 2    R E M O T E   A P P E A R A N C E S:

 3

 4              BONSIGNORE TRIAL LAWYERS
                    Attorneys for the Plaintiffs
 5                  23 Forest Street
                    Medford, Massachusetts  02155
 6                  781.350.0000

 7         BY:   ROBERT J. BONSIGNORE, ESQ.
                    rbonsignore@classactions.us
 8                     - and -
                    GEORGE OMAR KOURY, ESQ.
 9

10

11              COOLEY LLP
                    Attorneys for Defendant JetBlue Airways
12                  1299 Pennsylvania Avenue, NW, Suite 700
                    Washington, DC   20004
13                  202.728.7123

14         BY:   MATT NGUYEN, ESQ.
                    mnguyen@cooley.com
15

16

17    A L S O   P R E S E N T:

18              Simone Smith, Intern (Cooley)
                Andrew Whitner, Video Specialist
19

20

21

22

23

24

25
```

Page 20

J. Brown

1 the question to make sure I understand it correctly.
2 Is it true you've never flown Spirit
3 before?
4 A    That is true.
5 Q    Thank you very much, Ms. Brown.
6 MR. NGUYEN:  I'm going to scroll us
7 down a little bit to Request Number 4.
8 Q    Can you please read Request Number 4
9 out loud?
10 A    "Admit that you are not presently
11 employed as a travel agent."
12 Q    Ms. Brown, can you please read your
13 response?
14 A    It says, "Admit."
15 I believe that I did send a follow-up
16 to that regarding my -- the type of employment I
17 have.
18 Q    Ms. Brown, are you saying that your
19 response to Request Number 4 listed here is not
20 accurate?
21 MR. BONSIGNORE:  Objection.  Instruct
22 the witness not to answer as it is a work
23 product issue.
24 THE WITNESS:  Okay.

Page 21

J. Brown

1 MR. BONSIGNORE:  And requires a legal
2 opinion.
3 MR. NGUYEN:  Counsel, it's not work
4 product if she has served us these
5 responses, and so I'm asking whether the
6 response that is listed here which she
7 claims to have verified is accurate or
8 not.
9 MR. BONSIGNORE:  Objection.  Instruct
10 the witness not to answer.  It calls for a
11 legal conclusion, an expert opinion from a
12 lay witness.
13 In her circumstances, you're welcome
14 to ask her about her circumstances.
15 MR. NGUYEN:  Counsel, that is simply
16 an unacceptable objection, and defendants
17 disagree strongly with this assertion and
18 are happy to bring it to the Court.
19 BY MR. NGUYEN:
20 Q    Ms. Brown, I just want to confirm, are
21 you relying on advice of counsel --
22 A    Yes.
23 Q    -- to not respond as to whether this
24 particular response is inaccurate?

Page 22

J. Brown

1 A    I am relying on counsel, yes.
2 Q    Ms. Brown, do you see that it says
3 here that you admit that you are not presently
4 employed as a travel agent?
5 A    Yes.
6 Q    But, Ms. Brown, are you saying that
7 you are actually employed as a travel agent?
8 A    No.
9 Q    Ms. Brown, you're not presently
10 employed as a travel agent?
11 A    No, I am not.
12 Q    So, Ms. Brown, the response to this
13 request is accurate, then?
14 A    Yes.
15 Q    So you are not presently employed as a
16 travel agent?
17 A    No.  It's -- not a travel agent.
18 Q    What is your current job title today?
19 A    Travel manager for the Beach Boys.
20 Q    And, Ms. Brown, in that role, are you
21 responsible for booking travel?
22 A    I am.
23 Q    Ms. Brown, in that role are you
24 responsible for serving as an agent for your

Page 23

J. Brown

1 customers or your clients?
2 A    I don't have customers or clients.
3 Q    Ms. Brown, how would you describe your
4 relationship to the Beach Boys in terms of the
5 professional relationship?
6 A    I manage logistics, property locations
7 to venue locations, flights from all around the
8 United States and the world year round.
9 Q    And you don't believe that that's a
10 travel agent-type role?
11 A    No.  I don't sell travel.
12 MR. BONSIGNORE:  Objection.
13 Q    Okay.  Just trying to get that
14 clarification for the record.
15 I want to turn us over to Request
16 Number 5, then, Ms. Brown.  Can you read that out
17 loud?
18 A    "Admit that you are not presently the
19 whole or partial owner of a travel agency."
20 Q    And, Ms. Brown, can you read your
21 response?
22 A    "Admit."
23 Q    Is this response true and accurate, to
24 the best of your knowledge?

Page 40

J. Brown

1  prior travel agencies that you worked for --
2      A    Right.
3      Q    -- Meleco Travel wasn't one of them,
4  was it?
5      A    No.
6      Q    Ms. Brown, are you currently employed
7  with Meleco Travel?
8      A    I'm currently employed by Meleco.  We
9  only call my department Travel.
10     Q    Ms. Brown, what is the difference
11 between Meleco and Meleco Travel?
12     A    Because we had to go through a
13 certification process to book airline tickets and to
14 receive commissions on the bookings, which the
15 owner -- I'm sorry -- the lead singer of the Beach
16 Boys, Michael Edward Love Entertainment Company,
17 M-E-L-E-C-O -- he owns the agency.  And it was their
18 way to try to keep travel costs down for the band.
19     Q    Understood, Ms. Brown.
20          So do you consider Meleco Travel to be
21 a travel agency?
22     A    I do not.
23     Q    I'd like to turn us back to that page
24 right beforehand.

Page 41

J. Brown

1          Do you see how Interrogatory Number 5
2  asks if you were employed as a travel agent and the
3  agency or agencies you were employed at?
4      A    Yes.
5      Q    Do you believe that your response to
6  this interrogatory is incorrect because it is not a
7  travel agency?
8      A    I guess so.  I believe that's so.  I
9  may have misunderstood, originally, the question.
10     Q    Thank you, Ms. Brown.  Because Meleco
11 Travel is not a travel agency.
12     A    It's not a travel agency.  Through the
13 Airline Reporting Corporation, it may be identified
14 as a travel agency.
15     Q    Understood, Ms. Brown.
16          Who is the owner of Meleco?
17     A    Michael Edward Love, Michael Love, the
18 lead singer of the Beach Boys.
19     Q    And, Ms. Brown, do you receive a
20 salary from Meleco?
21     A    Yes.
22     Q    And, Ms. Brown, do you book flights
23 for anyone other than members of the Beach Boys and
24 their employees?

Page 42

J. Brown

1      A    I book travel for the lead singer's
2  family at no income to me, no extra income to me.
3  And I book travel -- I book all of the travel for
4  John Stamos.
5      Q    Understood, Ms. Brown.
6          And you don't -- you receive the same
7  salary regardless of how often he flies; is that
8  correct?
9      A    Yeah.
10     Q    And you receive the same salary
11 regardless of how often his family flies; is that
12 correct?
13     A    Yes.
14     Q    And you receive the same salary
15 regardless of how often John Stamos flies?
16     A    Yes.
17     Q    Thank you.
18          And when did you start working for
19 Meleco?
20     A    January 10th, 2000- -- 2000- -- I
21 think it's been 11 years -- January 10th, 11 years
22 ago.  Or it'll be 11 years in January -- or -- or
23 will it be -- no, I think it will be 12 years in
24 January.  I apologize.

Page 43

J. Brown

1          So it would have been what?  2000- --
2  sorry, my brain's befuddled with numbers.  I
3  don't -- I don't remember time frames very well.
4          But anyway, I think it -- I believe it
5  will be 12 years in January, on January 10th.  I
6  remember it was January 10th.
7      Q    Got it.
8          MR. NGUYEN:  Can we scroll a little
9          bit lower to Response B?
10     Q    Ms. Brown, would you say that
11 January 10, 2010, which you have listed here, is
12 accurate?
13     A    Yes.
14     Q    And so you've worked for the Beach
15 Boys at Meleco for approximately 13 years?
16     A    I -- I suppose it's -- I'm sorry, it's
17 either going to be 2000- -- 12 years in January or
18 13 years in January.  I'm honestly not exactly sure.
19     Q    And January was earlier this year,
20 right?  So it's already been 13 years?
21     A    No.  It has not.  It's been -- it
22 would have been 12 years, and it will be -- it will
23 be 13 years next January.
24     Q    Ms. Brown, do you know what year it

Page 48

J. Brown

1 databases or flight aggregators in your work at
2 Meleco?
3     A    No.
4     Q    So when you book --
5     A    What's a life aggregator?  I don't
6 know what a life aggregator is.
7     Q    A flight aggregator.
8     A    Oh, no.
9     Q    So nothing like Sabre?
10    A    Oh, I'm sorry.  Yes.  Sabre.  I didn't
11 re- -- I've never heard it referred to as a
12 database.
13    Q    How -- what kind of term would you use
14 to describe Sabre?
15    A    It's a -- I've forgotten the term, but
16 when -- it'll come to me.  I'll tell when you it
17 comes to me.
18    Q    No problem.
19        So you still have access to Sabre?
20    A    I do.
21    Q    Through your work at Meleco?
22    A    I do, yes.
23    Q    And, Ms. Brown, do you know how Sabre
24 populates the flights that appear on it?

Page 49

J. Brown

1     A    How they populate the flights that
2 appear on it?
3     Q    As in which flights and which airlines
4 show up on the Web?
5     A    Sabre should populate the flights
6 based on the request for the format that you put in.
7 So if you ask for a flight at 12 noon, it should
8 give you the flights closest to 12 noon and
9 descending to, you know, flights that are farther
10 away from it that are earlier and later.  So if you
11 ask for 12 noon and there's a flight at 12:05, that
12 one should come up first.
13    Q    Understood, Ms. Brown.  And that's
14 helpful.
15        Are there any airlines that don't show
16 up on Sabre?
17    A    Yes, there are some.
18    Q    I'm going to list a couple airlines,
19 and can you tell me whether they appear on Sabre?
20 Let's start with United.
21    A    Yes.
22    Q    Delta?
23    A    Yes.
24    Q    American?

Page 50

J. Brown

1     A    Yes.
2     Q    Southwest?
3     A    Yes.
4     Q    JetBlue?
5     A    Yes.
6     Q    Spirit?
7     A    Yes.
8     Q    Frontier?
9     A    Yes.
10    Q    Ms. Brown, have you ever booked a
11 Spirit flight for any member of the Beach Boys?
12    A    Not for the Beach Boys.
13    Q    Ms. Brown, have you ever booked a
14 flight on Frontier for any member of the Beach Boys?
15    A    Yes.
16    Q    Ms. Brown, have you ever booked a
17 flight on JetBlue for any member of the Beach Boys?
18    A    Often.
19    Q    Is JetBlue their preferred airline?
20    A    No.
21    Q    What is their preferred airline?
22    A    It depends on the traveler.
23    Q    Can you -- I promise this is, in part,
24 because it's a little bit before my time, but can

Page 51

J. Brown

1 you name all the current members of the Beach Boys
2 that you bought -- book tickets for?
3     A    Sure.
4        Michael Love.  Bruce Johnston.  We
5 just had some personnel changes.  So Brian
6 Eichenberger, Randy Leago, Michael Czascwicz, who is
7 a crew member, Christian Love, John Wedemeyer, Jon
8 Bolton, Timothy Bonhomme, John Bracken, who is a
9 crew member, Keith Hubacher, Michael Swift, who is a
10 crew member, and Tara Ricart, who is a crew member.
11     (Reporter requested clarification.)
12    Q    And, Ms. Brown, aside from those
13 people that you just mentioned, Michael Love's
14 family --
15    A    Yeah.
16    Q    -- and John Stamos, do you book
17 flights for anyone else?
18    A    I book flights for Mike Love's family
19 and his wife's family.
20    Q    Okay.  So --
21    A    And their family.
22    Q    Is there anyone else beyond those
23 people that you book flights for?
24    A    John Stamos and his family.

Page 52

J. Brown

Q   Anyone else?
A   His nanny.
Q   Anyone else?
A   Occasionally -- I mean, I book flights
for -- trying to think of his name.  Other
semi-original member.  The folk song guy.  Ugh, I
can't remember his name.  He was like an original
member.  The little short guy.  I can't think of his
name right now.  But I book flights for him.
       I book flights for Christopher Cross.
I book flights for a few other celebrities, you
know, from time to time because they're
collaborating.
Q   Understood.
       And, Ms. Brown, regardless of which
airline people choose to fly, you receive the same
salary, right?
A   Yes.
Q   And, Ms. Brown, regardless of the
ticket price that is paid, you receive the same
salary; is that right?
A   Yes.
Q   Your salary doesn't depend on the
price of airline tickets?

Page 53

J. Brown

A   No.
Q   Thank you, Ms. Brown.
       And is --
       MR. NGUYEN:  I think this would
       actually be a good time for us to take a
       10-minute break, if that's all right.  So
       we can go off the record.
       THE WITNESS:  Okay.
       THE VIDEOGRAPHER:  Off record.  The
       time is 2:58 p.m.
       (Whereupon, a recess was taken
       between 2:58 and 3:13 p.m.)
       THE VIDEOGRAPHER:  We're going back on
       the record.  The time is 3:13 p.m.
BY MR. NGUYEN:
Q   Welcome back, Ms. Brown.
A   Thank you.
Q   During the break, did you speak with
anyone, other than your attorney, regarding this
case?
A   I did not.
Q   Thank you, Ms. Brown.
       I want to turn our attention back to
flight bookings for the members of Meleco and their

Page 54

J. Brown

related persons.
A   Okay.
Q   All the people you book flights for.
       Do any of them belong to airline
loyalty programs?
A   Yes.  They all do.
Q   They all do?
A   Yes.
Q   And, Ms. Brown, is it fair to say they
prefer to fly the airlines that they are members of
loyalty programs for?
       MR. BONSIGNORE:  Objection.
A   They -- most of them have frequent
flier accounts with any airline they fly, but most
of them also have a preference.
Q   Got it.
       And can you think of any people who
you book flights for whose preference is United?
A   Yes.  I had to think for a second.
Q   Who are those people?
A   Tara Ricart.
Q   Anyone else?
A   I don't think anybody else has that as
their number one preference.

Page 55

J. Brown

Q   What about Delta?
A   Yes.  Sorry.
Q   And who are those people?
A   Oh, there was another crew member that
I forgot to mention:  Adam Richter, as in Richter
scale.  He flies Delta fairly often and -- he's been
flying American more, so I'm not sure that's still
his preference, but I believe it is.
Q   So it's either Delta or American for
Adam?
A   Yes.
Q   He prefers those airlines?
A   Yes.
Q   Is there anyone else who you can think
of that prefers Delta Airlines?
A   Michael Love and his wife, Jacqueline
Love, and their daughter who lives in Atlanta.
Q   Ms. Brown, I noticed that you looked
at something to your left.  Was that something
outside, not in the room?
A   Yes, it's a delivery truck bringing a
package to my door.  Sorry.
Q   Got it.  Well, certainly after this
deposition, I'm sure you can pick up the package.

Page 68

J. Brown

MR. BONSIGNORE:  Objection.

A    None of -- none of the tickets I purchase for the Beach Boys come out of my bank account, no.  I'm -- go ahead.

Q    And so you don't win or lose financially based on the price of tickets?

MR. BONSIGNORE:  Objection.

A    Actually, yes, I do win or lose based on the price of tickets in multiple ways.

Q    Specifically as it relates to Meleco?

A    As it relates to Meleco, it makes it very much harder for me to stay in budget.

Q    Got it.

So your salary doesn't depend on that, though, does it?

MR. BONSIGNORE:  Objection.

A    Not so far.  But airline prices are very, very high right now.

Q    Ms. Brown, how much money do you make per year from Meleco?

MR. BONSIGNORE:  Objection.

You can answer.

A    Okay.  I got a raise recently, so I would say probably about 50 to 55 a year.

Page 69

J. Brown

Q    That's thousand dollars?

A    Yes.

Q    So you make approximately $55,000 per year from Meleco travel?

A    Yes.

Q    And you said that you recently got a raise, so in the past you made less money from Meleco?

A    Yes.

Q    And, Ms. Brown, you said you were a salaried employee, right?

A    Yes.

Q    And so you --

A    Salary plus I do make some commissions on hotels.

Q    Do you receive any commissions on flights?

A    No.

Q    Thank you, Ms. Brown.

And if you book a thousand flights in a single year, your salary is the same; is that correct?

A    Yes.

Q    And, Ms. Brown, if you book 100

Page 70

J. Brown

flights in a year, your salary is the same; is that correct?

A    I don't think they would want to pay me -- I mean, it's not that I make that much money, but I don't think they would want to pay me that to book 100 flights a year.

Q    But you don't know one way or another as of today -- you receive the same salary regardless?

A    Right.

MR. BONSIGNORE:  Objection.  Asked and answered.

Q    Thank you, Ms. Brown.

What I want to do is I want to turn our attention away from Meleco and focus now on your own personal flight history.  And so I'd like to introduce Exhibit 3, which is Tab 3, which you should see on the screen shortly.

(Plaintiff Brown's Supplemental Responses and Objections to Defendants' First Set of Interrogatories was marked as Defendants' Exhibit Number 3 for identification, as of this date.)

BY MR. NGUYEN:

Page 71

J. Brown

Q    Ms. Brown, do you see that the title of this document is "Plaintiff's Responses and Objections to Defendants' First Set of Interrogatories"?

A    Yes.

Q    And do you see that on the right of "Responding Party" it says your name, "Jan Marie Brown"?

A    Yes.

MR. NGUYEN:  I'd like to turn us to the very last page of this document.

Q    Ms. Brown, do you see that you signed a verification here, under penalty of perjury, that the content of this document is true and accurate, to the best of your knowledge?

A    Yes.

Q    And your signature is there?

A    Yes.

Q    Thank you, Ms. Brown.

MR. NGUYEN:  I want to turn our attention over to page 6.

Q    Can you read the first line of Interrogatory Number 1?

A    "List every airline and route you have

Page 72

J. Brown

1 flown from 2015 to present, including any flights
2 booked prior to the date of the complaint, and
3 indicate the following for each trip as reflected in
4 the sample table below."
5    Q    And, Ms. Brown, no need to keep
6 reading.
7    A    I'm sorry.
8    Q    Do you understand what this
9 interrogatory is generally asking?
10    A    I believe so.
11    Q    Thank you, Ms. Brown.
12       MR. NGUYEN:  Can we move over to the
13       bottom half of this page?  And
14       specifically to the chart.
15       And I just want to scroll us over to
16       the next page as well just to show that
17       the chart ends with one additional entry
18       on the next page.
19    Q    Do you see that, Ms. Brown?
20    A    Yes.
21       MR. NGUYEN:  Let's scroll back up to
22       the top of that chart right there.
23    Q    And, Ms. Brown, based on this chart,
24 you have flown five times in the past eight years;

Page 73

J. Brown

1 is that correct?
2    A    From what I remember, yes.
3    Q    Ms. Brown, is this a true and complete
4 list of the flights you have taken in the past eight
5 years?
6    A    From -- from what I remember, yes.
7    Q    Ms. Brown, are there any flights that
8 you can think of today that are not listed here that
9 you took within the past eight years?
10    A    Not that I can remember, no.
11    Q    So, Ms. Brown, in the last eight
12 years, you haven't flown on Delta Airlines, have
13 you?
14    A    I have not.
15    Q    And, Ms. Brown, in the last eight
16 years, you haven't flown on Spirit Airlines?
17    A    I have not.
18    Q    And, Ms. Brown, it looks like you've
19 flown JetBlue once in the past eight years; is that
20 correct?
21    A    Yes.
22    Q    And, Ms. Brown, do you see the very
23 first line there where it says that you flew JetBlue
24 Reno to LaGuardia and LaGuardia to Reno?

Page 74

J. Brown

1    A    I'm sorry.  That was supposed to be
2 Americ- -- I'm sorry.  United.  I apolo- --
3       Wait.  That is supposed to be -- oh,
4 to LGB, not LGA.  I apologize.  Long Beach.  For a
5 trip to Disneyland.
6    Q    Ms. Brown, are you saying that instead
7 of flying from Reno to LaGuardia, you meant to write
8 Reno to LGB --
9    A    Yes.
10    Q    -- which is the Long Beach Airport?
11    A    Yes.
12    Q    Ms. Brown, can you agree with me that
13 this chart is incorrect because it does not contain
14 the right airport designation?
15    A    Yes.
16    Q    And, Ms. Brown, will you agree that
17 you and your counsel need to promptly supplement
18 this document because it is not truthful and
19 accurate, to the best of your knowledge, as of
20 today?
21    A    It -- yes.
22    Q    And, Ms. Brown --
23       MR. BONSIGNORE:  What number is that,
24       Counsel?  I can't -- it just has the

Page 75

J. Brown

1 chart.
2       MR. NGUYEN:  It's response to
3       Interrogatory Number 1.
4       MR. BONSIGNORE:  Okay.  So you need a
5       supplement to Interrogatory Number 1, a
6       correction, errata, whatever?
7       MR. NGUYEN:  Based on what your client
8       is representing, the very first entry in
9       this chart is inaccurate.
10       MR. BONSIGNORE:  Okay.  So she'll
11       check and correct.
12       THE WITNESS:  Yes.
13       MR. NGUYEN:  Thank you.
14 BY MR. NGUYEN:
15    Q    You are 100 percent sure you flew
16 JetBlue on this flight?
17    A    Yes.
18    Q    And, Ms. Brown, do you see where it
19 says "Price - Unknown"?
20    A    Yes.
21    Q    Ms. Brown, do you have any
22 recollection of how much you paid for this flight?
23    A    I don't know.  I actually bought --
24 one, two, three, four, five, six -- seven flights

Page 76

J. Brown

for seven people. Oh, eight people. It was a family trip to Disneyland for several days.

Q    Understood, Ms. Brown.

I'm actually from the Orange County area, so I grew up in that, so I know the Disneyland area quite well.

A    Okay.

Q    I like flying out of Long Beach, for what it's worth.

I will add, though, Ms. Brown, as a question, so you're saying you booked air travel on JetBlue for approximately eight people?

A    Yes.

Q    And they all took that same route, which is Reno to Long Beach?

A    Except for one of the flights, yes.

Q    And what was that other flight?

A    Southwest.

Q    And where was that person flying from?

A    Reno.

Q    Okay. So seven out of the eight people flew JetBlue, and only one of the eight flew Southwest along that same route?

A    Yes.

Page 77

J. Brown

Q    And, Ms. Brown, if Southwest were cheaper than JetBlue, do you anticipate you would have booked all eight of those tickets through Southwest?

A    I'm --

MR. BONSIGNORE:  Objection.

A    I believe that we chose JetBlue based on their low price to Long Beach and the fact that they had a nonstop flight.

Q    Understood.

And so the reason why you booked JetBlue was because it was cheaper than the other airlines that flew that route?

A    Yes. I was paying for a lot of tickets.

Q    Understood, Ms. Brown.

And I imagine you probably paid even more for those Disneyland tickets. That's an arm and a leg.

A    Yes, it is.

Q    Ms. Brown, is 2017 the last time you flew JetBlue?

A    Yes.

Q    In fact, Ms. Brown, it wouldn't

Page 78

J. Brown

surprise you that the remaining entries here don't show JetBlue, right?

A    No.

Q    And, Ms. Brown, do you have any flights booked in the next six months to a year with JetBlue?

MR. BONSIGNORE:  Objection.

A    Not at this moment, no.

Q    So no flights booked with JetBlue at this moment?

A    No.

Q    And, Ms. Brown, is it fair to say that in the last eight years, you have booked no flights with Spirit Airlines?

A    For myself personally?

Q    Correct.

A    I have not.

Q    And, Ms. Brown, have you ever flown Spirit Airlines?

A    No.

MR. BONSIGNORE:  Objection.

Q    In fact, your Request for Admission Number 1, you admitted that you had never flown Spirit; is that right?

Page 79

J. Brown

A    That's right.

Q    And, Ms. Brown, do you have any future flights booked as of today for Spirit in the next year?

A    Not at this moment.

Q    And, Ms. Brown, you said that Reno was your primary airport, right?

A    That's right.

MR. BONSIGNORE:  Objection.

Q    Ms. Brown, would you drive to any other airport in order to fly personally?

A    I could.

Q    Which airport would that be?

A    I have in the past flown out of San Francisco and may do so again because I have friends that live there that I travel with at times.

Q    Got it.

And so, Ms. Brown, how far, driving distance, is where you live in Reno from San Francisco's airport?

A    About three and a half hours.

There's also the possibility of Oakland and Sacramento, which is --

Q    I am familiar with those locations,

Page 108

J. Brown

1
2    A    I do not recall.
3    Q    Did any of your co-plaintiffs discuss
4  the outcome of that case with you?
5    A    They did not.
6    Q    So you don't know whether there was a
7  settlement in that case?
8    A    I do not recall.
9    Q    And you don't know the terms of that
10 settlement?
11   A    I do not recall.  I don't recall the
12 case, so I wouldn't know the terms.
13   Q    Ms. Brown, I want to turn us over to
14 the second case on that list.
15        Do you see that it says, "Malaney v.
16 United"?
17   A    Yes.
18   Q    And the chart indicates that you were
19 a plaintiff in that case?
20   A    Yes.
21   Q    Do you recall which airline United
22 merged with?
23   A    Continental.
24   Q    And, Ms. Brown, do you recall
25 receiving a settlement in this case?

Page 109

J. Brown

1
2    A    No.
3    Q    Your case was dismissed against the
4  airlines; is that correct?
5    A    I believe so.
6    Q    You did not stop the merger?
7    A    We were unsuccessful in stopping the
8  merger.
9    Q    Thank you, Ms. Brown.
10       I want to turn us over to the next
11 entry in that spreadsheet.  It looks like that's
12 Taleff v. Southwest.
13       Do you recall this case?
14   A    Vaguely.
15   Q    Do you recall which two airlines were
16 merging?
17   A    Southwest and it was another low-cost
18 carrier.  I can't recall the airline right now.
19   Q    You don't remember the name of the
20 airline?
21   A    I apologize.  Can you repeat?
22   Q    You don't remember the name of the
23 airline that merged with Southwest?
24   A    I don't remember which airline it was.
25 It was another low-cost carrier.  I can't -- I can't

Page 110

J. Brown

1
2  remember which one it was.
3    Q    Ms. Brown, you've been in the travel
4  industry for more than 30 years; is that right?
5    A    Yes.
6    Q    And you can't remember the name of the
7  airline that merged with Southwest?
8    A    That's what I said, yes.
9    Q    Thank you, Ms. Brown.
10       Do you recall how that case was
11 resolved?
12   A    I do not.
13   Q    Did you reach a settlement?
14   A    I don't think so.
15   Q    Did the airlines merge?
16   A    I believe they did.
17   Q    Your lawsuit was not successful at
18 stopping the merger?
19   A    I believe that is correct.
20   Q    Thank you, Ms. Brown.
21       I'd like to move us on to the next
22 entry on this list, which is Fjord v. AMR.
23       Do you see that column?
24   A    Yes.
25   Q    You were a plaintiff in that case,

Page 111

J. Brown

1
2  right?
3    A    Yes.
4    Q    Do you recall which two airlines were
5  seeking to merge in that case?
6    A    American Airlines and -- I'm really
7  sorry.  I'm really sorry.  For some reason, these
8  things are just not in my head right now.  I have
9  been having a little issue with long-term memory
10 recently, so I just don't remember which one it was.
11   Q    No problem, Ms. Brown.  And I'm sorry
12 to hear about the issues you've been facing.
13       Just as a quick question, how long
14 have you been facing issues with long-term memory?
15   A    Just recently.
16   Q    Like in the last year or so?
17   A    Yes.  Last few months -- last
18 couple -- three months.
19   Q    I'm sorry to hear that, Ms. Brown.
20       Has it affected some of your past
21 memories from a long time ago?
22   A    From a long time ago.
23   Q    Like the last 10 years?
24   A    No.  From before that.
25   Q    Okay.  And also the names of the

Page 112

J. Brown

1
2 airlines that were merged in these cases?
3     A    Yes.  I'm -- you know, I can tell you,
4 you know, we did -- we had United and American and
5 US and Alaska, I believe -- no, it was Alaska and --
6 nope.  Okay.  US Air and Alaska.  Yeah, I just
7 forget who they merged with.
8     Q    No problem, Ms. Brown.
9         So you don't recall for Fjord v. AMR?
10     A    I recall the suit, I just don't recall
11 who they merged with.
12     Q    Ms. Brown, do you recall how that case
13 was resolved?
14     A    I believe it was -- we did not -- were
15 not able to stop the merger.
16     Q    And did you receive any settlement
17 compensation from that lawsuit?
18     A    I don't believe so.
19     Q    The case was dismissed against you?
20     A    At some point the case was over.  I
21 guess that's called dismissed.
22     Q    And, Ms. Brown, I want to turn us to
23 the second-to-last entry, and I promise we're almost
24 done with this.
25        Can you read the name of that

Page 113

J. Brown

1
2 particular case?
3     A    Fjord versus US Airways.
4     Q    Ms. Brown, do you recall which airline
5 was seeking to merge at that time?
6     A    I do not.
7     Q    And, Ms. Brown, do you recall the
8 resolution of that case?
9     A    I do not.
10     Q    Was there a settlement in that case?
11     A    I don't believe so.  I believe we were
12 not able to stop the merger.
13     Q    Understood.
14        And, Ms. Brown, I want to turn us over
15 to the last case, which is Grace v. Alaska.
16     A    Yes.
17     Q    Do you recall what airline merged with
18 Alaska?
19     A    No.  I'm sorry.
20     Q    No problem at all, Ms. Brown.
21        Is it fair to say that you don't have
22 a recollection of any of the airlines that were
23 merged in a lot of these cases?
24     A    Any of the airlines that went away,
25 it's hard to remember once they're gone.  It's out

Page 114

J. Brown

1
2 of my mind.  And, like I said, long-term is fading.
3     Q    Got it.
4        You just forget about them, right?
5     A    Pretty much.  I mean, it -- you know,
6 once it's over and done with, you just go forward.
7     Q    Yeah.  And it's not that important to
8 you?
9     A    It's extremely important to me.
10 Extremely important to me.
11     Q    But you can't remember the names of
12 those airlines?
13     A    Right.  Which doesn't have anything to
14 do with how important it is to me.
15     Q    And, Ms. Brown, do you recall how the
16 case Grace v. Alaska was resolved?
17     A    I believe there was a settlement in
18 that case.
19     Q    And what were the terms?
20        MR. BONSIGNORE:  Objection.  Instruct
21 the client not to answer on the basis of
22 confidentiality.
23        We will allow you to reopen the
24 deposition if it's proven that the
25 confidentiality clause does not bind the

Page 115

J. Brown

1
2 plaintiff to silence.
3        We've gone through this multiple
4 times.  And I invite you to further
5 investigate it, and we will not object if
6 the understanding is incorrect.
7        We understand that there's a new
8 protective order, and our position is as
9 to the new protective order that it
10 doesn't make any difference.
11 Confidentiality orders or agreements are
12 two-sided, and we are only one side at
13 best.
14 BY MR. NGUYEN:
15     Q    Ms. Brown, are you relying on advice
16 of your counsel and refusing to respond?
17     A    Yes.
18     Q    Ms. Brown, I want to note for the
19 record that defense counsel disagrees strongly with
20 the representation made by your attorney.  The
21 protective order protects all highly confidential
22 information in this case to the extent it includes
23 the terms of a settlement.
24        And in addition to that, there is no
25 privilege that you can assert because the settlement

Deposition of Jan Marie Brown

J. Brown

1  15 years ago, maybe.  14, 15 years ago.
2      Q    Is it fair to say that in the next
3  five years you'll remain her legal guardian?
4      A    Absolutely.  However, we have worked
5  very hard to get her to a point where -- with her
6  staff that helps her, that we can leave her well
7  taken care of with them; so ...
8      Q    What's the longest length of time that
9  you've left your stepdaughter with the staff and not
10 you or your husband?
11     A    Well, she actually lives in a complex
12 for handicapped people now, a -- her own apartment.
13 But my husband didn't go to Europe with me, so
14 probably -- she went to Disneyland with us.  So --
15 actually, we haven't because I've traveled mostly
16 alone or with friends in the last several years
17 because it's better to have -- it has been better to
18 have somebody here to be there for her.
19     Q    It's better for you, your husband, or
20 both of you to be near your stepdaughter; is that
21 right?
22          MR. BONSIGNORE:  Objection.
23     A    At least one or the other of us, yes.
24     Q    And you would prefer that both of you

J. Brown

1  be near her to the extent possible?
2          MR. BONSIGNORE:  Objection.
3          Objection.
4      A    It's easier to coordinate care for her
5  when it's both of us working at it, because my
6  husband has to commute an hour each way for his job,
7  so -- so it takes some coordination for one or the
8  other or both of us to get away.
9      Q    Understood, Ms. Brown.
10         MR. NGUYEN:  I have no further
11     questions for you at this time.
12         MR. BONSIGNORE:  We'll take a break,
13     which I think she needs a break.
14         THE WITNESS:  Okay.  Thank you.
15         THE VIDEOGRAPHER:  Off record.  The
16     time is 4:38 p.m.
17         (Whereupon, a recess was taken
18     between 4:38 and 4:51 p.m.)
19         THE VIDEOGRAPHER:  Back on the record.
20     The time is 4:51 p.m.
21 BY MR. NGUYEN:
22     Q    Ms. Brown, before your counsel asks
23 you any questions, I just have one quick question
24 for you, which is:  During the break did you speak

J. Brown

1  with anyone, other than your attorney, about this
2  case?
3      A    No, I did not.
4          MR. NGUYEN:  Thank you.
5  EXAMINATION
6  BY MR. BONSIGNORE:
7      Q    Mrs. Brown, what, if any,
8  considerations will impact your travel in the
9  future?
10     A    Well, I'm --
11         MR. NGUYEN:  Objection.
12     A    I'm going to retire within the next
13 year to year and a half.  And that's going to be,
14 you know, my salary out of our income.  And it means
15 that we're going to have to be more frugal about the
16 travel.  It's more about what I need rather than
17 what, you know, I want, which is -- everybody wants
18 to fly first class if they can.
19         We've got my stepdaughter fixed up now
20 where she has the support system that she needs so
21 that we can get away.  And we want to travel a lot.
22 And that's going to be flying on Spirit, because
23 they do have the best prices out of Reno.  There's
24 no doubt about it.  And that's -- you know, the best

J. Brown

1  prices going forward with the reduced income is
2  going to mean a lot to us; so that's ...
3      Q    Thank you.
4          You were asked questions about the
5  proposed merger of Spirit and JetBlue.
6      A    Yes.
7      Q    What is your opinion as to how the
8  proposed merger will impact you and your --
9          MR. NGUYEN:  Objection.
10         (Reporter requested clarification.)
11     Q    Go ahead.  Answer -- you can answer.
12     A    Well, I believe that the merger --
13 excuse me -- sorry -- will affect me in actually
14 many ways because I've been through mergers before.
15 I've seen what the result of the mergers are.  I
16 see -- you know, I have a front row seat to it and
17 have had for -- ever since mergers started.
18         And I see what happens with the
19 flights:  There's reduced routing, there's reduced
20 number of seats going out, flights are packed, the
21 passengers are angry.  You know, prices right now
22 are at an all-time high.  And I believe a good deal
23 of that is due to the prior mergers.
24         Not to mention the fact that how it

Deposition of Jan Marie Brown

Page 128

J. Brown

affects me personally is I'm just getting ready to
do what I want to do for me, and the lowest cost
carrier out of Reno is going to be gone.  So I
need -- you know, it's going to affect me in quite a
few different ways.

And there's no amount of talking I
could do to tell you how frustrating it is to work
through these mergers for somebody who deals with
travel on a daily basis.  It's just so difficult.
My job has gotten harder and harder and harder and
harder because of mergers.

But the biggest thing to me personally
is that I'm getting ready to finally be able to
get -- sorry for the way I say it -- away from my
stepdaughter, and -- I mean, I love her, but you
know what I mean -- and I just feel like the prices
are going to be higher.  And I want to travel, I
want to take -- I want to travel like I used to;
so ...

MR. BONSIGNORE:  Thank you.  I have no
further questions.

FURTHER EXAMINATION

BY MR. NGUYEN:

Q     One additional question from me,

Page 129

J. Brown

Ms. Brown, and perhaps some follow-ups depending on
your response.

Have you conducted any economic
analysis personally regarding the impact of the
JetBlue/Spirit merger?

MR. BONSIGNORE:  Objection.

A     I haven't.

Q     Your opinion that you expressed a
minute ago is based on your own personal opinion and
not any expert opinion; is that right?

A     My opinion is based on --

MR. BONSIGNORE:  Objection to the
extent that it calls upon matters she
discussed with her counsel.

Other than that, you can answer.

A     Okay.  My opinion is based on my
experience in watching what happens to travel and
routes and prices and procedures and rules and all
of that after mergers happen.

Q     And, Ms. Brown, you're not an
economist, right?

A     I am not.

Q     And you're not a statistician?

A     I am not.

Page 130

J. Brown

Q     Do you have a degree in a quantitative
area?

A     I do not.

Q     And so what you just said is your
opinion; is that right?

MR. BONSIGNORE:  Objection to the
ex- -- I think she said it was her
opinion.  I'll withdraw the objection.

Q     Yes or no, Ms. Brown, is it --

MR. BONSIGNORE:  Well, objection.
Asked and answered, I would think the
objection would be.

A     Right.  Hold on.

I would say it is my opinion based on
past experience.

MR. NGUYEN:  Thank you, Ms. Brown.  No
further questions.

MR. BONSIGNORE:  No further questions.

THE VIDEOGRAPHER:  This concludes the
deposition.  We're off the record.  The
time is 4:57 p.m.

(Whereupon, at 4:57 p.m. the
deposition was concluded.)