# EXHIBIT 21

```
 1

 2   UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS
 3   - - - - - - - - - - - - - - - - - -x
     GABRIEL GARAVANIAN, et al.,
 4
                     Plaintiffs,
 5
     vs.                                 Civil Action Number
 6                                       1:23-cv-10678-WGY
     JETBLUE AIRWAYS CORPORATION
 7   and SPIRIT AIRLINES, INC.,

 8                   Defendants.

 9   - - - - - - - - - - - - - - - - - -x

10

11

12

13          REMOTE VIDEOTAPED DEPOSITION of ROSEMARY

14   D'AUGUSTA, taken by Defendants on Wednesday, June 14,

15   2023, commencing at 2:07 p.m. (Pacific Central Time),

16   before Pamela Grimaldi (via Zoom), a Registered Merit

17   Reporter, Certified Realtime Reporter, and Notary

18   Public within and for the State of New York.

19

20

21

22

23

24

25
```

```
 1
 2   R E M O T E   A P P E A R A N C E S:
 3
            BONSIGNORE TRIAL LAWYERS
 4               Attorneys for the Plaintiffs
                 23 Forest Street
 5               Medford, Massachusetts  02155
                 781.350.0000
 6
            BY:  ROBERT J. BONSIGNORE, ESQ.
 7               rbonsignore@classactions.us
                      - and -
 8               MELANIE PORTER, ESQ.
 9
10          PAUL WEISS RIFKIND WHARTON & GARRISON LLP
                 Attorneys for Defendant Spirit Airlines
11               1285 Avenue of the Americas
                 New York, New York  10019
12               212.373.3000
13          BY:  COLE RABINOWTIZ, ESQ.
                 crabinowitz@paulweiss.com
14                    - and -
                 BETHANY ROBINSON, ESQ.
15               brobinson@paulweiss.com
16
17   A L S O   P R E S E N T:
18          Alex Held, Video Specialist
19
20
21
22
23
24
25
```

Page 11

R. D'Augusta

A    The interrogatories.  My -- my response to the interrogatories.
Q    Okay.  And about how many times did you meet with counsel to prepare for this deposition?
A    I didn't meet with counsel, but I did confer via an email perhaps --
Q    Understood.
A    -- perhaps two or three times at the most.  I think two.
Q    Okay.  And without telling me anything about the contents of any of these communications, did counsel provide you with any documents to assist you in preparing for this deposition?
        MR. BONSIGNORE:  Objection.  I
     instruct the witness not to answer.
     That's attorney work product, our mental
     impressions on selecting what to hand her.
Q    And, Ms. D'Augusta, you're following your attorney's instruction not to answer?
A    Yes, I am.
Q    Okay.  So moving on just to some brief background questions.
        Could you quickly summarize your

Page 12

R. D'Augusta

educational background after high school?
A    After high school, straight to employment.  No -- no further educational --
Q    Okay.
   (Simultaneous speakers.)
Q    And are you currently employed?
A    No.
Q    Okay.  Can you tell me your employment history?  When were you last employed?
A    I was last employed in -- I believe it was 2021, officially.  The agency was closed -- my agency closed at the end of 2021.  And prior to that, I had worked and was employed by Perna Travel Service.
Q    Understood.
   (Reporter requested clarification.)
        THE WITNESS:  Perna, P-E-R-N-A,
     Travel.
Q    And how long did you work at Perna Travel Services?
A    I think it -- I think it's 29 years.  Since 1992 or thereabouts, maybe '93.
Q    Okay.  And you were the owner of Perna Travel or --

Page 13

R. D'Augusta

A    Yes.  Yes.  Yeah.
Q    Okay.  Is Perna Travel still in operation?
A    No.
Q    Okay.  Were there any other owners of Perna Travel?
A    Yes.  My husband.
Q    And -- okay.  Anyone else?
A    No.
Q    And what's your husband's name?
A    Thomas D'Augusta.
Q    Okay.  And before Perna Travel, did you have other employment?  Did you have another job?
A    Yes.  I was employed by Qantas Airways, the Australian airline --
Q    Okay.
A    -- for 13 or 14 years.
Q    Okay.  And what was your role with Qantas?
A    I was a -- a manager of two departments on the West Coast.
Q    What were those departments?
A    One was a central ticketing unit, and

Page 14

R. D'Augusta

one was a telemarketing unit.
Q    And when did you start working at Qantas?
A    I believe early '80s, 1980.
Q    Okay.  Why did you leave Qantas?
A    I didn't leave Qantas.  Qantas shut down its West Coast operations in San Francisco and moved the operations to Phoenix -- I mean Tucson, Arizona.  I was offered the same position in Arizona, but I chose not to -- not to go there.
Q    Do you remember what year that was?
A    The year that I -- it was approximately early '91 perhaps, maybe a year before I opened Perna Travel.
Q    Okay.  And did you have any other employment before Qantas?
A    Yes.  I was employed briefly here in Burlingame by a company called National Can Corporation.  And prior to that, I worked in Manhattan for a legal -- a law firm.  And, uh, that's about it.
Q    Okay.  Have you ever worked at Spirit Airlines?
A    Excuse me?  I couldn't hear the

Page 15

R. D'Augusta

Q Have you ever worked at Spirit Airlines?
A No, I have not.
Q Okay. Have you ever worked at JetBlue airlines?
A No, I have not.
Q And other than your job at Qantas, have you had any other job in the airline industry?
A No, I have not.
Q Okay. Do you own any stock in airline companies?
A No, I do not.
Q Okay. And do you have any ownership in any other travel-related companies?
A No.
Q Okay. So you mentioned that you were employed and an owner of Perna Travel; is that correct?
A Yes, it is.
Q And can you tell me why Perna is no longer in operation?
A COVID.
Q Can you explain that a little bit more

Page 16

R. D'Augusta

for me, please?
A Well, travel shut down. My clients stopped traveling entirely. And the recovery from COVID was too long and too slow, so I had to -- I was forced to close.
Q And are you still making any income from Perna Travel?
A No, I am not.
Q And are you still employed as a travel agent in any capacity for Perna Travel or any other entity?
A No, I am not.
Q Okay. Do you have any intention to return to the travel agency industry?
A No --
MR. BONSIGNORE: Objection. Relevancy.
Q You can answer.
A No, I have no intention. And actually, I'm prohibited by the Attorney General's office from participating in any travel whatsoever. Because once you give up your license to sell travel to the Attorney General, I cannot go back into travel. I was -- I -- so I have no intention of

Page 17

R. D'Augusta

doing that, but I would be prohibited at least in California from doing that.
Q And to clarify, when you say "prohibited" from travel, do you mean prohibited from engaging in travel agency services in the future?
A That's correct. From selling or servicing travel as a travel agent, correct.
Q And do you have any plans to leave California in order to be able to engage in travel agency services in the future?
A No.
Q Do the entity names Perna Golf Adventures and travelbroker.com sound familiar to you?
A Yes.
Q Can you explain what those are?
A Yes. My husband is a retired golf professional, and my husband organized or worked on organizing golf travel. He also manufactured and produced golf equipment, golf clubs. And that was a golf business separate of Perna Travel but operating within Perna Travel.
Q And did you -- scratch that.

Page 18

R. D'Augusta

Were you involved in the operations of Perna Golf Adventures?
A No.
Q And can you explain your familiarity and what travelbroker.com is?
A Travelbroker.com was we -- I did a lot of travel, discounted travel for first and business class through brokers. And I was going to go into that line of offering for my clients and people who did travel in first and business class.
So we attempted to branch out into that, but there were -- there were a lot of issues with -- I would have taken on certain liabilities for the tickets that I -- I didn't -- I wasn't prepared to do. So it didn't go anywhere.
Q What years were you involved in exploring the viability of travelbroker.com?
A Well, I don't rightly recall. I know it was early -- it was some -- early in the 2000s, I would guess, when I was doing more first and business class travel for clients and I was able to get them fares they couldn't get in the open market.
(Reporter requested clarification.)
A Yeah. I -- I don't recall. I think

Page 19

R. D'Augusta

it was in the mid-2000s somewhere when I was doing more first and business class travel for my clients and getting them fares that were not available in the open market, and I knew that there might be a market for that to other people and other clients, so that's why I ventured in that direction.
    But I don't think it was beyond 2010. I think it was somewhere in the range -- the upper -- maybe -- I -- I really am guessing. I don't know. I don't remember.
    Q    For Perna Travel, Perna Golf Adventures, and travelbroker.com, are you currently making any income from these entities?
    A    No.
    Q    And do you expect to have any future income from these entities?
    A    No.
    Q    Because these entities are no longer in operation, do these entities stand to be impacted by the Spirit-JetBlue merger?
    A    No.
    Q    Okay. And you mentioned that Perna Travel was in operation until 2021, correct?
    A    Well, when you say "operation," we

Page 20

R. D'Augusta

were not issuing tickets, but I was licensed and -- and I could have issued tickets. I hadn't given up any of my practice. But COVID took away a lot of -- all the business, and so I wasn't participating in revenue-producing business at that time.
    Q    So is it safe to say that you were a travel agent until 2021?
    A    Yes.
    Q    Okay. And when was the last year that you made sales or issued tickets as you were just describing?
    A    That would have been, I believe, 2019, the early part of 2019.
    Q    Okay. And when Perna Travel was in operation, how many customers per year would you typically work with in a given month?
        MR. BONSIGNORE:  Objection. Relevancy.
        THE WITNESS:  Am I allowed to answer that?
        MR. BONSIGNORE:  Unless I instruct you not to answer, you should answer. So I'm grateful that you pause -- pause after answers -- rather, I'm grateful if you

Page 21

R. D'Augusta

pause. But when I object, it's for the record and it's not for anything further as far as you're concerned unless I instruct you not to answer.
    Sorry, Cole. Is that okay? Just to move it along.
        MR. RABINOWITZ:  That's okay.
        THE WITNESS:  Thank --
        MR. BONSIGNORE:  Go ahead.
        THE WITNESS:  Can you repeat the question, please?
BY MR. RABINOWITZ:
    Q    When was the last year -- oh, withdrawn.
        When Perna Travel was in operation, how many customers would you typically work with in a given month?
        MR. BONSIGNORE:  Objection.
    A    Typically, there was -- there is no typical amount of customers; that varied month to month, day to day. My clients would call me whenever the need arose, and it could be 1 client or 10. I don't really have a good answer for that.
    Q    Was that the range in any given month,

Page 22

R. D'Augusta

1 to 10?
    A    No. No.
    Q    Was it more than that?
    A    Yes.
    Q    Was it over 50 in a given month?
    A    I'm not sure. I can't recall.
    Q    How would Perna Travel attract -- I'm sorry. I don't mean to interrupt you.
    A    No, I really don't --
        MR. BONSIGNORE:  Cole, can we --
        MR. RABINOWITZ:  Sorry?
        MR. BONSIGNORE:  Sorry.
        MR. RABINOWITZ:  Go ahead.
        MR. BONSIGNORE:  Continue.
    Q    Okay. How would Perna Travel attract clients?
        MR. BONSIGNORE:  Objection.
        Cole, can we just have a running -- can we stipulate to a running objection so I don't have to keep interrupting your questions?
        MR. RABINOWITZ:  I'm sorry. On what grounds --
        MR. BONSIGNORE:  Because --

Page 43

R. D'Augusta
Q Do you fly out of any other airports on a regular basis?
A "Regular basis"? Can you clarify that?
Q Has there ever been a time when you've flown more frequently than you have the past few years?
A Yes.
Q During that time, did you fly out of any airports other than San Francisco?
A Yes.
Q What airports were those?
A I've flown out of Oakland.
Q Okay. So just Oakland and San Francisco?
A Out of, yes.
Q Okay. Are there any cities you frequently would travel to, whether by car or plane?
A Yes.
Q Can you name those for me, please?
A Yes. JFK, New York; Newark, New Jersey; Reno, Nevada.
Q Is that all or are there any others?
A I have -- are you asking me have I

Page 44

R. D'Augusta
ever flown into other airports, other cities? Or the ones that I most frequently fly -- have flown into? I'm not sure of the question.
Q Let me take a step back, then.
In the last eight years, have you -- withdrawn.
MR. RABINOWITZ: Mr. Held, could we please pull up Tab 1? Actually, I'm sorry, Tab 5. Tab 6. I apologize. Tab 6. That's it. Third time's a charm.
And would you show that to Ms. D'Augusta, please?
(Plaintiff D'Augusta's Supplemental Responses and Objections to Defendants' Second Set of Interrogatories was marked as Defendants' Exhibit Number 1 for identification, as of this date.)
BY MR. RABINOWITZ:
Q Ms. D'Augusta, have you seen this document before? You might need to scroll down to fully see.
I'll represent to you that these are your responses to defendants' first interrogatories. And that this was served to defendants on May 17th.

Page 45

R. D'Augusta
A Yes.
MR. RABINOWITZ: Would you please scroll to page 7.
Q And would you look at the chart at the top.
A Yes.
MR. RABINOWITZ: Actually, would you scroll to the bottom of page 6 to be able to see -- and scroll up a little bit further. A little bit further, please. Thank you.
Q There -- and do you see the -- Interrogatory Number 1, the question "List every airline and route you've flown from 2015 to present" --
A Yes.
Q -- "and subsequent"?
MR. RABINOWITZ: And then could we return down to that chart, please, at the top of page 7?
Q And are -- are you familiar with this information?
A Yes.
Q And did you provide the information

Page 46

R. D'Augusta
contained in this chart?
A Yes.
Q Okay. So this appears to be a list of flights that you've taken in -- since 2015; is that correct?
A Yes.
Q Is this a complete list of the flights you've taken in the last eight years since 2015?
A Yes.
Q Okay. And so there are no flights on Spirit or JetBlue in the last eight years, correct?
A That is correct.
Q And have you ever flown Spirit or JetBlue?
A Spirit, no. JetBlue, no.
Q Okay.
MR. RABINOWITZ: Mr. Held, could we also put up Tab 4, please, for the witness? And could you please scroll down just so the full case caption is visible?
(Declaration of Rosemary D'Augusta in the AMR bankruptcy case was marked as Defendants' Exhibit Number 2 for identification, as of this date.)

Page 55
R. D'Augusta

Q   And, Ms. D'Augusta, are you familiar with this document?
A   Yes.
Q   Do you have any reason to believe that the facts in this document are not accurate?
    MR. BONSIGNORE: Objection.
A   Could I see the document a little bit, please?
Q   Absolutely. Let's -- let's scroll down to the relevant portion.
    MR. RABINOWITZ: Mr. Held, could we please scroll to the bottom of page 5, please?
Q   And, Ms. D'Augusta, I'd like to give you control of this.
    And actually, if you could just scroll down to the next page, please. There's a chart of various routes from city to city.
A   Yes.
Q   You testified earlier that the only flight that you've flown on in the -- withdrawn.
    You testified earlier that the only route you've flown on in the last eight years is between San Francisco and JFK, correct?

Page 56
R. D'Augusta

    MR. BONSIGNORE: Objection.
A   Yes, I believe that's correct.
Q   If I were to represent to you that the San Francisco to JFK route is not contained in this chart, would you agree with me?
    MR. BONSIGNORE: Objection.
A   I can't see the San Francisco --
Q   I believe you have control of the exhibit and you can scroll through it.
A   I'm trying to, but it won't move.
    Okay. There, I've got it.
    What was the question, please?
Q   If I were to represent to you that this chart does not contain the San Francisco to JFK route, would you agree with me?
A   Yes.
Q   Thank you.
    MR. RABINOWITZ: And, Mr. Held, we can take down the exhibit, please.
Q   Ms. D'Augusta, you haven't taken any flights into or out of Fort Lauderdale in the last eight years; is that correct?
A   That is correct.
Q   And you don't live in Fort Lauderdale,

Page 57
R. D'Augusta
correct?
A   Correct.
Q   And you also haven't taken any flights into or out of Orlando, correct?
A   What's the time frame?
Q   In the last eight years.
A   That is correct.
Q   And you don't list any flights as having been taken in the last eight years to or from Boston, correct?
A   That's correct.
Q   And the same for Los Angeles?
A   That's correct.
Q   And the same for Newark, EWR?
A   I'm confused on that question.
Q   I understand.
    MR. RABINOWITZ: Mr. Held, could we please put up Tab 6 again, please? And could we please scroll to page 7 to that chart?
Q   And, Ms. D'Augusta, I'm just going to reiterate, and I apologize for repeating, these four flights, the two round-trip flights from SFO to JFK, are the only flights you've taken in the last eight

Page 58
R. D'Augusta
years, correct?
A   To the best of my knowledge, that is correct.
Q   Okay. And you don't list any flights into or out of New York EWR, Newark; is that correct?
A   As having taken them in this time frame? Is that the question?
Q   Yes.
    The question is whether you have taken any flights into or out of Newark, EWR, within the last eight years. Correct?
A   I believe that's correct.
Q   And, Ms. D'Augusta, you agree with me that if you had taken flights into and out of Newark, EWR, within the last eight years, they should be listed on this chart, correct?
A   If I remembered it, yes, they should be.
    I may have taken a trip to Newark, but I don't think it's in the time frame you're referencing. I think it was prior to 2015 into and out of Newark. But it's not 2015, as best as I can recall.

Page 75

R. D'Augusta

by "all these other factors"?
 A   The cost of the airline ticket and where -- where -- you know, am I getting extra legroom in the seat or am I just getting a preference for an aisle or a window?  And how much is it going to cost me?
 Q   Ms. D'Augusta, what airports are closest to your house?
 A   San Francisco.
 Q   And is San Francisco your preferred airport to fly out of?
 A   Yes.
 Q   Are you familiar with which airlines fly into and out of that airport?
 A   Are you referring to domestic or international?
 Q   I'll rephrase.
     Are you familiar with which airlines fly into and out of San Francisco?  And I'm referring to both domestic and international flights.
 A   I am --
     MR. BONSIGNORE:  Objection.
 A   I -- I am fairly familiar, yes.

Page 76

R. D'Augusta

 Q   Does JetBlue fly into and out of San Francisco?
 A   Yes.
 Q   Does Spirit fly into and out of San Francisco?
 A   I believe so, yes.
 Q   You testified earlier that you've never flown on Spirit; is that correct?
 A   Correct.
 Q   Do you currently have plans to fly on Spirit in the future?
 A   I could have plans.  I don't know the future.
 Q   Do you currently have plans?  Do you have a ticket booked?
 A   No, I do not.
 Q   Are you planning to book a ticket for specific dates on Spirit?
 A   I have no plans at the moment to book a specific date on any airlines.
 Q   Is there any particular reason you've chosen not to fly Spirit?
     MR. BONSIGNORE:  Objection.  Assumes facts not in evidence, mischaracterizes

Page 77

R. D'Augusta

the witness' testimony.
 A   I never made the statement that I have chosen not to fly Spirit.  The airlines I chose in the past did not necessarily exclude any airline but were based on my particular preferences at the time of travel.
 Q   And, Ms. D'Augusta, you would agree to me [sic] that when you book travel, you are making a choice between airlines?
     MR. BONSIGNORE:  Objection.  Vague, unintelligible, calls for speculation, lack of foundation, overbroad.
 A   I would agree that I am making a choice between airlines, but the choice -- the choice may not be an equal choice because the city that I'm flying into may only have one nonstop carrier or one nonstop flight at the time of day I need to go; so ...
 Q   I understand.
     I'm sorry.  Go ahead.
 A   My choices are limited.  If I don't choose the nonstop, then I've got to go to the connecting flights, and that may not be optimal for me.

Page 78

R. D'Augusta

 Q   When you have made choices in the past to book airfare, you would agree with me that you've never chosen to book a Spirit flight, correct?
 A   The Spirit flight -- the Spirit options were not on the table.
 Q   I'm sorry.  That's not the question I -- I asked.
 A   I have not booked Spirit in the past.
 Q   Is there a reason you have not booked Spirit?
 A   No, there is not a -- a reason.
 Q   Okay.  And other than the one flight in January of 2009, you have not flown on JetBlue, correct?
 A   That's correct, to the best of my knowledge, yes.
 Q   Do you currently have any ticket booked to fly JetBlue in the future?
 A   Currently, I have no air ticket booked for the future on any airline.
 Q   Given that you have never flown Spirit and it has been over 10 years since you've flown JetBlue, how do you expect the merger will affect you?

Page 79

R. D'Augusta

MR. BONSIGNORE: Objection. Calls for an opinion from an unqualified witness. Objection to the extent it calls for a legal conclusion. Calls for speculation. Vague, unintelligible.

A   I speculate that the merger of JetBlue and Spirit will affect me and the plaintiffs and the general public by eliminating a major competitor to JetBlue, which Spirit is, and with that elimination, all of the goods and services that Spirit offers in the marketplace will be gone. The airline will be gone. Some of the aircraft will be gone. Seat availability will be gone. Prices will rise. Personnel will be eliminated. Airport staff will be affected. And on and on it goes across the country.

Q   Ms. D'Augusta, you're bringing a lawsuit to block the merger between Spirit and JetBlue, correct?

A   I'm sorry. The -- the audio crackled. I wasn't sure of the --

Q   I'll repeat myself. I'll repeat the question.

A   Thank you.

Q   You're bringing a lawsuit to block the

Page 80

R. D'Augusta

merger between Spirit and JetBlue, correct?

A   Correct.

Q   When did you first consider bringing this lawsuit?

A   In -- sometime, I believe, in the fall or late fall of '22, after the merger was announced.

Q   Are you familiar with your co-plaintiffs at all?

A   Yes, I know my co-plaintiffs.

Q   And how do you know them?

A   I know them as travel agents, and I know them as plaintiffs in related merger cases that we were involved with.

Q   And just to confirm, you've been plaintiffs with your co-plaintiffs in other litigations?

A   Correct.

Q   And to confirm, you've been a plaintiff in other lawsuits, correct?

A   Correct.

Q   And you've been a plaintiff in other lawsuits specifically requesting to block a merger, correct?

A   Correct.

Page 81

R. D'Augusta

MR. RABINOWITZ: Mr. Held, I'd like to pull up Tab 11 and have this admitted as an exhibit.

(Plaintiff D'Augusta's Supplemental Responses and Objections to Defendants' Interrogatories was marked as Defendants' Exhibit Number 3 for identification, as of this date.)

BY MR. RABINOWITZ:

Q   Ms. D'Augusta -- I'll wait for it to be pulled up. Excuse me.

Ms. D'Augusta, can you see the document?

A   Yes, I can.

Q   I'll represent to you that this is Plaintiff's Supplemental Responses and Objections to Defendants' First Set of Interrogatories for yourself, for Rosemary D'Augusta; is that correct?

A   Correct.

Q   Have you seen this document before?

A   Yes.

Q   And are you familiar with the facts contained in this document?

A   Yes. Although I can't see the

Page 82

R. D'Augusta

document. But I'm familiar with the one you're --

Q   You're free to scroll through the document.

A   Yes.

Q   And do you have any reason to believe the facts in this document are not correct?

MR. BONSIGNORE: Objection.

A   I'm trying to scroll down. It's not scrolling.

Q   Well, maybe I can direct your attention to the -- to page 6 which I believe contains the --

MR. BONSIGNORE: Objection.

Q   I'm sorry. Oh, withdrawn.

Ms. D'Augusta, can you see the text under Interrogatory Number 4?

A   I see that.

Q   And do you agree with me that it's -- asks for every complaint you have ever filed seeking to enjoin a merger under the Clayton Act?

A   Yes.

Q   And do you agree with me that at the bottom of the following paragraph, plaintiff responds, "See Exhibit A, attached hereto"?

Page 87

R. D'Augusta

MR. BONSIGNORE: I'm going to object. In the prior depositions, we agreed that -- well, I noted for the record that the protective order includes a mechanism by which subjects can be reopened, and that it's my understanding that the matters that are settled are subject to confidentiality agreements. And so I'd instruct the witness not to answer any further questions on that topic.

And my understanding that defense counsel will carry on a conversation with others, other plaintiffs' counsel, lead counsel Papale, who know the specifics about the confidentiality clause. And if you can poke a hole in it, you have your right, under the protocol, to proceed without objection from me.

MR. RABINOWITZ: I'll just state for the record that -- that -- I -- apologies. One moment, please.

(A discussion was held off the record.)

BY MR. RABINOWITZ:

Page 88

R. D'Augusta

Q   Ms. D'Augusta, are you -- will you follow your plain- -- your attorney's instruction not to answer the question?
A   Yes.
Q   Ms. D'Augusta, if you successfully prevented the merger but did not obtain any financial compensation, would that be a satisfactory outcome?
A   No.
Q   Why is that?
MR. BONSIGNORE: Objection.
A   My objective is to block the merger to -- to derail the trend that is occurring in this country to become -- towards monopolization, towards larger and larger, bigger and bigger. The power goes to the merged companies, and the people suffer because of it. The trend is towards monopolization in all facets of industry across the country, and my objective is to stand in front of it and let the people know it's got to stop. If we block it, it's a good thing.
Q   Ms. D'Augusta, in any of the prior merger cases that you were a plaintiff in -- withdrawn.

Page 89

R. D'Augusta

Ms. D'Augusta, following any of the cases challenging mergers that you were previously involved in, was the merger allowed to proceed?
A   Yes.
Q   So there were no challenges to mergers that were successful that you've been a part of?
A   We were not able to block the mergers to date, that is correct.
Q   And, Ms. D'Augusta, can you describe what impact the merger of Spirit and JetBlue would have on you personally?
MR. BONSIGNORE: Objection. Calls for an opinion from an unqualified witness, lack of foundation.
A   Personally, I feel threatened by the merger. In addition to the monopolization point that I just made, I feel that when you take away a competitor, a viable competitor, you take away the consumer's choice and you would take away my choice. You would take away jobs. You would -- you would, uh, take away flights.

I feel that the price of the airline tickets would increase. We would have less availability, and we would have fewer choices. And

Page 90

R. D'Augusta

in the long run, that hurts me and it hurts the consumer. And that's my position on it.
Q   When you first considered bringing this lawsuit to prevent the Spirit and JetBlue merger, what steps did you take to prepare to bring the lawsuit?
MR. BONSIGNORE: Objection to the extent the question is intended to obtain information that violates the attorney-client privilege.
A   I do not understand the question, and I would ask you to please clarify it for me.
Q   I understand.

Ms. D'Augusta, did you read the news about the Spirit and JetBlue merger prior to filing the lawsuit?
A   Yes, I did.
Q   Do you remember what you read?
A   Vaguely. I -- I don't -- I don't remember. I remember it saying that JetBlue was buying out Spirit and -- but I don't remember the details of the piece that I read. No, I don't remember it.
Q   And did you review any public

Page 91

R. D'Augusta
statements made by airlines or airline security filings prior to filing the challenge to the merger?
 A  Okay. Please rephrase that question for me. I was distracted.
 Q  Did you review any securities filings, annual reports, or public statements made by airlines prior to filing the challenge to the merger?
 A  No.
 Q  Did you review the complaint before it was filed?
 A  No.
 Q  Ms. D'Augusta, were you made aware of your document preservation obligations in this case?
 A  Yes.
 Q  And have you deleted any documents since this case was filed?
 A  No.
 Q  Have you deleted any flight receipts since the case was filed?
 A  No.
 Q  Have you deleted any documents or flight receipts since the middle of 2022?
 A  I don't -- I don't follow your

Page 92

R. D'Augusta
question. Are you speaking as a travel agency, Perna Travel, or are you speaking in my own personal files?
 Q  Both.
 A  No.
 Q  Have you deleted any documents pertaining to Spirit or JetBlue since the middle of 2022?
 A  No.
 Q  Have you deleted any documents pertaining to the potential merger of Spirit and JetBlue since the middle of 2022?
 A  No.
 Q  Have any such records been lost or destroyed?
 A  No.
 Q  When you first considered bringing this lawsuit to prevent the Spirit and JetBlue merger, what steps did you take to preserve documents relevant to the lawsuit?
 A  I have a -- an account with Pacer. And the documents that are filed in the lawsuit are filed with the court, and I have access to those records because I -- I subscribe to Pacer.

Page 93

R. D'Augusta
 Q  Ms. D'Augusta, I apologize if -- if I wasn't clear. I'm referring to your personal files, files that you might have saved on your computer or in your personal records as opposed to public court filings.
   Have you taken any steps to preserve your personal files or any documents held by Perna Travel that might be relevant to this lawsuit?
 A  Yes.
 Q  Can you tell me what those steps are?
 A  I have -- I have the pertinent documents put in a separate folder, Alioto folder.
 Q  Are there any auto-delete functions on any systems that you run on your computers or file storage systems?
 A  No. Except if I, myself, dump the files into a delete section, after 90 days the oldest will be deleted up to maybe 100 or something like that, and then they -- they go from there. But no, that's automatic. But I have to put them in there first; they don't automatically go into a delete folder.
 Q  Have you placed any files into the delete section since the middle of 2022?

Page 94

R. D'Augusta
 A  No.
   MR. RABINOWITZ:  Okay. Can we go off the record, please?
   MR. BONSIGNORE:  Yes.
   THE VIDEOGRAPHER:  Off the record at 4:57 p.m.
   (Whereupon, a recess was taken between 4:57 and 5:04 p.m.)
   THE VIDEOGRAPHER:  We're back on the record. The time is 5:04 p.m.
BY MR. RABINOWITZ:
 Q  Ms. D'Augusta, I want to confirm a couple of final points here that you've testified to earlier, the first of which is you have not ever flown on Spirit, correct?
 A  Correct, to the best of my knowledge.
 Q  And you have no future plans to fly Spirit, correct?
 A  That's not correct.
   MR. BONSIGNORE:  Objection.
 Q  Have you booked any tickets to fly Spirit in the future?
 A  I have not booked any tickets to fly any airline in the future.