# EXHIBIT 38

```
 1

 2   UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS
 3   - - - - - - - - - - - - - - - - - - -x
     GABRIEL GARAVANIAN, et al.,
 4
                  Plaintiffs,
 5
     vs.                              Civil Action Number
 6                                    1:23-cv-10678-WGY
     JETBLUE AIRWAYS CORPORATION
 7   and SPIRIT AIRLINES, INC.,

 8                Defendants.

 9   - - - - - - - - - - - - - - - - - - -x

10

11

12

13          REMOTE VIDEOTAPED DEPOSITION of DONNA FRY,

14   taken by Defendants on Tuesday, June 20, 2023,

15   commencing at 2:09 p.m. (Mountain Standard Time),

16   before Pamela Grimaldi (via Zoom), a Registered Merit

17   Reporter, Certified Realtime Reporter, and Notary

18   Public within and for the State of New York.

19

20

21

22

23

24

25
```

```
 1
 2    R E M O T E   A P P E A R A N C E S:
 3
            BONSIGNORE TRIAL LAWYERS
 4              Attorneys for the Plaintiffs
                23 Forest Street
 5              Medford, Massachusetts   02155
                781.350.0000
 6
         BY:    ROBERT J. BONSIGNORE, ESQ.
 7              rbonsignore@classactions.us

 8

 9          COOLEY LLP
                Attorneys for Defendant JetBlue Airways
10              500 Boylston Street, 14th Floor
                Boston, Massachusetts   02116
11              617.937.2349

12       BY:    MATT NGUYEN, ESQ.
                mnguyen@cooley.com
13                   - and -
                ZACH SISKO, ESQ.
14              zsisko@cooley.com

15

16
     A L S O   P R E S E N T:
17
                James Jarmon, Video Specialist
18
```

Page 12

D. Fry

1969.
 Q Got it.
 So -- and you're still a travel agent today?
 A Yes, I am.
 Q Okay. Just for our edification, can you walk me through some of the jobs you've held as a travel agent starting in 1969?
 A I was a travel agent for a travel agency owned by other people for about 10 years. And then I started my own travel agency in 1981, and that is the travel agency that I have owned and worked for ever since. And to this day.
 Q Got it.
 And what is the name of the travel agency that you worked for but did not own from 1969 to '81?
 A Ward World Travel.
 Q And do you still have any relationship with word -- Ward World Travel?
 A No.
 Q And you don't receive any income from them at this time?
 A Correct. No income.

Page 13

D. Fry

 Q Okay. I want to turn us over, then, to the travel agency that you say you owned.
 Are you the sole owner of that travel agency?
 A Yes.
 Q And what is the name of that travel agency?
 A Allways Travel.
 Q Got it.
 Are you familiar with a person named Donald Fry?
 A Yes. My husband.
 Q Is Donald Fry also a travel agent?
 A No. He is in -- he keeps the books, does the information for tax preparation.
 Q Does he work for Allways Travel?
 A No. Allways Travel was incorporated. He was an officer, and now Allways Travel is an LLC. So he is no longer part of the ownership.
 Q When did Allways Travel move from being a incorporated company to an LLC?
 A This February. February 2023.
 Q So up until February 2023, your husband, Mr. Fry, was an officer of Allways Travel?

Page 14

D. Fry

 A Correct.
 Q But he's no longer in any role associated with Allways Travel?
 A Correct.
 Q Does he receive any income or revenue from Allways Travel?
 A No.
 Q And so you're the sole owner at this time?
 A Yes.
 Q And you've been the sole owner since 1981?
 A Well, as I mentioned, when we were incorporated, he was part -- one of the owners.
 Q And what --
 A Until February of 2023.
 Q Understood.
 And what was the ownership interest, then, at that time? He was a fifty-fifty owner with you?
 A No. I was 51 percent, and Don was 49 percent.
 Q Got it.
 So you held control over the company

Page 15

D. Fry

at the time?
 A Yes.
 Q Got it.
 And what led you to restructure the company from an incorporated company to an LLC?
 A The fact that we no longer had employees. We used to, of course, have a brick-and-mortar location, an office, and had numerous travel agents, people that worked for the travel agency, so travel -- and at -- some years ago, we closed that office and I went to work from home and we no longer had employees. And, therefore, a lot of the paperwork and business-type activity was unnecessary, and so our CPA suggested that we consider going to an LLC instead.
 Q Got it.
 And so the company, Allways Travel, has gotten smaller over the years, from having employees to no longer having employees other than yourself?
 A Correct.
 Q And in the last 10 years, what would you estimate was the annual revenue of your travel agency?

Page 16

D. Fry

2  A   Uh, the --
3      MR. BONSIGNORE:  Objection.
4  A   10 years.
5      MR. BONSIGNORE:  You can answer.
6  A   Of course, we had COVID in between, so for two years, '19, '20 to '21, the two years within there, the income was pretty much zero.  And before that, probably -- um, probably 2 million a year.  And at this point, I doubt that I would be even in the 1-million-a-year category.
12  Q   And that's total revenue, right, not the income you receive from the agency?
14  A   I'm sorry.  That would be the agency sales per year.  You might repeat the question.  I'm not sure I understood the question.
17  Q   Yeah.  And so I was saying that the 2 million you were referring to is the agency's revenue and not your income, right?
20  A   That's correct.
21  Q   And how much income did you make on average from -- for the past 10 years through Allways Travel?
24  A   About 24,000 a year would be my income from Allways Travel.

Page 17

D. Fry

2  Q   And has that income increased or decreased in the last couple years?
4  A   Drastically decreased.
5  Q   Can you estimate how much income you made from Allways Travel last year?
7  A   Last year as travel started returning more back to normal, it was about 30,000.
9  Q   Okay.  And how about this year?
10 A   This year, I am only guessing that it might be in the maybe 10,000 range.
12 Q   Okay.  And let me just change the subject a little bit to focus more on your travel agency's customers.
15     Would you describe your customer base as mostly business?  Mostly leisure?
17 A   Mostly leisure.
18 Q   Okay.  And if you had to assign a percentage, what sort of percentage would you say were leisure customers?
21 A   At this point, 100 percent.
22 Q   Okay.  So you have no business travelers that you are catering to?
24 A   Right.  Correct.
25 Q   And do you receive a commission from

Page 18

D. Fry

2  booking travel for any of your customers?
3  A   Yes.  That is almost 100 percent of our income, so we are paid commission by tour companies, cruise lines, car rental companies, hotels.  If I mentioned cruise line, I will repeat cruise line.  So that is where most of our income comes from.  I do get some income from service fees.
9  Q   Okay.  And when you say most of your income comes from these commissions, would you estimate more than 80 percent?
12 A   Yes.  I would say probably at least 95 percent.
14 Q   Okay.  So 95 percent of your travel agency's revenue comes from commissions from cruises, hotels, and car rental companies?
17 A   Correct.
18 Q   And the remaining 5 percent is revenue from service fees?
20 A   Yes.  Possibly service fees.
21 Q   Are there any other sources of revenue that you haven't mentioned yet that fall within that 5 percent?
24 A   No.
25 Q   Okay.

Page 19

D. Fry

2  A   Those are the two areas of income.
3  Q   And as for your service fees, can you explain with that means?
5  A   Yes.  I have a service fee to issue airline tickets, for example, to plan the itineraries, find the best schedules, and actually issue tickets.
9      I am approved by ARC, Airline Reporting Corporation, so I can issue airline tickets through my computer program.  I use the Amadeus reservation system.
13     And because the airlines pay no commissions, I do have to charge a service fee for issuing air tickets.  And the other service fees would -- once in a while, depending on the type of trip a client wants to take, I would have to charge a service fee for the amount of time and research that that would involve.
20 Q   Okay.  That's helpful.
21     And so what you were saying is that of the remaining 5 percent, only some of that is from booking flights for customers?
24 A   But that is because of the service fee, not because airlines pay commission.  Airlines

Page 32

D. Fry

Point B, let's say.  So I would say if they're starting a trip and ending a trip near their home, Colorado Springs or Denver would be the originating and terminating point.

Q   Got it.
    What percentage of overall flights that you've booked for your travel agency would you say are Spirit flights?

A   Oh, probably 1 percent.

Q   Okay.  And what percentage of flights that you've booked for your travel agency would you say are JetBlue flights?

A   I would say probably in the same range, maybe 1 percent.  You're -- they are not represented in the Colorado area other than the one JetBlue flight.  But remember, I have clients in different places, and it could be an itinerary that's more than just a departure and a return to the same place.

Q   All right.  Given that JetBlue and Spirit all together represent approximately 2 percent of your travel agency's bookings, do you expect that your travel agency will be affected substantially by this merger?

Page 33

D. Fry

A   Oh, yes, affected.  I mean, everybody will be affected by any merger.  So the threat is there that when airlines merge, there will be ramifications throughout the industry.

Q   And how do you think it will affect your income, that 2 percent of the flights that you book are through JetBlue or Spirit?

A   My income from booking JetBlue or Spirit would be a fee.  As I mentioned, the airlines do not pay any commission to me at all.  So whether my clients fly Airline A or Airline B does not really affect my income.  I would charge them a service fee.

Q   Got it.
    So whether your clients flew Spirit or United, you still receive the same fee?

A   Correct.

Q   Got it.  Thank you.
    MR. NGUYEN:  I think this might be a good point for us to just take a quick break, if we might be able to take 10 minutes off the record.
    THE VIDEOGRAPHER:  Going off the record at 2:43 p.m.

Page 34

D. Fry

(Whereupon, a recess was taken between 2:43 and 2:54 p.m.)
    THE VIDEOGRAPHER:  Going back on the record at 2:54 p.m.
    MR. NGUYEN:  Thank you.
BY MR. NGUYEN:

Q   Welcome back, Ms. Fry.

A   Thank you.

Q   Other than your counsel, did you speak with anyone during the break about this case?

A   No.

Q   Got it.  Thanks.
    I want to spend a little bit more time talking about your travel agency and specifically any future flights you have booked.
    Is it fair to say that most of the flights you have booked in the future are through United, American, or Delta?

A   I would say the majority, yes.

Q   More than 80 percent?

A   I would say, yeah, probably at least 80.

Q   And what percentage of those flights are Spirit flights?

Page 35

D. Fry

A   At this point, I don't think I have any Spirit flights booked.

Q   Okay.  And any JetBlue flights booked?

A   No.  Not at this point.  There's a consideration for someone to fly JetBlue, and that would be connecting through Boston.  So that's why JetBlue would be a consideration.

Q   Got it.
    And where -- where were they planning on ultimately flying to?

A   They were flying to Italy, and so the domestic portions would be on JetBlue.  And the international portions -- oh, let's see, who they were -- they would be connecting with.  There was one possibility with American.

Q   Got it.
    And they haven't booked that --

A   And Delta.

Q   -- yet, have they?

A   No.

Q   And if you do book that flight, would you choose JetBlue if it were the cheapest option?

A   Yes.  Well, I give my clients options, so I consider the scheduling, the pricing, probably

Page 40

D. Fry

I want to turn our attention away from your business and switch our gears to talk about your own personal travel.

MR. NGUYEN: And so what I'm going to do is introduce Exhibit 1, which is Tab 1, James.

(Plaintiff Fry's Responses and Objections to Defendants' First Set of Interrogatories was marked as Defendants' Exhibit Number 1 for identification, as of this date.)

BY MR. NGUYEN:
Q   Ms. Fry, are you able to see the document on the screen?
A   Yes.
Q   Do you see that it's titled "Plaintiff's Responses and Objections to Defendants' First Set of Interrogatories"?
A   Yes.
Q   And do you see that the responding party is you, Plaintiff Donna Fry?
A   Yes.
Q   Got it. Thank you.
    And have you reviewed this document

Page 41

D. Fry

before?
A   Yes.
    MR. NGUYEN: Can we scroll to the very last page?
Q   Ms. Fry, do you see your name right there when it says that you verified, under penalty of perjury, that you've read this document and that it's true to the best of your knowledge?
A   Yes.
Q   And you signed it there on June 12th?
A   Yes.
Q   Great. Thank you.
    I'm going to now turn our attention to page 7 of the document.
    Ms. Fry, this is a spreadsheet or chart of your travel since 2016 up through present; is that right?
A   Uh-huh, correct.
    MR. NGUYEN: And it goes on to the next page, so if we could just scroll to page 8 really quickly so she can see.
Q   Do you see how it goes on to page 8?
A   I do. Yep.
Q   Okay. And, Ms. Fry, would it surprise

Page 42

D. Fry

you if none of the flights on here are JetBlue or Spirit?
A   That is correct. They are not JetBlue or Spirit.
Q   In fact, it looks like the airlines that you fly most are Southwest, Alaska, Delta, and United; is that right?
A   Correct.
Q   And I see that there's at least one or two American flights as well?
A   Yes.
Q   And it looks like your most common location of flying out of is mostly Tucson?
A   Yes.
Q   So from like 2017 onward, it looks like Tucson is either the arrival point or the departure point of your flights; is that right?
A   That's correct. We moved here at that time.
Q   Okay. So in 2016 you lived in Denver --
A   Colorado --
Q   -- or in the Denver area?
A   Colorado Springs.

Page 43

D. Fry

Q   Okay. And back at that time, JetBlue offered only one flight as well?
A   That's correct.
Q   And Spirit didn't offer any flights?
A   That's correct.
Q   And then when you moved to Tucson, that was in 2017?
A   That was January of 2018.
Q   Okay. And can you tell me the most popular airport -- airlines out of Tucson?
A   The -- probably the majority of the flights are on United, American, and Southwest.
Q   Got it.
    And does -- does Delta also fly out of Tucson?
A   Delta. But not very many flights, so that they would not have a majority of flights.
Q   And what about Alaska?
A   Oh, sorry. Alaska as well, because we have flown Alaska.
Q   What about JetBlue?
A   None of JetBlue.
Q   And what about Spirit?
A   None of Spirit that I'm aware of.

Page 52

D. Fry
A   At this time, I have no flights booked for myself, no.
Q   Got it.
And so in the next six months, is it fair to say you won't be flying JetBlue?
A   Within the next six months, I would guess I probably would not be flying JetBlue.
Q   And in the next six months, you don't expect to fly Spirit either?
A   I don't --
MR. BONSIGNORE:  Objection.
A   I don't expect to.
Q   Got it.
I want to turn our attention to some of these flights.
I want to ask whether you're able to get any free flights through your status as a travel agent.
A   I'm sorry.  Was that a question?
Q   Yeah.  I wanted to ask whether you're able to get any free flights through your status as a travel agent?
A   No.  I have not collected very many mileage points.  And, well, as a travel agent, no,

Page 53

D. Fry
definitely no.  But as a mileage club member, I have not collected enough points, so no.
Q   But if you had enough points through the mileage club, you would book free tickets through there, right?  Paying for it with points?
A   I would, yes.
Q   Got it.  Thank you.
I want to turn our attention away from some of your personal flights and move us over actually to the second-to-last page of this document, so that would be, I think, 14.
Ms. Fry, do you recognize this spreadsheet?
A   Uh, I'm sorry.  I have to get close to read it.
Q   No worries.  And I believe James can zoom in for you if that's helpful; so ...
Can you read that, Ms. Fry?
A   Uh-huh.  I don't remember seeing this sheet before.
Q   Ms. Fry, this document is Exhibit A attached to your Responses and Objections to Defendants' First Set of Interrogatories.  And it specifically responds to Interrogatory Number 4.

Page 54

D. Fry
Does that refresh your recollection?
A   Interrogatory Number 4.  Oh, I think I remember that one.  Yes.  So I think I remember Number 4.
Q   And so you recall reviewing this document before?  It's okay to say no if that's the case.  Just --
A   I don't remember.  Sorry.
Q   Okay.  But you did sign a verification of this document saying that it was truthful and accurate; is that right?
A   If it was in that group of pages, yes, that -- I guess I have signed that.
Q   And so to your knowledge, this chart is truthful and accurate?
A   To my best guess, it looks like it would be truthful and accurate.
Q   Thank you, Ms. Fry.
I just want to turn our attention right now to where it says, "Your name."
A   Uh-huh.
Q   Sort of kind of in the middle there.  It says "Donna Fry."
Does that --

Page 55

D. Fry
A   Yes.
Q   Do you see that?
A   Yes.
Q   Great.
MR. NGUYEN:  And if we can also, yeah, see the top of that chart as well.
Q   It looks like you were a plaintiff in the D'Augusta v. Northwest case.  Is that -- is that ringing a bell?
A   That could be true.
Q   And, Ms. Fry, do you recall how that case was resolved?
A   I don't recall.
Q   Did you reach a settlement?
A   I'm sorry.  I don't recall.  That was too long ago.
Q   Do you recall receiving any financial compensation for that case?
A   I don't remember.
Q   Okay.  Do you remember which airlines that case involved?
A   Well, that obviously says, "Northwest."  I assume it was maybe Northwest and Delta.  Just a guess.

Page 56
D. Fry
Q    And those airlines ultimately merged; is that right?
A    Yes.
Q    And it looks like, based on this chart, you were not a plaintiff in the next four lawsuits listed there; is that correct?
A    That's correct.
Q    So you were not a plaintiff in Malaney v. United?
A    No.
Q    You were not a plaintiff in Taleff v. Southwest?
A    No.
Q    You were not a plaintiff in Fjord v. AMR?
A    No.
Q    You were not a plaintiff in Fjord v. United -- sorry -- US Airways?
A    No.
Q    But you were a plaintiff in Grace v. Alaska?
A    And I'm sorry, where is that one?
Q    The far right column.
A    Okay. Yeah. The screen is covered

Page 57
D. Fry
there, so I don't see all of it. I'm sorry.
Q    Are you able to see the chart now?
A    No.
Q    But you do recall being a plaintiff in Grace v. Alaska?
A    Yes. And I would say that the Alioto law firm would have better information than I'm remembering.
Q    Got it.
     And so do you typically review these complaints before they're filed or are they filed and then you review them afterwards?
A    It's hard to answer that question with a definite this way or that way. Circumstances change. So I guess I have to say I don't remember which it was, before, after, during. Probably all of the above.
Q    Do you recall how the Grace v. Alaska case was resolved?
A    I'm trying to think of the airline -- I'm sorry. I don't remember.
Q    Is it fair to say that it wasn't that important to you since --
A    These are all important, but you're

Page 58
D. Fry
asking for details and this has been a long time since these cases came up. So it's always important, and that's why I get involved, because any merger affects my business, it affects my clients, not only myself, and the threat -- and we're at that point now where there have been so many mergers that we have all been affected by cancellation of routes once airlines merge and prices going up and the number of seats being not as many as individual airlines are in business. If a low-price carrier is erased from the market, that brings everybody's prices up.
     So these are important cases to me for that reason. And just the fact that I don't remember is because it's been a while, many years, and life goes on. And I just can't remember all that.
Q    Got it.
     So you can't remember which airline was being merged with Alaska in Grace v. Alaska? Just yes or no is fine.
A    No, I don't remember. Sorry.
Q    Got it.
     And that was approximately seven years

Page 59
D. Fry
ago, right, because the complaint, it looks like, was filed in 2016?
A    Again, I can't see that column. I'm just going to assume that you can read it.
Q    It wouldn't surprise you if the case was back in 2016, would it?
A    It wouldn't surprise me, no.
Q    Okay. And you don't remember either the airline that was merging with Northwest, that first lawsuit we talked about?
A    I think it was Delta.
Q    Okay. But you can't remember for sure?
A    Well, I'm sure Delta took over Northwest.
Q    Okay. Ms. Fry, I remember you talking a little bit earlier about the airlines used to provide you and other travel agents with commissions for booking flights with them.
     Do you recall that?
A    Yes.
Q    Were you part of any lawsuit against the airlines when they decided to stop providing commissions?

Case 1:23-cv-10678-WGY   Document 175-38   Filed 08/01/23   Page 10 of 10
Deposition of Donna Fry

Page 76

D. Fry

understanding that I should not answer those types of questions because they are protected under attorney-client privilege is my assumption.

Q  Ms. Fry, the terms of any settlement aren't covered by attorney-client privilege. I believe your counsel had said earlier that it was a confidentiality provision. That is separate and apart from the protective order in this case.

A  Okay. Again, I would answer I don't remember, and I really don't understand the confidentiality aspect of that question.

Q  Okay. No problem at all.

But nevertheless, you're refusing to respond on the advice of counsel?

A  I'm responding by I don't know.

Q  Okay.

MR. NGUYEN: I would just note very quickly for the record that defendants strongly disagree with the assertion of confidentiality in this matter, of course.

To date, defendants have produced a wide body of documents and third parties have produced a wide body of documents to plaintiffs that are highly confidential,

Page 77

D. Fry

and so we do not believe that the terms of any settlement are immune from discovery in this case.

And as you know, Robert, we'll plan to discuss this further with you and your colleagues.

Ms. Fry, we can take down this exhibit because this is all the questions that I have for you.

THE WITNESS: Okay. Thank you.

MR. BONSIGNORE: We can just roll right into it.

EXAMINATION
BY MR. BONSIGNORE:

Q  Ms. Fry, do you plan to fly personally in the future?

A  Oh, of course, I do. I just don't have anything planned at the moment. But as I mentioned, a lot of visits to family are definitely on the agenda, Seattle, Chicago. I haven't been on a vacation in a long time. I'm sure we'll be traveling. I just don't have anything planned at the moment.

Q  When you do fly in the future, will

Page 78

D. Fry

you consider all airlines or will you exclude any airline from consideration?

A  I will consider all airlines. And schedules change, so, of course, I'll be looking at good scheduling, good pricing, considering out of Tucson, considering out of Phoenix, connecting flights. That's part of the job I do, and I do the same job for myself as I would for a client, look at all options.

Q  So you testified earlier that you didn't fly Spirit in the past. Why is that?

A  The Spirit routes have not been accessible to me for the -- because of the areas that I have lived and the places that I have been traveling to.

MR. NGUYEN: I'm going to object.

A  I would hope -- I'm sorry?

(Reporter requested clarification.)

Q  You can keep going.

A  So I would hope that we could have more options in the future to consider.

For example, Tucson being a subsidiary of Phoenix, these mergers have created very few options out of Tucson, and so we need more low-cost

Page 79

D. Fry

carriers, especially thinking about Spirit, because they're about 50 percent of the low-cost market out there. We need more service and these -- I would hope that we could see more of that. But with mergers, we're seeing less and less.

I've been in the business a long time, and I've seen that happen, even out of Colorado Springs. When United merged with Continental, we lost a lot of direct service from Colorado Springs to Houston because of that.

So unfortunately, the smaller towns and cities are threatened.

MR. NGUYEN: Pam, I just wanted to make sure that my objection from the beginning of this answer is noted for the record. I don't see it on the live.

Thank you.

Q  Do you plan to continue to be employed and make your living as a travel agent?

A  I intend to continue, yes.

Q  And as -- as you continue, will you sell airline tickets?

A  I plan to, yes. I plan to have access to the ticket sales, yes.

215-341-3616    transcripts@everestdepo.com
Everest Court Reporting LLC                    Page: 22 (76 - 79)