# EXHIBIT 41

```
 1                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
     GABRIEL GARAVANIAN, ET AL.    )
 3                                 )
                  PLAINTIFFS,      )
 4                                 )
     VS.                           )
 5                                 )  CASE NO. 1:23-CV-10678-WGY
     JETBLUE AIRWAYS               )
 6   CORPORATION AND SPIRIT        )
     AIRLINES, INC.,               )
 7                                 )
                  DEFENDANTS.      )
 8

 9

10

11

12
                  REMOTE VIDEO DEPOSITION
13                  OF GABRIEL GARAVANIAN
                   MONDAY, JUNE 19, 2023
14

15

16

17

18

19

20

21

22

23

24       Reported By:
         Allison M. Hall, RDR, CRR, CSR
25
```

```
 1                  June 19, 2023
 2                   9:00 a.m.
 3         Video deposition of GABRIEL
 4    GARAVANIAN, held remotely via Zoom before
 5    Allison Hall, a Registered Diplomate
 6    Reporter, Registered Merit Reporter,
 7    Certified Realtime Reporter, and
 8    Certified Shorthand Reporter and Notary
 9    Public.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1          A P P E A R A N C E S:

 2

 3          ON BEHALF OF PLAINTIFFS:

 4          BONSIGNORE TRIAL LAWYERS, PLLC
                ROBERT J. BONSIGNORE, ESQUIRE
 5              GEORGE OMAR KOURY, ESQUIRE
                23 Forest Street
 6              Medford, Massachusetts 02155
                Phone: 781-856-7650
 7              E-mail: rbonsignore@classactions.us

 8
            ON BEHALF OF SPIRIT AIRLINES:
 9
            PAUL WEISS
10              THOMAS RUCKER, ESQUIRE
                2001 K Street NW
11              Washington D.C. 20006
                Phone: 202-223-7347
12              E-mail: trucker@paulweiss.com

13          PAUL WEISS
                YOAV GAFFNEY, ESQUIRE
14              1285 Avenue of the Americas
                New York, New York 10019
15              Phone: 212-373-3984
                E-mail: ygaffney@paulweiss.com
16
       ALSO PRESENT:
17
       James Jarmon, Video Specialist
18

19

20

21

22

23

24

25
```

Page 13

substances that would impair your ability to testify truthfully?
A. I don't take any drugs, so I guess I can answer completely.
Q. Okay. All right. So moving -- moving along, did you do anything to prepare for your deposition today?
MR. BONSIGNORE: Objection to the extent it calls for the invasion of the attorney-client privilege.
You can answer.
THE WITNESS: Yeah, I talked to Robert for a few minutes last night.
Q. (By Mr. Rucker) And -- and just to be clear, you know, with this last question and my next questions, I'm not expecting anything in terms of the substance of your conversations with counsel. That's obviously privileged.
I just want to know generally what you did for -- to prepare. Did you talk with Mr. Bonsignore in person or via telephone?
A. A cell phone.
Q. Was there anyone else on the call

Page 14

other than Mr. Bonsignore and yourself?
A. I don't think so. I don't think he had anybody on the phone with us.
Q. How long would you say the session lasted?
A. Maybe five minutes.
Q. Did you review any documents in preparation for your deposition today?
MR. BONSIGNORE: Objection.
THE WITNESS: I -- I -- what type of documents are you talking about?
Q. (By Mr. Rucker) Anything related to the matter that -- in preparation.
A. The only thing we went over was the Complaint.
MR. BONSIGNORE: Objection.
Q. (By Mr. Rucker) So anything outside of the Complaint did you review in preparation for today?
MR. BONSIGNORE: Objection.
THE WITNESS: No.
Q. (By Mr. Rucker) Did reviewing the Complaint refresh your recollection of anything?
A. I -- I'm not sure. I don't -- I

Page 15

really don't understand what you're getting at.
Q. That's okay. And just -- just to make absolutely sure, did your counsel provide you any written documents that refreshed your recollection?
MR. BONSIGNORE: Objection. Instruct not to answer. That's attorney-client -- that's attorney work product, rather. But you're welcome to ask him what he looked at.
Q. (By Mr. Rucker) So just -- just to make sure I have it absolutely right, so you reviewed the Complaint in preparation for today; is that right?
A. Yes, the written Complaint.
Q. Any other documents that you produced or otherwise related to the matter?
A. No. Are you still there, Tom?
Q. Yep. Was that a "no"?
A. Yes, it was.
Q. Okay.
A. I thought the screen froze. I'm sorry.
Q. My apologies. Okay. Got you. I

Page 16

got it.
Okay. Moving on. Could you please briefly summarize your educational background after high school.
A. Yes, I can. Four years UMass Amherst. Go, Massachusetts. And that was it. BA.
Q. What was your BA in?
A. It was actually business management.
Q. Are you currently employed?
A. Yes. Yes, I am.
Q. Where are you currently employed?
A. Founders Golf part time down in Myrtle Beach. The golf course is called Burning Ridge Golf Club.
Q. Do you work in any capacity selling travel services currently?
A. Yes, I do. I just started up again.
Q. Okay. And -- you know, we'll return to that in a little bit.
At any point, were you the owner of a travel agency?
A. Yes. The -- the travel agency was

Page 17

opened with my twin brother, Harry, on May 27th, 1986. And it was sold December 21st, 2020.
Q. Okay. We'll return to -- and, sorry, what's -- what was the name of the travel agency?
A. It's a little bit complicated. We started out as a franchise called Travel Agents International, TAI. And then in, I'd say, March 1998, Carlson Wagonlit Travel acquired Travel Agents International, and it was smart to go that -- that direction and stay with them. And we had signed a eight-year contract.
    The corporate name was always Garavanian Travel when we were incorporated. I like seeing my name in lights. And then on March 31st, 2006, we went independent and -- and joined a consortium. But -- but, you know, we were independent. And like I said, then we sold it.
Q. Got it.
A. So we're in it for a long time.
Q. So it -- when you -- right before you closed it, the travel agency was called

Page 18

Garavanian Travel; is that right?
A. Garavanian Travel, Inc.
Q. Garavanian Travel, Inc. Got it. Okay. So, yeah, we'll return to both your -- your prior ownership of the travel agency and your current work as an independent contractor. We'll return to that in a little bit.
    Do you own any stock in airline companies?
A. At the present time, no.
Q. When was the last time that you owned any stock in airline companies?
A. Give me a second on this. I -- I can't recall the exact dates. I've owned stock in JetBlue. I've owned stock in -- in Southwest. I almost said Spirit. Southwest. Oh, and I owned stock in United Airlines.
Q. Would you say you've owned stock in any of these companies in the last five years?
A. I'd say definitely not in the last five years. I know United was somewhere right after 9/11.

Page 19

Q. That you -- that you purchased it?
A. Yes. It was around, I'd say, 2002 or 2003. And then I was done with them around 2006.
Q. Uh-huh. Other -- currently do you have any ownership in any other travel-related companies?
A. No, I -- I do not.
Q. Okay. So let's talk a little bit about your travel history. How often do you travel?
A. Back and forth from Myrtle Beach to Boston and back probably four times a year.
Q. Do you always fly?
A. No.
Q. When you don't fly, how do you get to Myrtle Beach?
A. In January, I drove from Myrtle Beach up to Boston. It was on January 12th.
Q. Outside of your, you know, let's say four times a year average going to Myrtle Beach, do you travel anywhere else?
A. At the present time -- give me one second on that. Are you talking about this

Page 20

year or are you going -- how far back do you want to go?
Q. Let's look at last year. So look at the entirety of 2022.
A. Yeah. Last year, it was just basically Myrtle Beach to Boston or Boston to Manchester or Hartford. I'm trying to think. Yeah, in 2022, that was it. It was -- it was in those city pairs.
Q. Got it. Are these all business or are they personal trips?
A. They are personal trips. I -- I can't write them off. If you know how to, let me know.
Q. Well, I can't -- I can't advise on that today, but...
A. Okay.
Q. Let's -- let's look at -- let's look maybe at 2020, 2021. Was -- would you say that it was a similar four times a year to Myrtle Beach?
A. No. That's why I wanted to explain. I don't really -- well, in 2019, I flew down here with my daughter, the one that's leaving in two minutes, and we wound

Page 25

Q. Got it.
A. All right. The trip I did in -- in January -- January where I drove --
Q. Uh-huh.
A. -- Spirit was not operating in January. I actually wanted to try to fly over Christmas, had to stay down here because the prices, right, without Spirit being in there were over $750 roundtrip.
Q. Got it. Okay.
MR. RUCKER: I'd like to introduce what's marked -- what has Tab 1 in the file name as Exhibit 1.
(THEREUPON, Exhibit 1 was marked for identification.)
THE WITNESS: Okay. It's going to show up now?
MR. RUCKER: Yep. And James will help us out.
THE WITNESS: Oh, okay.
Q. (By Mr. Rucker) All right. So, yes, I'd like to introduce this as Exhibit 1.
Mr. Garavanian, this is your responses to -- responses and objections to

Page 26

defendants' first set of interrogatories.
Before I have -- actually, let's go ahead and -- if you want to go ahead and take control of the document.
Have you seen this document before?
A. Yes.
Q. Okay. I'll let you know -- or I'll go ahead and let you scroll through it if you want to familiarize yourself with this document.
(THEREUPON, a pause.)
THE WITNESS: Okay. I've read it.
Q. (By Mr. Rucker) Great. And, actually, I wanted to -- so I'll take control. I just want to just point out one thing.
So -- so just as -- so this is your -- yeah, so this is your first set of interrogatories -- responses and objections to defendants' first set of interrogatories. And -- and they were -- the certificate of service says May 17th, 2023.
MR. RUCKER: I'd like to introduce -- well, let's put this to the

Page 27

side for one second. We'll be right back to it.
I'd like to introduce what has Tab 6 in the file name and mark it as Exhibit 2. This is -- I just want to show you the verification, which is a separate document.
(THEREUPON, Exhibit 2 was marked for identification.)
Q. (By Mr. Rucker) Great. So, Mr. Garavanian, so this is your -- so it's a separate document, but it has the May 17th date. It's the verification associated with the plaintiffs' -- with your responses and objections to defendants' first set of interrogatories; is that correct?
A. Yes, that's my signature.
Q. Got it. Okay. And that's your electronic signature; is that correct?
A. Correct.
Q. So you signed and verified that those interrogatory responses are accurate?
A. To the best of my knowledge, yes.
Q. Okay.

Page 28

MR. RUCKER: Let's flip back to what's marked as Exhibit 1. Okay. And we're going to go to the -- page 6.
Q. (By Mr. Rucker) So Interrogatory 1 requests a list of every airline and route that you've flown from 2015 to present. And there's a chart here that outlines flights.
Is this a complete and accurate list of the flights that you have taken in the last five years?
A. So -- you're talking about the other airlines besides Spirit and JetBlue, correct?
Q. So this should be every -- every airline and route.
A. Okay.
MR. BONSIGNORE: Counsel, we will stipulate to supplement that answer, hopefully within a day, if he misunderstood the question.
MR. RUCKER: Okay. Yeah, I --
MR. BONSIGNORE: I'm just making a guess based on what I heard, but we'll see what happens.

Page 29

MR. RUCKER: Okay.
THE WITNESS: And --
Q. (By Mr. Rucker) And I just want -- sorry. Go ahead. Sorry. Go ahead.
A. Those are the flights I took that weren't Spirit and JetBlue. I gave those answers on another one and did not realize they were supposed to be on this chart too.
Q. All right. So just to confirm, the misunderstanding here was that you thought the -- the response should only include airlines outside of Spirit and JetBlue; is that right?
A. That is correct.
Q. Okay.
MR. RUCKER: Yeah, I'll take this back to the team. But noted. And thank you, Mr. Bonsignore.
MR. BONSIGNORE: Thank you.
Q. (By Mr. Rucker) Okay. So looking at the flights that are listed here and -- and noting that the -- these -- this -- this list does not include any Spirit or JetBlue flights, it looks like there are no flights listed to, from, or through Los Angeles in

Page 30

the last five years; is that correct?
A. No, it's not. I -- I had flown Delta -- it was February -- I just want to get the year -- February 2020 I flew Delta using frequent flyer points.
Q. Okay. For the -- did you use frequent flyer points for the entire price of the ticket?
A. Yes, I did. When it's frequent flyer, it doesn't -- you know, it doesn't post as, you know, a financial transaction. It's free. And that's -- so it's tough to have the records part. I -- I -- I forget on -- on that one. It was for my uncle and aunt's 50th anniversary. I went to Glendale.
Q. Got it. So that was -- so February 2020, correct?
A. Yes.
Q. And did you fly from Boston to Los Angeles?
A. Yes, I did.
Q. And then back to Boston?
A. Yes.
Q. Do you -- how -- do you remember

Page 31

how -- approximately how long your trip was?
A. With the connection flight, probably about seven and a half hours.
Q. Did you fly Delta from Boston to LAX and from LAX to Boston?
A. Yes, but it was not nonstop.
Q. So each -- and each connection was Delta?
A. That is correct.
Q. In the last five years, were there any other flights that you took to, from, or through Los Angeles?
A. This was after 2015 or before?
Q. So this would be -- so last five years -- so, yeah, from 2015 -- or, I'm sorry, from 2015 to present.
A. No. I don't -- I don't recall that.
Q. All right. Scroll back to the chart. It looks like there are no flights listed to, from, or through Ft. Lauderdale; is that correct?
A. Yes, that's correct.
Q. So -- so just to -- just to make sure, no flights since 2015 to, from, or

Page 32

through Ft. Lauderdale?
A. That -- that is correct.
Q. How about flights to, from, or through Orlando since 2015?
A. That's correct.
Q. How about flights to, from, or through Las Vegas since 2015?
A. That's correct.
Q. No flights listed to, from, or through New York LaGuardia since 2015?
A. No, that's not correct. The trip to Reno.
Q. Yep.
A. Give me a second. Okay. So on Reno, I was supposed to come back -- the ticket was written on -- you can see that on -- it was printed on August 16th -- August 3rd, 2016.
Q. I see, yep.
A. Traveling in September. On the way back, the flight got canceled, so they made me go Reno to -- actually, I take that back with the Vegas one. They redid it, so it went Reno, Las Vegas, Las Vegas, LaGuardia, back to Boston. But the ticket

Page 81

it's the frequent flyer program of the original one -- it's the frequent flyer program for the one set up for the credit card.
Q. Got it. So you --
A. But they merged them together.
Q. So you likely joined that in -- in or around June 2020; is that correct?
A. That is correct.
Q. Okay. Okay. Talking a little bit about JetBlue. You had mentioned a JetBlue flight that you took in 2018 from Boston to Puerto Rico and back to Boston; is that correct?
A. That is correct.
Q. When was the last time you flew on JetBlue?
A. I -- give me a second. I thought that was the last time I flew on them.
Q. Is that your answer? Just to make sure.
A. I believe that was the last time.
Q. Okay.
A. I -- I don't have the records in front of me.

Page 82

Q. Okay. Why haven't you flown JetBlue since 2018?
A. What happened was they were going from Boston to Ft. Lauderdale, and on that one I gave you, we -- it was for a cruise. And I cruised -- I was cruising two or three times a year. And their prices just kept on going up. It was cheaper for me to go on American Boston-Miami. So it was the price.
Q. Let's say comparing your last American and Spirit flights, do you have a preference for either airline?
A. Yeah, I --
MR. BONSIGNORE: Objection.
THE WITNESS: -- I'd rather go on Spirit because of the price.
Q. (By Mr. Rucker) Is Spirit always cheaper than the other airlines?
MR. BONSIGNORE: Objection.
THE WITNESS: Every time I've flown on Spirit, it has been, you know, a considerably less expensive choice.
Q. (By Mr. Rucker) What other airlines -- what airlines fly out of Boston Logan?

Page 83

MR. BONSIGNORE: Objection.
THE WITNESS: I'm going to go by memory. Definitely American, Delta, United. Southwest is going out of Boston now. Alaska is going out of there. Off the top of my head, that's the best I can do domestically.
Q. (By Mr. Rucker) Okay. Other than your Spirit flight that you have booked for this afternoon, do you have any plans to purchase any airline tickets in the future?
A. Yes, I do.
Q. Do you have any tickets purchased other than the Spirit flight you have booked for this afternoon?
A. Not -- not at this time.
Q. What airlines do you have in mind for your next trip?
A. Personally, I'm trying to do JetBlue Boston to Ft. Lauderdale.
Q. And why are you picking JetBlue?
A. Because I like the Ft. Lauderdale airport better for the cruise line.
Q. And why is it better for the cruise line?

Page 84

A. It's a smaller airport and it's easier to get to the -- to me, it's easier to get to the cruise port from Ft. Lauderdale.
Q. Where is the cruise port?
A. Port Everglades.
Q. Is there a flight from Boston to West Palm Beach --
MR. BONSIGNORE: Objection.
Q. (By Mr. Rucker) -- that you have considered?
A. I have considered it. I've flown Boston-West Palm Beach.
Q. Is West Palm Beach closer than Ft. Lauderdale to the cruise port?
A. No. That's -- I mean, you've got the cruise port in Miami and you got the one in Ft. Lauderdale. The one in Ft. Lauderdale, one of them is, like, five miles away.
MR. RUCKER: Okay. I'd like to take -- if it sounds good to you, take a break. Let's take a 10-minute break and go off the record, if that sounds good.
MR. BONSIGNORE: Yes.

Page 89

Q. How do you procure your customers?
A. I need to explain something first, and then it will be easier. I am now an independent contractor for Thomas Hogan Travel down here, okay?
  Also, when I sold, December '21, I had a no-compete for two years, and I honored that. So that's why I just started doing it in February with them again.
  And what they've been doing is giving me some of their overflow customers to contact me and put trips together. And that's been about it. I have not -- I -- I'm -- I'm doing it part time and, you know, I'm just starting the marketing ideas and that type of thing.
Q. So when did you start as an independent contractor for Thomas Hogan?
A. I'm going to say officially February of this year.
Q. Okay. And has Thomas Hogan provided you any overflow customers yet?
A. Yes, they have.
Q. How many?
A. Two that have closed and a third

Page 90

possible one. There were four or five other instances, but, I mean, the people did not go on the trip.
Q. Okay. So let me make sure I -- because I want to make sure I understand.
  Is "closed" meaning that the travel occurred or that they bought their --
A. They --
Q. -- travel through --
A. They bought the trip, and one of them came back. She went on a European cruise. She came back. The other one is almost finalized for a Greece trip that goes over to Italy.
Q. Okay.
A. And because those trips are involved, that's why they're giving them to me. You know, they need to be done by a -- a seasoned professional, and that's why I fit in good with them.
Q. So are all of the trips so far international?
A. That they've referred over? Yes, except for one. And that one was a potential that didn't happen.

Page 91

Q. Where was the potential trip that didn't happen? Where was the destination?
A. It was going to go Myrtle Beach to Hawaii, Honolulu.
Q. Did they have an airline in mind?
A. Not really. He -- we went back and forth on that. I -- I forget the itinerary I gave him on the airline, okay, but, I mean, like I said, he wasn't that -- he was serious, but he wasn't that serious as far as booking the airline ticket with us.
Q. Do you remember the airline? Which airline?
A. I believe it was Delta. I can't promise you on that, but I believe it was Delta.
Q. Which airlines did you book for the international trips?
A. On the international trip, I did not book the Celebrity cruise. I'm sorry. I did not book the air for the Celebrity cruise. They booked Alitalia out of Newark, New Jersey.
Q. So if you booked -- strike that.

Page 92

  In your capacity as an independent contractor, have you yet booked any airline travel for your customers?
A. The one for potentially -- actually, the answer is no. The answer is no, but potentially it might be Delta going to Greece.
Q. And has that ticket been bought yet?
A. No. That's what I said, no.
Q. So just to be clear, have any of your customers, as an independent contractor for Thomas Hogan, flown with Spirit?
A. No, they have not.
Q. And just to be clear, have they flown with JetBlue?
A. No, they have not.
Q. And the one potential trip going to Greece would be potentially Delta?
A. Yeah, one of the legs is going to be Delta, and I'm -- coming back from Naples, Italy, I'm not sure. I forget. I don't have it in front of me, which airline that they might do.
Q. Okay. Is that for this year?

Page 101

1  common.
2    Q.  Okay.  And let's say for trips
3  that do not involve a cruise, how is your
4  commission calculated?
5    A.  I --
6    Q.  I'm sorry.  Let me strike that.
7    A.  Okay.
8    Q.  How is the commission calculated
9  and then you get your stake in it?
10   A.  They stipulate -- it's a little
11 bit complicated when you're asking.  These
12 different types of trips, they have the
13 prepaid package trips, a company like Globus
14 Vacations, Trivago, I don't know if you've
15 heard of these before, Collette Tours.
16       If you put the passengers on
17 there, they'll tell you you're making -- on
18 average, it's like 12 or 15 percent
19 commission on it.  They're the ones that
20 tell you that.
21   Q.  Do you expect, in your capacity as
22 an independent contractor for Thomas Hogan,
23 that you will be focusing on travel that is
24 part of a tour or other sort of prepackaged
25 travel?

Page 102

1    A.  Yeah, that's -- that's on me.
2  That's the direction I want to go on.
3    Q.  Okay.  So is your compensation in
4  any way tied to the price of the airline
5  ticket?
6        MR. BONSIGNORE:  Objection.
7        THE WITNESS:  The airlines do not
8    pay commissions, so you have to charge,
9    you know, a service fee for the airline
10   ticket, so that's what we do.
11       If the person in -- you decide,
12   like, on some type of a scale how much
13   you're going to charge that person for
14   the airline ticket.
15   Q.  (By Mr. Rucker)  So is that more
16 akin to a flat fee for each airline ticket?
17   A.  So I think what you're asking
18 is -- just to rephrase it -- what I charge
19 to do an airline ticket and what Travel
20 Advisor B charges is the same thing, and
21 it's at my discretion what I'm going to
22 charge for the fee.
23   Q.  So the service -- I'm sorry.  So
24 let me just make sure I understand.
25       The service fee that you charge

Page 103

1  for booking a airline ticket --
2    A.  Uh-huh.
3    Q.  -- is in your discretion, the
4  amount?
5    A.  Correct.
6    Q.  So is the service fee ever
7  connected to the price of the airline
8  ticket?
9    A.  Yes and no.  I mean, it's not
10 consistent.  It's by -- by the person that's
11 issuing the airline ticket and charging the
12 service fee, they're the ones that decide
13 what it is.
14       They some -- you know, some
15 people, for a $200 airline ticket, they're
16 going to charge 50 bucks for it, okay.  I
17 wouldn't do that, okay, but that's how it
18 is.
19       There's no consistent pattern.  It
20 is individual --
21   Q.  But you --
22   A.  -- but not -- not industrywide.
23   Q.  Okay.  But in your -- so for your
24 approach as an independent contractor for
25 Thomas Hogan, are you going to make any

Page 104

1  connection in your discretion for
2  determining the service fee that is any way
3  connected to the airline ticket price?
4        MR. BONSIGNORE:  Objection.
5        THE WITNESS:  I -- yeah, I'll --
6    I'll have some kind of system of what I'm
7    going to charge for the service fee,
8    depending on how expensive the tour or
9    the cruise is.
10   Q.  (By Mr. Rucker)  So is it fair to
11 say that the service fee is going to be more
12 based on the -- the price of the tour or
13 cruise than it is the price of the airline
14 ticket?
15   A.  I -- ask that one more time.  I
16 just want to make sure I understand where
17 you're coming from.
18   Q.  So you mentioned that you're going
19 to be coming up with some kind of system.
20 As part of this system, are you going to --
21 are you planning on determining the amount
22 of the service fee on the price of the
23 overall cruise or tour package or on the
24 price of the airline ticket?
25       MR. BONSIGNORE:  Objection.

Page 105

THE WITNESS: I'll be honest with you, it's going to be more the tour or the package that they're booking.

Q. (By Mr. Rucker) So if a -- let's say a tour price or a cruise is more expensive, what effect does that have on the service fee?

MR. BONSIGNORE: Objection.

THE WITNESS: I'm going to give you a different scenario. If a person wants to do a $40,000 trip to Antarctica for two people, I'm not going to kill them on the fee on the airline ticket because I want that $40,000 booking, okay?

Now, if it's a 2- or $3,000 one, yes, it's going to be more of a scale, but it's a very hard question to answer on that one.

If a person is going to do an around-the-world cruise for 95 days, okay, I'm not going to kill myself to get, you know, a big fee on the airline ticket.

Q. (By Mr. Rucker) Okay. So then

Page 106

let's say -- let's ask -- let's look at the reverse. If an airline ticket price is higher, are you likely to charge a higher service fee?

A. In -- if I'm doing the airline ticket -- when you ask about this airline ticket, is that to go to a tour or a cruise or is that just a straight-up airline ticket?

Q. I'd like to know about both. Let's start with if they're going on a tour or cruise.

A. Tour -- if they're going on a tour or cruise, if the airline -- it's if the -- it all depends on how much that is. But individually, if the airline ticket is more money, right, yeah, the fee is going to be a little bit more money.

Q. And is that the same if there is no tour or cruise?

A. I'm sorry. I -- I confused you. If it's -- if it's an airline ticket without the cruise or the tour, that fee is going to be higher for that airline ticket. You know, whatever the price is for the airline

Page 107

ticket, the fee will be higher, okay, if that's -- if that's the question you wanted me to answer.

If -- because if it's just an airline ticket, then I'm going to be charging a higher fee. It doesn't matter what the price of the -- the airline ticket is.

Q. Okay. So what harm as a -- as an independent contractor do you expect from the merger between JetBlue and Spirit on your personal income?

A. The --

MR. BONSIGNORE: Objection.

THE WITNESS: I --

MR. BONSIGNORE: Okay. I -- I understood that you want me to limit my comments to objection and not provide any further coaching, I think it was called.

MR. RUCKER: That's correct.

MR. BONSIGNORE: Okay.

THE WITNESS: Okay. I'm a little bit confused with the question.

Q. (By Mr. Rucker) Do you believe -- let me -- let me rephrase it. Let me strike

Page 108

it and rephrase.

Do you believe the merger between JetBlue and Spirit will have any impact on your personal income as an independent contractor for Thomas Hogan?

MR. BONSIGNORE: Objection.

THE WITNESS: I -- I imagine it will.

Q. (By Mr. Rucker) How so?

A. Because what's going to happen is the price is going to be going up, and that means that people aren't going to be able to afford to go to some of these destinations or any of these trips because the price is going to be higher.

Q. And what -- what exact price are you talking about there?

A. The price -- the price of the airline ticket.

Q. And why will the airline ticket prices go up?

MR. BONSIGNORE: Objection.

THE WITNESS: Because there's going to be less choice, less capacity. And, you know, I've seen American and

Page 109

JetBlue code share twice out of Boston, and in both instances, after a month or two, the prices jacked up to the point where people -- it was costing people $600 roundtrip on airline tickets down to Orlando from Boston.

How can a family afford that for 2400 bucks before they even step into the park?

Q. (By Mr. Rucker) And I just want to be clear, these two instances of American and JetBlue code shares, those were not mergers, though, correct?

A. No, they were not mergers.

Q. So what's your basis -- based on your experience, what is your basis for knowing that after an airline merger, airline ticket prices go up?

A. Because I saw that with American -- I saw that with American and US Air after they merged. The prices went up. And there was also logistical problems left and right.

Q. And where specifically did you see prices go up?

Page 110

A. On American, it went up -- they were doing Orlando, and US Air was doing Orlando and Tampa. After they merged, those prices -- you didn't see $200 roundtrip, you started seeing 450 roundtrip.

Q. Do you expect that your customers, as an independent contractor, are going to be flying in and out of Orlando or Tampa?

MR. BONSIGNORE: Objection.
THE WITNESS: Yeah, I do.

Q. (By Mr. Rucker) And what's your basis --

A. Because --

Q. What's your basis for that?

A. Because people have gone there. Orlando, big amusement place. Tampa, a lot of golfing and amusement places like Busch Gardens. They're going to be going there or they're going to want to go there.

Q. Have your customers that you've had as an independent contractor since the beginning -- or as you started as an independent contractor, have they told you that they plan on going to Tampa or Orlando?

A. No. As I said, I've only been

Page 111

doing it since February.

Q. What else is your basis for -- you know, based on your experience, what else can you point to to show that airline prices go up after airline mergers?

MR. BONSIGNORE: Objection.
THE WITNESS: I'm basing it on when I owned the agency for 34 and a half years, okay?

Prime example, like I said -- I'm going to go back to the code share. What American did on the San Juan airport was phenomenal. They did -- beautiful airport, the prices were good and everything.

And then JetBlue went in there with them and started charging like a hundred fifty dollars one-way tickets each way. Everyone was all happy.

After three or four months, American pulled out. Now, all of the sudden, it's $800 roundtrip to go Boston to Puerto Rico.

And JetBlue said they didn't want to use that airport. They built a

Page 112

smaller, lousier airport right next door, okay? And that's the trip I went on the last time I went on JetBlue to that Puerto Rican airport, and the airport that American had taken care of, beautiful -- you know, white elephant now.

And the -- not as many people are in there -- not as many airlines are flying in and out of Puerto -- that San Juan airport anymore, so all of the sudden, you've got half the people that were working at that airport unemployed.

Q. (By Mr. Rucker) And just to be clear, this was a code share between American and JetBlue? It was not a merger; is that correct?

A. Correct.

Q. Have any of your customers, since you started as an independent contractor with Thomas Hogan, told you that they want to travel to San Juan?

A. No.

Q. Okay. I don't mean to keep asking, but what else can you point to,

Page 113

based on your experience, that shows that airline ticket prices go up after airline mergers?
 MR. BONSIGNORE: Objection.
 THE WITNESS: Northwest and Delta merger.
 Q. (By Mr. Rucker) Okay. What's specific about that merger?
 A. Going from Manchester to Cincinnati on Delta after they merged, there were -- they had eight flights a day -- I'm sorry -- it's eight roundtrips, so four flights a day going there.
 After they merged, Delta put one flight in there to go two -- two-hour flight was now 600 bucks roundtrip. That was about 12 years ago after the merger.
 Q. Have your clients, since you started as an independent contractor with Thomas Hogan, told you that they want to fly from Manchester to Cincinnati?
 A. No, they haven't.
 Q. Okay. Anything else, based on your experience, that shows that airline ticket prices go up after an airline merger?

Page 114

 A. Boston to Phoenix, American West and US Air. To -- that went way up. American West was charging like a hundred fifty dollars one way, and that -- I mean, you're not getting that to go to Phoenix anymore. It's -- this is back to 2020. You know, you're looking at $450 roundtrip easily.
 Q. Do you --
 A. Almost twice as much money.
 Q. I'm sorry. Go ahead. I'm sorry. Continue.
 A. Go ahead.
 MR. BONSIGNORE: Objection.
 Q. (By Mr. Rucker) Have any of your clients since you started as an independent contractor for Thomas Hogan told you that they would like to fly from Boston to Phoenix?
 A. No, they haven't.
 Q. Other than airline ticket prices going up, do you think there's going to be any other harms from the merger between JetBlue and Spirit?
 MR. BONSIGNORE: Objection.

Page 115

 THE WITNESS: Yes, I do.
 Q. (By Mr. Rucker) And what are they?
 A. Okay. There's going to be a problem with -- with the bags, with the -- as far as the baggage fees. There -- JetBlue and Spirit are on two separate programs and, you know -- and as far as weight, Spirit you can only do 40 pounds on your luggage. JetBlue allows 50.
 So if somebody is -- if JetBlue decides that they're going to go with 50 pounds, these people -- I'm sorry -- they got to stick with the 40-pound bag limit, okay, it's going to be a problem. People are going to be spending more money for the luggage.
 Q. What are you basing on -- I'm sorry. Strike that.
 Based on your experience, what are you basing this thought about baggage fees?
 A. Because I've flown on both airlines.
 MR. BONSIGNORE: Objection.
 THE WITNESS: You pay for more

Page 116

luggage on Spirit.
 Q. (By Mr. Rucker) Are there any other harms other than baggage fees?
 A. Yes.
 Q. What are they?
 A. This is why I think the price is going to go up. On JetBlue, they always have the snack and everything. On Spirit, they don't offer anything.
 So are they going to be giving out free snacks? They're going to have to get the money somewhere if they're going to be doing snacks on the flight. So, I mean, that's another thing that's going to cost them money.
 Q. Anything other than snacks?
 A. The merger of the two airlines, you're going to have trip interruptions. And, indirectly, this is my opinion. But you asked for it.
 MR. BONSIGNORE: Objection.
 THE WITNESS: You have the maintenance -- go ahead.
 MR. BONSIGNORE: No, answer.
 THE WITNESS: Okay. You're going

Page 117

to have the maintenance crews -- and you saw this with American and US Air. The ones on American on that merger made more money than the Spirit -- I'm sorry -- the US Air maintenance people.

So what would happen is they'd be delaying flights because they wanted the American maintenance person to fly from point A to B to service a plane where you have US Air maintenance people right there. And then they'd say, oh, we have a crew problem, that's why we're canceling the flight right now.

And this constantly happened.

Q. (By Mr. Rucker) Anything else other than trip interruptions?

MR. BONSIGNORE: Objection.

THE WITNESS: This has to do with trip interruptions, but their computer system. Okay. The two computer systems with US Air and American, there were issues. And the same thing with JetBlue and American with the code share.

And what's going to happen is the flight gets delayed and they say, hey,

Page 118

we're going to give you a $300 voucher. So the person -- this would be American and JetBlue, the code share. The person takes the $300 voucher, brings it to the American desk, and they say, oh, no, we can't take that voucher, bring it over to JetBlue.

Then they go over to JetBlue, and JetBlue sends them back to American, to the point where the people get frustrated and don't even use the vouchers.

Q. (By Mr. Rucker) Okay. Anything else other than interruptions with computer systems?

MR. BONSIGNORE: Objection.

THE WITNESS: Seat assignments. Okay? JetBlue is -- every time when they -- when they do the code share, the first problem -- and they say, well, we can't help it. They would be canceling out people's preassigned seats. For somebody like myself, if I'm traveling by myself, it's an inconvenience, but that's fine.

When you have a family of four and

Page 119

the kid is 5 and the other one is 4 and the family made sure on the way home that the seats were all together, and an hour and a half before flight time, they decide to cancel the flight -- I mean, I'm sorry, cancel the preassigned seats, that client is calling me and they're saying, Gabe, how come they're not giving me the seats?

I take a screenshot of it, okay, I have to give them -- I actually paid for it. This is in 2019. I actually paid for people's seat to sit together. The client was thankful. She goes, what happened?

I said, they cancelled the seat on you for no reason whatsoever, but we got proof that you had the seats in there. But nobody wants their kid to sit -- when they're 4 years old, to sit eight rows behind you.

Q. Just to be clear, this was a code share between American and JetBlue --

A. Yeah.

Q. -- not a merger; is that correct?

Page 120

A. Correct.

Q. Okay.

A. And the same thing happened -- the same thing was going on when American and US Air merged, you know, the problem with the seats.

Q. Okay. Anything else other than -- any other harms other than seat assignments?

A. The frequent flyer programs. I don't see how -- they're completely two different frequent flyer programs. I don't know how that's going to work out.

One of them is going to be very upset, okay, with the seat assignments -- not the seat assignments, the frequent flyer program. Okay?

It's easier to get mileage on -- on Spirit than it is on JetBlue, okay? So somebody is not going to be happy.

Q. Is it fair to say that your harms are mostly based on the fact that there are two ways of doing something and that there has to be a resulting single way to do something?

MR. BONSIGNORE: Objection.