# EXHIBIT 47

```
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - - - - -x
GABRIEL GARAVANIAN, et al.,

                Plaintiffs,

vs.                              Civil Action Number
                                  1:23-cv-10678-WGY
JETBLUE AIRWAYS CORPORATION
and SPIRIT AIRLINES, INC.,

                Defendants.
- - - - - - - - - - - - - - - - - - - -x
```

        REMOTE VIDEOTAPED DEPOSITION of YVONNE JOCELYN GARDNER, taken by Defendants on Tuesday, June 20, 2023, commencing at 11:12 a.m. (Mountain Time), before Pamela Grimaldi (via Zoom), a Registered Merit Reporter, Certified Realtime Reporter, and Notary Public within and for the State of New York.

```
 1

 2    R E M O T E   A P P E A R A N C E S:

 3

 4              BONSIGNORE TRIAL LAWYERS
                     Attorneys for the Plaintiffs
                     23 Forest Street
 5                   Medford, Massachusetts   02155
                     781.350.0000
 6
                BY:  ROBERT J. BONSIGNORE, ESQ.
 7                   rbonsignore@classactions.us

 8


 9              COOLEY LLP
                     Attorneys for Defendant JetBlue Airways
10                   500 Boylston Street, 14th Floor
                     Boston, Massachusetts   02116
11                   617.937.2349

12              BY:  MATT NGUYEN, ESQ.
                     mnguyen@cooley.com
13

14

15    A L S O   P R E S E N T:

16          Paul D'Ambra, Video Specialist
            Joyce Rodriguez-Luna, Intern (Cooley)
17

18

19

20

21

22

23

24

25
```

Page 12

Y. Gardner

Q And --
A And I have taught history --
Q And so --
A -- European history, medieval history.
Q Do you still teach?
A Yes.
Q And do you still serve as a travel consultant?
A Pardon?
Q Are you still presently a travel consultant?
A No.
Q When did you stop being a travel consultant?
A Oh, although I am a travel consultant still. I've been sick for the past year with COVID, very ill. Extremely ill. And so I haven't been able to do a lot. But I'm go -- I'm now -- I'm working on a destination wedding.
Q Okay. I'm sorry to hear about your prior sickness. I hope that you're recovering all right.
A Well, they think I am. I'm still aboveground.

Page 13

Y. Gardner

Q So you're still currently a travel consultant; is that right?
A Uh-huh. Yes.
Q And do you have an employer?
A No. I'm an independent contractor now.
Q Okay. And do you -- are you an independent contractor for a particular company?
A Yes. Travel Planners.
Q Travel Planners. And how long have you worked for Travel Planners?
A Oh, probably the last year and a half.
Q Okay. And prior to that, were you working in any other travel-related jobs?
A I owned my own business.
Q And what was the name of that business?
A Gateway Travel and Cruises.
Q How long have you been working for -- for Gateway Travel?
A 30 years.
Q Do you recall what year you started working for it?
A 1988.

Page 14

Y. Gardner

Q And so from 1988 through what year?
A To 2018.
Q Got it.
    So --
A When I came down with cancer.
Q I'm sorry to hear that as well, Ms. Gardner.
    So from 1988 through 2018, you worked for Gateway?
A Uh-huh. Correct.
Q And after that, you didn't have any travel agent employment until you started with Travel Planners; is that right?
A Uh-huh. Correct.
Q And you started with Travel Planners a year and a half ago, so that would be 2022?
A Uh-huh.
    THE COURT REPORTER: Was that a yes? Was that yes?
A Yes.
    My computer's making funny sounds. I don't know what's wrong with it.
Q Ms. Gardner, turning our attention specifically to Gateway Travel, did you -- are you

Page 15

Y. Gardner

the owner of Gateway Travel, or were you the owner?
A Yes, I was the owner. Uh-huh.
Q Were you the sole owner?
A Yes, I sure was.
Q And did you have any employees?
A Yes. About 15.
Q And can you please describe what your job responsibilities were as the owner of Gateway Travel?
A Well, we booked flights all over the world and made and planned trips for people and did cruises and whatever people wanted us to do.
Q And, Ms. Gardner, about how much revenue did Gateway Travel make each year?
A I would say we were probably -- I don't know. I'm not sure now because the people that bought it have all my records. I was --
    (Simultaneous speakers)
A -- took in probably 2 or $3 million, but I had to pay my employees out of that and rent, office rent and so on.
Q And how much money did you make per year from Gateway Travel?
    MR. BONSIGNORE: Objection.

Page 16

1  Y. Gardner
2  A  Okay.
3     MR. BONSIGNORE:  You can answer if you
4  can remember.
5     THE WITNESS:  If I can remember?
6     MR. BONSIGNORE:  Yes.
7  A  Well, it just depends on --
8  Christmastime it was slower, and so I imagine maybe
9  3 or 4,000 a month.
10 Q  So on average?
11 A  Net.  Net, that is.  I don't know ...
12 Q  So on average, you made 3 to $4,000
13 per month during the time you were the owner of
14 Gateway Travel?
15 A  Uh-huh.
16 Q  Ms. Gardner, just a quick reminder
17 that you should say "yes" or "no" as opposed to
18 uh-huh, just for the benefit of the court reporter.
19 A  Okay.
20 Q  And so per year that's approximately
21 36,000 to $48,000; is that correct?
22    (Reporter requested clarification.)
23 A  Maybe more than that.
24    MR. BONSIGNORE:  Objection.
25 Q  Okay.  So sometimes you would make

Page 17

1  Y. Gardner
2  more than 48,000, but on average 48,000 --
3  A  Well, are you talking about my
4  employees?  Or --
5  Q  I'm talking about your income from
6  Gateway Travel.
7  A  Oh, okay.
8     MR. BONSIGNORE:  Objection.
9     You can answer.
10 A  And I usually use some of it for, you
11 know, upgrading things, like computers and so on.
12 Q  Got it.
13    I just want to understand,
14 Ms. Gardner, how much money you made from Gateway
15 Travel each year.  And so does $48,000 sound right
16 on average?
17    MR. BONSIGNORE:  Objection.
18 A  Maybe -- for -- probably 50 to -- 50
19 to 75.
20 Q  Okay.  Thank you.  That's helpful.
21    And you said that some of the money
22 that you made from Gateway Travel was through
23 booking flights for customers; is that correct?
24 A  Flights and cruises and destination
25 weddings and -- I've been all over the world.  I've

Page 18

1  Y. Gardner
2  been in 67 countries.
3  Q  Yes.  Ms. Gardner, we'll get to those.
4     I just wanted to focus our attention
5  specifically on the flights for now.
6  A  Okay.
7  Q  So some of the revenue that your
8  travel agency made was through booking flights,
9  correct?
10 A  Yes.
11 Q  And how were you compensated for
12 booking flights?  Did you receive a commission on --
13 A  No.  Well, we used to, years ago until
14 the airlines cut the commission so that we had to
15 charge the client.
16 Q  Okay.  So when would you estimate that
17 the airlines stopped giving you a commission?
18 A  Oh, 2005.
19 Q  Okay.  So from 1988 through 2005, your
20 travel agency was making a commission from airlines?
21 A  Yes.  Through Airline Reporting
22 Corporation.
23 Q  Airline Reporting Corporation is ARC;
24 is that right?
25 A  Yep.

Page 19

1  Y. Gardner
2  Q  And when we say "commission," does
3  that mean that you would receive a percentage of the
4  base fare of the ticket as your commission?
5  A  Yes.
6  Q  So if the ticket were a higher price,
7  you would receive a higher commission?
8  A  Correct.
9  Q  And if the ticket were a lower price,
10 your commission would be lower?
11 A  That's right.
12 Q  And from 2005 onward, you said the
13 airlines stopped paying you a commission; is that
14 right?
15 A  That's right.
16 Q  How were you compensated for booking
17 flights from 2015 -- sorry -- 2005 through 2018?
18 A  I charged the client.  I don't work
19 for free.
20 Q  And what kind of charge was that?  Was
21 it a percentage of the ticket price?
22 A  No.  It just depend, because I had a
23 lot of business clients.  In fact, I had a lot of
24 lawyers.  They loved me.
25 Q  Well, that's good to hear,

Page 20

Y. Gardner
1  Ms. Gardner. I'm a fan of you so far. So let's
2  keep it up.
3      A   Well, I have to keep my sense of
4  humor.
5          MR. BONSIGNORE: Yep.
6      Q   So you said that it would depend.
7  Let's take an example, then. If the flight that you
8  were booking for a customer from 2005 to 2018 were
9  higher, would you charge a higher fee to the
10 customer?
11     A   You know, I can't remember if I -- how
12 we did it. Usually, it was more for transatlantic
13 or intercontinental air.
14         (Reporter requested clarification.)
15     A   You know, going over to Europe and so
16 on, if we had to, you know, do extra things like for
17 wheelchairs and -- let's see, what else.
18         I don't know. We just did everything
19 to please the customer.
20     Q   Okay. So, Ms. Gardner, European
21 flights are more expensive than domestic flights; is
22 that right?
23     A   Oh, yes.
24     Q   And you said that you would charge

Page 21

Y. Gardner
1  more for intercontinental or European flights in
2  terms of your fee?
3      A   That's right.
4      Q   So the higher the cost of the air
5  ticket, the higher your fee?
6      A   Yes.
7      Q   Okay. And I want to now turn our
8  attention over to your customers. You had said that
9  many of them are -- were lawyers. So can you
10 estimate for me, Ms. Gardner, the percentage of your
11 clients who were business travelers versus leisure
12 travelers?
13     A   Probably 55 percent.
14     Q   55 percent were business travelers?
15     A   Uh-huh.
16     Q   And what kind of businesses were
17 those?
18     A   Oh, the high tech is what we have here
19 in Colorado Springs. Oracle.
20     Q   Okay. And --
21     A   Microsoft.
22     Q   And are you saying, then, that most of
23 your customers were based out of the Colorado
24 Springs area?

Page 22

Y. Gardner
1      A   Well, and the surrounding area, some
2  from Denver.
3      Q   Would you say that most of your
4  customers operated out of Colorado or lived out of
5  Colorado?
6      A   Oh, no. I had clients all over the
7  US.
8      Q   I'm just asking if most of them. So
9  greater than 50 percent of them were based in
10 Colorado?
11     A   Yes.
12     Q   Would you say greater than 80 percent
13 of them were based in Colorado?
14     A   I would say probably 80 percent.
15     Q   Okay. Thank you.
16         And when booking flights for your
17 business customers, did they have any preferred
18 airline?
19     A   Well, it just depended on how good
20 they were to them. Yes, they did have preferred
21 airlines.
22     Q   Gotcha.
23         And so you had said that Oracle was
24 one of your customers. What was their preferred

Page 23

Y. Gardner
1  airline?
2      A   Pardon?
3      Q   You had said that Oracle was one of
4  your business customers.
5      A   Uh-huh.
6      Q   What airline did they prefer?
7      A   United.
8      Q   And Microsoft?
9      A   Oh, they -- just whichever one they
10 could get on.
11     Q   Okay. I want to --
12     A   Depends on whether they -- their
13 budget. I had to follow the budgets.
14     Q   Okay. And so you had said that Oracle
15 preferred to book United flights, and so whenever
16 you booked flights for Oracle travelers, you would
17 book United?
18     A   Well, we would try.
19     Q   Most of the time --
20     A   We have to put -- it's very
21 complicated when you're sitting in reservations.
22 They want the cheapest fare and they want to fly and
23 they want to have the comfort and they want to have
24 the service. And that's the mo- -- main thing that

Page 44
 1        Y. Gardner
 2    Q   At Travel Planners?
 3        Ms. Gardner, you said earlier that you
 4   were an independent contractor for Travel Planners;
 5   is that right?
 6    A   That's right.
 7    Q   And did you have any employees at
 8   Travel Planners?
 9    A   No.  No.  Just me.
10    Q   So I want to focus our attention on
11   your time working for Travel Planners.  You said
12   earlier that you made zero dollars per flight when
13   you were working for Travel Planners?
14    A   That's right.
15    Q   So you --
16        MR. NGUYEN:  I think now might
17    actually be a good time for us to take a
18    break, if that's okay with you,
19    Ms. Gardner.
20        THE WITNESS:  Okay.
21        THE VIDEOGRAPHER:  We're off the
22    record.  12:01 p.m.
23        (Whereupon, a recess was taken
24    between 12:01 and 12:19 p.m.)
25        THE VIDEOGRAPHER:  We are back on the

Page 45
 1        Y. Gardner
 2    record.  12:19 p.m.
 3   BY MR. NGUYEN:
 4    Q   Ms. Gardner, thank you for, again,
 5   being here.  Just wanted to ask you a quick question
 6   about the break.
 7        During the break period, did you speak
 8   with anyone other than your attorneys about this
 9   case?
10    A   No.
11    Q   Okay.  Thank you.
12        I want to return our attention, then,
13   to Travel Partners [sic].  That's the travel agency
14   that you currently work for, right, as an
15   independent contractor?
16    A   Uh-huh.  I haven't done much this
17   year, though, because I had COVID.
18    Q   Okay.  So would you say that your
19   work --
20    A   And I'm sort of back in it again.
21    Q   Would you say that your work at Travel
22   Planners, then, is sporadic, not full-time?
23    A   Yes.
24    Q   And, Ms. Gardner, do you have any
25   plans on retiring anytime soon?

Page 46
 1        Y. Gardner
 2    A   I'll probably never retire.  I'm that
 3   type of person.  I've worked all my life.
 4    Q   And you plan on being a travel agent
 5   for the rest of your life?
 6    A   Well, I'm not sure.
 7    Q   Maybe I'll be a little bit more
 8   specific.  Do you have any plans to retire from
 9   being a travel agent anytime soon?
10    A   I -- I love history and geography and
11   travel, that's what my degrees are in and so that's
12   what I like.
13    Q   So just to confirm, you don't have any
14   plans to retire from being a travel agent anytime
15   soon?
16    A   Oh, well, maybe in another year or so.
17   Who -- who knows?
18    Q   Okay.  So in a year, you might retire
19   from being a travel agent?
20        MR. BONSIGNORE:  Objection.
21    A   That's possible.
22    Q   If possible?
23    A   Is that an objection?
24        I don't know what I'm going to do.  I
25   take one day at a time.

Page 47
 1        Y. Gardner
 2    Q   Got it, Ms. Gardner.
 3        Do you have any future JetBlue flights
 4   booked for your customers at this time?
 5    A   Not right at the moment I don't.  Like
 6   I --
 7    Q   Do you have any --
 8    A   Go ahead.
 9    Q   Do you have any future flights booked
10   with Spirit at this time for your customers?
11    A   No.  Huh-uh.
12    Q   Do you have any future flights booked
13   with any airline at this time for your customers?
14    A   But I do book Spirit because
15   they're -- they have lower fares, and there are a
16   lot of people that can't afford these $680
17   round-trip fares.  I just -- I'm going to a wedding
18   in August, and I paid $680 round-trip.
19    Q   Ms. Gardner, I'm going to have that
20   answer removed, for that answer to be stricken from
21   the record because it wasn't responsive to the
22   question I asked.
23        I just want to ask the question again,
24   Ms. Gardner, which is do you have any future flights
25   booked with any airline at this time for your

Page 48

Y. Gardner

customers?

 MR. BONSIGNORE: Objection.
A For -- for what -- what airline?
Q Any airline.
A Well, I have a few.
Q From what airline?
A United.
Q Any others?
A Delta.
Q Any others?
A I think a couple on Spirit.
Q What are those Spirit flights?
A Minneapolis to Orlando.
Q You have a future flight booked to -- from Minneapolis to Orlando for one of your customers?
A Yes.
Q And when is that flight?
A When is what?
Q When is that flight taking place?
A Probably October. I think it's October.
Q You've already booked the flight?
A Uh-huh. Yes.

Page 49

Y. Gardner

Q And do you have records of having booked that flight?
A Well, Travel Planners would have it.
Q Got it.
 So Travel Planners would have the record --
A And then they just -- they send me a -- they send me an email.
Q With that information on it?
A Uh-huh.
Q Ms. Gardner, are you aware that defendants have served on you and other plaintiffs what are known as requests for production in this case?
A Well, they -- nobody asked me for production.
Q Ms. Gardner, are you aware that defendants served requests for production on you and other defendants?
A Well, I guess so. Yeah.
Q And are you aware that those requests for production included any flight-related travel for yourself or your customers?
A Yes, I'm aware.

Page 50

Y. Gardner

Q Ms. Gardner, did you produce any documents to defendants relating to the travel --
A Well, they keep track of it. I don't.
Q Ms. Gardner, you said you receive emails from Travel Planners?
A Well, sure, they -- let's see, how should I say this? They send me emails from Travel Planners and we -- we have to send in a sheet every month. But I haven't done that the last couple of months because I've been ill; so ...
Q Would the emails you've re- --
 MR. BONSIGNORE: We'll follow up with the witness, and to the extent she's worked while she has had COVID, we'll gather those documents and produce them as we have agreed to with the other witnesses.
 I'm not clear what needs to be done, if anything, but I'll find out and get it done.
 MR. NGUYEN: Thank you, Counsel. As you can tell, my questions were geared at the fact that it does appear that she has significant records of

Page 51

Y. Gardner

flights booked for herself and her customers, and nothing was produced to the defendants in this matter. And so we appreciate that you'll look into that and promptly supplement production prior to the close of fact discovery.
 MR. BONSIGNORE: Yep. Yep. Assuming something exists, because there's the balance between the COVID, and I'm just not sure what it is. But we're going to get on it instantly.
 MR. NGUYEN: Okay. I just want to emphasize that Ms. Gardner did testify that she has records of upcoming Spirit flights for her customers in emails received from Travel Planners, and so, you know, the question of if she has it, I think your client has testified to the fact that she does have it.
 MR. BONSIGNORE: Okay.
 THE WITNESS: Well, I can't keep my own records. They keep it. But five years ago -- I -- I looked for it all over the house, and I couldn't find it. I

Page 52

Y. Gardner

was -- from Minneapolis to Orlando on Spirit. And I can't find it.

And I don't keep any -- income tax records, something from 2015, that's seven, eight years ago. I don't keep my records.

MR. NGUYEN: Thank you, Ms. Gardner. There wasn't really a question pending there, but we appreciate that you and your counsel will get together in the near future to promptly supplement documents that were requested of you and that have not been produced to date.

BY MR. NGUYEN:

Q  I can return us now to the deposition.

A  Well, I'm not a criminal, but I can't find them; so ...

Q  Understood. And we'll get to that a little bit later.

Ms. Gardner, you testified earlier that you're currently a travel agent for Travel Planners; is that right? An independent contractor?

A  Uh-huh. Yes.

Q  I'd like to introduce as Exhibit 1

Page 53

Y. Gardner

Tab 3.

(Plaintiffs' Response to Request for Admissions was marked as Defendants' Exhibit Number 1 for identification, as of this date.)

BY MR. NGUYEN:

Q  And in a moment, you should be seeing a document appear on your screen.

Ms. Gardner, can you read the title of that document right there?

A  Plaintiff's Response to Request for Admissions.

Q  Got it.

And do you see where it says, "Responding party: Plaintiff Jocelyn Gardner"?

A  Uh-huh.

Q  Great.

I want to turn us over now to page 3, somewhere in the bottom half. Ms. Gardner, can you please read Request Number 4?

A  "Admit that you are presently not employed" -- "you are not presently employed as a travel agent."

Q  And, Ms. Gardner, can you read your

Page 54

Y. Gardner

response right below that?

A  Well, I don't work for a company. I'm an independent contractor.

Q  Ms. Gardner, do you see in the request whether it asks if you worked for any company?

A  Oh.

MR. BONSIGNORE: Counsel, we agree to -- let me see that. We -- we can change that.

Q  Ms. Gardner, can you confirm for the record that your response to Request Number 4 is incorrect?

MR. BONSIGNORE: I don't know whether it's incorrect. I think she's -- it's a matter of semantics.

THE WITNESS: Well, it says "admit" under it, so I don't know.

MR. BONSIGNORE: I'll just let the witness explain it. And then if you would like it supplemented, let me know.

BY MR. NGUYEN:

Q  Ms. Gardner, you said earlier that you were a travel agent; is that correct?

A  Well, I still have my license.

Page 55

Y. Gardner

Q  Ms. Gardner, do you see how your response to Request Number 4 says that you are not a travel agent?

A  Yes, I am.

Q  So are you agreeing, then, that your response to Request 4 is incorrect?

A  I don't know what you're talking about. "Admit that you're not presently employed as a travel agent." I don't know what that is. I'm not -- I don't -- I don't understand that.

Q  Ms. Gardner, did you fill out these responses or did someone fill out these responses for you?

A  Did what?

Q  Ms. Gardner, did you fill out these responses or did someone fill out these responses for you?

MR. BONSIGNORE: Objection. Instruct the client not to answer. It's attorney-client privilege.

Q  Ms. Gardner, did you review this document before it was sent to plaintiff -- to defendants?

A  No.

Page 56

1  Y. Gardner
2  Q   So you did not review this document
3  before it was sent to defendants?
4       MR. BONSIGNORE:  Objection.
5    Attorney-client privilege.  Instruct her
6    not to answer.
7       MR. NGUYEN:  Counsel, I'm not asking
8    whether she discussed it with you or the
9    substance of the discussion.  I'm asking
10   whether she reviewed a document that she
11   signed a verification for.
12 Q   I'm going to repeat the question,
13 Ms. Gardner.
14 A   Okay.
15 Q   Did you not review this document
16 before it was sent to defendants?
17      MR. BONSIGNORE:  Objection.
18 Q   Ms. Gardner, you can answer.
19      MR. NGUYEN:  Counsel, do you want to
20   let your client know that she can answer
21   to the extent that it doesn't touch on
22   privileged information.
23      MR. BONSIGNORE:  You can touch -- to
24   the extent it doesn't touch upon the
25   conversations that you had with your

Page 57

1  Y. Gardner
2    counsel, to the extent you're able to
3    remember.
4  Q   Ms. Gardner, I'll repeat the question.
5      Before today, had you ever seen or
6  reviewed this document?
7      Yes or no?
8       MR. BONSIGNORE:  Have you shown her
9    the whole document?
10 A   I -- I'm -- I remember something about
11 this, but I don't know exactly how I answered it.
12 Q   Ms. Gardner, I want to turn our
13 attention to Request Number 5.  It asks you to
14 "Admit that you are not presently the whole or
15 partial owner of a travel agency"?
16 A   No, I'm not.
17 Q   Okay.  And so you do not consider
18 yourself as an independent contractor to be the
19 owner of a travel agency?
20 A   You can -- you can work as an
21 independent contractor.
22 Q   Ms. Gardner, it wasn't --
23      (Simultaneous speakers.)
24 A   Somebody else's ARC number; so ...
25 Q   Ms. Gardner, it wasn't a trick --

Page 58

1  Y. Gardner
2  A   I'm not doing it illegally.  That's
3  just the way it is in the travel business.
4  Q   Ms. Gardner, I'm not accusing you of
5  doing anything illegal.  I was just trying to
6  understand your interpretation of your independent
7  contractor role.
8      So to clarify, you do not in that role
9  consider yourself to be an owner of a travel agency?
10 A   No, I'm not an owner now.  I was.
11      MR. NGUYEN:  Okay.  So just to close
12   us out on this, counsel for plaintiffs, it
13   does sound like your client will need to
14   supplement and change her response to
15   Request Number 4.
16      We're also concerned that she has
17   indicated that she hasn't reviewed this
18   document prior to service even though she
19   apparently signed a verification saying
20   that she had reviewed this document and
21   knew it was truthful.  And so we'd like
22   you to get to the bottom of this well
23   before the close of fact discovery.
24      And just for the record, given the
25   incomplete nature of this response, we are

Page 59

1  Y. Gardner
2    going to have to reserve the right to
3    recall Ms. Gardner and continue her
4    deposition later on if -- especially if
5    her response changes in a material way.
6    Is that understood?
7       MR. BONSIGNORE:  Okay.  The
8    deposition -- I disagree with the
9    characterization, but I understand your
10   position.  I think that -- I also
11   disagree -- I'm certain I disagree with
12   your interpretation of her position.
13      We will look at Number 4 and come up
14   with an answer as to whether she needs to
15   change it or not.  And also Number 5,
16   there's different ways to look at it.  I
17   think she explained it, but we'll look at
18   the transcript and -- and go from there.
19      But I understand your position.  Of
20   course, you have the right to recall her.
21   And I will get on this, as I have the
22   other ones, right away.
23      And Mr. Papale is the -- as we've
24   discussed before, the point person on
25   supplementing these answers, and you have

Page 60

1  Y. Gardner
2  his information.  He provided the original
3  answers, and so I think we're in good
4  shape as far as that goes.  We've got a
5  plan, and we've stated our positions for
6  the record.
7      MR. NGUYEN:  Thank you very much,
8  Mr. Bonsignore.  We can return to the
9  deposition.
10 BY MR. NGUYEN:
11     Q    Ms. Gardner, I just want to close out
12 our discussion about Travel Planners and your role
13 for them.  How much money would you estimate that
14 you made this year from Travel Planners?
15     A    I have no idea.
16     Q    Is it more or less than $10,000?
17     A    More.
18     Q    Is it more or less than $20,000?
19     A    More.
20     Q    Is it more or less than $50,000?
21     A    For what period of time are you
22 talking about?
23     Q    Ms. Gardner, I said this year.
24     A    I didn't do anything much last year
25 because I was in bed and rehab with COVID.

Page 61

1  Y. Gardner
2      Q    Okay.  So you didn't make any income
3  from Travel Planners last year?
4      A    No, huh-uh.  I couldn't do anything.
5  I had somebody else do it for me.
6      Q    Okay.  And how much income did you
7  make this year from Travel Planners?
8      A    Nothing today -- to date.
9      Q    Okay.  Thank you very much for that.
10     I am going to turn us over now from
11 your business income over to some of your personal
12 travel history.
13     MR. NGUYEN:  So we can close this
14 exhibit.
15     Q    I'd like to introduce Tab 1 as
16 Exhibit 2.
17     (Plaintiff Gardner's Responses and
18     Objections to Defendants' First Set of
19     Interrogatories was marked as Defendants'
20     Exhibit Number 2 for identification, as of
21     this date.)
22 BY MR. NGUYEN:
23     Q    Ms. Gardner, this document is
24 Plaintiff's Responses and Objections to Defendants'
25 First Set of Interrogatories.

Page 62

1  Y. Gardner
2      Do you see how after responding party
3  it says "Plaintiff Jocelyn Gardner"?
4      A    Yes.
5      Q    Okay.  And, Ms. Gardner, do you recall
6  signing a verification of this document?
7      A    Yes.
8      Q    Ms. Gardner, are you aware that
9  defendants' counsel has not received any such
10 verification?
11     A    That what?
12     Q    Are you aware that defendants have not
13 received any signed verification from you as it
14 relates to this document?
15     A    Huh.  I don't know.
16     MR. BONSIGNORE:  Is that the sup- --
17 okay.  That's the first, not the
18 supplement.
19     MR. NGUYEN:  That's correct,
20 Mr. Bonsignore.  So we would ask that
21 plaintiffs' counsel promptly provide that
22 verification to the extent it is
23 available.
24     THE WITNESS:  Well, I remember it, but
25 I don't -- I sent a verification.

Page 63

1  Y. Gardner
2  BY MR. NGUYEN:
3      Q    Okay, Ms. Gardner.  Your counsel will
4  get to the bottom of this.
5      But, Ms. Gardner, to your knowledge,
6  this document and your responses in it are truthful
7  and accurate; is that correct?
8      A    I can't remember.  I had so many
9  documents sent to me.
10     Q    Would it help if you took a minute to
11 review this document on the screen?
12     A    With the verification, I don't know.
13     Q    So, Ms. Gardner, you can't recall
14 whether the responses in this document are truthful
15 or not?
16     A    If what?
17     Q    You cannot recall whether the
18 responses in this document are truthful or not?
19     A    Well, sure they are.
20     Q    Okay.  So I want to ask my question
21 again.
22     To your knowledge, is the responses in
23 this document truthful and accurate?
24     MR. BONSIGNORE:  Objection.
25     You can answer.

Page 64

Y. Gardner

A   I think I gave that to Lawrence Papale.
Q   Ms. Gardner, I'm asking a different question, which is whether the responses are accurate, and I just need a yes or no.
A   Yes.
Q   Okay. Thank you.
    I want to move us over to page 7 now, if we can.
    Ms. Gardner, our very first interrogatory to you asks you to provide a list of all the flights that you've taken in the past eight years.
    Do you see this chart here?
A   Yeah. This is -- yeah, this is correct.
Q   Okay. So this chart contains all the flights you've taken in the last eight years; is that right?
A   I probably have taken more than that, but I just took -- took the ones that had JetBlue on them, I guess. Uh-huh.
Q   Ms. Gardner, are you saying that this chart is incomplete or inaccurate?

Page 65

Y. Gardner

A   No. I'm not saying it's incomplete or -- I mean, it's accurate, absolutely. But I don't have -- I told you, I don't have any documents. I sold my agency.
Q   So, Ms. Gardner, are you saying that there are some flights that you've taken that are missing from this chart?
    MR. BONSIGNORE: Objection. It mischaracterizes the testimony.
Q   Ms. Gardner, the question is: Are there flights that you have taken in the last eight years that are not listed here?
A   Oh, yeah, there are flights that aren't -- in the last eight years? I thought it was only supposed to be five years or six, seven years. I -- I -- I can't remember really.
Q   Ms. Gardner, can you think of any examples of the flights you've taken in the last eight years that do not appear on this chart?
A   Oh, no. I've taken all the ones that are on this chart. Absolutely.
Q   But I'm talking about --
A   Because I don't have -- I don't have the documents. I mean, I -- I'm not -- I'm not a

Page 66

Y. Gardner

criminal. I just --
Q   I'm simply asking, Ms. Gardner, whether you can think of any examples of the flights that you've taken that do not appear on this chart.
A   You mean domestic or international?
Q   Both.
A   In the last eight years?
Q   Correct.
A   In 2015 ... I thought it was just only supposed to be up until now. And starting in about 2- -- since I left the agency, or I sold the agency. Well, I've got Fiji down there. No, I can't -- I can't figure it now.
Q   So you can't remember if there are any flights that you've taken that are not listed here?
A   Well, I've taken --
    MR. BONSIGNORE: Objection.
A   -- a lot of flights on United and because my son is a pilot, assistant chief pilot for United Airlines. So I fly as an SA if it's available.
Q   Okay. Ms. Gardner, I want to ask a little bit more about that. Do you get, then, free flights through United?

Page 67

Y. Gardner

A   Well, he pays for it. I don't know.
Q   So when you book United flights your son pays for it for you?
A   Well, you mean for myself? If I book one for myself, I pay for my own. But if he offers me the coupon to -- to go as an SA, space available, then I usually take it.
Q   How many flights have you taken with your son in this way?
A   Oh, my goodness, probably 20, 25.
Q   Any within the last eight years?
A   Oh, yeah. Yes.
Q   How many would you say in the last eight years?
A   About 20, maybe.
    (Simultaneous speakers.)
A   Maybe 15 or 20. It's hard to -- trying to remember. We went to Düsseldorf. We went to Düsseldorf and Lyon, Cornwall (ph) and ...
Q   So, Ms. Gardner, in the last eight years, you took 15 or 20 flights with United Airlines? Yes or no?
A   Yes, uh-huh.
    Grand Rapids, Michigan; New York City.

Page 68

Y. Gardner

1  Q  Ms. Gardner, are any of those flights
3  listed on this chart?
4  A  No.  Because they're space available.
5  They are SAs.  It's when I can get on.  I sit at the
6  airport, and I wait until I can -- my number is
7  called.
8  Q  Ms. Gardner, the question that was
9  presented to you for Interrogatory Number 1 is "List
10 every airline and flight you have flown from 2015 to
11 present."
12 A  Well, but that's --
13 Q  Whether or not it's space available.
14    MR. BONSIGNORE:  At this point it's
15 objected.  You're badgering an elderly
16 witness.  She's made clear that the
17 flights are on an as-needed basis, they're
18 free, and they don't provide her with any
19 paperwork, and that she's testified to the
20 best of her ability on her prior flights.
21    MR. NGUYEN:  Mr. Bonsignore --
22    MR. BONSIGNORE:  You asked for
23 paperwork.  She has no paperwork.  If she
24 goes to the airport and they put her on a
25 plane and don't provide her with anything

Page 69

Y. Gardner

2  or if she didn't keep it or lost it while
3  she was in Düsseldorf, then that's just
4  the way it is.
5     MR. NGUYEN:  Mr. Bonsignore, you're
6  testifying for the witness.  She hasn't
7  said she doesn't have --
8     MR. BONSIGNORE:  No, I'm objecting to
9  you badgering her, and I'm providing the
10 basis for that objection so you will stop.
11    MR. NGUYEN:  Mr. Bonsignore, she has
12 already identified several flights that
13 she took with United that are not on this
14 list.
15    MR. BONSIGNORE:  And --
16    MR. NGUYEN:  She's not saying that she
17 can't remember them; she's saying that
18 they are flights she has taken in the last
19 eight years that are not on this list.
20    MR. BONSIGNORE:  Right.  And I'm not
21 sure she remembered them until just now
22 when you prompted her memory.  But we will
23 supplement.  If that's the point, we'll
24 supplement.  But just a little bit easier
25 on her.  I don't know whether you know it

Page 70

Y. Gardner

2  or not.  Your tone of voice is harsh.  But
3  that's just -- let's slow it down, lighten
4  it up, and, you know, try and get the
5  information we need to get.
6     And, of course, I am going to be on
7  this.
8     MR. NGUYEN:  Thank you.  I appreciate
9  that.
10 BY MR. NGUYEN:
11 Q  And it was, Ms. Gardner, not my
12 intention to sound harsh.  And so if I did, I
13 apologize.
14    I want to take our attention over to
15 the --
16 A  You asked me if I -- if I have flown
17 on the other flights.  Well, I told you that it was
18 United, and my son is a pilot, assistant chief pilot
19 and a line check airman for United out of Houston,
20 and he books it for me.  So I'm not -- I'm not
21 paying him for it.
22 Q  Got it.
23    And whenever possible, do you try to
24 fly United?
25 A  Pardon?

Page 71

Y. Gardner

2  Q  Whenever it's possible, do you try to
3  fly United?
4  A  Not always, no.  I -- where I can get
5  it for the least expensive.
6  Q  Okay.
7  A  Price is very important to me.
8  Q  So when it's free for you because your
9  son --
10 A  Yeah, that's right.
11 Q  -- is able to provide it, you prefer
12 to fly United?
13 A  Uh-huh.
14 Q  Do you have any plans in the next six
15 months to fly United?
16 A  Yes, I am.
17 Q  Can you name those flights?
18 A  Well, I'll be going to my
19 granddaughter's wedding in Michigan in September.
20 Q  Congratulations.
21    On United Airlines?
22 A  I suppose.
23 Q  Do you have any other flights planned
24 in the next six months?
25 A  Yes.  I sure am.

Page 72

Y. Gardner
Q Can you name --
A I like to fly. I like aviation.
Q Can you name them now?
A What other flights that I'm going to fly on?
Q That you've already booked.
A No. I haven't booked any. But I'm thinking about going to Israel.
Q Okay. So you haven't booked any future flights as of today?
A No. Huh-uh.
Q But if you are going to fly --
A Yes.
Q -- and you could do it for free through United, you would prefer to use United?
A Well, they charge you the taxes. You can't get away from taxes. You have to pay the taxes. So that would probably be around $167. But I offer it to my son and he won't take it from me; so ...
Q Okay. So let me clarify my question, then.
 If you do have plans to fly in the next six months, and you're able to do it through

Page 73

Y. Gardner
United on a space available basis --
A As an SA, uh-huh.
Q -- you would prefer to do that rather than pay for your own ticket; is that right?
A Well, no, not exactly. It just depends on where I'm going, and how quickly I have to get there, and the price, and what kind of a plane I'm going to fly on.
Q You said that you had plans to fly to Israel in the future; is that right?
A I'd like to. I've been there before. But I'd like to go again.
Q When do you plan on going?
A I'm not sure.
Q Okay.
A Maybe I'll take -- maybe I'll take my brother.
Q But you haven't booked a ticket yet?
A Maybe I'll take my grandchildren. Plans are not made.
Q Okay. No plans are made. Got it. Thank you.
 I want to turn our attention to, then, your other flight listed here, the last one on this

Page 74

Y. Gardner
list.
 Do you see how it says in July 2015 you flew Spirit?
A Uh-huh.
Q Is it fair to say that that was the last Spirit flight you took?
A To Spirit, yes.
Q So you haven't flown Spirit since 2015?
A No, I haven't.
Q Okay. And you don't have any Spirit flights booked in the future, do you?
A No. But I might. I might. I like them because they are inexpensive, and I don't have to pay $680 for a trip, round-trip fare.
Q But you've never flown Spirit since 2015?
 MR. BONSIGNORE: Objection. You can answer.
A Have I flown on what?
Q Ms. Gardner, since 2015 you've never flown Spirit?
A No, huh-uh.
 MR. BONSIGNORE: Objection.

Page 75

Y. Gardner
Q What do you like about Spirit in terms of its amenities?
A Oh, I -- they're a casual airline and their fares are -- their fares are good and -- yes. It would be a shame to lose them.
Q Ms. Gardner, do you like paying for carry-on bags?
A Do I like --
 MR. BONSIGNORE: Objection.
A What?
Q Do you like paying for carry-on bags?
A No.
Q Are you aware that Spirit requires you to pay to carry on a bag?
 MR. BONSIGNORE: Objection. You can answer.
 THE WITNESS: I can answer?
 MR. BONSIGNORE: Yeah.
A Okay. What --
 MR. BONSIGNORE: To the extent that you can answer, answer.
Q Ms. Gardner, just for your assistance, I'll repeat my question, which is: Are you aware that Spirit requires you to pay to carry on a bag?

Page 76
Y. Gardner
1
2     MR. BONSIGNORE: Objection.
3  Q   Ms. Gardner, you can answer.
4  A   Pardon?
5  Q   You're able to answer my question,
6 Ms. Gardner.
7     MR. BONSIGNORE: Can you repeat the
8     question?
9     MR. NGUYEN: Sure.
10 Q   For the, I think, third time, are you
11 aware that Spirit requires you to pay to bring a
12 carry-on bag on your flight?
13    MR. BONSIGNORE: Objection. Assumes
14    facts not in evidence. Objection overall.
15    You can answer to the extent you can
16    answer.
17 A   Yes, I'm aware.
18 Q   And you said earlier you don't like
19 paying for a carry-on bag; is that right?
20 A   Well, no. Yes and no.
21 Q   Ms. Gardner, I want to repeat a
22 question that I asked you a little bit earlier,
23 which is "Do you like paying for carry-on bags?"
24 And you responded "No."
25    Has your response changed?

Page 77
Y. Gardner
1
2     MR. BONSIGNORE: Objection.
3     Mischaracterizes the witness's testimony.
4     And it's unintelligible. Like...
5     "Paying" is not defined. What does that
6     mean? Hidden fee? Baggage fee? You have
7     to provide more information.
8  Q   Ms. Gardner, you've served as a travel
9 agent for the past 40 years approximately; is that
10 right?
11 A   And I was an airline employee.
12 Q   What airline were you an employee for?
13 A   I was a stewardess for Western
14 Airlines out of Los Angeles and Continental Airlines
15 and then was accepted by Pan American. Now, this is
16 way back in the olden days.
17 Q   Got it.
18    And I want to return to my question
19 because I didn't get a yes-or-no answer to that.
20    You've served as a travel agent for
21 approximately 40 years; is that right?
22 A   Yeah. 30 years.
23 Q   Do you understand what it means to pay
24 for bringing on a carry-on bag?
25 A   No.

Page 78
Y. Gardner
1
2     MR. BONSIGNORE: Objection.
3  Q   Okay. I'm going to turn our attention
4 over to something else now.
5     MR. NGUYEN: If we could take a
6     10-minute break, I think Ms. Gardner would
7     benefit and so would the rest of us. So
8     we can go off the record.
9     THE VIDEOGRAPHER: We're off the
10    record. 1:01 p.m.
11    (Whereupon, a recess was taken
12    between 1:01 and 1:17 p.m.)
13    THE VIDEOGRAPHER: We are back on the
14    record. 1:17 p.m.
15 BY MR. NGUYEN:
16 Q   Ms. Gardner, I want to take us back to
17 our discussion regarding SA, the space available
18 flights that you're able to take through your son.
19 A   Yes.
20 Q   Whenever it's possible for you to take
21 space available flights, you try to do so, right?
22    MR. BONSIGNORE: Objection.
23 A   Well, don't they have space available
24 on JetBlue?
25 Q   Ms. Gardner, my question is: Do you

Page 79
Y. Gardner
1
2 try to take space available flights whenever
3 possible?
4     MR. BONSIGNORE: Objection.
5  A   Well, I can only do it on United.
6  Q   Correct. So whenever a space
7 available flight through United is available to you,
8 you try to take that?
9  A   If it's -- if it's available and I'm
10 on the wait list --
11    MR. BONSIGNORE: Objection.
12    Go ahead. You can answer now.
13 A   I don't always fly. I fly other
14 airlines also.
15 Q   If you had to choose, Ms. Gardner,
16 between paying the market price for a flight with a
17 different airline or flying space available with
18 United, which do you prefer?
19    MR. BONSIGNORE: Objection.
20    You can answer.
21 A   Just depends on where I'm -- where I'm
22 traveling to.
23 Q   Let's say that a different airline and
24 United both offer flights at the same time on the
25 same day. You would prefer space available,

Page 108

Y. Gardner

```
      MR. BONSIGNORE:  Objection.
  Q   Ms. Gardner, you can respond.
  A   Were you waiting for me?
  Q   Yes.  The question was:  Were you a
plaintiff in Fjord v. AMR?
  A   AMR is American?
  Q   AMR is AMR Corporation, which includes
American Airlines and US Airways.
  A   Oh, okay.
  Q   Were you a plaintiff in Fjord v. AMR?
  A   Yes.
  Q   Okay.  And did you reach a settlement
in that case?
  A   No.
  Q   The case was dismissed?
  A   I'm not sure.  I don't know what
happened.
  Q   But you didn't receive any financial
compensation from that case?
  A   Oh, no.  Absolutely not.
  Q   Okay.  I want to turn over to the next
case, which is Fjord v. US Airways.
      Did you receive a settlement in that
case?
```

Page 109

Y. Gardner

```
  A   No.
  Q   No financial compensation from that
case?
  A   No.  No.
  Q   Did you successfully block the merger?
  A   Yes.
  Q   Are you saying that in Fjord v.
US Airways, plaintiffs blocked the merger?
  A   You mean in Fjord -- in Fjord in the
US Airways?
  Q   Correct.
  A   Did I suggest that they block the
merger?
  Q   I said did you successfully block the
merger or did the companies merge?
  A   Oh, they merged.
  Q   Okay.  So you didn't successfully
block the merger?
  A   No.
  Q   Okay.  I want to turn us over to the
last case on this list, that's Grace v. Alaska.
      Ms. Gardner, did you reach a
settlement in that case?
  A   No.
```

Page 110

Y. Gardner

```
  Q   You did not reach a settlement in
Grace v. Alaska?
  A   No.
  Q   You didn't receive any financial
compensation from Grace v. Alaska?
      MR. BONSIGNORE:  Objection.  Instruct
   the witness not to answer on the basis of
   confidentiality.
      MR. NGUYEN:  Counsel, she just said
   that there was no settlement.
      MR. BONSIGNORE:  Okay.
      MR. NGUYEN:  So there would be no
   confidentiality provision to --
  A   I don't know.  I don't know what
transpired with that.
  Q   So you don't know whether a settlement
was reached or not?
  A   No.
  Q   Do you remember receiving any money?
      MR. BONSIGNORE:  Objection to the
   extent that it is subject to a
   confidentiality agreement.
  Q   So, Ms. Gardner, you don't remember
receiving any money from Grace v. Alaska?
```

Page 111

Y. Gardner

```
      MR. BONSIGNORE:  Objection to the
   extent that it falls under the
   confidentiality and instruct the witness
   not to answer.
  Q   Ms. Gardner, do you recall the outcome
of that case?
  A   I do.
  Q   Did the airlines merge?
  A   Um, I don't know if they did or not.
  Q   You didn't keep track of that?
  A   Well, Alaska and what other airline?
  Q   Alaska and Virgin.
  A   Alaska and who?
  Q   Virgin.
  A   I don't think they did.  Did they?
      THE WITNESS:  Did they, Robert?
      MR. BONSIGNORE:  I can't answer that.
      THE WITNESS:  Oh, okay.
  A   I can't answer that either.  I don't
know whether they did or not.
  Q   So you were a plaintiff in Grace v.
Alaska, but you don't know what the outcome is in
terms of the merger?
  A   No.
```

Page 112

```
 1          Y. Gardner
 2     Q   You didn't look it up?
 3     A   No.
 4     Q   It wasn't important to you?
 5     A   No.
 6     Q   Okay.  And, Ms. Gardner, it looks like
 7  across all of these cases you like to sue to block
 8  airline mergers; is that right?
 9     A   I don't -- I don't -- I don't
10  remember.
11     Q   I'm just asking whether you typically
12  sue to block airline mergers?
13     A   That I seem to block airline mergers?
14     Q   Maybe I'm being imprecise with my
15  language and an easier word might be more helpful.
16         Ms. Gardner, do you typically file
17  lawsuits to block airline mergers?
18     A   I don't think so.
19         (Reporter requested clarification.)
20     Q   But you sued to block airline mergers
21  in these six cases; is that right?
22     A   Well, I ...  I'm looking -- always
23  looking out for my clients, and they always want to
24  have -- they want to have the comfort, and they
25  don't want to have the lessening of airline flights
```

Page 113

```
 1          Y. Gardner
 2  and so on.  And I don't really have any control over
 3  it.
 4     Q   You don't have any control over
 5  whether you file a lawsuit?
 6         MR. BONSIGNORE:  Objection.
 7      Mischaracterizes the witness' testimony.
 8     Q   You can answer, Ms. Gardner.
 9     A   The what?
10     Q   You can answer the question.
11     A   Well, I just -- would you repeat
12  exactly what you said -- I'm sorry.  I have a cold,
13  and I sometimes -- I have a little ear blockage and
14  that's why I have to have you repeat.  And there's
15  nothing else I can do about it today because that's
16  when they -- they assigned me to this, today.
17     Q   No problem.
18     A   Could you repeat that?
19     Q   No problem, Ms. Gardner.  And I'm
20  sorry about your cold.
21         To repeat my question, you said, "I
22  really don't have any control over it."  And so I
23  asked:  Are you saying that you don't have any
24  control over whether you file a lawsuit?
25     A   That's true, that's true.  I don't.
```

Page 114

```
 1          Y. Gardner
 2     Q   Okay.  I'm going to close out -- and
 3  we can go ahead and move on to my last set of
 4  questions, if that's all right?
 5         MR. NGUYEN:  And I'm hoping to finish
 6      this in the next five minutes, Robert, so
 7      that we don't have to go to another break,
 8      if that's okay?
 9         MR. BONSIGNORE:  Okay.
10     Q   Ms. Gardner, would you consider this
11  case successfully resolved if JetBlue gave you a
12  financial compensation?
13     A   I'm not interested in -- in financial
14  compensation.  I'm only interested in -- in trying
15  to, um, see that Spirit isn't taken away, and so I
16  can give my clients the best service.  And when they
17  want the cheapest flight, that I can look at Spirit
18  and say, you know, It's good they're still together
19  instead of merging with another airline.  Then the
20  prices go sky high, and then you lose business.
21  People don't want to fly when the prices are -- go
22  sky high.  They just --
23     Q   So, Ms. Gardner, if you -- if you were
24  offered $10,000 to dismiss your lawsuit, you would
25  reject that?
```

Page 115

```
 1          Y. Gardner
 2         MR. BONSIGNORE:  Objection.  Asked and
 3      answered.
 4     Q   You can answer.
 5     A   You want to offer me a thousand
 6  dollars?
 7         I'm just more in trying to keep the
 8  airline industry in line with what it was when I
 9  flew with them in the '50s and the '60s, and it's
10  never going the same again.  It just won't.
11     Q   And you, back in the '50s and '60s,
12  really liked the services that airlines provided,
13  right?
14     A   Oh, absolutely.  We had top-notch
15  service.  We had champagne flights.  And, I mean, it
16  was wonderful.
17     Q   All included in the flight?
18     A   And the fares were decent.
19         (Simultaneous speakers.)
20     A   -- the GDP have gotten larger, so we
21  have to expect that, I guess.
22     Q   And so you prefer airlines that
23  provide good service; is that correct?
24     A   Pardon?
25     Q   You prefer airlines that provide good
```