# EXHIBIT 50

Deposition of Valarie Jolly

1

2   UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF MASSACHUSETTS
3   - - - - - - - - - - - - - - - - - - - - -x
    GABRIEL GARAVANIAN, et al.,
4
                        Plaintiffs,
5
    vs.                                   Civil Action Number
6                                          1:23-cv-10678-WGY

    JETBLUE AIRWAYS CORPORATION
7   and SPIRIT AIRLINES, INC.,

8                       Defendants.

9   - - - - - - - - - - - - - - - - - - - - -x

10

11

12

13          REMOTE VIDEOTAPED DEPOSITION of VALARIE JOLLY,

14   taken by Defendants on Wednesday, June 21, 2023,

15   commencing at 12:02 p.m. (Central Time), before Pamela

16   Grimaldi (via Zoom), a Registered Merit Reporter,

17   Certified Realtime Reporter, and Notary Public within

18   and for the State of New York.

19

20

21

22

23

24

25

Deposition of Valarie Jolly

```
 1

 2      R E M O T E   A P P E A R A N C E S:

 3

 4              BONSIGNORE TRIAL LAWYERS
                     Attorneys for the Plaintiffs
 5                   23 Forest Street
                     Medford, Massachusetts  02155
 6                   781.350.0000

 7              BY:  ROBERT J. BONSIGNORE, ESQ.
                     rbonsignore@classactions.us
 8

 9

10              COOLEY LLP
                     Attorneys for Defendant JetBlue Airways
                     1299 Pennsylvania Avenue, NW, Suite 700
11                   Washington, DC  20004
                     202.728.7123
12
                BY:  MATT NGUYEN, ESQ.
13                   mnguyen@cooley.com

14

15
        A L S O   P R E S E N T:
16
                Austin Marineau, Intern (Cooley)
17              Andrew Whitner, Video Specialist

18

19

20

21

22

23

24

25
```

Deposition of Valarie Jolly

Page 24

V. Jolly

2  Q    And what was the name of that travel
3 agency?
4  A    Riverside Travel.
5  Q    And did you hold an ownership stake in
6 Riverside Travel?
7  A    Yes.
8  Q    Were you a sole owner?
9  A    No.
10  Q    You were a co-owner?
11  A    Yes.
12  Q    Who were your co-owners?
13  A    Michele McKechnie and Michael Hatala.
14  Q    And are you still affiliated with this
15 company?
16  A    Yes.
17  Q    Are Michele and Michael also still
18 affiliated with this company?
19  A    Yes.
20  Q    What is the ownership breakdown of the
21 company?
22  A    One-third, one-third, and one-third.
23  Q    Does anyone have a plurality?
24  A    I don't know what that means.
25  Q    As in does anyone have slightly -- so

Page 25

V. Jolly

2 33 percent plus 33 percent, plus 33 percent would be
3 99 percent, and so my ask is whether someone holds
4 slightly more --
5  A    No.
6  Q    -- ownership.  Okay.
7    And how many employees does this
8 company have?
9  A    Two.
10  Q    And does that include you?
11  A    Yes.
12  Q    And who else is employed at that
13 company?
14  A    Michele McKechnie.
15  Q    And so Michael Hatala is not an
16 employee but a co-owner of the company?
17  A    Yes.
18  Q    How much revenue did Riverside Travel
19 make last year?
20  A    You just asked two different
21 questions.  There is a difference between revenue
22 and making.  Do you want to know how much revenue it
23 generated or what the company made?
24  Q    How much revenue did Riverside Travel
25 generate last year?

Page 26

V. Jolly

2  A    Approximately 2 million.
3  Q    And how much income did you receive
4 from Riverside Travel?
5  A    About 70,000.
6  Q    And do you receive additional income
7 based on your ownership stake or does -- is that
8 included in the 70,000?
9  A    No, I do not make extra based on my
10 ownership stake.
11  Q    Got it.
12    So the 70,000 is part of your
13 ownership stake in the company?
14  A    It's my salary.
15  Q    Okay.  And do you have an estimate for
16 how much Riverside Travel is worth as a company if
17 it were to be sold?
18  A    I do not.  I do not.
19  Q    Got it.
20    And how many customers per year does
21 Riverside Travel serve?
22  A    Don't know.  Maybe 200.
23  Q    And can you provide a percentage
24 breakdown estimate of how many of those customers
25 are business versus leisure?

Page 27

V. Jolly

2  A    Approximately 30 percent are business
3 and 75 -- and 70 percent leisure.
4  Q    Okay.  I want to start us off with the
5 business side of the business, then, and ask you:
6 What kind of businesses are your agency's primary
7 clients?
8  A    We have a large production company
9 that does conventions.  We have a large insurance
10 company.  And a -- excuse me, not large.  They're
11 small -- they're small, you know, based on the
12 world.  And one tech company.
13  Q    Ms. Jolly, where are those companies
14 based?
15  A    One is based in Grapevine, Texas, one
16 is based in Fort Worth, and one is based in Austin.
17  Q    Is it fair to say that most of your
18 business clients are Texas-based?
19  A    Yes.
20  Q    More than 80 percent?
21  A    Yes.
22  Q    100 percent?
23  A    No.
24  Q    Thank you, Ms. Jolly.
25    I want to turn us over to your leisure

Deposition of Valarie Jolly

Page 28

1            V. Jolly
2 clients and get a little bit more detail about them.
3         Are most of them Texas-based as well?
4     A    No.
5     Q    What is the most common city that your
6 leisure customers are based out of?
7     A    I don't think there is a most common
8 city.  North Texas, there are quite a few, but we
9 have people from all over the country.
10     Q    So you wouldn't even say a majority of
11 those customers are Texas-based?
12     A    No.
13     Q    Aside from Texas, what are the most
14 common states that those other customers reside?
15     A    Florida, Northeast, Minnesota.
16 They -- they really come from all over.
17     Q    And you said earlier that once you
18 joined Riverside Travel, you have owned and worked
19 for it ever since; is that correct?
20     A    Yes.
21     Q    And what year did you start working
22 for Riverside Travel?
23     A    1995.
24     Q    So approximate -- almost -- almost 30
25 years now?

Page 29

1            V. Jolly
2     A    Yes.
3     Q    And would you say that Riverside
4 Travel's revenue has increased or decreased across
5 the last 10 years?
6     A    Are you including COVID?
7     Q    Sure.
8     A    Well, I would say steadily increased
9 and then COVID completely gone, and then now going
10 back up again.
11     Q    And would you say that the revenue you
12 received last year is higher or lower than the
13 historical average over the past 10 years?
14     A    Well, if I do a historical average, I
15 have to average in the COVID years; so I ...
16     Q    Let's exclude the COVID years.
17     A    Okay.  Then ask your answer again --
18 ask your question again.
19     Q    Would you say that the revenue that
20 your travel agency received last year is higher or
21 lower than the historical average over the past 10
22 years, excluding COVID?
23         MR. BONSIGNORE:  Objection.
24     A    I would say average.  It's --
25     Q    Okay.

Page 30

1            V. Jolly
2     A    -- probably about the same as the
3 average.
4     Q    Thank you, Ms. Jolly.
5         And I want to dig a little bit more
6 deeply into the sources of revenue for your travel
7 agency.
8         Do you receive commissions for the
9 purchase of flights?
10     A    For purchase of what?  Flights?
11     Q    Flights.
12     A    No.
13     Q    In the past did you receive
14 commissions for the purchase of flights?
15     A    Yes.
16     Q    Up until what date did you receive
17 commissions?
18     A    Um, I think it was around '95 when --
19 I think it was around '95 when the airlines colluded
20 to -- to remove commissions.
21     Q    So that year was the same year you
22 started at Riverside Travel?
23     A    No.  So it probably was a couple of
24 years before that.
25     Q    So when you started at Riverside

Page 31

1            V. Jolly
2 Travel, you did not receive any commissions from
3 airlines?
4     A    I don't remember exactly, but I know
5 it had started.
6     Q    Ms. Jolly, would it surprise you if
7 others had testified that commissions ended around
8 2000 or so?
9     A    It wouldn't surprise me because they
10 went down in sequences.  So I was talking about when
11 it was beginning.
12     Q    Okay.  But up until around 2000 or so
13 you were still receiving some commission from
14 airlines?
15     A    Yes, I think so.
16     Q    And this was a percentage of the base
17 fare of flights booked?
18     A    Yes.
19     Q    And so if a flight were more
20 expensive, the percentage commission would be higher
21 in total dollar value?
22     A    Yes.
23     Q    And if the flight were less expensive,
24 the percentage commission would be lower in total
25 dollar value?

Deposition of Valarie Jolly

Page 32

V. Jolly

1
2    A    Yes.
3    Q    Thank you, Ms. Jolly.
4        And when the commissions stopped, I
5    know we don't know exactly which year, did your
6    travel agency change its fee structure to
7    accommodate that?
8    A    E structure?
9    Q    Fee structure.
10   A    Fee structure.  Yes.
11   Q    How so?
12   A    We started charging fees for each
13   transaction.
14   Q    And what was that fee?
15   A    When we started, I think it was $20.
16   This is something I have not refreshed my memory on.
17   Q    And do you still charge that same fee
18   today?
19   A    No.
20   Q    Do you charge any fee for the booking
21   of flights to your customers?
22   A    Yes.
23   Q    What is that fee?
24   A    $50.
25   Q    And that is irrespective of the

Page 33

V. Jolly

1
2    airline; is that correct?
3    A    Yes.
4    Q    So if you booked a United flight for a
5    customer, you would receive the same base fee as you
6    would had you booked an American flight for them?
7    A    Yes.
8    Q    And the same is true for JetBlue?
9    A    Yes.
10   Q    And the same would be true for Spirit?
11   A    Yes.
12   Q    And, Ms. Jolly, just to confirm, it's
13   a flat fee that does not depend on the price of the
14   ticket?
15   A    Correct.
16   Q    So if a ticket were a thousand
17   dollars, you would still receive the same $50 fee?
18   A    Yes.
19   Q    If the flight were $100, you would
20   still receive a $50 flat fee?
21   A    Yes.
22   Q    Thank you, Ms. Jolly.  That's helpful.
23       You said that your customers on the
24   business side are primarily based in Texas.  Can you
25   name the three most common airports that your

Page 34

V. Jolly

1
2    customers on the business side fly out of?
3    A    Dallas/Fort Worth, Love Field, and
4    Austin-Bergstrom.
5    Q    Would those comprise the majority of
6    flights booked for your business travelers?
7    A    Majority, yes.
8    Q    More than 80 percent?
9    A    No.
10   Q    Where would it be closer to,
11   50 percent to 80 percent?
12   A    I would say 70 percent.
13   Q    Okay.  So 70 percent of your business
14   travelers fly in and out of those three airports,
15   which are Dallas/Fort Worth, Love Field, and Austin?
16   A    Yes.
17   Q    And where do they typically fly to?
18   A    All -- all over the -- all over the US
19   and other countries.
20   Q    Okay.  So both domestic and
21   international?
22   A    Yes.
23   Q    Okay.  I want to start off first,
24   then, with the Dallas/Fort Worth airport.
25       Ms. Jolly, what are the biggest

Page 35

V. Jolly

1
2    airlines out of Dallas/Fort Worth?
3    A    American, Delta, and United.
4    Q    Does Southwest operate out of
5    Dallas/Fort Worth?
6    A    No.
7    Q    Does JetBlue?
8    A    I am not sure right now.
9    Q    You can't remember?
10   A    No.  Because they have gone in and
11   out, and I haven't seen them recently in an
12   availability display.
13   Q    Got it.
14       So you haven't booked a JetBlue flight
15   recently out of Dallas/Fort Worth?
16   A    No.
17   Q    Does Spirit operate in and out of
18   Dallas/Fort Worth?
19   A    I know they have.
20   Q    But they don't currently?
21   A    I think they do, but, again, I don't
22   know exactly.
23   Q    Have you seen them recently in an
24   availability display?
25   A    I may have to Las Vegas.

Deposition of Valarie Jolly

Page 36

V. Jolly

2  Q    But you can't remember?
3  A    I'm not positive.
4  Q    But you think that Spirit may fly
5 between Dallas/Fort Worth and Las Vegas?
6  A    Yes, possibly.
7  Q    Any other routes that you can think of
8 that Spirit flies in and out of Dallas to?
9  A    I know they have gone to Atlanta.
10  Q    And they currently operate that route?
11  A    I don't know if they currently operate
12 it.
13  Q    Have you booked flights for customers
14 between Dallas and Atlanta through Spirit recently?
15  A    Not recently.
16  Q    But you have in the past?
17  A    Yes.
18  Q    How long ago was that?
19  A    About four or five years ago.
20  Q    And that was the last time you booked
21 a Spirit flight between Dallas and Atlanta?
22  A    Yes.
23  Q    What about the Las Vegas route?  When
24 was the last time you booked that route for a
25 customer through Spirit?

Page 37

V. Jolly

2  A    I don't recall.
3  Q    Have you ever booked that route for a
4 customer through Spirit?
5  A    I don't remember.
6  Q    One way or another, you can't
7 remember?
8  A    I don't remember.
9  Q    Is it fair to say within the last
10 three years, you haven't?
11  A    To Las Vegas?
12  Q    From Dallas/Fort Worth to Las Vegas on
13 a Spirit flight?
14  A    Yes, that would be fair.
15  Q    More than 10 years?
16  A    I don't know.
17  Q    Okay.  I want to turn our attention
18 over to the next airport that you noted, that's the
19 Dallas Love Field airport, right?
20  A    Yes.
21  Q    That's a smaller airport, right?
22  A    Yes.
23  Q    Which airlines operate out of Love
24 Field?
25  A    Southwest is the main airline.

Page 38

V. Jolly

2  Q    Are there --
3  A    Um --
4  Q    Sorry.  I didn't mean to interrupt
5 you.  Please continue.
6  A    In the past Delta has, Alaska Air has.
7 In the past American even has.
8  Q    So today, only Southwest?
9  A    No.  I think there are other airlines.
10  Q    Can you name them?
11  A    Not off the top of my head.
12  Q    What about JetBlue?
13  A    I do not know.
14  Q    What about United?
15  A    I do not know.
16  Q    What about Spirit?
17  A    I don't think Spirit uses Love.
18  Q    Got it.
19       But you don't know one way or another
20 for JetBlue or United?
21  A    I don't.
22  Q    Is it fair to say you haven't booked
23 many JetBlue flights out of Love Field?
24  A    Yes.
25  Q    And is it fair to say you haven't

Page 39

V. Jolly

2 booked any Spirit flights out of Love Field?
3  A    Yes.
4  Q    Got it.
5       I want to turn our attention now to
6 that third airport that you noted, that's Austin.
7 What are the main airlines that fly in and out of
8 Austin?
9  A    American, Delta, and United.
10  Q    Does Southwest fly out of Austin?
11  A    Yes.
12  Q    Does JetBlue?
13  A    I don't know.
14  Q    Because you haven't booked any JetBlue
15 flights out of Austin recently?
16  A    I just -- I can't recall.  I haven't
17 booked any recently.
18  Q    So you haven't booked any JetBlue
19 flights out of Austin in the past five years?
20  A    I could have.  I book a lot of
21 flights.  But I don't recall.
22  Q    And does Spirit operate out of Austin?
23  A    I do not know.
24  Q    Is it fair to say you haven't booked
25 any Spirit flights out of Austin recently?

Page 64

1          V. Jolly
2          MR. NGUYEN:  And can we move to the
3     very last page of the document?
4     Q     Ms. Jolly, do you see this
5  verification page?
6     A     Yes.
7     Q     And in this verification, you verify
8  under penalty of perjury that you've reviewed the
9  document and that the responses are true, to the
10 best of your knowledge; is that correct?
11    A     Yes.
12    Q     And you signed the document below?
13    A     Yes.
14    Q     Great.  Thank you very much,
15 Ms. Jolly.
16          I want to turn our attention over to
17 page 7, the top half.
18          And, Ms. Jolly, I'll represent to you
19 for the sake of convenience for all of us that
20 Interrogatory Number 1 requests every airline and
21 route you have flown from 2015 to present, including
22 any flights booked prior to the date of the
23 complaint.
24          And what appears here is part of your
25 response.  And --

Page 65

1          V. Jolly
2          MR. BONSIGNORE:  Objection.  Oops.
3     Sorry.  I thought you were done.
4     Q     And so I want to read very briefly the
5  second paragraph right there, which says, "Subject
6  to and without waiving the objections stated above,
7  plaintiff responds by referring to Exhibit A,
8  annexed hereto, which represents plaintiff's current
9  best efforts to supply the information requested."
10         Is that correct?
11    A     Yes.
12         MR. BONSIGNORE:  Objection.
13    Q     And right after that it says, "In
14 addition, Plaintiff states that Plaintiff has flown
15 the route between New York City (Metropolitan Area)
16 (Newark and LaGuardia) and Dallas/Fort Worth with
17 American Airlines approximately 8 to 10 times over
18 the past 20 years.  Plaintiff has flown Spirit
19 Airlines from Dallas to Minneapolis.  Plaintiff
20 intends to fly Spirit Airlines between LAS and MN in
21 the future."
22         Is that what it says?
23         MR. BONSIGNORE:  Objection.
24    A     That is -- that is what it says.
25    Q     Thank you, Ms. Jolly.

Page 66

1          V. Jolly
2          So I want to start with the last two
3  sentences that we just read there.  You said that
4  you have flown Spirit Airlines from Dallas to
5  Minneapolis; is that correct?
6     A     Yes.
7     Q     Earlier you testified that Spirit
8  flies out of Las Vegas and Atlanta.  Does Spirit fly
9  out to Minneapolis as well from Dallas/Fort Worth?
10         MR. BONSIGNORE:  Objection.
11    A     It did -- it did at that time.
12    Q     Okay.  But Spirit no longer flies to
13 Minneapolis from Dallas/Fort Worth?
14         MR. BONSIGNORE:  Objection.
15    A     Was that a statement?  Were you making
16 a statement?
17    Q     It was a question.  So I can repeat it
18 if it's easier for you.
19    A     If -- yes, repeat it as a question.
20    Q     But Spirit no longer flies to
21 Minneapolis from Dallas/Fort Worth; is that correct?
22    A     I do not know.
23         MR. BONSIGNORE:  Objection.
24    Q     You haven't flown that route since?
25    A     Since the last time I flew it?

Page 67

1          V. Jolly
2     Q     Correct.
3     A     No, I haven't flown it since the last
4  time I flew it.
5     Q     Since the last time -- since the time
6  that was noted in your interrogatory response?
7     A     Yes.
8     Q     So you've only flown that route once?
9          MR. BONSIGNORE:  Objection.
10    A     Yes.
11    Q     And you can't fly that route with
12 Spirit again because Spirit no longer offers that
13 route?
14    A     Are you asking a question or making a
15 statement?
16    Q     It's a question.
17    A     I don't know.  They --
18    Q     You don't know whether --
19    A     I don't know whether they fly right
20 now between Dallas and Minneapolis.
21    Q     In the last three years, have you
22 looked up whether Spirit flies between Dallas and
23 Minneapolis?
24    A     No.
25         MR. BONSIGNORE:  Objection.

Deposition of Valarie Jolly

Page 68

V. Jolly
Q    Is it fair to say that you haven't
looked for yourself or your customers during that
period for the Dallas to Minneapolis route with
Spirit?
        MR. BONSIGNORE:  Objection.
A    Yes.
Q    And why did you make that trip to
Minneapolis?
A    For a trade show.
Q    And how often do you go to trade shows
in Minneapolis?
A    I have four or five times.
Q    And the other four or five times
you -- I should say the other four times, you have
flown with an airline that is not Spirit; is that
correct?
A    Yes.  I think Spirit didn't exist at
that time.
Q    So what were the other airlines that
you flew with on the Dallas-to-Minneapolis route?
A    American.
Q    For all of those times?
A    Yes.
Q    And I want to take us over to that

Page 69

V. Jolly
last sentence in your interrogatory response which
says, "Plaintiff intends to fly Spirit Airlines
between LAS-MN in the future."
        Is "MN" Minneapolis?
A    Yes.
Q    Ms. Jolly, it was my understanding
that you live in Dallas/Fort Worth area?
A    Yes.
Q    Why would you fly between Las Vegas
and Minneapolis without a connection or an origin in
Dallas/Fort Worth?
A    I think I misworded that.  I probably
meant to say I might go between Las -- to Las Vegas
or Minneapolis.
Q    So is it fair to say, Ms. Jolly, that
that sentence is incorrect?
A    Yes.
Q    And you signed a verification
testifying that the responses are true, to the best
of your knowledge, right?
A    Yes.
Q    And so because you agree that this
response is incorrect, I'm sure your counsel is
taking notes of this, that you will agree to

Page 70

V. Jolly
supplement this response --
A    Yes.
Q    -- so that it is accurate?
A    Yes, I will.
Q    And so I want to then touch on what
you said, which is based on what you said earlier,
you meant to say Las Vegas and Dallas/Fort Worth; is
that correct?
A    No.  I meant to say that I could fly
Spirit either to Las Vegas or to Minneapolis.
Q    Okay.  Got it.
        So from Dallas/Fort Worth to Las Vegas
is one route, and then Dallas/Fort Worth to
Minneapolis is another one?
A    Exactly.
Q    Understood.
        And so let me just start first with
the Dallas/Fort Worth to Las Vegas route.
        Have you ever flown Spirit Airlines
along that route before?
A    No.
Q    And as you testified earlier, you
can't remember whether Spirit still operates that
route?

Page 71

V. Jolly
A    Yes.
Q    And do you have any future flights
booked with Spirit as of today to fly to Las Vegas?
        MR. BONSIGNORE:  Objection.
A    No.
Q    And turning our attention to that same
route, are there other airlines that service that
particular route, Dallas/Fort Worth to Las Vegas?
A    Yes.
Q    And what are those airlines?
A    All of the airlines one way or
another.
Q    Okay.  So can you name those airlines
between Dallas/Fort Worth to Las Vegas and back?
A    That you can get from Dallas/Fort
Worth to Las Vegas?
Q    Correct.
A    American, Delta, United, Southwest.
Frontier.
Q    But not JetBlue?
A    Um, I don't know.
Q    And, to your knowledge, you don't know
whether Spirit still operates that route?
A    I don't know.

Page 80

V. Jolly

2 taken from 2015 to present; is that correct?
3     A    Yes.
4     Q    And this spreadsheet goes on to two
5 pages.  So I just want to quickly show us the second
6 page so that we can see that it goes on to the
7 second page.
8         Do you see that there?
9     A    Yes.
10    Q    Thank you, Ms. Jolly.
11        MR. NGUYEN:  Let's start at the very
12      top again of page 11.
13    Q    Ms. Jolly, just for my awareness, I
14 see a bunch of airline codes that, you know, might
15 be clear to someone who has been involved in the
16 industry for quite some time.  But just for the
17 record, want to help clarify that.
18        So when it says "AA" under airline,
19 does that mean American Airlines?
20    A    Yes.
21    Q    And what it says "BA," what airline is
22 that?
23    A    British Air.
24    Q    Understood.
25        And when it says "SW," is that

Page 81

V. Jolly

2 Southwest?
3     A    Yes.
4        MR. NGUYEN:  And I want to scroll a
5      little bit lower on the same page.
6     Q    And it looks like you listed "Spirit"
7 there; is that correct?
8     A    Yes.
9     Q    And at that time, you flew Spirit from
10 Dallas/Fort Worth to Minneapolis.  That was the time
11 you were talking about in your interrogatory
12 response; is that correct?
13    A    Yes.
14    Q    And aside from that time, you have not
15 flown Spirit since?
16    A    Correct.
17    Q    So from 2018, September of 2018
18 through 2023, you have not flown a Spirit flight?
19    A    Yes, correct.
20    Q    And prior to 2018, you had not flown a
21 Spirit flight?
22    A    Correct.
23        MR. BONSIGNORE:  Objection.
24    Q    Thank you, Ms. Jolly.
25        I also want to note that on the fifth

Page 82

V. Jolly

2 column on the row that is the Spirit flight, it says
3 "Promo" there.  Do you see the word "promo"?
4     A    Yes.
5     Q    Can you explain to me what "promo"
6 means in this context?
7     A    As I said, I was going to a trade
8 fair, so that means the purpose of the trip was
9 promotion.
10    Q    Got it.
11        And so did Spirit pay for that flight
12 for you?
13    A    No.  That is the purpose of the trip.
14    Q    Understood.
15        To promote your own travel agency?
16    A    Yes.
17    Q    Got it.
18        And on the right-hand side, not
19 including that column that I think it pertains to
20 points, if we scroll to the top of this page, the
21 second-to-last column says who paid.  And It looks
22 like many of these entries say "Me/BUS."
23        Does "BUS" mean business?
24    A    Yes.
25    Q    And when your business pays for your

Page 83

V. Jolly

2 flights, do you use your business's bank account to
3 do so?
4     A    Use the business's -- what do you mean
5 "use the business's bank account"?
6     Q    As in are you using your own personal
7 debit or credit card to buy this ticket or are you
8 using your bank's money -- or sorry, your business's
9 money in order to buy these flights?
10    A    It would be the business.
11    Q    Okay.  And so you don't personally pay
12 for the flights that say "Me/Business."  It's your
13 business, which you are a 33 percent owner of?
14    A    Exactly.
15    Q    Understood.
16        And is it fair to say that all of the
17 flights that say "Me/Business" were done with some
18 business purpose in mind?
19    A    Yes.
20    Q    And so all the ones, on the other
21 hand, that say "Me," were done personally?
22    A    Uh, yes.
23    Q    Thank you, Ms. Jolly.
24        MR. NGUYEN:  I want to bring us back
25      down to that Spirit entry a little bit

Deposition of Valarie Jolly

Page 84

1          V. Jolly
2     lower on this page.
3     Q    Do you see how on the right-hand side
4  it says "Me/Business"?
5     A    Yes.
6     Q    And that's consistent with what you
7  said earlier, that this was a promotional flight,
8  right?  It was designed to bring you to a trade show
9  where you could advertise your business?
10    A    Yes.
11    Q    And you've never booked a personal
12  flight through Spirit, have you?
13    A    I haven't, but family members have.
14  And I have helped family members.
15    Q    Thank you.  We can get to that later,
16  but I want to specifically focus on you.
17        You've never booked a personal Spirit
18  flight?  Yes or no?
19    A    No.
20    Q    Thank you, Ms. Jolly.
21        And do you see how you paid $145 for
22  that flight?
23    A    Yes.
24    Q    And, Ms. Jolly, do you see right above
25  it it shows that American Airlines -- you also flew

Page 85

1          V. Jolly
2  that same route.  It looks like that was your
3  departure flight and Minneapolis-Dallas/Fort Worth
4  was your return flight, right?
5     A    Yes.
6     Q    And, Ms. Jolly, the Dallas/Fort Worth
7  to Minneapolis leg of that flight through American
8  Airlines was $137.20; is that correct?
9     A    Yes.
10    Q    That was less than the Spirit flight
11  that you flew to return; is that correct?
12    A    Yes.
13    Q    Because 145 is more than 137?
14    A    Yes.
15    Q    And so you would say that at that time
16  American Airlines had a lower rate than Spirit?
17    A    Yes.
18    Q    Thank you, Ms. Jolly.
19        MR. NGUYEN:  I want to start back up
20        at the top of this page and just slowly
21        scroll down through the end of the next
22        page.
23    Q    Ms. Jolly, I'm going to represent to
24  you, or you can see it on the screen, that the vast
25  majority of your flights are with American Airlines.

Page 86

1          V. Jolly
2  Is that a fair representation?
3        MR. BONSIGNORE:  Objection.
4     A    Yes.
5     Q    And aside from the airlines we talked
6  about earlier, it looks like there are only two
7  other airlines that are listed in your chart, which
8  include AF, fourth from the bottom.  What airline is
9  AF?
10    A    Air France.
11    Q    Got it.
12        And it looks like the very last entry
13  says "AA/HA."
14        What is HA?
15    A    Hawaiian Air.
16    Q    And why is there a slash there?
17    A    Because the connection is onto
18  Hawaiian air.
19    Q    Got it.
20        So you flew out using American, and
21  then you made a connection through Hawaiian; is that
22  correct?
23    A    Yes.
24    Q    Thank you, Ms. Jolly.
25        MR. NGUYEN:  I'm going to turn us back

Page 87

1          V. Jolly
2        to the top of this exhibit.  So the top
3        of -- yeah, that first page.
4     Q    And under "Reason for Trip," it looks
5  like the most common reason for your trip is "Escort
6  Tour."  Is that a fair statement?
7     A    Yes.
8     Q    And, Ms. Jolly, what is an escort
9  tour?
10    A    It -- I escort tours to Europe.
11    Q    And so when you say that you "escort
12  tours to Europe," that means that you fly with some
13  of your customers and you escort them around a
14  particular destination?
15    A    Yes.
16    Q    And do you pay for those tickets
17  yourself or are you paid by the customer to fly with
18  them?
19    A    My business pays for the tickets.
20    Q    And is the ticket price included in
21  the overall cost borne by the customer?
22    A    That is hard to answer.  Because it is
23  a whole package tour that includes lots and lots of
24  different components.
25    Q    Got it.

Page 116

V. Jolly

1
2 flights booked as of today?
3    A    No.
4    Q    No flights booked as of today with
5 JetBlue?
6    A    No.
7    Q    None with Spirit?
8    A    No.
9    Q    And I want to turn our attention over
10 to Exhibit -- I believe 2, which is Tab 3.
11        MR. NGUYEN:  If we can put that on the
12      screen.
13        (Plaintiff Jolly's Supplemental
14      Responses and Objections to Defendants'
15      First Set of Interrogatories was marked as
16      Defendants' Exhibit Number 2 for
17      identification, as of this date.)
18 BY MR. NGUYEN:
19    Q    Just scrolling a little bit down to
20 the center of this page, Ms. Jolly, do you see there
21 that the document is titled "Plaintiff's
22 Supplemental Responses and Objections to Defendants'
23 First Set of Interrogatories"?
24    A    Yes.
25    Q    And, Ms. Jolly, do you see your name

Page 117

V. Jolly

1
2 to the right of the "Responding Party" line?
3    A    Yes.
4    Q    Thank you, Ms. Jolly.
5        MR. NGUYEN:  I want to turn us to the
6      very last page of that document.  Can we
7      get to the middle of that page?
8    Q    Ms. Jolly, do you see that it says,
9 "Verification to follow"?
10    A    Yes.
11    Q    Do you recall ever signing a
12 verification for this particular document?
13    A    I signed verifications for several
14 documents.
15    Q    Ms. Jolly, would it surprise you if
16 defendants' counsel has not received a verification
17 from you for this document?
18    A    Would it surprise me?
19    Q    Yes.
20    A    I -- no, it wouldn't surprise me.
21    Q    Do you believe you've signed a
22 verification for this particular document?
23    A    I believe I have.
24    Q    Do you believe that you provided --
25        MR. BONSIGNORE:  Counsel, we'll agree

Page 118

V. Jolly

1
2      to get you the verification if you don't
3      have it.
4        MR. NGUYEN:  Thank you very much,
5      Counsel.
6 BY MR. NGUYEN:
7    Q    Notwithstanding, Ms. Jolly, the fact
8 that you have not -- that we have not received a
9 verification of this document, can you tell me today
10 that it is true, accurate, and complete, to the best
11 of your knowledge?
12    A    Did we go through the whole document?
13    Q    If it would be helpful, you're welcome
14 to scroll through the document.
15        MR. NGUYEN:  We can start from the
16      very top if that's something that you can
17      do for us, Andrew.
18        THE WITNESS:  Can you go a little
19      slower so I can ...
20    A    Okay.  So this is the first set of
21 interrogatories.  Is that what this is?
22    Q    It's your supplemental response to the
23 first set of interrogatories.
24    A    Okay.  So it's the supplemental
25 response to the first set of interrogatories.  So it

Page 119

V. Jolly

1
2 would have been the second response to the first set
3 of interrogatories; is that correct?  It would have
4 been the second verification to the first set of
5 interrogatories?
6    Q    That's correct.
7    A    Okay.
8        THE WITNESS:  So let's keep going
9      through so that I can answer.
10        You can keep going until we get to the
11      actual ...
12    A    Okay.
13    Q    Ms. Jolly, now that you've had the
14 opportunity to review this document, do you
15 recognize it?
16    A    Yes.
17    Q    And to the best of your knowledge, is
18 it true and accurate?
19    A    Yes.
20    Q    And you and your counsel plan to
21 provide a signed verification as soon as possible?
22    A    Yes.  I think I've already -- I have
23 already signed a verification.
24    Q    But you don't know whether it was
25 given to defendants' counsel?

Deposition of Valarie Jolly

Page 124

1                    V. Jolly
2        Q    Ms. Jolly, I'm going to move us over
3   to the last case on the list, Grace v. Alaska.  Were
4   you deposed in that case?
5        A    I do not remember.
6        Q    One way or another, you can't recall?
7        A    No.
8        Q    And that case was more recent, right,
9   2016?
10       A    Yes.
11       Q    And, Ms. Jolly, you can't remember
12  whether you were deposed in the last seven years?
13       A    I cannot.
14       Q    And, Ms. Jolly, in any of these six
15  cases, did you testify at -- as a witness at a
16  trial?
17       A    Yes.
18       Q    Which one?
19       A    American Airlines.
20       Q    Any others?
21       A    No.  Not that I can recall.
22       Q    And, Ms. Jolly, let me first begin
23  with the -- the first case again.
24            Based on this chart, there is not an X
25  by your name where it says "D'Augusta v. Northwest";

Page 125

1                    V. Jolly
2   is that right?
3        A    Yes.
4        Q    So you were not a plaintiff in that
5   case?
6        A    I was not a plaintiff.
7        Q    Ms. Jolly, have any of the other
8   plaintiffs told you the result of that case?
9        A    No.
10       Q    So you don't know whether there was a
11  settlement reached or not?
12       A    I don't.
13       Q    And you don't know what the terms of
14  that settlement would have been if there were one?
15       A    I don't.
16       Q    Ms. Jolly, were you aware of this case
17  when it was first brought?
18       A    Yes.
19       Q    Why did you choose not to be a
20  plaintiff?
21       A    I do not recall.
22       Q    But ultimately, the decision was to
23  not be a plaintiff in this case?
24       A    I -- I guess.  I don't recall.
25       Q    But from 2010 onward, you've been a

Page 126

1                    V. Jolly
2   plaintiff in every one of these cases?
3        A    Yes.
4        Q    Is it fair to say, Ms. Jolly, that
5   you'll sue to block any airline merger?
6        A    Yes.
7        Q    Because you think airline mergers are
8   bad as a whole?
9        A    Yes.
10       Q    And, Ms. Jolly, did you receive any
11  settlement compensation in Malaney v. United?
12       A    I don't --
13            MR. BONSIGNORE:  Objection to the
14       extent it involves a confidential
15       settlement.
16       Q    Just to repeat the question,
17  Ms. Jolly, did you receive any settlement
18  compensation in Malaney v. United?
19            MR. BONSIGNORE:  Objection.  I
20       instruct her not to answer as the
21       settlement is confidential.  To the
22       extent -- to the extent there is a
23       settlement and that settlement is
24       confidential.
25       Q    Ms. Jolly, there wasn't a settlement

Page 127

1                    V. Jolly
2   in that case, was there?
3            MR. BONSIGNORE:  Oh, okay.
4        A    I don't think so.
5        Q    And so there would be no
6   confidentiality provision in a nonexistent
7   settlement?
8        A    I'm not an attorney.  You can tell me.
9        Q    So, Ms. Jolly, you didn't receive any
10  financial compensation in Malaney v. United, did
11  you?
12       A    If I had, it would be confidential.
13       Q    But you said there was no settlement?
14       A    I don't think so.
15       Q    So to the best of your knowledge,
16  there was no settlement?
17       A    Yes.
18       Q    And so did you not receive financial
19  compensation, to the best of your knowledge, because
20  there was no settlement?
21       A    To the best of my knowledge.
22       Q    Thank you, Ms. Jolly.
23            Turning to Taleff, was there a
24  settlement reached in that case?
25       A    I don't think so.

Deposition of Valarie Jolly

---

Page 128

V. Jolly

1
2  Q   The airlines in question ultimately
3  merged?
4  A   Yes.
5  Q   Which airlines were those?
6  A   Was that Southwest and AirTran?  I
7  think that was Southwest and AirTran.
8  Q   Okay.  And returning back to Malaney
9  v. United, do you recall which airlines merged in
10 that instance?
11 A   Continental and United.
12 Q   Got it.
13     And in neither of those cases did you
14 reach a settlement?
15 A   I --
16     MR. BONSIGNORE:  Objection.
17 A   -- don't think so.
18     MR. NGUYEN:  Mr. Bonsignore, based on
19     the testimony of the witness and our prior
20     experiences, this is not one of those
21     cases where an --
22     MR. BONSIGNORE:  I just want to get my
23     objection in before she goes.  But she can
24     answer.
25 A   You were asking about two cases?

---

Page 129

V. Jolly

1
2  Q   Taleff now.
3  A   Oh, you're asking about Taleff?  I
4  think there might have been a settlement in Taleff,
5  but I am not positive.
6  Q   Do you recall receiving any financial
7  compensation from that settlement?
8      MR. BONSIGNORE:  Objection.  And
9      instruct the witness not to talk about the
10     settlement as it's subject to a con- --
11     confidentiality clause that we have no
12     right to waive.
13        To the extent that I'm incorrect, we
14     have a protocol in place and have agreed
15     that the defendants can reopen the
16     deposition and inquire.
17 Q   Ms. Jolly, to the best of your
18 knowledge, does the Taleff settlement contain a
19 confidentiality provision?
20 A   I -- to the best of my knowledge, if
21 there is one, I'm sure there would be one.
22 Q   Ms. Jolly, would it surprise you if no
23 other person has testified that there was a
24 settlement in Taleff v. Southwest?
25 A   It -- it wouldn't surprise me.  I was

---

Page 130

V. Jolly

1
2  not sure if there is one or not.
3      MR. NGUYEN:  Mr. Bonsignore, do you
4      want to allow your client to answer this
5      question in light of the fact that every
6      other person has evidence that there was
7      no settlement?
8      MR. BONSIGNORE:  Can you state the
9      question?
10 Q   Ms. Jolly, you did not receive any
11 financial compensation from Taleff v. Southwest, did
12 you?
13     MR. BONSIGNORE:  She can answer that.
14 A   I do not --
15     THE WITNESS:  What?
16     MR. BONSIGNORE:  You can answer that
17     question.
18 A   I do not know.  I do not remember.
19 Q   Okay.  It wasn't important to you one
20 way or another?
21 A   No.
22 Q   Turning over to Grace v. Alaska, did
23 you reach a settlement in that case?
24 A   I am not sure.  I think -- I think we
25 did reach a settlement in that one.

---

Page 131

V. Jolly

1
2  Q   And the airlines ultimately merged?
3  A   Yes.
4  Q   What were the airlines in question?
5  A   Oh, gosh.
6  Q   You can't remember?
7  A   No, I can't remember.  My mind has
8  gone blank.
9  Q   It wasn't -- it wasn't important to
10 you?
11 A   Yes, it is important to me.  It's
12 important to me that every illegal merger, that
13 someone stands up and says, "This is wrong."  That
14 is what is important to me.
15 Q   But you can't -- but, Ms. Jolly, you
16 can't remember the airline that merged?
17 A   Oh, gosh.  I can't.
18 Q   And, Ms. Jolly, you've been in the
19 travel agent industry for more than 30 years?
20 A   Yes.
21 Q   And you still can't remember the
22 airline that merged?
23     MR. BONSIGNORE:  Objection.
24 A   Give me a minute.
25     Was it Alaska and Frontier?  No.

---

Deposition of Valarie Jolly

Page 140

V. Jolly

2 lot -- going out of Puerto Rico.  So I will
3 definitely be looking at that.  And any -- anyplace
4 else.  Like I say, I'm planning on ramping up on my
5 personal travel and winding back my business travel,
6 so a lot of that will be across the United States.
7        And I'm always going to check, because
8 I'm looking at the value -- I don't just use points,
9 I look at the value versus what a ticket costs.  I
10 actually had a really good experience on Spirit when
11 I flew on them.  Like I say, I had the choice to
12 purchase, you know, all of the benefits, and it was
13 a really good experience.  I had no problem with it
14 at all.
15        So I definitely will be looking at
16 Spirit, and they go to a lot of places that I want
17 to go.
18    Q    Thank you.
19        Do you have any other concerns --
20 would -- would you please describe any other
21 concerns that you have if this merger goes through?
22        MR. NGUYEN:  Objection.
23    A    Yes.
24        I have seen and seen many times when
25 the smaller airlines leave a -- leave a market, the

Page 141

V. Jolly

2 prices go up, the service goes down, the -- the
3 mergers are just all about the stockholders.  It has
4 nothing to do with the experience that the customers
5 need.
6        And just as an example, what I was
7 thinking during -- during the deposition earlier, is
8 that when I went to Minnesota, I went on American
9 for about $140, came back on Spirit for $145.  If
10 Spirit is gone and I try and do that exact same
11 thing, I guarantee you -- well, I can't guarantee
12 you, but in my experience, that same fare to
13 Minnesota will triple and quadruple because there is
14 no competition.  Every time a merger happens,
15 competition lessens.  The airlines can do whatever
16 they want.
17        Earlier in the deposition also,
18 several times he asked me if I prefer American
19 Airlines.  I don't prefer American Airlines.  I
20 don't have a choice.  Because of all of the mergers,
21 they're almost the only one that goes out of Dallas.
22        I do not want to see another option
23 leave from the Dallas airport so that not only I
24 don't have an option but other people who I know and
25 love -- my grandson lives in Atlanta for the

Page 142

V. Jolly

2 military and there was a parents' day, and the only
3 way my -- his parents, my kids, were able to afford
4 to fly there was on Spirit.  They couldn't afford
5 any of the other airlines.
6        And so if that's gone, there's a lot
7 of people who will not be able to fly because they
8 simply can't afford it.  And every time there's a
9 merger, that's what happens.  We lose capacity.  The
10 fares go up in the markets that we lose the
11 competitors.
12    Q    Okay.  You've listed two cities that
13 you intend to fly Spirit on, or at least consider
14 Spirit, that being two -- well, three -- two to
15 Puerto Rico, two cities in Puerto Rico, and then
16 also New York.
17        Are there any other cities that Spirit
18 serves that you intend to fly, whether you've made
19 concrete plans now or not?
20    A    I don't know all of the cities that
21 they fly to, but definitely I've got friends in
22 Florida, anyplace in the Northeast that they go or
23 in the, you know, Utah area.  I'm not familiar.  But
24 I would always consider them.  And I fly and intend
25 on flying even more.

Page 143

V. Jolly

2    Q    And, in fact, you flew Spirit eight
3 times to New York in the past?
4    A    No, I didn't fly Spirit eight times to
5 New York, but I went to New York a lot, and I would
6 consider Spirit, you know, any time.
7    Q    In the future?
8    A    In the future.
9        MR. BONSIGNORE:  Thank you.  No
10    further questions.
11 FURTHER EXAMINATION
12 BY MR. NGUYEN:
13    Q    Ms. Jolly, I have a couple additional
14 questions.
15        Dallas/Fort Worth is your primary
16 airport; is that right?
17    A    Yes.
18    Q    And Love Field is your secondary
19 airport?
20    A    Yes.
21    Q    Based on your travel history over the
22 last eight years, are there any other airports that
23 you commonly fly out of?
24    A    No.
25    Q    And so is it fair to say that when you