# EXHIBIT 53

```
 1

 2   UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS
 3   - - - - - - - - - - - - - - - - - - -x
     GABRIEL GARAVANIAN, et al.,
 4
                    Plaintiffs,
 5
     vs.                                Civil Action Number
 6                                      1:23-cv-10678-WGY
     JETBLUE AIRWAYS CORPORATION
 7   and SPIRIT AIRLINES, INC.,

 8                  Defendants.

 9   - - - - - - - - - - - - - - - - - - -x

10

11

12

13        REMOTE VIDEOTAPED DEPOSITION of MICHAEL

14   MALANEY, taken by Defendants on Wednesday, June 21,

15   2023, commencing at 9:04 a.m. (Eastern Time), before

16   Pamela Grimaldi (via Zoom), a Registered Merit

17   Reporter, Certified Realtime Reporter, and Notary

18   Public within and for the State of New York.

19

20

21

22

23

24

25
```

```
 1

 2   R E M O T E   A P P E A R A N C E S:

 3

 4           BONSIGNORE TRIAL LAWYERS
                 Attorneys for the Plaintiffs
 5               23 Forest Street
                 Medford, Massachusetts  02155
 6               781.350.0000

 7           BY:  ROBERT J. BONSIGNORE, ESQ.
                  rbonsignore@classactions.us
 8

 9
             COOLEY LLP
10               Attorneys for Defendant JetBlue Airways
                 1299 Pennsylvania Avenue, NW, Suite 700
11               Washington, DC  20004
                 202.728.7123
12
             BY:  MATT NGUYEN, ESQ.
13                mnguyen@cooley.com

14

15
     A L S O   P R E S E N T:
16
             Shireen Ardaiz, Intern (Cooley)
17           Andrew Whitner, Video Specialist

18

19

20

21

22

23

24

25
```

Page 20
M. Malaney

Request Number 1 and 2 because I want to make sure those requests for admission also use the "never" terminology. And so I want to confirm that for Request Number 1, you're admitting that you have never flown Spirit Airlines in your life?
    A    I admit.
    Q    And I want to confirm that for Request Number 2, you're admitting you have never flown JetBlue throughout your life?
    A    I admit.
    Q    Okay. So even though your responses for Requests 6 and 7 may change, your responses to the remainder of these requests is the same?
    A    I'd like to see Number 8 again.
    Q    Okay. We can scroll down to Number 8, which is about halfway through the page 4. I didn't ask you about Number 8, and you didn't --
    A    Oh, well, let me -- oh. No. 6 and 7 need to be changed.
    Q    Okay. But what you're saying, based on what I understand you to have said earlier, is that from 2015 to present you have not been employed as a travel agent; is that right?
    A    That is correct.

Page 21
M. Malaney

    Q    Okay. And the same is true for -- from 2015 to present, you have not been the whole or partial owner of a travel agency; is that right?
    A    That is correct, yes.
    Q    Since 2015, what have you done for employment?
    A    I have driven delivery trucks, one for Same Day Delivery and one for Napa Auto Parts.
    Q    Okay. And, Mr. Malaney, you are not in any way employed in the travel industry anymore, then, are you?
    A    No, I am not.
    Q    And you don't receive any residual income or commission from a travel agency?
    A    No, I do not.
    Q    And, Mr. Malaney, it appears you don't fly very often; is that true?
    A    Only a few times in all those years, yes.
    Q    All right. We'll get into that a little bit later.
        MR. NGUYEN: We can take down this
        document now.
    Q    Mr. Malaney, when you were employed as

Page 22
M. Malaney

a travel agent, can you please explain what general services you provided?
    A    Well, I was the owner. I did all the accounting. I cleaned the bathroom. I washed the windows. I vacuumed the floor. I answered telephone calls. I booked travel. I escorted some travel.
    Q    Got it.
        So, Mr. Malaney, you said at the beginning that you did all the accounting, which means that you're familiar with the financials of your prior travel agency; is that correct?
    A    I was familiar with it, yes, sir.
    Q    Got it.
        And you had said that you also booked travel. Does that mean purchasing flight tickets on behalf of customers?
    A    I was their travel agent, yes.
    Q    Got it.
        And did that also include, you know, flights domestically as well as international?
    A    Correct, both international and domestic.
    Q    Approximately how many customers would

Page 23
M. Malaney

you estimate you served every year?
        MR. BONSIGNORE: Objection.
    A    I -- yeah. I would be guessing at that number.
    Q    Would you say more or less than 100?
    A    More than a hundred.
    Q    Would you say more or less than 300?
    A    I would say more than 300.
    Q    Okay. More or less than 500?
    A    Couldn't answer that.
    Q    Okay. So greater than 300 customers per year; is that right?
    A    Yes.
    Q    Great.
        And when did you first start this travel agency?
    A    1980.
    Q    1980.
        And when did you close the travel agency?
    A    2014.
    Q    Okay. And do you have any owner- -- I think, as we said earlier, you no longer have any ownership interest in a travel agency, right?

Page 48

M. Malaney

Northwest, I did receive. I didn't -- early on I didn't receive it because I wasn't regarded as a -- a player or a significant travel agent. But my business grew and then I became a significant agent, and -- but then when Delta took them over, that -- that was gone.
Q  And do you recall when that contract ended?
A  Yeah. When -- when Delta -- when Northwest became Delta.
Q  Around what year?
A  2000, 2001. No. 2002. About 2003. And that's pretty accurate.
Q  Okay. So for the majority of your time as a travel agent, Northwest was offering you a commission?
A  Correct.
Q  Thank you, Mr. Malaney.
    But all of this is in the past, right? Because you no longer own or operate a travel agency anymore?
A  Correct, I do not.
Q  Since approximately 2014?
A  That is correct.

Page 49

M. Malaney

Q  And prior to that, you had said that you booked travel for leisure customers as well as business customers, right?
A  That is correct.
Q  And that you made money through booking significant packages for these customers?
A  Significant what?
Q  Packages for these customers.
A  Oh, yeah, correct. Yes.
Q  To international destinations?
A  Oh, yes.
Q  All right.
    MR. NGUYEN: I'd like to introduce Tab 2 as Exhibit 2.
    (Article, "Travel Agent and 'Bachelor' Dad Sentenced to Probation and Restitution," was marked as Defendants' Exhibit Number 2 for identification, as of this date.)
BY MR. NGUYEN:
Q  Mr. Malaney, you should see a document on your screen shortly.
    Mr. Malaney, can you read the title of that document?

Page 50

M. Malaney

    MR. NGUYEN: And can we move to the center of it?
Q  And, Mr. Malaney, can you please read that out loud?
A  "Travel Agent and 'Bachelor' Dad Sentenced to Probation and Restitution."
    MR. NGUYEN: And I want to scroll us to the top of the second page.
Q  Mr. Malaney, is that you?
A  Yes.
Q  And, Mr. Malaney, can you read that first sentence right below your picture?
A  "66-year-old Mike Malaney pleaded guilty to larceny. On Thursday, he was given probation and ordered to pay his victim $25,000."
Q  Got it.
    MR. NGUYEN: And can we scroll a little bit below this advertisement? I'm sorry, I wasn't able to eliminate the advertising here.
Q  But can you read that first paragraph out loud?
    (Reporter requested clarification.)
A  "Last year he was supposed to book a

Page 51

M. Malaney

trip for 88-year-old Connie Baker and 17 of her family members. Baker and her husband were celebrating their 65th wedding anniversary. Malaney took their money and didn't plan the trip. 'It's been terribly hard just to think 17 of us would have been at the airport with no tickets. It has been hard emotionally,' says Baker."
Q  Thank you, Mr. Malaney.
    And can you skip the next paragraph and then read the one that starts with "Malaney was" out loud right below that.
A  "Malaney was convicted of embezzlement in 1974. During his sentencing, Judge Paul Sullivan scolded him for being a repeat offender. 'What I don't understand is, after being convicted of embezzlement from a bank, you didn't learn your lesson.'"
Q  Thank you, Mr. Malaney.
    Would this trip -- I believe it was -- was it to Aruba? Yes or no?
A  Yes.
Q  Was this trip an example of the international packages that you would be responsible for booking as a travel agent?

Page 52

M. Malaney

```
 2   A    Yes.
 3   Q    And, Mr. Malaney, is it true that you
 4  pleaded guilty to larceny?
 5   A    Yes.
 6   Q    And, Mr. Malaney, just a little bit
 7  more specifically, is it true that you pleaded
 8  guilty under Penal Code Section 750.362, Larceny by
 9  Conversion, over $20,000?
10   A    Yes.
11   Q    Mr. Malaney, is it true that you
12  defrauded Ms. Baker and 17 of her family members?
13  Yes or no?
14        MR. BONSIGNORE:  Objection.
15   A    Yes.
16   Q    Mr. Malaney, I believe that you were
17  initially charged as well with Michigan Code of
18  Criminal Procedure Section 679.10, that's punishment
19  for subsequent felony.
20        Is it true that you were charged with
21  that offense?
22        MR. BONSIGNORE:  Objection.
23   A    Yes.
24   Q    Did you ultimately plead guilty to
25  that offense or was that charge dismissed?
```

Page 53

M. Malaney

```
 2        MR. BONSIGNORE:  Objection.
 3   A    I don't actually recall.
 4   Q    And that particular charge related to
 5  your 1974 embezzlement as it says in the article; is
 6  that correct?
 7        MR. BONSIGNORE:  Objection.
 8   A    I don't understand your question.
 9   Q    So, Mr. Malaney, you were also charged
10  with violating Michigan Code of Criminal Procedure
11  punishment for subsequent felony, sentence imposed
12  for term of years considered indeterminate, use of ^
13  convictions enhanced sentence prohibited.  But you
14  were never ultimately -- you never ultimately
15  pleaded to that particular offense, did you?
16        MR. BONSIGNORE:  Objection.
17   A    I can't recall.
18   Q    Okay.  But you did -- you were
19  convicted of embezzlement in 1974, right?
20   A    Yes.
21   Q    And that was a jury trial?
22   A    No.
23        MR. BONSIGNORE:  Objection.
24   Q    Did you plead guilty at that time?
25   A    Honestly, I don't recall.
```

Page 54

M. Malaney

```
 2   Q    Okay.  So you can't recall whether you
 3  pleaded guilty or were convicted by a jury?
 4   A    Oh --
 5        MR. BONSIGNORE:  Objection.
 6   A    I pleaded guilty.
 7   Q    Okay.  And for that particular
 8  offense, what punishment did you receive?
 9        MR. BONSIGNORE:  Objection.
10   A    Probation.
11        MR. BONSIGNORE:  Counsel, this is
12  beyond the scope of questions allowed.
13  You're -- you tested him pretty
14  vigorously.
15        MR. NGUYEN:  Counsel, I would say that
16  because this document relates specifically
17  to his role as a travel agent, that it is
18  not beyond the scope, and so it also goes
19  to credibility of the witness and bias of
20  the witness, and it also is temporally
21  situated, and my questioning will get at
22  that shortly as to when he stopped being a
23  travel agent.
24        And so if you'll let me finish my
25  questions, I will certainly make sure to
```

Page 55

M. Malaney

```
 2  confirm its relevance.
 3        MR. BONSIGNORE:  Okay.  Coming about
 4  it, relevance, in a different way that's ^
 5  old.  But we'll continue on as -- I'll
 6  continue to object.  But it's beyond the
 7  time allowed for examination.
 8        Whether he's a travel agent or not,
 9  he's someone who flies.  So it's also
10  irrelevant in that regard.  The only
11  possible relevance is bias and -- well,
12  credibility.  And that --
13        MR. NGUYEN:  Mr. Bonsignore, you're
14  welcome to note the objection for the
15  record, but I would emphasize that under
16  Rule 30, speaking and suggestive
17  objections are not permitted.  So feel
18  free to continue to object as you will.
19        We can have a differing view on what
20  relevance is.  And we can resolve this
21  later on.
22        Thank you.
23  BY MR. NGUYEN:
24   Q    Mr. Malaney, I'm going to -- before I
25  was interrupted, I was asking:  Do you know
```

Page 56
M. Malaney
1
2  approximately what year this charge against you took
3  place?
4      A    What charge?
5      Q    Your charge for larceny by conversion
6  of Ms. Baker and 17 of her family members.
7          MR. BONSIGNORE:  Objection.
8      A    I guess it was sometime in 2014.
9          MR. NGUYEN:  Can we scroll to the very
10         first page of the article?  And I just
11         want to go right below -- the image is not
12         there.  But right below that is a
13         published date.
14 BY MR. NGUYEN:
15     Q    Would it surprise you if -- that this
16 article was published in 2015 regarding your
17 offense?
18     A    I guess I made a mistake.
19     Q    And what was your sentence for
20 pleading guilty to this particular crime?
21         MR. BONSIGNORE:  Objection.
22     A    18 months probation and restitution.
23     Q    And did you pay full restitution,
24 Mr. Malaney?
25     A    Yes, I did.

Page 57
M. Malaney
1
2      Q    And did you serve the entirety of your
3  probation period?
4          MR. BONSIGNORE:  Objection.
5      A    Yes, I did.
6      Q    And, Mr. Malaney, is the 2014-2015
7  period when you stopped being a travel agent?
8          MR. BONSIGNORE:  Objection.
9      A    Yes.
10     Q    And, Mr. Malaney, was the reason you
11 stopped being a travel agent because of this charge
12 and plea?
13         MR. BONSIGNORE:  Objection.
14     A    I think it had a big -- big thing to
15 do with my decision to leave the business, yes.
16     Q    Because it affected your reputation?
17         MR. BONSIGNORE:  Objection.
18     A    Of course it did.
19     Q    And WZZM, which is the author of this
20 article, that's the local station in the Grand
21 Rapids area; is that right?
22         MR. BONSIGNORE:  Objection.
23     A    Yes, it is.
24     Q    So this was widely publicized within
25 your local community?

Page 58
M. Malaney
1
2          MR. BONSIGNORE:  Objection.
3      A    Yes, it was.
4      Q    Did you lose travel agent customers as
5  a result of this news becoming public?
6          MR. BONSIGNORE:  Objection.
7      A    No.
8      Q    Because you had already closed your
9  business by then?
10         MR. BONSIGNORE:  Objection.
11     A    I thought that I had, yes.
12     Q    Okay.  And when you testified earlier
13 that the revenue that you had received in 2014 from
14 your travel agency, your income was approximately
15 $90,000 -- do you recall testifying that?
16         MR. BONSIGNORE:  Objection.
17     A    I do, yes.
18     Q    Did that include the $25,000 you stole
19 from Ms. Baker and her family?
20         MR. BONSIGNORE:  Objection.
21     A    I guess that it did.
22     Q    Okay.  Thank you very much,
23 Mr. Malaney.
24         MR. NGUYEN:  We can close out this
25         document.

Page 59
M. Malaney
1
2      Q    And what I'm going to do is I'm going
3  to turn our attention away from your role as a
4  travel agent, which ceased in 2014; is that right?
5      A    That's what I thought, yes.
6      Q    And you no longer receive any income
7  relating to the travel industry, correct?
8      A    No, I don't.
9      Q    You're a driver now, right?
10     A    Correct.  A delivery driver.
11     Q    Thank you.
12         I want to turn us now, then, to your
13 personal flying, because your counsel indicated that
14 it was something of relevance.
15         MR. NGUYEN:  And so what I want to do
16         is I want to introduce Tab 4 as Exhibit 3.
17         (Plaintiff's Responses and
18         Objections to Defendants' First Set of
19         Interrogatories was marked as Defendants'
20         Exhibit Number 3 for identification, as of
21         this date.)
22         MR. BONSIGNORE:  Objection.
23         MR. NGUYEN:  I wasn't exactly sure
24         what you were objecting to, Counsel,
25         because there wasn't a question present,

Page 68

1  M. Malaney
2  A    I guess I'm all traveled out.
3  Q    So you don't like flying either?
4       MR. BONSIGNORE:  Objection.
5  A    Well, no, I -- you know, if there's
6  someplace to go that's important to me.
7  Q    When you say you're "all traveled
8  out," it means that you don't plan on flying too
9  often in the future?
10      MR. BONSIGNORE:  Objection.
11      Mischaracterizes the witness' testimony.
12 A    I will travel whenever I want to when
13 there's something that I want to go do and see.
14 Most of it will be with my daughter.  But, you know,
15 I -- I've traveled for a lot of reasons, you know.
16 Q    Got it.
17      Mr. Malaney, do you have any current
18 flights booked right at this date?
19 A    I do not.
20 Q    No?  None from JetBlue?
21 A    None from JetBlue.
22 Q    None from Spirit?
23 A    None from Spirit.
24 Q    None from any other airline?
25 A    None from any other airline.

Page 69

1  M. Malaney
2  Q    Thank you, Mr. Malaney.
3       I want to turn our attention back to
4  the other three flights you said you had booked that
5  were not listed in your interrogatory response.
6       What was the second of the other three
7  flights that you can recall?
8  A    You know, these were all in my
9  interrogatory responses.  There's nothing outside of
10 that.
11 Q    Mr. Malaney, do you see where it says
12 in your interrogatory response, "Plaintiff did not
13 fly from 2015 to present"?  Yes or no?
14 A    I do see that.
15 Q    And earlier you testified that there
16 were four other flights that you had taken that are
17 not documented in this response; is that right?
18 A    That's what I said.  But I was
19 mistaken.  Again, I've been mistaken.
20 Q    Okay.  So --
21 A    I have flown four times, yes.
22 Q    Okay.  And so we already talked about
23 the LAX flight and the Seattle flight.  So I want to
24 know what the third flight on that list is.
25 A    To LaGuardia Airport in New York.

Page 70

1  M. Malaney
2  Q    From Grand Rapids?
3  A    From Grand Rapids.
4  Q    What airline did you fly?
5  A    I flew Southwest Airlines there, and I
6  flew -- I believe it was United Airlines home.
7  Q    And what year was that flight?
8  A    2019.
9  Q    Okay.  And did you pay for that flight
10 yourself?
11 A    Yes, I did.
12 Q    Do you recall how much you paid?
13 A    Roughly $900.
14 Q    Okay.  And I want to turn our
15 attention to that fourth flight that you had
16 mentioned.  Do you recall where you flew to?
17 A    I flew to San Francisco and then after
18 San Francisco up to Seattle.
19 Q    Okay.  So from Grand Rapids to San
20 Francisco to Seattle back to Grand Rapids?
21 A    That is correct.
22 Q    And what airline did you fly with?
23 A    Delta Air Lines.
24 Q    For all of those three flights?
25 A    Correct.

Page 71

1  M. Malaney
2  Q    And do you recall how much you paid
3  for that trip?
4  A    $497.
5  Q    And do you recall what year that trip
6  was taken?
7  A    2023.
8  Q    Earlier this year?
9  A    That is correct.
10 Q    What month?
11 A    February.
12 Q    And did you pay for this ticket
13 yourself?
14 A    Yes, I did.
15 Q    Did your wife also travel with you?
16 A    She did not.
17 Q    Because she doesn't like flying?
18 A    That's correct.
19 Q    Got it.
20      Mr. Malaney, are you a member of any
21 airline loyalty programs or frequent flier programs?
22 A    No.
23 Q    So I want to turn our attention over
24 to the top of page 8 of this document.  For your
25 convenience, I'm just going to note that

Page 76
M. Malaney

Q And you haven't flown JetBlue in your life?
A That is correct.
Q And you haven't flown Spirit Airlines in your life?
A That is correct.
Q In fact, neither JetBlue nor Spirit fly in or out of Grand Rapids airport; is that correct?
A As far as I know, yes, correct.
Q And Grand Rapids airport is your primary airport?
A Yes, it is.
Q Thank you, Mr. Malaney.
 And you have no future travel booked as of today; is that correct?
A That is correct.
 MR. BONSIGNORE: Objection.
Q And if you fly in the near future, will you most likely fly out of the Grand Rapids airport?
A Most likely, yes.
Q You're fairly certain?

Page 77
M. Malaney
A I'm fairly certain.
Q Thank you, Mr. Malaney.
 I'm going to turn our attention over to another document.
 MR. NGUYEN: But what I want to do first is give us the opportunity to take a 10-minute break. Does that sound all right to you?
 THE WITNESS: That would be fine.
 MR. NGUYEN: Okay. Let's go off the record.
 THE VIDEOGRAPHER: Off the record. The time is 10:43 a.m.
 (Whereupon, a recess was taken between 10:43 and 10:55 a.m.)
 THE VIDEOGRAPHER: Back on the record. Time is 10:55 a.m.
BY MR. NGUYEN:
Q Welcome back, Mr. Malaney.
 During the break, did you speak with anyone, other than counsel, about this case or this deposition?
A No, I didn't.
Q Thank you, Mr. Malaney.

Page 78
M. Malaney
 MR. NGUYEN: I will very quickly need to note for the record, Mr. Bonsignore, that I only now just saw that second email that you had sent at approximately 10:00 a.m., and then I proceeded to see a response from your co-counsel, Lawrence Papale, saying, "Please shut that down," and I just want to understand whether he is indicating that this is like a clawback on privilege grounds or anything like that?
 MR. BONSIGNORE: No. That was an inadvertent section that should be deleted. That should -- I thought I deleted everything underneath it. God knows what that relates to. I thought I went underneath and deleted all text except for the -- except for the document itself.
 So that's an inadvertent production that has nothing to do with anything. I didn't -- I might not have even been on that email, the earlier one. I don't remember that language ever being sent to

Page 79
M. Malaney
me.
 MR. NGUYEN: The email was sent from Lawrence at 10:08 a.m. I think in response to you forwarding the document, and so I just want to confirm for the record that plaintiffs are not trying to claw back this document or anything; that later on I can actually review it.
 MR. BONSIGNORE: Oh, no. Two things. First of all, delete that text, it was inadvertently produced.
 Secondly, yes, of course you can review that document. It's in response to what you asked for and what we're trying to produce to you. And I'm sorry about the confusion there.
 MR. NGUYEN: Okay. Thank you very much. I appreciate that, Counsel.
 You know, again, just for the record, I have not had the opportunity to actually review it. And because I saw that language, I avoided reviewing it.
 And so, you know, as I think you will not be surprised, not only will we hold