# EXHIBIT 61

1        UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF MASSACHUSETTS
2
   GABRIEL GARAVANIAN, et al.,          )
3                                       )
              Plaintiffs,               )
4                                       )
   v.                                   ) Case No.
5                                       ) 1:23-cv-10678-WGY
   JETBLUE AIRWAYS CORPORATION and      )
6  SPIRIT AIRLINES, INC.,               )
                                        )
7             Defendants.               )

8

9

10          *********************************
             REMOTE VIDEOTAPED DEPOSITION OF
11                 LISA RUTH McCARTHY
                    June 22, 2023
12          *********************************

13

14

15        LISA RUTH McCARTHY, produced as a witness at

16   the instance of the Defendants, was duly sworn and

17   deposed in the above-styled and numbered cause on

18   June 22, 2023, from 9:06 a.m. to 11:48 a.m. EST,

19   stenographically reported remotely, pursuant to

20   the Federal Rules of Civil Procedure and the

21   provisions stated on the record.

22

23

   Reported by:   Rebecca A. Graziano, CSR, RMR, CRR
24                 Texas CSR 9306
                   California CSR 14407
25                 Illinois CSR 084.004659

Deposition of Lisa Ruth McCarthy

```
 1                    A P P E A R A N C E S

 2       (all attendees appearing via remote videoconference)

 3

         REPRESENTING THE PLAINTIFFS:
 4
          Mr. Robert J. Bonsignore
 5        BONSIGNORE TRIAL LAWYERS
          193 Plummer Hill Road
 6        Belmont, New Hampshire   03220
          (702) 852-5276
 7


 8

         REPRESENTING THE DEFENDANTS:
 9
          Mr. Zach Sisko
10        COOLEY, LLP
          500 Boylston Street
11        Boston, Massachusetts   02116
          (617) 937-2300
12        zsisko@cooley.com

13

         THE VIDEOGRAPHER/VIDEOCONFERENCE TECHNICIAN:
14
          Mr. Alex Held
15
         ALSO PRESENT:
16
          Ms. Simone Smith, Cooley, LLP
17

18

19

20

21

22

23

24

25
```

Page 12

1  but I want to -- after you graduated from Union,
2  what positions did you have in between graduating
3  and being at MAD Travel?
4     A     Well, I taught tennis, I worked in retail
5  sales, I was a freelance graphic designer, I sold
6  air-conditioning.  I also currently coach a
7  weight-loss program.
8          That's what I remember.  Those are the
9  big ones, I guess.
10    Q     Okay.  Were you employed by any travel
11 agencies prior to your working at MAD Travel?
12    A     No, I was not.
13    Q     Okay.  Have you ever been employed as a
14 travel agent?
15    A     No.
16    Q     Describe for me what MAD Travel does.
17    A     MAD Travel is a full-service travel agency
18 that arranges travel for their clients, in
19 addition to selling travel insurance, hotels,
20 cruises, air tours.  The typical travel agency
21 duties.
22    Q     What's your role at MAD Travel?
23    A     I work in the back office, so I handle
24 accounting, I handle human resources, I handle
25 marketing, supplier relations.  I do reporting.

Page 13

1  Everything but sell the travel.
2     Q     Got it.
3          How many employees does MAD Travel
4  have?
5     A     There are seven of us in total.
6     Q     How many of those are travel agents?
7     A     Six of them.
8     Q     So you're the only nontravel agent that
9  works for MAD Travel?
10    A     That's correct.
11    Q     Okay.  Who is the owner of MAD Travel?
12    A     Lee McCarthy.
13    Q     Is that a family member?
14    A     Lee is my husband, yes.
15    Q     Okay.  Is your husband the sole owner of
16 MAD Travel?
17    A     Yes, he is.
18    Q     Okay.  Has he always been the sole owner?
19    A     No.  He purchased the agency from the
20 previous owner, and it was a -- I don't remember
21 exactly how many years, but I will say an
22 approximate five-year buyout in which they were
23 co-owners, and now he is currently the 100 percent
24 sole owner.
25    Q     Who was that prior co-owner?

Page 14

1     A     Dorothy Crenshaw.
2     Q     Okay.  When did that sale occur?
3     A     It started in 1994.
4     Q     So the five-year period you just
5  described, that started in 1994?
6     A     Correct.
7     Q     Okay.  How long had MAD Travel been in
8  business prior to your husband purchasing it?
9     A     It was started in 1981.
10    Q     Okay.  Has it always been based in Naples,
11 Florida?
12    A     Yes.
13    Q     I think you may have answered this
14 already, Ms. McCarthy, but just to be clear, have
15 you ever worked at an airline?
16    A     No, I have not.
17    Q     So you've never worked for Spirit?
18    A     No, I have not.
19    Q     Neither JetBlue?
20    A     No, I have not.
21    Q     Okay.  Great.
22          So discussing a little bit --
23 MAD Travel, you said you have a -- I think you
24 used the term "back-office job"?
25    A     Correct.

Page 15

1     Q     Okay.  And that entails accounting?
2     A     Yes.
3     Q     And other human resources?  Marketing,
4  things like that?
5     A     That's correct.
6     Q     Okay.  How many customers does MAD Travel
7  service in a typical year?
8     A     I don't know exactly.  Hundreds.
9     Q     More than a thousand?
10    A     I don't know.
11    Q     More than 500?
12    A     That would be a good guess, but I don't
13 know for sure.  I haven't counted.
14    Q     What was the total revenue of MAD Travel
15 last year?
16    A     I don't know exactly.
17    Q     Could you give me an estimate?
18    A     I would guess in the 12 to $14 million
19 range.
20    Q     Is that total revenue or total sales?
21    A     I'm sorry.  That's total sales.
22    Q     Okay.
23    A     So -- yeah.
24    Q     So 12 to 14 million in total sales; that's
25 correct?

Page 44

1 testimony during the break?
2   A    No.
3   Q    Okay.  Great.
4        Ms. McCarthy, do you have any
5 ownership interest in MAD Travel?
6   A    No.
7   Q    Do you receive a salary --
8   A    Yes.
9   Q    -- for your work?
10  A    Yes.
11  Q    What is that salary?
12  A    I'm -- probably around $73,000 annually.
13  Q    Are you sure of that or --
14  A    No.
15  Q    Have you received approximately $73,000
16 from MAD Travel for the entire time that you
17 worked there?
18  A    No.
19  Q    Are you entitled to any bonuses or other
20 incentive compensation?
21  A    It's not part of my compensation plan, but
22 I get a holiday bonus every so often.
23  Q    So regardless of MAD Travel's performance
24 in a given year, your salary remains the same?
25  A    That's correct.

Page 45

1        MR. BONSIGNORE:  Objection.
2 BY MR. SISKO:
3   Q    Going back to the incentive agreements
4 that MAD Travel has with -- may have with
5 American, United, and Delta, are you aware of when
6 any of those ended?
7   A    I don't know the dates of the contracts.
8   Q    You don't have an estimate?
9   A    No.
10  Q    But based on MAD Travel having received
11 some incentive payments in the last year, at least
12 some of them were in force in 2022?
13  A    I believe, yes.
14       MR. BONSIGNORE:  Objection.
15 BY MR. SISKO:
16  Q    Okay.  Okay.  I want to go back to Travel
17 Leaders Network.
18       Does MAD Travel have an agreement of
19 some kind with Travel Leaders Network?
20  A    Yes.
21  Q    What type of agreement?
22  A    MAD Travel is considered a franchise.
23  Q    A franchise within the Travel Leaders
24 Network consortium?
25  A    Yes.

Page 46

1   Q    Okay.  I may have asked this, but what
2 benefits does MAD Travel receive from the
3 consortium?
4   A    Well, so we -- there's education, there's
5 marketing, there's networking, there are buying
6 power, commission levels.  I think we did talk
7 about this before too.
8   Q    And does MAD Travel share any of those
9 commissions with Travel Leaders Network?
10  A    Well, yes.
11  Q    Describe how that works.
12  A    Well, again, I don't know for sure,
13 because I'm not part of the Travel Leaders company
14 and their contract teams, but it's my
15 understanding that our commission levels are a
16 percentage of a greater commission, and so we get
17 a percentage of the commission and Travel Leaders
18 probably gets a percentage.
19  Q    Do those commissions also apply to air
20 travel booked?
21  A    Yes.
22  Q    And that would be those largely
23 international commissions we were talking about
24 earlier?
25  A    Yes.

Page 47

1   Q    So your understanding is that Travel
2 Leaders gets a cut of those commissions, and
3 MAD Travel takes a piece of those commissions;
4 correct?
5   A    Yes.
6   Q    Okay.  And you don't know the breakdown
7 for how those commissions are allocated?
8        MR. BONSIGNORE:  Objection.
9        THE WITNESS:  Well, I don't know
10    for everything, so no.  I mean, I'm not --
11    I'm not on the Travel Leaders side, so I
12    don't know -- if they offer me a
13    12 percent commission from Carnival
14    cruises, I don't know what percentage
15    they're getting.
16 BY MR. SISKO:
17  Q    Does -- is this -- strike that.
18       Does Travel Leaders Network -- strike
19 that.
20       Is -- the agreement between Travel
21 Leaders Network and MAD Travel, what type of
22 agreement is it?  It's a franchise agreement?
23  A    Yes.
24  Q    And who signed that agreement for
25 MAD Travel?

Page 60

1  of the trip is, MAD Travel is paying for your
2  flights?
3    A    Most of the time, yes, I would say.
4    Q    Most of the time.  And the other times
5  would be the times in which you've paid for
6  flights using points?
7    A    Yes.
8        MR. BONSIGNORE:  Objection.
9  BY MR. SISKO:
10   Q    Did MAD Travel pay for -- well, strike
11 that.  We can talk about that shortly.
12       How about the AmEx credit card?  What
13 flight-related -- or air travel-related benefits
14 do you receive from that card?
15   A    Flights can be booked directly by American
16 Express and using miles to redeem, so -- so
17 instead of paying monetarily, you can use the
18 points accrued.
19   Q    Is there a specific airline with which you
20 have to book if you use those points?
21   A    I don't believe so.
22   Q    And are you aware of how many points you
23 have on your AmEx credit card?
24   A    I don't know right now.
25   Q    Is there a particular reason why you

Page 61

1  signed up for these loyalty programs?
2    A    I mean, MAD Travel wants to have, you
3  know, both an American Express and a non-American
4  Express credit card because some are accepted some
5  places and some are accepted others.
6    Q    And talking specifically about American's
7  AAdvantage member program, is there a reason why
8  you joined American's loyalty program?
9    A    Well, if I fly multiple times on any given
10 carrier, it makes sense to join their loyalty
11 program.
12   Q    How about Delta?
13   A    Same.
14   Q    And the same true for United?
15   A    Yes.
16   Q    You do not have a loyalty program with
17 JetBlue; is that correct?
18   A    I don't believe that I do.
19   Q    Is there a reason for that?
20   A    I probably just forgot to sign up for it.
21   Q    Have you ever flown JetBlue?
22   A    Yes.
23   Q    How many times?
24   A    I don't know.
25   Q    Do you have a loyalty program with Spirit?

Page 62

1    A    No.
2    Q    Have you ever flown Spirit?
3    A    No.
4    Q    Okay.  Great.
5        MR. SISKO:  We can take this down
6    and move on.
7  BY MR. SISKO:
8    Q    Quickly on the loyalty programs, do you
9  have online accounts associated with each of those
10 memberships we just discussed?
11   A    Yes.
12   Q    And I'm talking specifically about the
13 American, United, and Delta loyalty programs; is
14 that fair?
15   A    Yes.
16   Q    Did you review your account history for
17 any of those programs before you answered this
18 interrogatory?
19       MR. BONSIGNORE:  Objection to the
20   extent it requires the witness to discuss
21   matters involving conversations with her
22   counsel.
23       So apart from conversations with
24   your counsel, you can answer the question.
25       THE WITNESS:  Can you repeat the

Page 63

1  question, please?
2  BY MR. SISKO:
3    Q    Sure.
4        Did you review your online accounts
5  with any of the Delta, American, or United loyalty
6  programs before you answered this interrogatory?
7        MR. BONSIGNORE:  I'll just -- is it
8    okay if I just incorporate my reference
9    by -- okay.
10       MR. SISKO:  Sure.
11       MR. BONSIGNORE:  I incorporate, by
12   reference, my above objection.
13       You can answer.
14       THE WITNESS:  I don't remember.
15       MR. SISKO:  Okay.  Can we pull up
16   Tab 3, please?
17       (McCarthy Exhibit 2 marked.)
18 BY MR. SISKO:
19   Q    So this is -- I'm marking as Exhibit 2 a
20 document Bates-stamped MCCARTHY000001, which was
21 produced in this case -- excuse me.
22       Ms. McCarthy, I know this is somewhat
23 difficult to read, so if we could scroll in a
24 little bit -- zoom in, excuse me -- a little bit.
25       So, Ms. McCarthy, this is a chart

Deposition of Lisa Ruth McCarthy

Page 76

1  they're flying my routes.
2  BY MR. SISKO:
3  Q    So if we look again at this exhibit,
4  there's no mention of Spirit on here, is there?
5  A    No.
6          MR. BONSIGNORE:  Objection.
7  BY MR. SISKO:
8  Q    Have you ever flown Spirit, Ms. McCarthy?
9  A    I have not.
10  Q    Not in the last eight years?
11  A    I have not.
12  Q    Never in your life?
13  A    As far as I can remember, I have not.
14  Q    Okay.  Is there a reason for that?
15  A    Well, it appears as though it wasn't the
16  best option at the time.
17  Q    Ms. McCarthy, have you ever flown
18  Frontier?
19  A    I don't recall.
20  Q    Have you ever flown Allegiant?
21  A    I don't believe so.
22  Q    You'd agree with me that Spirit, Frontier,
23  and Allegiant are three ultra-low-cost carriers;
24  correct?
25  A    Yes.

Page 77

1  Q    And you have not flown them in the last
2  eight years?
3  A    It appears that's correct.
4  Q    And as far as you can recall, you've never
5  flown any of those carriers?
6  A    Well, I don't know.  I can't --
7  Q    You don't -- can you recall -- I apologize
8  for interrupting.
9      Can you recall any time in the last
10  eight years in which you've flown Spirit,
11  Frontier, or Allegiant?
12  A    Not in the last eight years.
13  Q    Can you recall any time in which you've
14  flown Spirit, Frontier, or Allegiant?
15  A    Well, I am not certain.  I may have flown
16  Frontier.
17  Q    Not certain, though?
18  A    Correct.
19  Q    So you -- but you'd agree with me that you
20  haven't flown any ultra-low-cost carrier in the
21  last eight years; correct?
22  A    That's what the data is showing, correct.
23  Q    Okay.  Is there a reason why you choose
24  not to fly ultra-low-cost carriers?
25  A    No.

Page 78

1  Q    No reason at all?
2  A    I am not choosing the flights based on
3  whether it's ultra low cost or not ultra low cost.
4  It's based on how that particular flight serves my
5  needs at the time.
6  Q    So looking a little bit more at the
7  flights themselves -- and, again, if it wasn't
8  clear, feel free to scroll around the document.
9  You're more than entitled to take a look at all of
10  this.
11      Are there any flights -- have you
12  flown -- strike that.
13      Have you flown into or out of Orlando
14  within the last eight years?
15  A    I don't know.  Do we need to go through
16  the entire document?
17  Q    You don't have to.  You're certainly
18  allowed to.  I'm asking, do you recall ever flying
19  out of Orlando -- flying to or from Orlando within
20  the last eight years?
21  A    I don't recall, but I can look through the
22  document closely if you want me to.
23  Q    No.  That's okay.
24          MR. BONSIGNORE:  Object --
25  objection.

Page 79

1  BY MR. SISKO:
2  Q    I'm just asking for your recollection.
3      Just out of curiosity, my geography
4  isn't great, but how long of a drive is it from
5  Fort Myers to Orlando?
6  A    From -- well, I reside in Naples.
7  Q    I apologize.  Naples to Orlando?
8  A    Well, it could be three and a half to four
9  hours or more.
10  Q    Would -- if you were going to Orlando,
11  would you fly or drive?
12  A    I would drive.
13  Q    Okay.  Ms. McCarthy, do you recall flying
14  to or from New York in the last eight years?
15  A    Well, to -- to the Tri-State -- like to
16  one of the three New York airports, whether it be
17  Newark, LaGuardia, or JFK.
18  Q    Do you consider Newark to be a New York
19  airport?
20  A    Yes.
21  Q    Okay.  But I'll represent to you that
22  there are no flights to JFK on this chart.  Are
23  you aware of any flights you've taken to or from
24  JFK in the last eight years?
25  A    I am not.

Page 84

1  A    No.
2  Q    Do you ever book a flight directly through
3  an airline's website?
4  A    Primarily all of the flights that -- that
5  have been booked for my husband and myself have
6  been booked through Worldspan.
7  Q    What -- what class of ticket do you
8  usually purchase?
9  A    I fly coach, I fly premium economy, and
10 I've flown business.
11 Q    Is economy -- strike that.
12     Are there any particular amenities
13 that you prefer to have on a flight?
14 A    I just want a seat.
15 Q    Just a seat is fine?
16 A    That's usually the -- you know, you need
17 to get to -- from -- to where I'm going is my
18 biggest thing.
19 Q    Okay.  So things like leg room, those
20 aren't important to you?
21     MR. BONSIGNORE:  Objection; asked
22     and answered.
23 BY MR. SISKO:
24 Q    You can answer.
25 A    I mean, comfort is always something -- I

Page 85

1  mean, everybody likes to be comfortable with
2  whatever they want to do.  But, again, the most
3  important thing, if I have to be in New York by
4  10:00 in the morning, then I'm going to choose the
5  flight that's going to get me there by 10:00 in
6  the morning.
7  Q    So service is your primary consideration?
8  A    Yes.
9  Q    Okay.  So, Ms. McCarthy, you've flown on
10 JetBlue three times in the last eight years; is
11 that correct?
12 A    Yes.
13 Q    Do you have any current plans to fly
14 JetBlue in the future?
15 A    I don't have any future travel, other than
16 this weekend, booked.
17 Q    Sure.  And where are you headed this
18 weekend?
19 A    I am going to Connecticut.
20 Q    Okay.  And do you have any travel plans in
21 the future that are not yet booked?
22 A    I hope to travel in the future.
23 Q    Anything specific?
24 A    Nothing specific right now.
25 Q    Okay.  And your flight to Connecticut this

Page 86

1  weekend, what airline is that on?
2  A    I believe it is American.
3  Q    Okay.  I'm not sure it's on the chart.
4  That's why I ask.
5  A    Correct.
6  Q    And, Ms. McCarthy, you've never flown on
7  Spirit, as we've discussed; correct?
8  A    Correct.
9  Q    And do you have any plans to fly Spirit in
10 the future?
11 A    I'm -- I -- I definitely would fly Spirit
12 in the future.
13 Q    But -- and just to be clear, you've never
14 flown an ultra-low-cost carrier at all in the last
15 eight years; correct?
16 A    Correct.
17     MR. BONSIGNORE:  Objection; asked
18     and answered.
19 BY MR. SISKO:
20 Q    I think you said that's right?
21 A    Yes.
22 Q    So given that you've never flown Spirit
23 and only flown JetBlue three times in the last
24 eight years, how do you think this proposed merger
25 would impact your personal travel?

Page 87

1  A    Well, I think with the merger, it's going
2  to eliminate one of -- you know, eliminate
3  competition; right?  So it's going to eliminate a
4  carrier with other options in the market.  So I
5  think that it's going to affect prices on all
6  airlines.  They're going to be higher.  Without
7  those planes in the sky, there's going to be fewer
8  seats available, fewer seats on the planes,
9  increased prices, like I said.  I think there's
10 going to be fewer people -- support staff on the
11 ground servicing the gates.
12     I think -- I think for -- for me, it's
13 going to remove another consideration for my
14 travels.  I think for other people's travels, I
15 think it's going to be doing all the same thing.
16 I think there's going to be lots of people that
17 aren't going to be able to afford the non-low cost
18 carriers, so I think they aren't going to be able
19 to travel by air.
20 Q    Thanks for that, Ms. McCarthy.  I think my
21 question was a little different.
22     How is the proposed JetBlue and Spirit
23 merger going to impact your personal travel?  What
24 I heard you say was it will remove -- it may
25 remove a consideration for you, and I'm asking how

Page 88

1  that can be true if you have never flown Spirit in
2  your life.
3  A    Well --
4        MR. BONSIGNORE:  Objection.
5        THE WITNESS:  Just because I
6  haven't chosen Spirit in the last eight
7  years or previously doesn't mean that it's
8  not going to be a consideration in the
9  future.  I think that with the way the
10 industry is headed with escalating prices
11 all the time, it's going to be more
12 important than ever that I make an
13 educated decision based on all of the
14 factors, and whether or not Spirit exists
15 to give me that ultra-low-cost option.  I
16 think without Spirit in the market it's
17 going to give the other carriers the
18 ability to increase their prices even
19 more.
20 BY MR. SISKO:
21 Q    So other than -- well, let's take that
22 there.
23       Just to reiterate, you don't pay for
24 your own travel; correct?
25 A    Well, my employer pays for my travel, but

Page 89

1  my husband owns the agency.  So while it is not
2  coming out of my direct income, it certainly makes
3  a difference on his bottom line and the bottom
4  line of MAD Travel.
5  Q    Right.  Because your business and personal
6  travel are both booked through MAD Travel;
7  correct?
8  A    Yes.
9  Q    And so other than potentially removing a
10 consideration from the market, can you give me any
11 specific harm that will come to you as a result of
12 this merger?
13 A    Well, again, I think escalating prices.  I
14 think it's going to be harder to get seats on
15 airplanes if you're removing a carrier out of the
16 marketplace.  You know, I think it's also, by
17 eliminating jobs and all of that, I think that my
18 personal experience flying is going to be
19 diminished.  As it is, customer service seems to
20 be on the decline.  And then without -- you know,
21 without the employees and all of that, it's going
22 to be harder -- harder than it already is.
23 Q    Ms. McCarthy, I'm not trying to badger.
24 You've answered my question by a series of "I
25 think" statements, and I'm asking you other than

Page 90

1  potentially removing a consideration from your
2  personal travel, is there a specific harm that you
3  can identify as a result of this merger?
4        MR. BONSIGNORE:  I'm -- I'm going
5  to object.  I think you -- well, I'm
6  certain you pointed out the word "I think"
7  correctly, but I think it's a -- well, I
8  think it's a matter of semantics and that
9  just shows that "I think" is the intended
10 word for "my opinion."  As I just said, I
11 think it's just a matter of semantics.
12       So I think it's objection; asked
13 and answered, is the point I'm trying to
14 make.
15       MR. SISKO:  Okay.  We can -- we can
16 move on.
17       Actually, that might be a nice time
18 for a break.  If we can go off the record,
19 please.
20       THE VIDEOGRAPHER:  We're off the
21 record.
22       (Recess from 11:17 a.m. to 11:31 a.m.)
23       THE VIDEOGRAPHER:  We are back on
24 the record.  The time is 11:31.
25       MR. SISKO:  Okay.  Thank you.

Page 91

1  BY MR. SISKO:
2  Q    Ms. McCarthy, welcome back.
3        During the break, did you discuss your
4  testimony with anyone other than your counsel?
5  A    No.
6  Q    Great.  Thank you.  Just a few more
7  questions for you.
8        You're aware that this lawsuit is
9  brought -- strike that.
10       You're aware that the lawsuit you're a
11 plaintiff in is to block the proposed merger
12 between JetBlue and Spirit; correct?
13 A    Yes.
14 Q    And I want to be clear.  For the next
15 couple questions, I don't want to hear anything
16 about your conversations with counsel or anything
17 that would be covered by the attorney-client
18 privilege, but we're going to talk a little bit
19 about the lawsuit itself.  Okay?
20 A    Okay.
21 Q    When did you first consider bringing this
22 lawsuit?
23 A    As soon as I heard that there was a
24 possibility that they were going to merger -- or
25 actually -- yeah.

Deposition of Lisa Ruth McCarthy

Page 104

1   future.
2           MR. BONSIGNORE:  Thank you.  No
3   further questions.
4           MR. SISKO:  I have just a couple
5   more off that.
6           FURTHER EXAMINATION
7   BY MR. SISKO:
8   Q     Ms. McCarthy, you just testified that for
9   any future but not yet booked travel plans, you
10  intend to pay for that travel yourself?
11  A     Well, when I'm no longer with MAD Travel,
12  which I'm thinking is in the very near future,
13  yes, I would be paying for my own personal travel.
14  Q     Why will you not be involved with
15  MAD Travel any longer?
16  A     Well, I'm not getting any younger, so I --
17  I'm looking towards retirement.
18  Q     If you don't mind me asking a rude
19  question, what's your age, Ms. McCarthy?
20  A     I'm 55.
21  Q     Okay.
22          MR. SISKO:  No further questions.
23          MR. BONSIGNORE:  No further
24  questions.
25          THE VIDEOGRAPHER:  Okay.  This

Page 105

1   concludes the video deposition of Lisa
2   McCarthy.  We're off the record at 11:48.
3   (Off the record at 11:48 a.m. EST)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25