# EXHIBIT 65

```
 1                UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MASSACHUSETTS
 3
 4   GABRIEL GARAVANIAN, et al.,
 5                  Plaintiffs,
 6        vs.                      Case No. 1:23-cv-10678-WGY
 7   JETBLUE AIRWAYS CORPORATION and
 8   SPIRIT AIRLINES, INC.,
 9                  Defendants.
10   _____/
11
12          VIDEOTAPED DEPOSITION OF TIMOTHY NIEBOER
13                     APPEARING REMOTELY
14
15                  Sunday, June 18, 2023
16                       1:03 p.m. EDT
17
18
19
20
21
22
23   REPORTED BY:
24   Cheri L. Poplin, CSR-5132, RPR, CRR
25   APPEARING REMOTELY FROM WAYNE COUNTY, MICHIGAN
```

```
 1   REMOTE APPEARANCES:

 2
        FOR PRIVATE PLAINTIFFS:
 3
                ROBERT J. BONSIGNORE
 4              MELANIE PORTER
                Bonsignore Trial Lawyers, PLLC
 5              23 Forest Street
                Medford, Massachusetts 02155
 6              781.350.0000
                rbonsignore@classactions.us
 7              porter@classactions.us

 8
        FOR DEFENDANTS:
 9
                COLE A. RABINOWITZ
10              Paul, Weiss, Rifkind, Wharton & Garrison LLP
                535 Mission Street, 24th Floor
11              San Francisco, California 94105
                212.373.3956
12              crabinowitz@paulweiss.com

13              RaCIA D. POSTON
                Paul, Weiss, Rifkind, Wharton & Garrison LLP
14              1285 Avenue of the Americas
                New York, New York 10019
15              212.373.3903
                rposton@paulweiss.com
16

17   ALSO PRESENT:

18        Dan Cotilla, Video Technician

19

20

21

22

23

24

25
```

Page 8

1  Q. Okay. You aren't taking any medications or other
2     substances that could impair your ability to testify
3     truthfully?
4  A. No.
5  Q. Great. And is there anyone else in the room with you
6     right now?
7  A. No.
8  Q. Okay. And do you have any documents with you in the
9     room?
10 A. No.
11 Q. Any notes? Okay. Are there any windows or
12    applications other than this Zoom screen open on your
13    computer that you are referring to?
14 A. Everything is closed.
15 Q. Great. And then I'll just note on your screen it says
16    Tim and Steph, but you are just Tim here today and
17    Steph is not here; correct?
18 A. That is correct. Yes.
19 Q. Okay. Great. So I may show you documents during
20    today's deposition. Can you agree that you will look
21    only at those documents that I show you during the
22    deposition?
23 A. Yes.
24 Q. Great. Okay. So have you ever been deposed before?
25 A. Yes, I have.

Page 9

1  Q. When was that?
2  A. One is probably about four years ago and then previous
3     to that it's been a very long time. I don't recall.
4     But I have done it more than once.
5  Q. Okay. And four years ago, was that during a trial or
6     an arbitration?
7  A. That was during a lawsuit with a construction company
8     that I worked for.
9  Q. Okay. Were you a plaintiff in that lawsuit?
10 A. We were not the plaintiff, no.
11 Q. Okay. And what was the general subject matter of that
12    testimony?
13 A. Another construction company was going after damages
14    that supposedly our company caused, which did not turn
15    out to be the case. It got -- it got settled out of
16    court.
17 Q. Okay. Have you been deposed in any case involving
18    mergers or acquisitions?
19 A. No.
20 Q. Did you do anything to prepare for your deposition
21    today?
22        MR. BONSIGNORE: Objection to the extent it
23    calls for the invasion of the client --
24    attorney-client privilege or attorney work product.
25 BY MR. RABINOWITZ:

Page 10

1  Q. I'll just clarify that, you know, please don't share
2     any substantive communications between you and
3     Mr. Bonsignore. However, the fact of those
4     communications, whether you met with him, whether he
5     provided you any documents without anything about the
6     contents of those documents, it's important that you
7     don't share those privileged communications, however,
8     the fact of the communication is something that I'm
9     asking about. So I'll just ask it again.
10        Did you do anything to prepare for your
11    deposition today?
12        MR. BONSIGNORE: Objection.
13        You can answer.
14 A. Just went into the history of my flight and stuff like
15    that and just -- it was all prepared on my own,
16    so . . .
17 BY MR. RABINOWITZ:
18 Q. Did you have any meetings with counsel, Mr. Bonsignore
19    or otherwise, before today's deposition?
20 A. Very limited.
21 Q. How many times did you meet with counsel before
22    today's deposition?
23 A. There were no meetings. It was only phone calls.
24    Maybe three times at most. Very brief.
25 Q. And who participated in those phone calls?

Page 11

1  A. Myself and Robert, or Bob.
2  Q. Was anyone beside counsel present?
3  A. No.
4  Q. Were you shown documents during that phone call?
5  A. No.
6  Q. Okay. So I want to touch briefly on your education
7     and employment history. Can you briefly summarize
8     your educational background after high school?
9  A. I went to Michigan Technological University, got a
10    civil engineering degree. Then after that I worked
11    for an asphalt paving company and worked -- it was
12    Thompson-McCully. Then I worked for Kajeen (ph)
13    Engineering for a short period and then Rieth-Riley
14    Construction, and now I work for Angelo Iafrate
15    Construction as an estimator.
16 Q. When did you graduate college? What year?
17 A. '85.
18 Q. And can you repeat just your current job for the
19    record?
20 A. I am a senior estimator with Angelo Iafrate
21    Construction.
22 Q. And how long have you worked there?
23 A. 23 years.
24 Q. And what are your responsibilities?
25 A. I estimate larger scale projects. Work with project

Page 12

1 managers to make sure that the project goes on track
2 and within budget.  But the main thing is, you know,
3 estimating multiple projects throughout the year,
4 upwards of a hundred million dollar plus jobs.
5 Q. What kinds of projects are those?  Do they specialize
6    in a certain industry or is it broad?
7 A. It's fairly broad.  We do heavy highway.  So we do
8    roadway construction.  We do MDOT, which is Michigan
9    Department of Transportation.  We do run -- you know,
10   airports, like at the Detroit Metro Airport runways.
11   We do site development, utilities, concrete work.
12   More in the larger scale projects.
13 Q. Do you ever interact with airlines in your job
14    capacity?
15 A. Not directly, no.
16 Q. And I apologize to ask you to go back, but would you
17    mind repeating the employer's name?  I just want to
18    make sure we get that in the record accurately.
19 A. Sure.  Angelo Iafrate Construction, and Iafrate is
20    I-A-F-R-A-T-E, Construction.
21 Q. Great.  So have you ever worked at an airline previous
22    to your current job?
23 A. No, I have not.
24 Q. So you've never worked at Spirit?
25 A. No.

Page 13

1 Q. And you've never worked at JetBlue?
2 A. No.
3 Q. Have you ever been employed as a travel agent prior to
4    your current job?
5 A. No.
6       MR. RABINOWITZ:  I'd like to pull up the
7    document under Tab 1, Mr. Cotilla.
8       VIDEO TECHNICIAN:  And this will be
9    Exhibit 1.
10      (Marked EXHIBIT 1 for identification)
11 BY MR. RABINOWITZ:
12 Q. Mr. Nieboer, I'm just going to scroll through this
13    document briefly for you.  Do you recognize this
14    document?
15 A. Yes.
16 Q. You've seen it before?
17 A. Yes.
18 Q. Did you participate in putting this document together
19    in the sense of providing the facts that are included
20    in this document?
21 A. I did not put anything together other than answer the
22    questions within the document.
23 Q. I understand.  And do you have any reason to believe
24    that the facts or the answers in this document are
25    incorrect?

Page 14

1 A. There was one, a Number 6.  Everything else looked
2    good.  I -- Number 6 said admit that you have never
3    been employed as a travel agent and it says deny, but
4    it should be admit because I have never been employed
5    as a travel agent.  I thought it got corrected.  It
6    did not.
7 Q. Okay.  Thank you for clarifying.
8 A. Um-hmm.
9 Q. So just for the record --
10      MR. BONSIGNORE:  We'll -- we'll provide an
11   errata.  Melanie, can you make a note of that, please?
12   I'll do it too.
13      MS. PORTER:  Yes.
14 BY MR. RABINOWITZ:
15 Q. And would the response to Request for Admission
16    Number 7 also need to be corrected?
17 A. Let's see.  My mother was a travel agent or owned a
18    travel agency, and after she passed away I transferred
19    ownership to her employee, so technically no, I have
20    not been an owner of a travel agency.  If you want to
21    say maybe like a month, that -- that's all I've had.
22    I've never had any workings with it.  Other than that,
23    that's all it was.
24 Q. Were you ever involved in the operations of your
25    mother's travel agency?

Page 15

1 A. No.
2 Q. And when you might have had a short duration of
3    ownership of your mother's travel agency, did you
4    realize any or make any income from that travel
5    agency?
6 A. I did not.
7 Q. And what was the name of your mother's travel agency?
8 A. Travel Professionals.
9 Q. And where was it located?
10 A. Kalamazoo, Michigan.
11 Q. Do you know about when the business was started?
12 A. The business was started about close to 40 years ago.
13 Q. And was it your mother that started the business?
14 A. My -- my stepfather -- my mom was a travel agency for
15    her whole life -- or travel agent for her whole life,
16    and my stepfather really believed in her and the way
17    that she conducted herself, and he -- literally he had
18    a flourishing company in real estate and he sold that
19    and started up a travel agency.  I'm not sure if it
20    started out as Travel Professionals, but I believe
21    that's where it ended up, but they started a new
22    agency.
23 Q. And is Travel Professionals still in business now?
24 A. It should be.  It was taken over when she passed
25    literally because of what happened to her with the

Page 16

```
 1   airlines previously.  She literally -- the company was
 2   literally just struggling.  She literally had nothing
 3   to her name, and she -- excuse me.
 4 Q. You can take a moment.
 5 A. Trying not to do this.
 6 Q. Would you like to take a brief break?
 7 A. Just give me a minute.  She's -- they struggled for a
 8   long time, so really there wasn't much left of the
 9   company, but she had one employee and that employee
10   wanted to continue with the company and so we let it
11   happen.
12 Q. And when that decision was made, was that when your
13   mother passed away and the ownership might have
14   briefly been in your stead?
15 A. Correct.  There were no documents signed to my name.
16   It was just like through inheritance and then it was
17   passed on to her.  She --
18 Q. It passed on to her -- I'm sorry.
19 A. Passed on to her employee and her name was Julie, and
20   I believe that the company still -- still is --
21   exists.
22 Q. What year did the transfer of the business through you
23   to Julie occur?
24 A. 2019.
25 Q. And what is Julie's last name?
```

Page 17

```
 1 A. Gooding.
 2 Q. Mr. Nieboer, you do not have any connection with
 3   Travel Professionals currently; correct?
 4 A. That is correct.
 5 Q. And you do not expect to have any relationship with
 6   Travel Professionals in the future; correct?
 7 A. Correct.
 8 Q. Do you have any intention of entering the travel
 9   agency industry in the future?
10 A. After what I've seen, not at all.
11 Q. And do you anticipate making any income from the
12   travel agency industry in the future?
13 A. No.
14 Q. Would you agree with me that because you do not
15   anticipate having any relationship with the travel
16   agency industry or working as a travel agent or making
17   any income from the travel agency industry that you
18   will not be impacted by the Spirit or JetBlue merger
19   in your capacity as a travel agent; correct?
20 A. As a travel agent, correct.  As a consumer, yes.
21 Q. Mr. Nieboer, earlier when you were discussing the
22   experience your mother had in the travel agency
23   industry you appeared to -- you appeared to be
24   thinking about some events that we did not speak about
25   yet.  Would you please share a little bit about that
```

Page 18

```
 1   background?
 2 A. The -- it's from the history of the airline companies.
 3   You know, as always, when mergers happen and
 4   competition goes away and monopoly becomes stronger,
 5   they -- and this is, you know, communicating through,
 6   you know, with my mom's stuff, there was collusion
 7   that eliminated most or -- most of the fees that the
 8   travel agents could -- could charge, and basically
 9   when all that happened, they literally lost about
10   everything, and when my mom -- my stepdad passed
11   first.  When my mom passed -- or when he passed, I
12   actually had to pay -- help to pay for his funeral and
13   stuff because after the airlines colluded and cut
14   their fees way down, they lost -- my mom always
15   referred to her agency as a 401(k).  She never thought
16   anything like that would happen to her, but she lost
17   the company -- or not the company, but she lost her
18   income and she actually had to work basically until
19   she passed at the age of 78, and it's all because of
20   the airline industry trying to take out the -- the
21   middleman, which is basically the travel agents and
22   the travel agent companies, the travel agencies.  I
23   literally, again, had to -- because they didn't really
24   have anything, I literally had to help her out.
25 Q. And the change that you were referring to taking
```

Page 19

```
 1   place, is that the airline's decision to stop paying
 2   commission fees to travel agents?
 3 A. That is my understanding, yes.
 4 Q. And do you recall about when that change took place?
 5 A. I want to say it was early 2000s.  Probably -- I think
 6   it was around maybe 2010, 2011.
 7 Q. And do you recall if any specific airlines were
 8   involved in that decision or was it all airlines?
 9      MR. BONSIGNORE:  Objection.  Relevancy.
10      You can answer.
11 A. Okay.  I cannot tell you -- there were multiple
12   airlines involved.  The only one that I know is
13   American Airlines.
14 BY MR. RABINOWITZ:
15 Q. And American Airlines stopped paying commissions to
16   travel agents?
17 A. That is my understanding.
18      MR. BONSIGNORE:  Objection to the extent it
19   calls for an opinion from an unqualified witness or
20   calls for speculation and relevancy.
21      You can answer.
22 A. That's kind of what I was just going to say.  It was
23   my understanding.  I was not directly involved in it.
24   It's just the comments and things that my mom and
25   stepdad had told me.
```

Page 68

1  Q. Just to confirm, Allegiant flies out of Flint; is that
2     correct?
3  A. Yeah. I mean, they do, yes. I don't know other
4     airports and stuff that they fly out of, but yes, I
5     took Allegiant out of Flint, yes.
6  Q. Does Spirit fly out of Flint?
7  A. I don't think so. I -- I don't know.
8  Q. And Flint is the closest airport to your house;
9     correct?
10 A. That is correct.
11 Q. Would you say that you have a preference to fly
12    Spirit?
13 A. No. Not at all.
14 Q. Why is that?
15 A. Like I said, I look at the most economical, and Spirit
16    is generally the most economical flight. You go
17    through the search engines and stuff, that's what pops
18    up as the cheapest on the routes that I -- that
19    they -- they're on.
20 Q. How do you normally search for a flight that you are
21    looking to take?
22 A. Through multiple, like Expedia, Hopper. Multiple
23    ones. Kayak. I check --
24 Q. Do you use -- I apologize.
25 A. I check a bunch of them.

Page 69

1  Q. Do you ever book through the airline's website
2     directly?
3  A. Yeah. I've done it with Spirit a long time ago. I
4     mean, it's . . . I can't think of anybody else that
5     I've done directly right off the top of my head,
6     but . . . So . . .
7  Q. Have you ever used a travel agent to book a flight?
8  A. My mom a long time ago.
9  Q. How long ago about?
10        MR. BONSIGNORE: Objection.
11 BY MR. RABINOWITZ:
12 Q. Was it over ten years ago?
13 A. I'm not absolutely sure.
14 Q. Was it since 2015?
15 A. I would say probably not. I'm not absolutely sure.
16 Q. Are there any airlines that you would never fly on?
17 A. No.
18 Q. Why is that?
19 A. I'm sorry?
20 Q. Is there any reason that you wouldn't fly on any
21    airline? Let me -- withdrawn. Withdrawn. Let me
22    clarify that.
23 A. Yeah.
24 Q. Do you ever restrict your search to exclude certain
25    airlines?

Page 70

1  A. No.
2  Q. Do you typically fly alone or do you typically fly
3     with other people?
4        MR. BONSIGNORE: Objection.
5        You can answer.
6  A. Like you saw, a few times down to Hilton Head because
7     my wife was already down there. Other than that, most
8     of the time when I fly it's -- it's with my wife or
9     family.
10 BY MR. RABINOWITZ:
11 Q. Do your travel companions prefer any particular
12    airline?
13 A. No. My -- my wife is very understanding, but on
14    Spirit her back hurts a little bit in the seat, but
15    she knows economically it's the best way to go, but
16    no.
17 Q. Is it safe to say that you and your travel companions
18    would prefer a more comfortable seat?
19        MR. BONSIGNORE: Objection.
20 A. That I could not tell you. Again, I'm all about
21    economics and . . .
22 BY MR. RABINOWITZ:
23 Q. When you travel, what do you typically bring for
24    luggage?
25        MR. BONSIGNORE: Objection.

Page 71

1  A. We bring the least amount as possible. We do not
2     typically check our bags. We typically have -- our
3     suitcase is based upon what they allow to take the
4     flight on and it's very small, but we typically do not
5     check our bags in.
6  BY MR. RABINOWITZ:
7  Q. Are you willing to pay a fee to bring a carry-on bag?
8        MR. BONSIGNORE: Objection.
9  A. I try not to the most I can, so . . . I definitely
10    don't like to pay any added fees or anything like
11    that, no.
12 BY MR. RABINOWITZ:
13 Q. Would the possibility of paying an extra fee for a
14    carry-on bag make you choose another airline?
15        MR. BONSIGNORE: Objection.
16 A. I don't really research into it that far.
17 BY MR. RABINOWITZ:
18 Q. Do you know which carriers charge baggage fees for
19    carry-on bags?
20        MR. BONSIGNORE: Objection.
21 A. I know Spirit does, but from all the other ones, you
22    know, I'm not absolutely sure.
23 BY MR. RABINOWITZ:
24 Q. How do you know Spirit charges a baggage fee?
25 A. It's -- it's a part of the booking process.

Page 76

1  A. Yes.
2  Q. Have you ever flown out of Traverse City Airport?
3  A. No.
4  Q. Have you ever flown into Traverse City Airport?
5  A. No.
6  Q. How far is Traverse City Airport from your house?
7  A. I have a house in Traverse City too. Future. That
8     could be possibly future. That's all that was for.
9  Q. Okay. But you have never booked a ticket in or out of
10    Traverse City; correct?
11 A. Correct.
12 Q. Are you familiar with the airport -- or withdrawn.
13        Are you familiar with the airlines that fly
14    into and out of Traverse City?
15 A. Not at all.
16        MR. RABINOWITZ: Counsel, is this a good
17    time for a break?
18        MR. BONSIGNORE: Yes. If it's good for
19    you.
20        MR. RABINOWITZ: Okay. Can we go off the
21    record, please?
22        VIDEO TECHNICIAN: The time is 3:19 p.m.
23    We're off the record.
24        (Recess taken at 3:19 p.m.)
25        (Back on the record at 3:33 p.m.)

Page 77

1         VIDEO TECHNICIAN: The time is 3:33 p.m.
2     We're back on the record.
3  BY MR. RABINOWITZ:
4  Q. Mr. Nieboer, did you consult with anyone other than
5     your counsel during the break?
6  A. No.
7  Q. And did you refer to any documents during the break?
8  A. No.
9  Q. Okay.
10 A. Can I say one last? I apologize for some of the
11    inaccuracies on the chart, and I will definitely, you
12    know, work through and make -- make everything
13    correct, so . . .
14 Q. Appreciate that. Thank you.
15        MR. RABINOWITZ: Speaking of the chart,
16    Mr. Cotilla, could we please put up Tab 3, the
17    interrogatory response to Number 1? That chart,
18    please. It's on Page 7.
19 BY MR. RABINOWITZ:
20 Q. Mr. Nieboer, this chart shows that the last time
21    you've flown Spirit was in 2019; correct?
22 A. That's what it's showing. Correct.
23 Q. Have you flown Spirit since 2019?
24 A. You know, I have to further investigate, you know.
25    I -- I cannot recall.

Page 78

1  Q. Do you remember sitting here today having flown on a
2     Spirit flight since 2019?
3  A. I believe one of the documents you showed up -- or
4     showed up was Spirit, but I don't recall if it had a
5     date on it.
6         MR. RABINOWITZ: Mr. Cotilla, could we
7     please put up Tab 5? And scroll to Nieboer 03. I
8     believe it would be the third page.
9  BY MR. RABINOWITZ:
10 Q. Mr. Nieboer, is that -- is this the Spirit flight that
11    you were referring to?
12 A. Yes.
13 Q. And do you recall this flight taking place since 2019?
14 A. I do not. I -- I have to further look into it.
15        MR. RABINOWITZ: Thank you, Mr. Cotilla.
16    We can take the document down.
17 BY MR. RABINOWITZ:
18 Q. Mr. Nieboer, do you have any plans to fly on Spirit in
19    the future?
20 A. Yeah, I guess. Anything that's economical. Yes. For
21    sure.
22 Q. Do you have any tickets booked to fly on Spirit?
23 A. I do not.
24 Q. Do you have a destination chosen that you will be
25    flying to --

Page 79

1         MR. BONSIGNORE: Objection.
2  BY MR. RABINOWITZ:
3  Q. -- on Spirit?
4         THE WITNESS: I'm sorry.
5         MR. BONSIGNORE: Sorry. I was -- we're --
6     I think he was playing -- playing with me there. You
7     can answer.
8  BY MR. RABINOWITZ:
9  Q. I'll ask the question again. How about that?
10        MR. BONSIGNORE: Okay.
11 BY MR. RABINOWITZ:
12 Q. Have you selected a destination that you'll be flying
13    Spirit to?
14        MR. BONSIGNORE: Objection.
15        Go ahead.
16 A. No. Not at all.
17 BY MR. RABINOWITZ:
18 Q. Do you have specific dates that you will be flying
19    Spirit on?
20 A. I do not. I mean, it'll be May and February, but I
21    can't guarantee it's Spirit.
22 Q. So you could possibly be flying another airline for
23    those trips; correct?
24        MR. BONSIGNORE: Objection.
25 A. Anything's possible, but they've always been the most

Page 80

1  economical one, so that is what I would run with.
2  BY MR. RABINOWITZ:
3  Q.  Going back to the Spirit Saver Club briefly.  Do you
4      understand what will happen to your membership in the
5      Spirit Saver Club post merger if you still had a
6      membership?
7          MR. BONSIGNORE:  Objection.
8  BY MR. RABINOWITZ:
9  Q.  Withdrawn.  Withdrawn.
10         You currently do not have a Spirit Saver
11     Club membership; correct?
12 A.  Correct.
13 Q.  As a result, your Spirit Saver Club membership does
14     not stand to be impacted by the Spirit/JetBlue merger;
15     correct?
16         MR. BONSIGNORE:  Objection.
17 A.  Yeah.  I don't have it, so you are correct.
18 BY MR. RABINOWITZ:
19 Q.  Mr. Nieboer, do you have a specific recollection of
20     having flown on JetBlue?
21 A.  No.
22 Q.  What's your opinion of JetBlue Airlines?
23 A.  I have none.
24         MR. BONSIGNORE:  Objection.
25 A.  I'm sorry.  I have none.

Page 81

1  BY MR. RABINOWITZ:
2  Q.  In your experience, are JetBlue's fares generally
3      lower or more expensive than legacy airlines, like
4      American, Delta, Southwest, or United?
5          MR. BONSIGNORE:  Objection.
6  A.  I -- I don't know because I've never chosen them.  I
7      could not tell you.
8  BY MR. RABINOWITZ:
9  Q.  Are you familiar with what kind of amenities JetBlue
10     offers on its flights?
11         MR. BONSIGNORE:  Objection.
12 A.  No.  Not at all.
13 BY MR. RABINOWITZ:
14 Q.  Do you currently have any plans to fly JetBlue in the
15     future?
16 A.  Same thing.  If they're economical, I will.  I don't
17     have any objection to them at all.
18 Q.  But you have no specific plans to fly JetBlue;
19     correct?
20 A.  That is correct.
21         MR. BONSIGNORE:  Objection.
22         THE WITNESS:  Sorry.
23 BY MR. RABINOWITZ:
24 Q.  Have you purchased a ticket to fly on JetBlue in the
25     future?

Page 82

1  A.  No.
2  Q.  Given that you've never flown JetBlue, how do you
3      expect the merger of Spirit and JetBlue will affect
4      you?
5          MR. BONSIGNORE:  Objection.
6  A.  Mergers only help the companies, not the public.  It
7      helps -- you know, the corporations make all the extra
8      money and along with -- I mean, my opinion, you know,
9      the government steps in and says, hey, we're gonna
10     stop this thing and next thing you know people go
11     behind closed doors and -- and things happen and
12     everything goes through, but it's -- they're the only
13     ones that are going to make out of this, and what's
14     gonna happen is there's gonna be I'm sure less seats
15     available because any redundant flight that maybe
16     JetBlue and Spirit were -- were there for, well, the
17     Spirit one's going away, so there's gonna be less
18     seats, less opportunity to -- to fly to certain
19     destinations is what I feel and see.  It's just --
20     it's all a matter of supply and demand, and if the
21     supply goes down and the demand is still there, prices
22     go up, so . . .  Now it just gets a lot more
23     expensive, and I know for the -- the people that can
24     barely afford it, their life is gonna change, too,
25     because they're not gonna be able to fly the way they

Page 83

1  want.
2  BY MR. RABINOWITZ:
3  Q.  Mr. Nieboer, is the higher prices for airfare the
4      primary impact of the Spirit/JetBlue merger that you
5      expect to experience?
6          MR. BONSIGNORE:  Objection.
7  A.  Well, less availability for sure.  I mean, there's a
8      possibility of other flights that were going to the
9      same destination.  You know, that's -- that -- that's
10     a big concern.  But it could be a lot more expensive.
11 BY MR. RABINOWITZ:
12 Q.  Would the higher prices be an important factor to you?
13 A.  Definitely.
14 Q.  What other facts or personal experiences do you have
15     to support your opinion that only corporations benefit
16     from this merger?
17 A.  It's just -- one thing I've always said is mergers
18     just hurt the public, only help the companies, and
19     I've always said that this -- this country is gonna
20     be, and this is long -- long ago, is gonna be just a
21     few merged companies and they're the ones that are
22     gonna be reaping the benefits from it, not the people.
23     My opinion.
24 Q.  Does that apply to all mergers?
25 A.  You know, again, it's -- you're creating more and more

Page 88

1 Q. What do you mean not personally? Is there another
2    capacity in which you're familiar with them?
3 A. I don't really know them personally overall. There
4    was one gentleman that my mom had communicated with a
5    long time ago that I -- his name is Mike. I don't
6    recall his last name. But that's it.
7 Q. Do you know in what capacity your mom communicated
8    with Mike?
9 A. Over the -- American Airlines.
10 Q. Can you explain that a little more?
11 A. The -- the -- the lawsuits of collusion from -- from
12    in the past.
13 Q. Was your mother involved in those lawsuits?
14 A. Yes. Because she was damaged by them. Like I said,
15    she passed penniless because of them.
16 Q. You mentioned that the airlines' decision to stop
17    paying commissions to flight attendant -- or flight --
18    travel agents -- excuse me. Withdrawn.
19        You mentioned that airlines' decisions to
20    stop paying commissions to travel agents is what led
21    to the downturn in your mother's business; is that
22    correct?
23        MR. BONSIGNORE: Objection.
24 A. Big time, yes.
25 BY MR. RABINOWITZ:

Page 89

1 Q. Can you explain that a little more?
2 A. When -- I mean, they used to -- used to talk about it
3    a lot, but . . . Here we go. After she passed -- we
4    knew that financially they were -- they struggled.
5    Before the airlines did this to them, they were living
6    very well, and after they passed, turned out that they
7    had not additional mortgages but they had a couple
8    homes. One was a condo by her office and one was up
9    north. They had at one time were -- informed us that
10    they were all paid off. After this happened to them,
11    they were remortgaged to the hilt on our up north
12    home. They were mortgaged up to the hilt on their
13    condo. They were doing anything they could to
14    survive. They were in their 60s when it happened to
15    them. They couldn't start or anything else. They --
16    like I said, they were penniless, and I actually had
17    to pay for my stepfather's cremation and -- because a
18    very proud woman, outstanding woman had to come to me
19    and tell me that she couldn't pay for her husband's
20    funeral or cremation and expenses, so . . .
21 Q. Sounds like a very difficult situation. I'm very
22    sorry to hear that.
23 A. Yep.
24 Q. And the financial struggles that your mother
25    experienced were as a result of the airlines' decision

Page 90

1    to stop paying commissions to travel agents; is that
2    correct?
3 A. That is correct.
4 Q. Is it fair to say that that decision by airlines is
5    upsetting to you?
6        MR. BONSIGNORE: Objection.
7 A. Monopolies, mergers are upsetting to me because -- and
8    I know there's a lot of other people that have gone
9    through the same thing, but I've also lived it, too, I
10    mean, along with them, so . . .
11 BY MR. RABINOWITZ:
12 Q. Is it your representation that the airlines' decision
13    to stop paying commissions to travel agents is related
14    to any merger?
15 A. I would say past -- I mean, just monopolies in
16    general. Just -- I mean, it's all a result of just
17    limiting and reducing competition that the little
18    person can't do anything about and they all suffer.
19 Q. Was your mother involved in any other challenges to
20    airline mergers aside from the American Airlines
21    merger?
22        MR. BONSIGNORE: Objection.
23 A. It wasn't necessarily a merger that I can recall, but
24    not that I know of at all.
25 BY MR. RABINOWITZ:

Page 91

1 Q. So you are not familiar with your mother's
2    participation as a plaintiff in any merger challenges
3    to airline mergers?
4 A. No. Not --
5        MR. BONSIGNORE: Objection.
6        THE WITNESS: Sorry.
7 BY MR. RABINOWITZ:
8 Q. Let me repeat the question. You are not familiar with
9    the fact that your mother was a plaintiff in prior
10    challenges brought to airline mergers; is that
11    correct?
12 A. Correct. Yeah. I don't know.
13 Q. Have you been a plaintiff in any other challenges to
14    mergers?
15        MR. BONSIGNORE: Objection.
16 A. To other airline mergers?
17 BY MR. RABINOWITZ:
18 Q. No. To any mergers in any industry.
19 A. I cannot recall. I -- you know, possibly one, but I'm
20    not actually sure.
21 Q. Which challenge to a merger would that be?
22 A. I -- you know, I don't know offhand.
23 Q. Are you not sure because you can't remember any or
24    because there might be multiple that you are not sure
25    about?

Page 96

1  A. Yes.
2  Q. Mr. Nieboer, do you recall which lawsuit resulted in a
3     settlement?
4  A. I do not.
5  Q. Mr. Nieboer, can you explain what impact the Spirit
6     and JetBlue merger will have on you personally?
7  A. I think we went through that before, but just going to
8     be pricing is going to go up and availability is -- is
9     going to go down, so my biggest thing is -- what I'm
10    concerned about is mainly pricing.
11 Q. Are there any other ways that the merger will impact
12    you personally?
13         MR. BONSIGNORE: Objection.
14 A. Well, other than financial, you know, this day and age
15    if I want a flight to go somewhere and there's less
16    and less people or less flights available, it's gonna
17    be more difficult for me to go to my destination in
18    the time that I want to, so I just feel like there's
19    gonna be possibly a less opportunity to go to the
20    destinations that I want and I want to say -- yeah.
21    Because the -- they're not available as far as the
22    seats and everything that if JetBlue and -- or
23    Spirit's gone, they'll eliminate some destinations and
24    stuff which could take longer. Right now I'm seeing
25    sometimes that based upon availability when I look

Page 97

1     these things up, some of the flights can be a day
2     long, and that's all based upon availability. If I'm
3     going to some place, I don't want to go back there the
4     next day. I want to be there within hours of when I'm
5     flying out, but . . . And I can see more of that
6     happening. When I look at them and see that a -- I
7     don't know anybody that would want to fly and then be
8     there the following day, and there's many flights like
9     that, again, because the competition is really --
10    really reduced.
11 BY MR. RABINOWITZ:
12 Q. Are there any other ways that the merger will have a
13    personal impact on you?
14 A. I would say no.
15 Q. Have you been involved in any prior challenges to
16    airline mergers?
17         MR. BONSIGNORE: Objection.
18 A. Not that I recall, no.
19 BY MR. RABINOWITZ:
20 Q. In any of the prior litigations that you've been
21    involved in, have any cases had a favorable outcome
22    for you?
23         MR. BONSIGNORE: Objection. Instruct the
24    witness not to answer to the extent that it requires
25    him to address matters that are subject to privilege

Page 98

1     or confidentiality.
2  BY MR. RABINOWITZ:
3  Q. Mr. Nieboer, is it possible for you to answer the
4     question without divulging any confidential
5     information under a settlement agreement or divulging
6     any information relating to the contents of
7     communications with attorneys?
8  A. No.
9  Q. Will you follow your attorney's advice not to answer
10    the question?
11 A. Yes.
12 Q. Mr. Nieboer, when you first considered bringing this
13    lawsuit to prevent the Spirit and JetBlue merger, what
14    steps did you take to prepare for the lawsuit?
15         MR. BONSIGNORE: Objection to the extent
16    that it calls upon the witness to disclose privileged
17    matters or attorney work product.
18         THE WITNESS: Is it okay to answer?
19         MR. BONSIGNORE: Yes. To the extent that
20    you're not discussing --
21 A. Yes.
22         MR. BONSIGNORE: -- matters related to your
23    lawyers.
24 A. Could you repeat the question again?
25 BY MR. RABINOWITZ:

Page 99

1  Q. Sure. When you first considered bringing this lawsuit
2     to prevent the Spirit and JetBlue merger, what steps
3     did you take to prepare for the lawsuit?
4  A. Basically the -- what are they? Interrogatories or
5     the -- I collected the flight information and stuff
6     that I was requested to to put together. I'm not an
7     attorney, so I'm just doing what -- what the questions
8     and everything are --
9          MR. BONSIGNORE: Objection. Instruct you
10    not to go any further.
11 BY MR. RABINOWITZ:
12 Q. Mr. Nieboer, before the Complaint was filed, did you
13    take any steps to prepare to bring the lawsuit?
14         MR. BONSIGNORE: Objection to the extent
15    that prior activities involve privileged matters
16    relating to his lawyers. Lawyers.
17 A. No.
18 BY MR. RABINOWITZ:
19 Q. Did you educate yourself about Spirit and JetBlue
20    prior to filing the lawsuit?
21 A. Did I educate myself?
22 Q. Yes.
23 A. No.
24 Q. Did you read any news about the Spirit and JetBlue
25    merger?

Page 100

1  A.  I had seen -- or heard or seen information a while
2      ago, but have I got into great detail?  I -- no.  I
3      just -- it's a merger that I don't think should
4      happen, so . . .
5  Q.  Based on what information did you think it shouldn't
6      happen?
7  A.  Based on my feelings, my -- mergers are -- are -- only
8      hurt the public.  They don't help the public, so . . .
9  Q.  Did you review any public statements by the airlines
10     or any securities filings before filing your lawsuit?
11         MR. BONSIGNORE:  Objection to the extent
12     that the response requires matters subject to the
13     attorney-client privilege.
14         You can answer.
15 A.  Repeat the question.
16 BY MR. RABINOWITZ:
17 Q.  Did you yourself review any public statements by the
18     airlines or any securities filings filed by the
19     airlines before filing your lawsuit?
20 A.  No, I did not.
21         MR. BONSIGNORE:  I incorporate my last
22     objection.
23         Go ahead.
24 A.  No, I did not.
25 BY MR. RABINOWITZ:

Page 101

1  Q.  Did you review the Complaint before it was filed?
2          MR. BONSIGNORE:  Objection to the extent
3      that it calls for matters subject to the
4      attorney-client privilege, and I think I have to
5      instruct him not to answer that.
6          MR. RABINOWITZ:  Mr. Bonsignore, can you
7      identify the particular communication?  I'm asking
8      merely whether Mr. Nieboer read the Complaint.
9          MR. BONSIGNORE:  Oh, okay.  That would be
10     the -- be based upon attorney work product.
11         MR. RABINOWITZ:  But, Mr. Bonsignore, the
12     Complaint is a public filing.  It has been filed in
13     this lawsuit.
14         MR. BONSIGNORE:  The privilege would be
15     when he reviewed it.  The work product is our thought
16     when he needed to review it.  So, for example, if he
17     contributed and we incorporated his thinking into it,
18     at what point in time we did what.
19         MR. RABINOWITZ:  I understand.
20 BY MR. RABINOWITZ:
21 Q.  Mr. Nieboer --
22         MR. RABINOWITZ:  And, Mr. Bonsignore, I'm
23     not going to ask whether or not he contributed to the
24     Complaint or anything like that.  I'm merely asking
25     whether he reviewed the Complaint.  Is that okay if I

Page 102

1      ask that question?
2          MR. BONSIGNORE:  Yes.  Go ahead.
3  BY MR. RABINOWITZ:
4  Q.  Mr. Nieboer, did you review the Complaint before it
5      was filed?
6  A.  I'm not exactly sure when they were -- when it was
7      filed, but briefly and mainly because I don't
8      understand all the legalese and everything that goes
9      along with it, so . . .  I'm not an attorney and
10     they're all written by an attorney, so I don't
11     understand the language.
12 Q.  Did you take any steps to verify whether the facts in
13     the Complaint are accurate?
14 A.  Not at all.
15 Q.  So, Mr. Nieboer, I just want to review a couple items
16     here.  To confirm, you do not have any recollection or
17     records of flying on Spirit since 2019; correct?
18 A.  That's not true, no.  I -- I be -- I gotta check to
19     see what that one Spirit flight was, when it was, so,
20     again, I apologize that the document was not full to
21     all the information that I provided.  That was
22     oversight on my part.  But I will correct it.
23 Q.  Is it your contention here today that you have taken a
24     Spirit flight more recently than 2019?
25         MR. BONSIGNORE:  Objection.

Page 103

1  A.  I don't know.
2  BY MR. RABINOWITZ:
3  Q.  Do you have any plans to fly Spirit in the future?
4  A.  Yeah.  Again, if -- yeah.  For sure.  If it's -- if
5      it's still there and if it's economically feasible and
6      it's going to my destination in the time frame that I
7      wanted to go.
8  Q.  But you currently haven't purchased any tickets to fly
9      Spirit in the future; correct?
10 A.  No.
11         MR. BONSIGNORE:  Objection.
12         THE WITNESS:  I'm sorry.
13         MR. BONSIGNORE:  No.  Go ahead.  You can
14     answer now.
15 A.  No.  Not at all.
16 BY MR. RABINOWITZ:
17 Q.  And you also haven't selected dates to fly Spirit on
18     in the future; correct?
19         MR. BONSIGNORE:  Objection.
20         You can answer.
21 A.  Not for Spirit directly, no.  I have dates that I'll
22     be flying somewhere, but who's going to do it or who's
23     going to take me there and back or whatever, no.
24 BY MR. RABINOWITZ:
25 Q.  And you also do not have any recollection of flying