# EXHIBIT 78

```
 1                UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 2
     GABRIEL GARAVANIAN, ET AL.     )
 3                                  )
                 PLAINTIFFS,        )
 4                                  )
     VS.                            )
 5                                  )  CASE NO. 1:23-CV-10678-WGY
     JETBLUE AIRWAYS                )
 6   CORPORATION AND SPIRIT         )
     AIRLINES, INC.,                )
 7                                  )
                 DEFENDANTS.        )
 8


 9


10


11


12
                    REMOTE VIDEO DEPOSITION
13                     OF SONDRA RUSSELL
                    MONDAY, JUNE 19, 2023
14


15


16


17


18


19


20


21


22


23


24       Reported By:
         Allison M. Hall, RDR, CRR, CSR
25
```

| | |
|---|---|
| 1 | June 19, 2023 |
| 2 | 12:07 p.m. |
| 3 | Video deposition of SONDRA RUSSELL, |
| 4 | held remotely via Zoom before Allison |
| 5 | Hall, a Registered Diplomate Reporter, |
| 6 | Registered Merit Reporter, Certified |
| 7 | Realtime Reporter, and Certified |
| 8 | Shorthand Reporter and Notary Public. |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

```
 1          A P P E A R A N C E S:

 2

 3          ON BEHALF OF PLAINTIFFS:

 4          BONSIGNORE TRIAL LAWYERS, PLLC
                ROBERT J. BONSIGNORE, ESQUIRE
 5              23 Forest Street
                Medford, Massachusetts 02155
 6              Phone: 781-856-7650
                E-mail: rbonsignore@classactions.us
 7

 8          ON BEHALF OF SPIRIT AIRLINES:

 9          PAUL WEISS
                THOMAS RUCKER, ESQUIRE
10              2001 K Street NW
                Washington D.C. 20006
11              Phone: 202-223-7347
                E-mail: trucker@paulweiss.com
12

13

14

15     ALSO PRESENT:

16   James Jarmon, Video Specialist

17

18

19

20

21

22

23

24

25
```

Page 13

1 or anything that's privileged.
2     Did you do anything to prepare for
3 your deposition today?
4     A.   Yes.
5     Q.   Did you meet with your counsel?
6     A.   On the phone.
7     Q.   Okay. Did you talk with your
8 counsel once on the phone?
9     A.   Yes.
10    Q.   How long did this -- how long was
11 this phone call?
12    A.   Fifteen minutes.
13    Q.   Was anyone else besides counsel
14 present?
15    A.   No.
16    Q.   Did you review any documents in
17 preparation for your deposition today?
18    A.   Yes.
19    Q.   Did any of these documents refresh
20 your recollection?
21    A.   Yes.
22    Q.   How did they refresh your
23 recollection?
24    A.   The Complaint.
25    Q.   How did the -- how did reviewing

Page 14

1 the Complaint refresh your recollection?
2     A.   Insight on what would be bad if
3 the merger happened.
4     Q.   Did your counsel provide you any
5 written documents that refreshed your
6 recollection?
7     A.   No.
8         MR. BONSIGNORE:  Objection.
9     Q.   (By Mr. Rucker) Okay.  All right.
10 Moving on to the next section, could you
11 briefly summarize your educational
12 background after high school.
13    A.   One year college.
14    Q.   Which college?
15    A.   Texas Woman's University and
16 McLennan County University.
17    Q.   Okay.  Are you currently employed?
18    A.   Yes.
19    Q.   Where are you currently employed?
20    A.   Self-employed.  Sandy's Getaway
21 Travel.
22    Q.   Are you the owner of Sandy's
23 Getaway Travel?
24    A.   Yes.
25    Q.   Are there any other owners of

Page 15

1 Sandy's Getaway Travel?
2     A.   No.
3     Q.   How many other owners are there?
4     A.   I'm sole proprietor.
5     Q.   Got it.  Oh, I'm sorry.  I
6 misheard you.  So there are no other owners.
7     A.   Yeah.
8     Q.   My apologies.  Okay.  And so I
9 will -- will return to Sandy's Getaway
10 Travel later on.
11        Do you own any stock in any
12 airline companies?
13    A.   No.
14    Q.   Do you have any ownership in any
15 other travel-related companies?
16    A.   Not to my knowledge, no.
17    Q.   Okay.  So I'd like to talk a
18 little bit about your travel history.  How
19 often would you say you travel in a given
20 year?
21    A.   Probably six -- six times a year.
22    Q.   Okay.  Are these business or
23 personal trips?
24    A.   Personal.
25    Q.   Okay.  Do you ever fly for

Page 16

1 business?
2     A.   Yes.
3     Q.   And what would -- what would those
4 business trips consist of?
5     A.   When I have a group and I escort
6 the group.
7     Q.   Is this a group that you've been
8 hired to sell travel services?
9     A.   Yes.
10    Q.   So do you actually go to the
11 destination with them or are you helping
12 them on their transportation there?
13    A.   I go with them.
14    Q.   Got it.  For your personal travel,
15 do you travel mostly by plane?
16    A.   Sometimes.
17    Q.   What other modes of transportation
18 do you use?
19    A.   My car.  Drive.
20    Q.   Uh-huh.  Do you ever take a train
21 for a trip?
22    A.   No.
23    Q.   And just to be clear, you're
24 driving as part of a personal trip; is that
25 right?

Page 29

know, keep going on another line of questioning, but we'll keep up your Exhibit A.
   It appears from the chart that you have flown American usually. Is that -- is it fair to say that you have a preference to fly American?
   A.  Yes.
   Q.  And why do you prefer flying on American?
   A.  The routing, flight times, and convenience from Waco -- the times I'd go out of Waco.
   Q.  Any other reasons?
   A.  Sometimes price.
   Q.  And when you mean sometimes price, is -- are you -- are you saying that American is cheaper than other airlines?
   A.  Sometimes.
   Q.  Do you remember, you know from those instances, what would the more expensive airlines be?
   A.  Delta would be more sometimes.
      (Court reporter equipment technical issue.)

Page 30

      THE VIDEOGRAPHER: Going back on the record at 1:15 p.m. Central.
      MR. RUCKER: Allison, do you mind reading back the last couple of questions just so Ms. Russell can just have it on hand where we were.
      (THEREUPON, the court reporter read back the referred-to portion of the record.)
   Q.  (By Mr. Rucker) So continuing on that line of questioning, are -- are there any other airlines other than Delta that are typically more expensive than American?
   A.  I don't remember.
   Q.  Okay.
      MR. RUCKER: Okay. So then, James, do you mind putting back up what we marked as Exhibit 1? I'll have a --
      Okay. Perfect.
   Q.  (By Mr. Rucker) So what I -- this is back to Exhibit A. So this is the list of flights that you provided in your interrogatory responses. And I wanted to just ask a couple more questions about this chart, mindful that there might be some

Page 31

flights that are missing.
      Do you normally book a class of airline?
      MR. BONSIGNORE: Objection.
   Q.  (By Mr. Rucker) I'm sorry. My apologies. Do you normally -- strike that.
      Do you normally book a certain class of airline ticket when you're flying?
   A.  Repeat the question.
   Q.  I'll -- let me -- let me rephrase it.
   A.  Yeah.
   Q.  Do you normally book first class, premium economy, economy, basic economy or coach -- what -- when you're flying?
      MR. BONSIGNORE: Objection.
      THE WITNESS: Business.
      MR. BONSIGNORE: Go ahead.
      (Court reporter equipment technical issue.)
      THE VIDEOGRAPHER: Going back on the record at 2:02 p.m.
      MR. RUCKER: Allison, could you please read the last two questions and answers?

Page 32

      (THEREUPON, the court reporter read back the referred-to portion of the record.)
      MR. RUCKER: All right. I'm going to strike that last question and we'll move on.
      But thank you, Allison.
      And apologies for that inconvenience, Ms. Russell, we'll -- we'll continue.
   Q.  (By Mr. Rucker) Okay. So are there any particular amenities you like to have while on an airline flight?
   A.  Extra leg room, bigger seats.
   Q.  Anything else?
   A.  No.
   Q.  Okay. Okay. We'll go ahead and keep moving forward.
      MR. RUCKER: So, James, do you mind putting back up Exhibit 1, please. All right.
   Q.  (By Mr. Rucker) So here is Exhibit 1 again. I'm going to go back to the chart at the end and I'm going to zoom out just so that you can see it in its

Page 41

Q. Does this appear to be an American Airlines confirmation document for a flight from Waco to Dallas/Fort Worth on May 3rd, 2023?
A. Yes.
Q. And returning from Dallas/Fort Worth -- I'm sorry; my apologies -- and then connecting from Dallas/Fort Worth to Ft. Lauderdale on May 3rd, 2023?
A. Yes.
Q. And then there's a return flight on May 13th from Ft. Lauderdale to Dallas/Fort Worth?
A. Yes.
Q. And then from Dallas/Fort Worth on May 13th back to Waco on May 13th, 2023?
A. Yes.
Q. Okay. And I just want to make sure. So it looks like there are two passengers associated with this trip.
Is one of them yourself?
A. Yes.
Q. Okay. And do you remember -- and I will scroll up. In the top left here, it looks like there's -- it's dated December

Page 42

13th, 2022.
Do you believe that this is about when you booked this trip?
A. Yes.
Q. Okay. I want to flip back to Exhibit 1. So this is a flight -- this is a trip from Waco to Dallas -- to -- you know, Waco to Dallas/Fort Worth, Dallas/Fort Worth to Ft. Lauderdale, again booked on -- in December 2022.
I just want to point out I don't think that this flight is listed on your chart --
A. Right.
Q. -- is that correct?
A. Yes.
Q. Okay. Is this one of the flights that you think needs to be added?
A. Yes.
Q. Okay. Sounds good. Thank you.
So I want to -- so we'll keep on Exhibit 1 for now.
Have you ever flown on Spirit?
A. No.
Q. Why have you never flown on

Page 43

Spirit?
A. No need to fly on Spirit.
Q. Have you ever flown on JetBlue?
A. No.
Q. Why have you never flown on JetBlue?
A. No need.
Q. Can you explain a little bit more by what you mean you had no need to fly on Spirit?
A. Because of the routing.
Q. Does Spirit fly out of Dallas/Fort Worth?
A. Yes.
Q. So are you saying -- am I correct in -- strike that.
When you say that you have not chosen Spirit because of routing, and Spirit flies out of Dallas/Fort Worth, does that mean that Spirit does not go to any of the destinations that you are looking for from Dallas/Fort Worth?
MR. BONSIGNORE: Objection.
Q. (By Mr. Rucker) Do you want me to rephrase it, Ms. Russell?

Page 44

A. Yeah. Repeat it again.
Q. So is it fair to say that you have not flown Spirit out of Dallas/Fort Worth because it does not -- the airline does not go to the destinations you are looking to go to?
A. That is correct.
MR. BONSIGNORE: Objection.
Q. (By Mr. Rucker) Okay. Okay. I'd like to switch to talking a little bit about your -- your current role as owner of Sandy's Getaway Travel.
I'm sorry. My apologies. Let me -- one more thing and then we'll move to that.
Do you have any plans to fly on Spirit in the future?
MR. BONSIGNORE: Objection.
You can answer.
THE WITNESS: Oh, I can answer?
MR. BONSIGNORE: Yeah.
THE WITNESS: Oh, okay.
I can if the opportunity comes.
Q. (By Mr. Rucker) Do you have any tickets booked on Spirit?

Page 45

 1    MR. BONSIGNORE: Objection.
 2    THE WITNESS: Not -- oh.
 3    MR. BONSIGNORE: You can answer.
 4    THE WITNESS: Oh, I can answer?
 5  Not at the time.
 6    Q.  (By Mr. Rucker) Do you have any
 7  trips in mind for the remainder of the year
 8  that you could potentially fly on Spirit?
 9    MR. BONSIGNORE: Objection.
10    THE WITNESS: I can answer?
11    MR. BONSIGNORE: Yes.
12    THE WITNESS: Oh, okay.
13    No trips planned for the end of the
14  year.
15    Q.  (By Mr. Rucker) Okay. Do you
16  have any future flight plans on JetBlue?
17    MR. BONSIGNORE: Objection.
18    THE WITNESS: No.
19    Q.  (By Mr. Rucker) Okay. So now I'd
20  like to turn over to talking about your role
21  as owner of Sandy's Getaway Travel.
22    How many customers do you work
23  with in a typical month?
24    A.  Now or in the past?
25    Q.  Let's -- let's start with, you

Page 46

 1  know, 2023 year to date.
 2    A.  And, I'm sorry, in -- in what
 3  timeframe? A month?
 4    Q.  Yeah, average customers per month.
 5    A.  Per month?
 6    MR. BONSIGNORE: Objection.
 7    THE WITNESS: Yeah, I would say
 8  maybe 15, 20.
 9    Q.  (By Mr. Rucker) Okay. So 15 to
10  20 customers --
11    A.  Uh-huh.
12    Q.  -- each month, let's say, for 2023
13  so far?
14    A.  Right.
15    Q.  Is that something --
16    A.  Yes.
17    Q.  Would that number be higher if we
18  looked at -- you know, looked across 2022?
19    A.  Yes.
20    Q.  Best guess at what an average
21  number of customers would be?
22    MR. BONSIGNORE: Objection.
23    THE WITNESS: I would say maybe
24  30 -- 30 to 40 customers a month.
25    Q.  (By Mr. Rucker) And then just

Page 47

 1  looking back one more year. If we were to
 2  look at 2021, would that be about the same
 3  average number of customers per month?
 4    A.  2021? No. Less.
 5    Q.  Okay. Would that be because of
 6  the pandemic?
 7    A.  Yes, uh-huh. COVID.
 8    Q.  How long have you owned this
 9  travel agency?
10    A.  Since 1984.
11    Q.  And just one more question about
12  the average number of clients. So if you
13  were to look at, let's say, 2018 or 2019, so
14  before the pandemic, what would be your best
15  guess at an average number of customers per
16  month?
17    A.  Forty.
18    MR. BONSIGNORE: Objection.
19    THE WITNESS: Okay.
20    Q.  (By Mr. Rucker) Was that 40 per
21  month?
22    A.  Forty.
23    Q.  So let's -- let's just talk about,
24  like, kind of the last year.
25    How do you typically procure your

Page 48

 1  clients?
 2    A.  I'm sorry. How do I what?
 3    Q.  How do you -- how do -- how do
 4  clients come to -- to find you and get your
 5  travel agent services?
 6    A.  By referrals and phone. We have
 7  moved our agency to the house and I am
 8  trying to cut back, so not doing as much
 9  business before the COVID and pandemic. And
10  everything is by appointment only because
11  we're at home.
12    Q.  So is the lower average number of
13  customers per month that you told me for
14  2023 because you have chosen to lighten your
15  load compared to previous years?
16    MR. BONSIGNORE: Objection.
17    THE WITNESS: Yes.
18    Q.  (By Mr. Rucker) Do you have any
19  repeat customers?
20    A.  Yes.
21    Q.  And are your clients local or
22  nationwide?
23    A.  Local.
24    Q.  Do you work more with business
25  travelers or leisure travelers?

Page 57

A. Actually, before 2015. I think it was 2014.
Q. Okay. Why have you not booked a Spirit flight for any of your customers since 2014?
A. Complaints.
MR. BONSIGNORE: Objection.
Q. (By Mr. Rucker) What did your customers complain about Spirit?
MR. BONSIGNORE: Objection.
THE WITNESS: A bad experience.
Q. (By Mr. Rucker) What made it --
A. Flight delays.
Q. Sorry. I'm sorry. Continue. I apologize for interrupting.
A. Yeah. That's okay. Flight delays.
Q. Any other reasons that they've cited for their bad experience?
A. No.
Q. How does -- strike that.
What is Sandy's Getaway Travel's main source of revenue?
A. We get commissions from the wholesalers, cruise lines, hotels, car

Page 58

rentals, and when we were issuing airline tickets, we charge a service fee because the airlines no longer pay us a commission.
Q. Have you stopped issuing airline tickets?
A. Yes. When we moved the office to home and then, of course, the pandemic hit, and I made that decision to no longer issue airline tickets.
Q. When was the last time that you issued an airline ticket?
A. '22.
Q. Okay.
A. I'm not sure.
Q. Do you mean 2022?
A. Yes.
Q. Best guess, was it first half of the year? Second half of the year?
A. I don't know.
Q. Do you have any plans on resuming issuing airline tickets in the future?
A. No.
Q. And why is that?
A. Because I'm --
MR. BONSIGNORE: Objection.

Page 59

THE WITNESS: -- trying to downsize on occasion.
Q. (By Mr. Rucker) What is it about issuing airline tickets that would help you downsize?
A. It -- to issue an airline ticket takes time away from working on, say, a $10,000 cruise. Somebody calls in and wants an airline ticket and they want you to research, and that's time-consuming. And we only charge a $30 ticketing fee.
So, to me, I chose -- it's just not cost-effective to spend all that time to make $30 when, if I sell a cruise, I can make more money selling a cruise.
Q. Is it fair to say when looking at 2023 year to date, Sandy's Getaway Travel has not earned any revenue from the issuance of airline tickets?
A. That is correct. Yeah.
Q. What impact do you believe the merger between JetBlue and Spirit will have on your business?
MR. BONSIGNORE: Objection.
THE WITNESS: Well, of course,

Page 60

airline ticket prices will go up. We won't have a choice. Competition is going to be deleted.
And what bothers me, you know, it's not only going to affect me, but consumers, but the people that are going to lose their jobs, whether it be ticket agents, baggage handlers. Unfortunately, those people are not going to have a job.
Q. (By Mr. Rucker) So taking that piece by piece, if Sandy's Getaway Travel stops issuing airline tickets, how will ticket prices going up affect your personal income?
MR. BONSIGNORE: Objection.
THE WITNESS: It will not.
Q. (By Mr. Rucker) Well, do you think the merger between JetBlue and Spirit will have other impacts on your business?
MR. BONSIGNORE: Objection.
THE WITNESS: I'm sorry. I'm just not sure about that.
Q. (By Mr. Rucker) You said competition is going to be deleted. How will that --

Page 61

A. Yes.
Q. How will that affect your customers?
MR. BONSIGNORE: Objection.
THE WITNESS: Customers will not have a choice. They will be limited. Fewer choices on airlines.
Q. (By Mr. Rucker) But in the last year, have any of your customers flown on JetBlue or Spirit?
A. No.
Q. So will their choices be limited?
MR. BONSIGNORE: Objection.
THE WITNESS: Yes.
Q. (By Mr. Rucker) How will people losing their jobs affect your business?
A. Well, if they've lost their job, they have no money to travel to go on a trip, whether it be by car, cruise. Not necessarily flying. Their funds are going to be limited.
Q. Do you know if any of your customers work for JetBlue or Spirit?
A. No.
Q. Okay. We're going to move to the

Page 62

last section of my questioning.
Ms. Russell, are you okay to continue, or do you want to take a break?
A. Yes. I'm good.
Q. Good? Okay. Okay.
When did you first begin considering to bring this suit related to the merger between JetBlue and Spirit?
MR. BONSIGNORE: Objection to the extent that it calls for the involvement of communications between the deponent and her counsel on the basis of privilege, although we agreed that I will just say objection.
You can answer to the extent it doesn't involve communications with your lawyers.
THE WITNESS: Yeah. I had communication with our attorney. I don't remember when, the date.
Q. (By Mr. Rucker) And, of course, I'm not seeking any privileged information with my next questions or my last question. But do you recall when you heard that JetBlue and Spirit had agreed to a

Page 63

merger?
A. Yes.
Q. Do you know approximately when that was?
A. No. Sorry.
Q. Do you remember reading something that told you that the parties -- or that the airlines were merging?
A. Yes.
Q. What do you remember reading?
A. I read an article -- I can't remember where -- about it, or when. Yeah. Several -- well, I'm sure several years ago. I don't remember.
Q. Okay. Are you familiar with your co-plaintiffs in this action?
A. With my what?
Q. With your -- the other plaintiffs in this action.
A. I have talked to some of them. Well, e-mail.
Q. Have you e-mailed them outside of this litigation?
A. No.
Q. So your communication with the

Page 64

other plaintiffs have been related to this litigation?
A. Yes.
Q. Have you been involved in any past litigation aimed at blocking airline mergers?
A. Yes.
Q. Which -- which litigations were those?
A. Delta, Northwest, Alaska, Virgin Atlantic, American.
Q. Any others?
A. That's all I can remember.
Q. Okay.
MR. RUCKER: James, I'd like to introduce what has Tab 4 in the file name as the next exhibit.
(THEREUPON, Exhibit 3 was marked for identification.)
MR. RUCKER: Okay.
Q. (By Mr. Rucker) So, Ms. Russell, these are your supplemental responses and objections to the defendants' first set of interrogatories. Like before, I'm going to scroll just so that -- just so that you can

Page 65

see.
So we're still waiting on the verification that you've signed and -- signed for the accuracy of these responses, but I want to draw your attention to one of your responses. I'll give you a chance to look at it.
So this is your response to Interrogatory No. 4. Do you -- do you -- are you familiar with this document?
A. Yes.
Q. Okay. Do you want to go ahead and take a minute to -- to read it and let me know.
(THEREUPON, a brief pause.)
THE WITNESS: Okay.
Q. (By Mr. Rucker) All right. So as you can see, this request was seeking every Complaint you have ever filed seeking to enjoin a merger under the Clayton Act, including any payments and/or benefits.
Your response refers to Exhibit A that I will go ahead and scroll down to.
Are you familiar with this exhibit?

Page 66

A. Yes.
Q. And you -- did you provide the information used to put together this chart?
A. Yes.
Q. And is it correct that you have been involved with each of the listed airline merger litigations?
A. Yes.
Q. Okay. Have any of these merger litigations resulted in a settlement for the plaintiffs?
MR. BONSIGNORE: Objection. It is my understanding that the -- that and related questions are subject to a confidentiality agreement, so I will instruct the witness not to answer.
And with past deponents, we have entered into an agreement pursuant to the deposition protocol that if my understanding is wrong, you have reserved the right to recall the witness and so inquire.
And I, again, point out that that hasn't happened yet, so I think I'm pretty right. But, nonetheless, you

Page 67

preserve your ability to recall.
MR. RUCKER: Okay. I appreciate that, Mr. Bonsignore. And I just want to make sure I understand for the record that you're instructing your client not to respond to my question based on confidentiality reasons; is that correct?
MR. BONSIGNORE: Yes.
MR. RUCKER: And I do want to put on the record that -- and we'll figure this out -- but that there is a way that to deem certain parts of the transcript as being highly confidential.
Q. (By Mr. Rucker) But, Ms. Russell, are you going to abide by your counsel's advice regarding my question?
A. Yes.
MR. BONSIGNORE: In furtherance of that observation, I just don't feel comfortable, as I was not a party to those other settlements, and I don't believe it's my right to -- to waive it.
Other than that, I think we've covered everything.
MR. RUCKER: I understand. And

Page 68

I'm not going to -- I will be asking about other -- I won't continue on that question -- line of questioning.
Q. (By Mr. Rucker) Ms. Russell, what was your reasoning behind commencing the Grace v. Alaska litigation?
A. The same. Injury to clients. Price increase. Cost going up on -- on the ticket. And the same way -- the competition. Not going to have very many choices. Same -- basically same thing.
Q. And the "same" you are referring to are the reasons you listed related to the JetBlue-Spirit merger; is that correct?
A. Yes.
Q. Are they the same reasons you commenced the Fjord v. US Airways litigation?
A. Yes.
Q. Are they the same reasons that you commenced the Fjord v. AMR litigation?
A. Yes.
Q. Are they the same reasons you commenced the Taleff v. South- -- what I think is Southwest Air litigation?

Page 69

1  A. Yes.
2  Q. And are they the same reasons you
3  commenced the Malaney v. United litigation?
4  A. Yes.
5  Q. And are they the same reasons you
6  commenced the D'Augusta vs. Northwest
7  litigation?
8  A. Yes.
9  Q. Had you been involved in any
10 merger litigations outside of the airline
11 industry?
12 A. No.
13 Q. Okay.
14     MR. RUCKER: All right. That's
15 all of my questions, so we are good to go
16 off the record.
17     MR. BONSIGNORE: Okay. Could we
18 have a -- a private room for a minute?
19     MR. RUCKER: For you and Ms. --
20 for you and Ms. Russell?
21     MR. BONSIGNORE: Yes.
22     MR. RUCKER: Of course.
23     Thank you, Ms. Russell, for your
24 time. I really appreciate it.
25     THE WITNESS: Uh-huh.

Page 70

1     THE VIDEOGRAPHER: We are now off
2  the record at 2:57 p.m.
3     (THEREUPON, a recess was taken.)
4     THE VIDEOGRAPHER: Going back on
5  the record at 3:27 p.m. Central.
6          EXAMINATION
7  BY MR. BONSIGNORE:
8  Q. Good afternoon. I have a few
9  questions.
10    Do you have any plans to travel in
11 the future? Strike that.
12    I have a few questions.
13    Do you plan to travel in the
14 future?
15 A. Yes, I do a --
16 Q. Go ahead. I didn't want to --
17 A. A lot. When I can.
18 Q. Okay. Is the travel within the
19 United States, outside the United States or
20 both?
21 A. Inside the US.
22 Q. Okay. And will you travel by air?
23 A. Yes.
24 Q. Will you discount any airline when
25 deciding who to travel with?

Page 71

1  A. No.
2  Q. Will Spirit be included in your
3  future travel plans?
4  A. Yes.
5  Q. Do you intend to continue on as a
6  travel agent?
7  A. Yes.
8  Q. As part of being a travel agent,
9  will you book air flights?
10 A. Yes.
11 Q. Will you discount any airline when
12 you book future air -- air trips for your
13 clients?
14 A. No.
15     MR. BONSIGNORE: Okay. No further
16 questions.
17     THE VIDEOGRAPHER: Is that all for
18 the record?
19     MR. BONSIGNORE: Yes.
20     THE VIDEOGRAPHER: This now
21 concludes the video deposition of Sondra
22 Russell. We are now off the record at
23 3:29 p.m. Central.
24     (Proceedings concluded at
25 3:29 p.m.)