# EXHIBIT 95

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**PROPOSED ACQUISITION OF SPIRIT AIRLINES, INC.**

**BY JETBLUE AIRWAYS CORPORATION**

**DOJ FILE NUMBER:  HSR-2022-2842**

**RESPONSE OF JETBLUE AIRWAYS CORPORATION TO THE**

**ANTITRUST DIVISION OF THE U.S. DEPARTMENT OF JUSTICE'S**

**REQUEST FOR ADDITIONAL INFORMATION AND DOCUMENTARY MATERIAL**

**ISSUED SEPTEMBER 12, 2022**

---

**DECEMBER 12, 2022**

**CONFIDENTIAL**

---

JETBLUE AIRWAYS CORPORATION                CONFIDENTIAL TREATMENT REQUESTED

## INTRODUCTORY STATEMENT

JetBlue Airways Corporation ("JetBlue") submits the following information in response to the Request for Additional Information and Documentary Material Issued to JetBlue on September 12, 2022 (the "Second Request") by the Antitrust Division of the U.S. Department of Justice (the "Division"), as modified by the following letters and emails from the Division, which are expressly incorporated herein and are attached, together with a copy of the Second Request, as **Attachments 0-1** through **0-11**:

- October 11, 2022 Letter from Brendan Sepulveda to Ryan Leske re Proposed Modifications to Specifications 1(a), 1(d), 23, 24, 25, 26, 37 and Definition of Airline Worker
- October 12, 2022 Letter from Ryan Leske to Brendan Sepulveda re Proposed Modifications to Specifications 1(d), 23, 24, 25, and 26
- October 13, 2022 Email from Ryan Leske to Brendan Sepulveda re Proposed Modifications to Specifications 23, 24, 25
- October 24, 2022 Letter from Brendan Sepulveda to Jessica Delbaum and Andrew Finch re Timing of Second Request Response (the "Timing Agreement")
- October 25, 2022 Letter from Brendan Sepulveda to Ryan Leske re Proposed Modifications to Specifications 2, 3, 13, and Instruction 11.
- October 27, 2022 Letter from Ryan Leske to Brendan Sepulveda re Proposed Modifications to Specification 13 and Instruction 11
- November 1, 2022 Letter from Ryan Leske to Brendan Sepulveda re Proposed Modifications to Specification 48 and Instruction 2
- November 7, 2022 Letter from Brendan Sepulveda to Ryan Leske re Proposed Modifications to Specifications 48 and Instruction 2
- November 8, 2022 Email from Ryan Leske to Brendan Sepulveda re Proposed Modification to Instruction 2

JetBlue objects to the Second Request as being overbroad and unduly burdensome, including to the extent it requests documents or information that JetBlue does not maintain in the ordinary course of business or that are outside of JetBlue's possession, custody, or control. JetBlue incorporates by reference these objections into its responses to each Specification of the Second Request. Subject to, and without waiving these objections, JetBlue has provided its responses in compliance with the Second Request, as modified, and non-privileged documents and information responsive to the Second Request have been provided to the extent such documents or information are in JetBlue's possession, custody, or control or could be reasonably determined from information maintained in the ordinary course of business.

To the extent that JetBlue has been unable to provide information responsive to any Specification of the Second Request, or to the extent that the Division asserts that any response to any Specification, or any other part of this submission, is incomplete, JetBlue states that reasonable, good-faith efforts have been undertaken to discover and compile such information and to otherwise respond to the Second Request and that any inadequacies exist solely because the Second Request, or a particular Specification thereof, is overly broad, requests information that is not in the possession, custody, or control of JetBlue, or is not available to JetBlue after

reasonable search and inquiry of its files or personnel, requests information that is not maintained in the ordinary course of JetBlue's business, requests information that cannot be compiled, reduced to writing, or organized in a particular manner within a reasonable period of time or without undue burden, requests information that is cumulative or duplicative of other Specifications, or requests information that is subject to a legitimate claim of privilege.

JetBlue has used the definitions and terms set forth in the Second Request.  By doing so, JetBlue does not waive, and hereby reserves, its rights under all applicable laws and regulations.  JetBlue does not concede that the definitions in the Second Request are meaningful or appropriate.  To the extent that certain terms may convey a particular legal meaning or connotation, JetBlue's response should not be construed as an admission.  In responding to the Second Request (as modified) and providing the information requested, JetBlue does not waive its right to contend that any such documents, data, or information are inadmissible in any subsequent administrative or judicial proceeding.

The references below to prior submission of non-privileged responsive custodial documents mean that JetBlue has conducted a reasonable search for documents responsive to the Second Request, as modified, from the custodians of JetBlue in Attachment A to the October 24, 2022 Timing Agreement (attached as **Attachment 0-6**), in a manner consistent with the Summary of JetBlue's TAR process sent to the Division on September 9, 2022 (attached as **Attachment 0-12**).

Custodial documents responsive to the Second Request were submitted to the Division on November 10, 2022, November 16, 2022, and December 2, 2022, in a manner consistent with the production requirements of the Second Request.  JetBlue hereby incorporates by reference its custodial document productions to this Second Request response to the extent necessary to provide documents or information responsive to the Second Request.

On December 7, 2022, JetBlue produced a privilege log consistent with Instruction 11 of the Second Request.  JetBlue objects to the Second Request to the extent that it seeks production of documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, or any other applicable privileges.  JetBlue is withholding certain documents that might otherwise respond to the Second Request on the grounds that such documents constitute privileged attorney-client communications or work product.  While JetBlue has made every effort to identify privileged documents and withhold them from production, if any privileged documents were inadvertently produced, that inadvertent production does not constitute a waiver of any applicable privilege or protection.  JetBlue requests that any inadvertently produced privileged documents be returned to JetBlue as soon as such inadvertent production is discovered by any party.

All documents, information, and data submitted in response to the Second Request are submitted under the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, 15 U.S.C. § 18a *et seq*., and contain highly confidential information of JetBlue.  JetBlue's response to the Second Request, and its accompanying documents and information, should be accorded confidential treatment under 15 U.S.C. § 18a(h) and to the full extent of all other applicable laws and regulations.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

JetBlue understands that the Division will use the information provided by JetBlue in response to the Second Request only for the Division's own legitimate law enforcement purposes and no other purpose, and that the Division will implement reasonable safeguards to prevent the unauthorized use or disclosure of any required personally identifiable information provided to the Division by JetBlue.

For the sole purpose of complying with the Second Request, JetBlue has provided proprietary and competitively sensitive information.  By providing such proprietary and competitively sensitive information, JetBlue: (1) does not waive any claim that such information is proprietary or confidential and cannot be reviewed by any third party outside the Division without the Company's prior knowledge or consent; and (2) is not waiving any claim or right to seek a protective order for such information and material against any third party seeking to discover or otherwise obtain the information in any proceedings before any court, tribunal, administrative body, alternative dispute resolution entity, or otherwise.  In particular, any experts or other consultants reviewing this information and material shall use it only for the purposes of reviewing the Transaction that is the subject of this investigation, and shall not retain any information received once this investigation has concluded.  Furthermore, any experts or other consultants shall not use any information whether directly or derivatively in any publications, studies, reports, testimony, or statements other than as part of this official investigation.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 1(a)

Submit one copy of each organization chart and personnel directory for the Company as a whole and for each of the Company's facilities or divisions involved in any activity relating to any Relevant Product.

## JetBlue's Response to Specification 1(a)

JetBlue provided organization charts to the Division on June 6, 2022 (JBLU-DOJ-00000001 – JBLU-DOJ-00000012).  Per the Division's letter dated October 11, 2022, the Division agreed to defer JetBlue's further response to Specification 1(a).

## Specification 1(b)

Submit a list that identifies the persons responsible for establishing the Company's policies, practices, and procedures, or for approving any exceptions thereto, including for (1) setting air fares, including ancillary fees, or schedules; (2) determining which routes to enter or exit; (3) determining Company strategy and policy relating to frequent flyer programs, corporate and travel agency sales, discounts, and incentives; (4) making yield management decisions; (5) evaluating the profitability of routes served; (6) determining the frequency and capacity of flights on particular routes; and (7) determining aircraft fleet composition and deployment.

## JetBlue's Response to Specification 1(b)

The following persons, listed in alphabetical order, are responsible for establishing JetBlue's policies, practices, and procedures, or approving any exceptions thereto for (1) setting air fares, including ancillary fees, or schedules; (2) determining which routes to enter or exit; (3) determining Company strategy and policy relating to frequent flyer programs, corporate and travel agency sales, discounts, and incentives; (4) making yield management decisions; (5) evaluating the profitability of routes served; (6) determining the frequency and capacity of flights on particular routes; and (7) determining aircraft fleet composition and deployment.

- Nicolas Alemann, Manager, Revenue Management / Yield Management: Mr. Alemann is one of three managers within JetBlue's Yield Management team.  He has responsibilities for making yield management decisions.

- Jeremy Blechman, Manager, Revenue Management / Yield Management: Mr. Blechman is one of three managers within JetBlue's Yield Management team.  He has responsibilities for making yield management decisions.

- Chris Buckner, Vice President, Loyalty and Partnerships: Mr. Buckner is the head of Loyalty and Partnerships for JetBlue, which is responsible for determining JetBlue's strategy and policy relating to frequent flyer programs.

- Dave Clark, Head of Revenue and Planning: Mr. Clark is the head of Revenue and Planning for JetBlue and oversees the Network Planning, Northeast Alliance, Operational Planning & Analysis, and Sales and Revenue Management teams for JetBlue.  Network Planning is responsible for determining which routes to enter or exit, determining the

frequency and capacity of flights on particular routes, determining, in consultation with other teams, network and system-wide capacity, and determining aircraft fleet deployment. Sales and Revenue Management is responsible for setting air fares (including ancillary fees), making yield management decisions, and evaluating the profitability of routes served. The Northeast Alliance team is responsible for overseeing the implementation of the Northeast Alliance by coordinating with JetBlue's other business functions.

- Dave Fintzen, Vice President, Northeast Alliance: Mr. Fintzen leads JetBlue's Northeast Alliance team and is responsible for overseeing the implementation of the Northeast Alliance, including by coordinating with JetBlue's other business functions.

- Eric Friedman, Director, Route Planning: Mr. Friedman leads JetBlue's Route Planning Team and is responsible, in consultation with other Crewmembers, for determining which routes to enter or exit, as well as determining the frequency and capacity of flights on particular routes.

- Joanna Geraghty, President & Chief Operating Officer: Ms. Geraghty, along with JetBlue's Chief Executive Officer, Robin Hayes, leads JetBlue's overall strategy including having a role in setting fares and ancillary fee strategies; determining schedules, routes, and frequencies; setting strategy and policies for JetBlue's TrueBlue frequent flier program and corporate sales; making yield management decisions; evaluating profitability of routes served; and determining fleet composition and deployment.

- Michelle Girkinger, Director, Alliances & Partnerships: Ms. Girkinger is the director of Alliances and Partnerships for JetBlue, which is responsible for considering, negotiating, approving, and implementing codeshare or other joint marketing agreements.

- Nicole Goveas, Manager, Revenue Management / Yield Management: Ms. Goveas is one of three managers within JetBlue's Yield Management team. She has responsibilities for making yield management decisions.

- Ellen Ham, Vice President, Labor Relations: Ms. Ham leads JetBlue's Labor Relations team and is responsible for negotiating and ensuring compliance with JetBlue's union agreements.

- Nicholas Han, Manager, Route Planning: Mr. Han is a member of JetBlue's Route Planning Team and has responsibilities for determining which routes to enter or exit, as well as determining the frequency and capacity of flights on particular routes.

- Alex Harris-Hertel, Director Schedule Planning: Mr. Harris-Hertel leads JetBlue's Schedule Planning team, which is responsible, in consultation with other teams, for setting flight schedules.

- Robin Hayes, Chief Executive Officer: Mr. Hayes leads JetBlue's overall strategy including having a role in setting fares and ancillary fees strategies; determining

schedules, routes, and frequencies; setting strategy and policies for JetBlue's frequent flier program and corporate sales; making yield management decisions; evaluating profitability of routes served; and determining fleet composition and deployment.

- Ursula Hurley, Chief Financial Officer: Ms. Hurley oversees JetBlue's Finance and Treasury, Financial Planning and Analysis, Accounting, Corporate Audit, and Strategic Sourcing and Fleet teams and is responsible for, among other things, determining, in consultation with other Crewmembers and the Board, JetBlue's fleet composition.

- Evan Jarashow, Manager, Revenue Management / Pricing: Mr. Jarashow is a manager within JetBlue's Pricing team.  He has responsibilities for setting air fares.

- Dave Jehn, Vice President, Network Planning:  Mr. Jehn leads JetBlue's Network Planning Team, which is responsible for determining which routes to enter or exit, determining the frequency and capacity of flights on particular routes, and setting flight schedules.

- Richard Johns, Director, Revenue Management[1]: Mr. Johns leads JetBlue's Revenue Management Team, which is responsible for setting fares and ancillary fees, as well as making yield management decisions.

- Edward Kayton, Head of Talent & Crewmember Experience[2]: Mr. Kayton leads JetBlue's Talent and Crewmember Experience team and is responsible for crewmember recruitment, training, and culture.

- Jack Massey, General Manager, Capacity Planning: Mr. Massey is a member of JetBlue's Route Planning Team and has responsibilities for determining which routes to enter or exit, as well as determining the frequency and capacity of flights on particular routes.

- Roberta Mehoke, Director, Corporate Sales: Ms. Mehoke is director of Corporate Sales for JetBlue, which is responsible for determining company strategy and policy relating to corporate and travel agency sales, discounts, and incentives.

- Jayne O'Brien, Head of Marketing & Loyalty: Ms. O'Brien oversee JetBlue's Loyalty and Partnerships team, which is responsible for determining JetBlue's strategy and policy relating to JetBlue's frequent flyer program.

- Martha ("Laurie") Villa, Chief People Officer: Ms. Villa oversees JetBlue's Labor Relations, Talent & Crewmember Experience, Total Rewards, Corporate Social Responsibility, and Diversity and Inclusion Teams.  She is responsible for all aspects of Crewmember recruitment, training, and culture.

- Jonathan Weiner, Vice President, Sales and Revenue Management: Mr. Weiner is the head of Sales and Revenue Management for JetBlue, which is responsible for setting air

---

[1]   Since JetBlue submitted its organization charts on June 6, 2022, Mr. Johns was promoted to Director, Revenue Management.  Mr. Johns continues to oversee the Revenue Analysis and Ancillary Strategy Team.

[2]   Since JetBlue submitted its organization charts on June 6, 2022, Mr. Kayton has left JetBlue.

JETBLUE AIRWAYS CORPORATION                CONFIDENTIAL TREATMENT REQUESTED

fares (including ancillary fees), making yield management decisions, and evaluating the profitability of routes served.

## Specification 1(c)

Submit a list that identifies the persons responsible for (1) negotiating the Transaction; (2) analyzing the Transaction; (3) recommending that the Transaction be approved; (4) approving the Transaction; and (5) integration planning and implementation for the Transaction, and include a brief description of the role and responsibility of each person listed.

## JetBlue's Response to Specification 1(c)

The following persons, listed in alphabetical order, are responsible for negotiating, analyzing, recommending, and/or approving the transaction, as well as integration planning for the transaction.[3]

- Joanna Geraghty, President & Chief Operating Officer: Ms. Geraghty, along with Mr. Hayes, is responsible for the overall strategy for JetBlue and was involved in negotiating the Transaction (along with legal counsel), analyzing the Transaction, and recommending that the Transaction be approved.  She, along with Mr. Hayes, is also ultimately responsible for integration planning.

- Robin Hayes, Chief Executive Officer: Mr. Hayes leads the overall strategy for JetBlue and was responsible for negotiating the Transaction (along with legal counsel), analyzing the Transaction, recommending that the Transaction be approved, and approving the Transaction. He, along with Ms. Geraghty, is also ultimately responsible for integration planning.

- JetBlue Board of Directors: The JetBlue Board of Directors approved the Transaction.

- Derek Klinka: Director, Strategy & Business Development: As a Director within JetBlue's Strategy & Business Development team, Mr. Klinka was involved in analyzing and recommending the Transaction.

- Tracy Lawlor, Chief Strategy & Business Development Officer: Ms. Lawlor leads JetBlue's Strategy & Business Development team and was involved in analyzing and recommending the Transaction.  Ms. Lawlor also oversees the integration planning for the Transaction.

- Brandon Nelson, General Counsel and Corporate Secretary: Mr. Nelson is the head of JetBlue's legal department and was involved in his legal capacity in negotiating the Transaction, analyzing the Transaction, and recommending that the Transaction be approved.

---

[3]   While JetBlue and Spirit have started planning for the eventual integration of the two companies, JetBlue and Spirit have not started implementation for the Transaction.

JETBLUE AIRWAYS CORPORATION                     CONFIDENTIAL TREATMENT REQUESTED

### Specification 1(d)

Submit a list that identifies all the Company's agents, representatives, and advisors, including investment bankers, retained in relation to the Transaction or to the development, production, marketing, or sales of the Relevant Service; for each agent, representative or advisor, identify all Messaging Application accounts provided by the Company to each agent or advisor.

### JetBlue's Response to Specification 1(d)

As modified by the Division's letter dated October 11, 2022, this Specification is limited to agents and representatives retained by JetBlue in relation to (i) the Transaction or (ii) any other proposed acquisition of Spirit by JetBlue.

JetBlue objects to the automatic characterization of individuals identified in response to this Specification as agents and representatives of JetBlue in all circumstances.  Subject to and without waiving JetBlue's objections, the following is a list of agents, representatives, and advisors retained by JetBlue in relation to the Transaction:

- Bank of America
- Bates White
- Bloom Strategic Counsel
- Cooley LLP
- DDC Public Affairs
- Epiq
- FleishmanHillard
- Goldman Sachs
- Innisfree
- Kekst CNC
- McKinsey & Company
- Munger, Tolles & Olson LLP
- Polaris Consulting
- Shearman & Sterling LLP
- White & Case LLP

Subject to the same objection, the following is a list of agents, representatives, and advisors retained by JetBlue in relation to JetBlue's proposed acquisition of Spirit by the Company as described in the Tender Offer Statement on Schedule TO filed by the Company with U.S. Securities and Exchange Commission on May 16, 2022:

- Bank of America
- Bates White
- Deloitte
- Epiq
- Goldman Sachs
- Innisfree
- Kekst CNC
- Munger, Tolles & Olson LLP
- Shearman & Sterling LLP
- White & Case LLP

Subject to the same objection, the following is a list of agents, representatives, and advisors retained by JetBlue in relation to any other proposed acquisition of Spirit by JetBlue:

- Compass Lexecon
- Shearman & Sterling LLP
- UBS

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 1(e)

Submit a list that identifies the persons most knowledgeable about the Company's electronic data systems and policies or practices regarding responsive electronically stored information, including each database or data set responsive to Specification 2.

## JetBlue's Response to Specification 1(e)

The persons most knowledgeable about JetBlue's electronic data systems and policies or practices regarding responsive electronically stored information are:

- Jason Lenhart – Vice President, Technology
- Milin Trivedi- Director of Cloud and Infrastructure
- Luis Corona – Sr. Manager, Infrastructure Services
- Jeffrey Earl – Manager, Infrastructure Architecture Automation
- Michael Geles – Senior Database Administrator
- Vincent Cammarata – Senior Database Administrator
- Dayton Jones – Manager, IT Network Engineering
- Sudeep Koshy – Database Administrator
- Richard Medford – Manager, IT Systems Engineering
- Loni Williams – Manager, IT Telecommunications
- Justin Thompson – Director of Data Engineering
- Ameen Sherali – Manager, Platform Engineering
- James Fetcho – Platform Engineer

## Specification 1(f)

Submit a description of each database or data set responsive to Specification 2, including:  (1) its software platform; (2) its type (e.g., flat, relational, or enterprise); (3) the sources (e.g., other databases or individuals) used to populate the database; (4) a Data Dictionary and any other keys that decode or interpret the data; (5) for relational or enterprise databases, documents specifying the relationships among tables (e.g., an entity relationship diagram); (6) any query forms; (7) any regularly prepared reports produced from that database; (8) the entity within the Company that maintains and updates the data; and (9) the entity within the Company that is the primary user of the data.

## JetBlue's Response to Specification 1(f)

JetBlue refers the Division to the email from Ryan Leske to Brendan Sepulveda and Sarah Riblet dated September 27, 2022 containing its response to Specification 1(f).

## Specification 1(g)

Submit for each Collaborative Work Environment maintained by the Company that contains responsive documents or information, a description of the environment, including a description of the environment's structure, and a list that identifies the persons who have access to the environment.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**JetBlue's Response to Specification 1(g)**

Generally, relevant JetBlue Crewmembers have access to a variety of Microsoft SharePoint and Teams sites based on their roles within the organization.  The organization and structure of these sites varies based on the type of information stored and accessibility required.  Non-privileged responsive documents from these Collaborative Work Environments have been submitted with JetBlue's documentary submission.

**Specification 1(h)**

Submit for each Messaging Application maintained by the Company, a description of the application, its intended use, its use in practice, how messages are stored and can be recovered or produced, and the categories of employees able or authorized to use it.

**JetBlue's Response to Specification 1(h)**

JetBlue Crewmembers have access to Microsoft Teams and, until September 15, 2020, had access to Skype for internal discussion of general commercial matters.  Messages from each of these applications are saved to each employee's mailbox.  Non-privileged responsive messages from these applications have been submitted with JetBlue's documentary submission.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 2

Submit each database or data set relating to the Relevant Service used or maintained by the Company at any time after January 1, 2017 that contains information relating to the Company's:

a.  route profitability;

b.  market share or quality of service index ("QSI");

c.  market pricing;

d.  market revenue performance;

e.  bookings;

f.  corporate discount or travel agent contracts;

g.  fleet planning or deployment;

h.  route development;

i.  capacity planning;

j.  yield management;

k.  code-sharing;

l.  scheduling;

m.  slot holdings;

n.  frequent flyer programs; or

o.  determination of passengers and revenue attributable to leisure versus business travel by route or city pair.

## JetBlue's Response to Specification 2

As modified by the Division's letter dated October 25, 2022, JetBlue's response to Specifications 2 and 3 is limited to (1) a refresh of the databases or data sets, which were provided in response to Civil Investigative Demand No. 30427 and the Division's requests for data production in *United States et al. v. American Airlines Group Inc. and JetBlue Airways Corporation* ("NEA Litigation") (i.e., Salesforce data, frequent flyer data, Planitas data, reservation booking data, Sabre PRISM data, and monthly profit and loss data); (2) any new databases or data sets listed in JetBlue's response to Specification 1(f) and that are requested by the Division; and (3) a complete new set of ticket and reservation booking data from Sabre Data Warehouse for the period from January 1, 2017 to the present.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

As set forth in the October 24, 2022 Timing Agreement, JetBlue produced its monthly profit and loss data on October 28, 2022,[4] as well as its ticket data and Salesforce win-loss data on November 10, 2022.

All remaining responsive data is being produced in the materials enclosed with this response with the following bates ranges:

| Database | Beginning Bates | Ending Bates |
|---|---|---|
| Remaining Salesforce Data | JBLU-DOJ-11171199 | JBLU-DOJ-11171207 |
| Frequent Flyer Data | JBLU-DOJ-11171208 | JBLU-DOJ-11171210 |
| Planitas Data | JBLU-DOJ-11171211 | JBLU-DOJ-11171211 |
| Reservation Booking Data | JBLU-DOJ-11171212 | JBLU-DOJ-11171212 |
| PRISM Data | JBLU-DOJ-11171213 | JBLU-DOJ-11171213 |

---

[4]   In response to a request from the Division sent to JetBlue on October 31, 2022, JetBlue produced the backup data to the monthly profit and loss reports on November 1, 2022.

JETBLUE AIRWAYS CORPORATION                 CONFIDENTIAL TREATMENT REQUESTED

## Specification 3

For each database or data set identified in response to Specification 2 that contains cost or margin information, submit one copy of each regularly produced (no more frequently than in four week periods) report generated using that database since January 1, 2017, and any documentation that defines, describes, or explains the calculation in any terms, measures, or aggregations appearing on the materials provided.

## JetBlue's Response to Specification 3

As modified by the Division's letter dated October 25, 2022, JetBlue's response to Specifications 2 and 3 is limited to (1) a refresh of the databases or data sets, which were provided in response to Civil Investigative Demand No. 30427 and the Division's requests for data production in *United States et al. v. American Airlines Group Inc. and JetBlue Airways Corporation* ("NEA Litigation") (i.e., Salesforce data, frequent flyer data, Planitas data, reservation booking data, Sabre PRISM data, and monthly profit and loss data); (2) any new databases or data sets listed in JetBlue's response to Specification 1(f) and that are requested by the Division; and (3) complete new set of ticket and reservation booking data from Sabre Data Warehouse for the period from January 1, 2017 to the present.

As set forth in the October 24, 2022 Timing Agreement, JetBlue produced its monthly profit and loss data on October 28, 2022,[5] as well as its ticket data and Salesforce win-loss data on November 10, 2022.

All remaining data is being produced in the materials enclosed with this response with the following bates ranges:

| Database | Beginning Bates | Ending Bates |
|---|---|---|
| Remaining Salesforce Data | JBLU-DOJ-11171199 | JBLU-DOJ-11171207 |
| Frequent Flyer Data | JBLU-DOJ-11171208 | JBLU-DOJ-11171210 |
| Planitas Data | JBLU-DOJ-11171211 | JBLU-DOJ-11171211 |
| Reservation Booking Data | JBLU-DOJ-11171212 | JBLU-DOJ-11171212 |
| PRISM Data | JBLU-DOJ-11171213 | JBLU-DOJ-11171213 |

---

[5]   In response to a request from the Division sent to JetBlue on October 31, 2022, JetBlue produced the backup data to the monthly profit and loss reports on November 1, 2022.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**Specification 4**

Submit all minutes (including attachments) of meetings of the Company's Board of Directors or any committees thereof and all materials submitted to the Board or any committees thereof.

**JetBlue's Response to Specification 4**

Non-privileged documents responsive to this Specification, are being produced in the materials enclosed with this response and are located at JBLU-DOJ-11153276 – JBLU-DOJ-1116527.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**Specification 5**

Identify each member of the Company's Boards of Directors, and separately for each:

    a.  state the name of each entity within the Company on whose Board of Directors they serve;

    b.  state their original date and method of appointment;

    c.  state their duration or term of appointment;

    d.  describe their duties and responsibilities;

    e.  state whether, for any duration of time in the past five calendar years, they occupied an executive board position or officer position in the Company;

    f.  state whether they hold, or for any duration of time in the past five calendar years have held, an officer, director, or advisor position in any other entity, and for any such positions, identify the position, the entity, and the dates they held the position at that entity; and

    g.  identify each of their predecessor(s) and successor(s) on the Company's Boards of Directors, if any.

**JetBlue's Response to Specification 5**

For JetBlue's response to this Specification please refer to **Attachment 5**.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 6

Describe, or submit documents sufficient to show, the Company's policies relating to officers, directors, or employees serving as officers, directors, or advisors of other entities.

## JetBlue's Response to Specification 6

Non-privileged documents responsive to this Specification, are being produced in the materials enclosed with this response and are located at JBLU-DOJ-11144285 – JBLU-DOJ-11145987.

JetBlue has made a good faith and reasonable effort to locate the historical version(s) of the JetBlue Governance Guidelines that was current as of September 12, 2019 to December 11, 2019 but has been unable to do so.  JetBlue believes that the terms of that version would be largely the same, if not identical to, the versions provided herein.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**Specification 7**

Submit all transcripts of the Company's quarterly and annual earnings calls, industry conferences, and any materials prepared for, relied upon, or provided therewith, and submit all of the Company's quarterly and annual earnings statements.

**JetBlue's Response to Specification 7**

Non-privileged documents responsive to this Specification, are being produced in the materials enclosed with this response and are located at JBLU-DOJ-11165276 – JBLU-DOJ-11171198.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 8

List separately for each subpart below each federal judicial district in which the Company:

   a.  has an agent to receive service of process (include each agent's name, current business and home addresses, and telephone numbers);

   b.  has an office or a facility; for each office or facility, list the address and identify the individual in charge (with his or her title), and if the office or facility is in the District of Columbia, indicate whether the office or facility's sole purpose is to contact federal governmental agencies; and

   c.  inhabits, is found, or transacts business, and is incorporated or licensed.

The Company may respond to this Specification by agreeing to personal jurisdiction and to accept service of process in all federal judicial districts.

## JetBlue's Response to Specification 8

JetBlue agrees to personal jurisdiction, and to accept service of process, in all federal judicial districts for any lawsuit brought by the Division challenging the Transaction that arises out of this investigation.  JetBlue reserves all other rights and objections related to jurisdiction and venue.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 9

Submit documents sufficient to show (and to the extent not reflected in such documents, describe) the Company's policies and practices relating to (a) the retention and destruction of documents, and the retention, storage, deletion, and archiving of electronically stored information, including e-mail, text messages, voice mails, or other communications, and (b) the use of personal electronic devices and Messaging Applications for work purposes.

## JetBlue's Response to Specification 9

JetBlue's policy relating to the retention and destruction of documents, and the retention, storage, deletion, and archiving of electronically stored information, including e-mail, text messages, voice mails, or other communications, is being produced in the materials enclosed with this response and is located at JBLU-DOJ-11171724.

JetBlue's Mobile Device Policy is are being produced in the materials enclosed with this response and is located at JBLU-DOJ-11171789.  This policy does not directly cover the use of personal devices and Messaging Applications for work purposes, but JetBlue Crewmembers are provided a company device if deemed necessary by their hiring manager and Crewmembers are generally discouraged from using personal devices for work purposes.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 10

Identify the persons responsible for preparing the response to this Request and submit a copy of all instructions prepared by the Company relating to the steps taken to respond to this Request. Where oral instructions were given, identify the person who gave the instructions and describe the content of the instructions and the persons to whom the instructions were given. For each specification, identify the persons who assisted in the preparation of the response and identify the persons whose files were searched.

## JetBlue's Response to Specification 10

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JetBlue's response to the Second Request was prepared by counsel with the assistance of JetBlue officers and Crewmembers, economists, and an e-discovery vendor. The names of individuals whose files were searched in response to this Second Request are listed in Attachment A to the Division's October 24, 2022 letter setting forth the Timing Agreement. In addition, JetBlue performed more targeted searches for files in response to requests that ask for specific documents. These more targeted searches included a search of the files of Doug McGraw, Chief Communications Officer, for materials responsive to Specification 45.

Oral instructions were given by Jessica Delbaum, Ryan Leske, Noni Nelson, Krista Koskivirta, and Daniel Chozick of Shearman & Sterling LLP during various telephone calls and videoconferences since September 12, 2022, with the individuals identified in the table below, all from JetBlue. During these telephone calls and videoconferences, Ms. Delbaum, Mr. Leske, Ms. Nelson. Ms. Koskivirta, and Mr. Chozick explained the Second Request in detail. In addition, Ms. Delbaum, Mr. Leske, Ms. Nelson, Ms. Koskivirta, and Mr. Chozick, as well as Tina Asgharian, Ben Fleshman, Jake Kotler, Richard Schwed, and Ryan Shores, also of Shearman & Sterling LLP, consulted with the individuals identified below from time to time in preparation of the interrogatory, data, and documentary responses. Further information concerning the content of instructions is withheld on the grounds of attorney-client privilege and attorney work product.

The following table lists persons who assisted in the preparation of the response for each Specification in the Second Request.

| Name | Title | Specifications Assisted With |
|---|---|---|
| Nicolas Acuna | Senior Analyst, Talent Management, JetBlue | 14, 15 |
| Nicolas Alemann | Manager, Revenue Management / Yield Management, JetBlue | 1(f), 22, 26, 28, 32, 33 |
| Renee Anckner | Vice President & Associate General Counsel, JetBlue | 13, 15, 16, 23 |
| Tracy Bink | Director, IT Strategic Programs, JetBlue | 37 |
| Jill Berberich | Director, Tech Ops PMO & Digital Transformation, JetBlue | 14, 15 |
| Jeremy Blechman | Manager, Revenue Management / Yield Management, JetBlue | 1(f), 22, 26, 28, 32, 33 |
| Chad Bohn | Manager, Brand & Consumer Insight, JetBlue | 1(f), 28 |
| Indiana Brito | Senior Analyst, Organizational Management, JetBlue | 14, 15 |
| Kristen Brown | Director, Benefits, JetBlue | 19 |

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

| Name | Title | Specifications Assisted With |
|------|-------|------------------------------|
| Chris Buckner | Vice President, Loyalty and Partnerships, JetBlue | 1(f), 2 |
| William Cade | Vice President, Tech Ops, JetBlue | 14, 15 |
| Timothy Cahn | Manager, Ancillary Products & Strategy, JetBlue | 26 |
| Jose Caiado | Director, Investor Relations, JetBlue | 7, 26 |
| Erick Capps | Manager, Properties, JetBlue | 13 |
| Michael Carbone | Vice President & Associate General Counsel, JetBlue | 14, 15, 18 |
| Megan Cayea | Manager, Loyalty Accounting, JetBlue | 1(f), 2, 3 |
| Demaris Colon | Senior Analyst, People Data Management, JetBlue | 14, 15 |
| Kevin Costello | Director, Infrastructure, Properties, & Development, JetBlue | 13, 23 |
| Reese Davidson | Director, International and Regulatory Counsel, JetBlue | All |
| Devina Dewnarayan | Legal Analyst, JetBlue | 9, 17 |
| Joseph Ehrenkranz | Senior Analyst, Loyalty Programs & Analysis | 2, 3 |
| Sylvia Espanola | Director, Compensation, JetBlue | 14, 15 |
| Sean Fairbanks | Director, Airport Operations, JetBlue | 14, 15 |
| Michael Fier | Senior Analyst, Loyalty Programs & Analysis | 2, 3 |
| Dave Fintzen | Vice President, Northeast Alliance, JetBlue | 31 |
| Brian Friedman | Director, Litigation & Regulatory Counsel, JetBlue | 9, 31 |
| Eric Friedman | Director, Route Planning, JetBlue | 1(f), 2, 3, 13, 22, 23, 28. 29, 31, 32, 33, 38, 39, 40 |
| Michelle Girkinger | Director, Alliances & Partnerships, JetBlue | 31, 37 |
| Lincoln Gleeton | Compliance Analyst, JetBlue | 6 |
| Jeffrey Goodell | Vice President, Government & Airport Affairs, JetBlue | 13, 23 |
| Brendan Goodrich | Senior Analyst, Infrastructure, Properties & Development, JetBlue | 13 |
| Alla Gorelik | Manager, Strategy & Business Development, JetBlue | 38, 39, 40, 41, 44 |
| Nicole Goveas | Manager, Revenue Management / Yield Management, JetBlue | 1(f), 22, 26, 28, 32 |
| Shelly Greissel | Managing Director, Customer Support, JetBlue | 14, 15 |
| Dora Habachy | Director, Fleet & Finance Counsel, JetBlue | 1(d), 4, 5, 6, 11, 48 |
| Nicholas Han | Manager, Route Planning, JetBlue | 22, 23, 28, 29 |
| Alex Harris-Hertell | Director, Schedule Planning, JetBlue | 31 |
| Michael Hillyard | Senior Analyst, Revenue Management, JetBlue | 26 |
| Allen Huang | Former Vice President & Associate General Counsel, JetBlue | 1(a) |
| Jacqueline Hung | Manager, People Data Management, JetBlue | 14, 15 |
| Evan Jarashow | Manager, Revenue Management / Pricing, JetBlue | 1(f), 2, 3, 22, 26, 28, 32, 33 |
| Dave Jehn | Vice President, Network Planning, JetBlue | 22, 23, 28, 29, 31, 32, 33 |
| Richard Johns | Vice President, Sales and Revenue Management, JetBlue | 1(f), 2, 3, 22, 26, 28, 32, 33 |
| Tom Kuehn | Manager, Properties, JetBlue | 13 |
| Joseph King | Director, Fleet Strategy & Programs, JetBlue | 11 |
| Robin King | Director, Talent & Crew Relations, JetBlue | 14, 15 |
| Derek Klinka | Director, Strategy & Business Development, JetBlue | 31, 37, 38, 39, 40, 41, 44 |
| Dmitry Kopylov | Vice President, Strategic Sourcing and Fleet, JetBlue | 11 |
| Robert Land | Senior Vice President & Associate General Counsel, JetBlue | 1(b), 1(c) |
| Sharon Laska | Director, JetBlue | 14, 15 |
| Shauntel Lizzarazo | Director, Customer Experience, JetBlue | 14, 15 |
| Chris Lum II | Director, System Chief Pilot, JetBlue | 14, 15 |
| Martin Mares | Manager, Properties, JetBlue | 13 |
| Emily Martin | Director, Corporate Communications, JetBlue | 7 |

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

| Name | Title | Specifications Assisted With |
|------|-------|------------------------------|
| Jack Massey | General Manager, Capacity Planning, JetBlue | 26 |
| Doug McGraw | Chief Communications Officer, JetBlue | 7, 45 |
| Rich Medford | Manager, IT Systems Engineering, JetBlue | 1(g), 1(h), 12, 13, 16, 17, 19, 21, 22, 23, 24, 25, 27, 29, 30, 31, 32, 33, 34, 37, 40, 43, 44, 45, 46, 47, 48 |
| Roberta Mehoke | Director, Corporate Sales, JetBlue | 1(f) |
| Matthew Migliardi | Manager, SOC Programs, Technology & Strategy, JetBlue | 14, 15 |
| Kelly-Marie Mingo | Senior Contract Counsel, JetBlue | 16 |
| Brandon Nelson | General Counsel & Corporate Secretary, JetBlue | 1(b), 1(c), 1(d), 4, 11, 18, 48 |
| Jayne O'Brien | Head of Marketing & Loyalty, JetBlue | 28 |
| Steven Olson | Vice President, System Operations, JetBlue | 14, 15 |
| Scott Park | Manager, Investor Relations, JetBlue | 7 |
| Jaimee Pocchiari | Labor & Employment Counsel, JetBlue | 18 |
| Laura Rodgers | Regulatory & Litigation Counsel, JetBlue | All |
| Gregory Royall | Manager, Sales Operations & Analysis, JetBlue | 1(f), 2, 3 |
| Jonah Rosen | Manager, Loyalty Program Experience, JetBlue | 1(f), 2, 3 |
| Nikolaos Sakkas | Director, Talent Crew & Values Relations, JetBlue | 14, 15 |
| Rona Sarhad | Manager, Infrastructure Development Strategy, JetBlue | 13 |
| Dana Shapir | Vice President, Airports Experience, JetBlue | 14, 15 |
| Angela Sitaram | Senior Analyst, Labor Relations, JetBlue | 17 |
| Harry Spencer | Vice President, Total Rewards, JetBlue | 14, 15, 19 |
| Patrick Staudt | Manager, Fleet Strategy & Analysis, JetBlue | 11 |
| Gregory Stiller | Director, Brand Strategy, Planning and Insights, JetBlue | 28 |
| Justin Thompson | Director, Customer and System Analytics, JetBlue | 28 |
| Milin Trivedi | Director of Cloud and Infrastructure, JetBlue | 1(e), 1(g), 1(h), 12, 13, 16, 17, 19, 21, 22, 23, 24, 25, 27, 29, 30, 31, 32, 33, 34, 37, 40, 43, 44, 45, 46, 47, 48 |
| Don Uselmann | Vice President, Inflight Experience, JetBlue | 14, 15 |
| Laurie Villa | Chief People Officer, JetBlue | 14, 15 |
| Jonathan Weiner | Vice President, Sales and Revenue Management, JetBlue | 1(f), 2, 3, 22, 26, 28, 32, 33 |
| Sebastian White | Director, Corporate Communications, JetBlue | 7 |
| Janelle Williams | Manager, Talent Management, JetBlue | 14, 15 |
| Jeffrey Winter | Vice President, Flight Operations, JetBlue | 14, 15 |
| Daniel Wood | IT Technology Systems Engineer, JetBlue | 1(g), 1(h), 12, 13, 16, 17, 19, 21, 22, 23, 24, 25, 27, 29, 30, 31, 32, 33, 34, 37, 40, 43, 44, 45, 46, 47, 48 |

**Specification 11(a)**

State or describe the types of aircraft currently in your Company's fleet, including any aircraft operated by regional code-sharing partners, the number of each type, and the seat capacity of each type.

**JetBlue's Response to Specification 11(a)**

The table below lists the types of aircraft currently in JetBlue's fleet including the number and seat capacity of each type.

| Fleet Type | Aircraft Count[6] | Seat Count |
|---|---|---|
| A321ceo (High Density ("HD")) | 28 | 200 |
| A321neo (HD) | 16 | 200 |
| A320ceo (HD) | 119 | 162 |
| A321neo (Low Density ("LD")) | 2 | 160 |
| A321ceo (LD) | 35 | 159 |
| A320ceo (LD) | 11 | 150 |
| A220-300 | 12 | 140 |
| A321LR | 5 | 138 |
| E190 | 60 | 100 |
| **Total** | **288** | - |

**Specification 11(b)**

State or describe for any aircraft or group of aircraft that your Company leases, describe the terms of the lease, including the duration and any provisions that would allow your Company to return the aircraft prior to the expiration of the lease.

**JetBlue's Response to Specification 11(b)**

Please see **Attachment 11**, which lists the aircraft currently leased by JetBlue and describes the key terms of each lease.

**Specification 11(c)**

State or describe the number and type of aircraft the Company plans to add or remove from its fleet, separately for each calendar year from 2022 to 2026, and the seating capacity of each such aircraft.

---

[6]   Aircraft as of 11/23/2022.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## JetBlue's Response to Specification 11(c)

The table below lists the number and types of aircraft that JetBlue plans to add to its fleet for each calendar year from 2022 through 2026.[7]  Please see JetBlue's response to Specification 11(a) for the currently conceived seating capacity of each aircraft.[8]  JetBlue notes that it constantly evaluates its seating configuration for each aircraft and has not made a final determination of the seating capacity of the aircraft listed below.

| Aircraft Type | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|
| A321neo (LD) | 0 | 6 | 5 | 6 | 6 |
| A321neo (HD) | 0 | 0 | 0 | 0 | 6 |
| A321LR | 2 | 6 | 0 | 0 | 0 |
| A321XLR[9] | 0 | 0 | 8 | 5 | 0 |
| A220-300 | 6 | 18 | 30 | 24 | 14 |
| **Total** | **8** | **30** | **43** | **35** | **26** |

The table below lists the number and types of aircraft that JetBlue plans to remove from its fleet for each year from 2022 through 2026.

| Aircraft Type | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|
| A320ceo (LD) | 0 | 4 | 6 | 1 | 0 |
| A320ceo (HD) | 0 | 2 | 5 | 6 | 3 |
| E190 | 5 | 6 | 32 | 16 | 1 |
| **Total** | **5** | **12** | **43** | **23** | **4** |

## Specification 11(d)

State or describe any changes made to the Company's aircraft delivery or retirement schedules in the last five years.

## JetBlue's Response to Specification 11(d)

The exact delivery and retirement schedule of JetBlue's aircraft changes with great frequency as a result of Airbus delivery constraints and changing supply and demand conditions that could warrant changes to the delivery and/or retirement schedule.  Describing each change would be unduly burdensome given the frequent changes.

---

[7]   Delivery timing reflects contractual delivery dates. Airbus notified JetBlue of ongoing delays. As a result, at Q3 2022 earnings JetBlue publicly stated that it expects only 22 deliveries in 2023. JetBlue expects these delays to continue into 2024.

[8]   JetBlue notes that the expected capacity of the A321XLR will be the same as the A321LR currently in JetBlue's fleet.

[9]   First XLR contractual deliveries scheduled for 2024.  Airbus expects JetBlue's first XLR to arrive in 2025.  The delay is a result of FAA/EASA certification timing.  Airbus has provided informal guidance that they will allow JetBlue to pull forward 5 A321neos to offset the 13 XLRs being delayed.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

Nonetheless, JetBlue lists below the changes to its contracts with Airbus made in the last 5 years as well as any publicly stated changes to JetBlue's delivery or retirement schedules. Please note the dates listed below reflect the final contractually agreed dates with Airbus.  JetBlue may have decided to make changes to its fleet plan longs before the dates listed below, which were then implemented through contracts, amendments, and public announcements listed below.

*Purchase Agreement Amendments for the Order of Airbus A320 and A321 Aircraft*

- December 19, 2017: Airbus Amendment No. 8 to (i) reschedule the delivery of one (1) A321 NEO Aircraft from May 2019 to Q4 2019.

- July 7, 2018: Airbus Amendment No. 10 to (i) convert the Company's remaining twenty-five (25) A320 NEO Aircraft into A321 NEO Aircraft; and (ii) reschedule nine (9) A321 NEO Aircraft upon conversion (specifically: two Aircraft delayed from Q1 2022 to Q1 2024; two (2) Aircraft pulled forward from Q2 2021 to June 2020; two (2) Aircraft delayed from Q3 2021 to Q2 2024; one (1) Aircraft delayed from Q2 2022 to Q2 2024; one (1) Aircraft delayed from Q3 2022 to Q2 2024; and one (1) Aircraft delayed from Q4 2022 to Q2 2024).

- April 19, 2019: Airbus Amendment No. 12 to (i) convert thirteen (13) A321 NEO Aircraft into thirteen (13) A321 LR Aircraft; and (ii) reschedule six (6) A321 LR Aircraft upon conversion (specifically: one (1) A321 LR Aircraft from November to December 2020; one (1) A321 LR Aircraft from December 2020 to February 2021; one (1) A321 LR Aircraft from January 2021 to March 2021; two (2) A321 LR Aircraft from February 2021 to April 2021; and one (1) A321 LR Aircraft from Q2 2022 to Q3 2022).

- June 20, 2019: Airbus Amendment No. 13 to (i) convert thirteen (13) A321 NEO Aircraft into thirteen (13) A321 XLR Aircraft; and (ii) reschedule six (6) A321 XLR Aircraft upon conversion (specifically: one (1) A321 XLR Aircraft from Q2 2023 to Q3 2023; one (1) A321 XLR Aircraft from Q3 2023 to Q4 2023; two (2) A321 XLR Aircraft from Q1 2024 to Q2 2024; two (2) A321 XLR Aircraft from Q2 2024 to Q3 2024).

- May 4, 2020: Airbus Amendment No. 14 to reschedule delivery of seventy-two (72) Aircraft due to COVID.  The delays impact the entirety of JetBlue's A321 NEO order book consisting of forty-six (46) A321 NEO Aircraft, thirteen (13) A321 LR Aircraft, and thirteen (13) A321 XLR Aircraft. Delays range from three (3) to sixty (60) months and average twenty-one (21) months across the seventy-two (72) Aircraft.

- October 16, 2020: Airbus Amendment No. 15 to reschedule the delivery of seventeen (17) Aircraft due to COVID.  The breakdown of the seventeen (17) Aircraft is: thirteen (13) A321 NEO Aircraft; three (3) A321 LR Aircraft; and one (1) A321 XLR Aircraft (specifically: one (1) A321 NEO Aircraft from March 2022 to Q1 2027; one (1) A321 NEO Aircraft from May 2022 to Q1 2023; one (1) A321 NEO Aircraft from Q1 2023 to Q1 2027; one (1) A321 NEO Aircraft from August 2022 to Q1 2027; one (1) A321 NEO Aircraft from December 2022 to Q2 2027; one (1) A321 NEO Aircraft from Q1 2023 to Q2 2027; one (1) A321 NEO Aircraft from Q2 2023 to Q3 2027; one (1) A321 NEO

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

Aircraft from Q3 2023 to Q3 2027; one (1) A321 NEO Aircraft from Q4 2023 to Q3 2027; one (1) A321 NEO Aircraft from Q1 2024 to Q3 2027; one (1) A321 NEO Aircraft from Q1 2025 to Q4 2027; one (1) A321 NEO Aircraft from Q3 2025 to Q4 2027; one (1) A321 NEO Aircraft from Q4 2025 to Q4 2027; one (1) A321 LR Aircraft from September 2021 to June 2022; one (1) A321 LR Aircraft from June 2022 to Q1 2027; one (1) A321 LR Aircraft from September 2021 to Q2 2027; and one (1) A321 XLR Aircraft from Q1 2024 to Q4 2025).

*Retirement Schedule for A320 and A321 Aircraft*

- July 2020: Placed 22 aircraft with Avenue Capital and Aero Capital Solutions for end-of-life sale leasebacks that solidified retirement dates for aircraft as described in **Attachment 11**.  Before these end-of-life sale leasebacks, JetBlue had planned on retiring these aircraft, but no exact date of retirement was contemplated.

*Purchase Agreement and Amendments for the Order of Airbus A220 Aircraft*

- Initial Purchase Agreement signed December 31, 2018 consisted of 60 firm orders of the A220-300 Aircraft and options to purchase another 60 orders of the A220-300 Aircraft. The order included the ability to convert 20 of the 60 firm orders into the A220-100 Aircraft and 20 of the 60 option orders into the A220-100 Aircraft

- June 20, 2019: Option Notice to exercise JetBlue's right to purchase 10 of the 60 A220-300 option aircraft

- May 4, 2020: Amendment No. 2 to advance the delivery of one (1) A220-300 Aircraft from February 2026 to Q4 2021

- October 16, 2020: Amendment No. 3 to give Airbus the right to advance an A220-300 Aircraft from January 2026 to Q4 2022

- November 30, 2020: Amendment No. 4 to reschedule one (1) A220-300 Aircraft from January 2023 to December 2022

- February 13, 2022: Amendment No. 5 for JetBlue's exercise of 30 A220-300 option aircraft and adjust their delivery schedules to pull them forward as much as possible which ranges for advancements from one to four years

- September 15, 2022: Amendment No. 6 to amend the delivery schedules of 49 aircraft to delay them from one to four months.  These delays were required by Airbus due to production delays and were out of JetBlue's control.  This contractual amendment is intended to provide JetBlue with compensation for the delays.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

*Retirement Schedule for E190 Aircraft*

- July 2018: JetBlue announced initial plan to retire 60 E190 aircraft (30 owned and 30 leased) by the end of 2025.

- July 2021: JetBlue announced decision to delay retirement of the E190 fleet.

- August 2022: JetBlue announced decision to accelerate 30 owned E190 retirement, pulling them forward by over a year to mid-2025 versus prior plans to exit the fleet by year-end 2026.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**Specification 12**

Submit all documents:

     a.  discussing any actual or contemplated purchase, sale or lease of gates at any domestic airport; and

     b.  discussing the valuation of any gates or other facilities at any airport identified in Appendix A.

**JetBlue's Response to Specification 12**

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JETBLUE AIRWAYS CORPORATION                 CONFIDENTIAL TREATMENT REQUESTED

## Specification 13

Separately for each airport listed in Appendix A:

    a.   state the total number of passenger boarding gates;

    b.   state (1) the number of passenger boarding gates over which the Company exercises control, (2) the number of gates leased directly from the airport, and (3) the number of gates sub-leased from another airline, and for each lease or sublease, describe the terms and conditions and submit any related agreements;

    c.   identify each airline that controls gates at that airport and the number of gates controlled by that airline;

    d.   submit all documents discussing any constraints on entry or expansion of service at the airport; and

    **e.**   identify each airport that is an alternative for local passengers, and separately for each alternative airport, provide the information or documents requested in subparts a through d of this Specification.

## JetBlue's Response to Specification 13

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

For JetBlue's response to Specification 13, please refer to the letter, and its accompanying attachments and submission, from Noni Nelson to Brendan Sepulveda and Sarah Riblet dated November 22, 2022.

JETBLUE AIRWAYS CORPORATION                CONFIDENTIAL TREATMENT REQUESTED

**Specification 14**

For each type of airline worker employed or contracted by the Company:

    a.  describe any identifying information such as job title, category, grade, or classification, job description, job responsibilities, and any applicable SOC, NAICS, or O*NET codes;

    b.  state the location(s) where those workers are employed;

    c.  state any occupational licensing requirements;

    d.  state the business unit of the Company that hires workers for the position; and

    e.  state whether that type of worker is represented by a union and, if so, identify the union.

**JetBlue's Response to Specification 14**

As modified by the Division's letter dated October 10, 2022, this Specification is limited to persons in JetBlue's airport operations, customer support, ground operations, inflight crew (including pilots), system operations, and technical operations work groups, which includes workers at aircraft maintenance facilities.

In the ordinary course of its business, JetBlue does not maintain employee data in a way that enables it to provide the information requested by Specification 14 on a full calendar year-by-calendar year basis but can extract data as of a specific day. As part of its good faith, reasonable efforts to respond to this Specification, JetBlue has therefore provided employee data in response to Specification 14 as of September 12 for each of 2019, 2020, 2021, and 2022.

Please refer to the spreadsheet titled **Attachment 14** for JetBlue's response to Specification 14. In the ordinary course of its business, JetBlue's employee data includes an employee's "org" (i.e., hiring department) and "position" (i.e., job title) but JetBlue does not assign or record the "type" of airline worker. Separate from, and not otherwise regularly used with, the employee data, JetBlue also maintains in the ordinary course of its business detailed "Position Explanations" ("PEs", i.e., job descriptions) that contain comprehensive identifying information including detailed descriptions of essential responsibilities, minimum experience and qualifications, preferred experience and qualifications, expectations, relevant equipment, work environment, and physical effort requirements. Therefore, in order to respond to Specification 14 to provide information according to each "type" of airline worker, JetBlue has made a reasonable and good faith attempt to analyze the available employee data and PEs and manually categorize the job titles into different types of airline workers.

JetBlue is not able to provide the information requested in Specification 14 for contracted airline workers since JetBlue does not have possession, custody, or control of information about contracted airline workers. Contracted airline workers are retained by third-party firms and there is no employment relationship between those workers and JetBlue. JetBlue contracts with third-party firms to provide certain airline worker services, such as maintenance, deicing, and aircraft cleaning. The third-party firms are responsible for providing any airline workers that are necessary to provide the contracted services, and JetBlue does not receive sufficient information

about the airline workers to respond to Specification 14. JetBlue believes that the respective third-party firms would be the best source for the requested information regarding contracted airline workers. Please refer to JetBlue's response to Specification 16 for a list of relevant third-party firms retained by JetBlue to supply airline workers.

## JetBlue's Response to Specification 14(a)

Please refer to **Attachment 14** for JetBlue's response to Specification 14(a). JetBlue has over 22,000 airline workers across approximately 440 unique positions. In the ordinary course of its business, JetBlue does not maintain the identifying information requested in Specification 14(a) for each type of JetBlue airline worker. In the ordinary course of its business, JetBlue maintains detailed Position Explanations ("PEs" i.e., job descriptions) that contain comprehensive identifying information including detailed descriptions of the position; essential responsibilities; minimum experience and qualifications; preferred experience and qualification; expectations; relevant equipment; work environment; and physical effort requirements. Such information, however, is maintained separately from, and not otherwise regularly used with, the employee data requested in the remainder of Specification 14. Further, JetBlue does not in the ordinary course of its business track the exact date on which a PE ceases to be used; the individual hiring business units do maintain records of whether a PE is "current" or "historical." Accordingly, the job titles provided in response to Specification 14(a) do not correspond identically to the position titles in the PEs.

As part of its good faith, reasonable efforts to respond to Specification 14(a), JetBlue has reviewed the available current and historical PEs and identified for reference in **Attachment 14** corresponding Bates numbers for some equivalent PEs for each type of airline worker. Further, all responsive current and historical PEs in JetBlue's possession are provided and Bates stamped JBLU-DOJ-11142316 – JBLU-DOJ-11144283 and **Attachment 14** includes for reference a list of the PEs that are current and historical.

Further, in the ordinary course of its business, JetBlue does not maintain information about any applicable SOC, NAICS, or O*NET code and it would be unduly burdensome for it to attempt to match up codes that it does not use in the ordinary course of its business with the approximately 440 unique positions at the company.

## JetBlue's Response to Specification 14(b) and (d)

Please refer to **Attachment 14** for JetBlue's response to Specification 14(b)-(d).

## JetBlue's Response to Specification 14(c)

Below are the main occupational licensing requirements for JetBlue Crewmembers. Please also refer to the Position Explanations provided in response to Specification 14(a) at JBLU-DOJ-11142316 – JBLU-DOJ-11144283 for further details of occupational licensing requirements, which are incorporated herein.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

| Type of Airline Worker | Required Occupational License/s |
|---|---|
| Air Traffic Controller | FAA Part 65 License |
| Auditor, Maintenance, Technician, Technical Operations | FAA Airline Transport Pilot License FAA Airframe and Powerplant |
| Dispatch | FAA Aircraft Dispatcher Certification FAA Part 65 License |
| Inflight | Flight Attendant Certificate |
| Pilot | FAA Airline Transport Pilot License FAA First Class Medical Certificate FCC Radio Operators License |

**JetBlue's Response to Specification 14(e)**

The Air Line Pilots Association ("APLA") represents JetBlue pilots.  The airline division of the Transport Workers Union ("TWU") represents JetBlue inflight Crewmembers.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**Specification 15**

Separately, for each category of worker listed in response to Specification 14:

  a.  for each location identified in response to 14(b), state:  (i) the number of total workers
      employed or contracted by the Company, (ii) the residential zip codes from which such
      workers commute, and (iii) the average years of service;

  b.  state the total number of workers hired or contracted in the last 24 months at each
      location identified in response to 14(b) and the residential zip codes of such workers prior
      to being hired or contracted; and

  c.  describe any alleged violation of any federal or state worker protection laws made by
      such workers in the last five years;

  d.  describe any planned layoffs, location changes, or other consequences of the Transaction;
      and

  e.  describe any barriers to relocation or changing employment to another airline or to
      another employer in any industry.

**JetBlue's Response to Specification 15**

As modified by the Division's letter dated October 10, 2022, this Specification is limited to
persons in JetBlue's airport operations, customer support, ground operations, inflight crew
(including pilots), system operations, and technical operations work groups, which includes
workers at aircraft maintenance facilities.

**JetBlue's Response to Specification 15(a)-(b)**

Please refer to **Attachment 15-1** for JetBlue's response to Specification 15(a)-(b).  As described
in JetBlue's response to Specification 14, in the ordinary course of its business, JetBlue does not
maintain information about its Crewmembers in a way that enables it to provide the information
requested by Specification 15 on a full calendar year-by-calendar year basis but can extract data
for a specific day.  As part of its good faith, reasonable efforts to respond to this Specification,
JetBlue has therefore provided Crewmember information in response to Specification 15 as of
September 12 for each of 2019, 2020, 2021, and 2022.  In the ordinary course of its business,
JetBlue does not maintain historical records of the residential zip codes from which its airline
workers commute or the residential zip codes of airline workers prior to being hired.

Further, in the ordinary course of its business, JetBlue does not have information about the types
of airline workers contracted by third-party firms that are retained by JetBlue to provide airline
workers (*see* JetBlue's response to Specification 16 for a list of such third-party firms retained by
JetBlue).  As described in JetBlue's response to Specification 16, JetBlue retains the third-party
firms on a service basis and is not provided information about the airline workers contracted.
JetBlue believes that the respective third-party firms would be the best source for the requested
information regarding contracted workers.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**JetBlue's Response to Specification 15(c)**

JetBlue objects to Specification 15(c) as vague and unduly burdensome.  The term "any federal or state worker protection laws" is undefined and could encompass dozens, if not hundreds, of worker-related statutes, regulations, and common law standards across the federal government and fifty states covering a wide range of subjects, ranging from safety to payment of benefits to discrimination to many other subjects.  Moreover, "any alleged violation" of such laws could, for example, encompass anything from an informal, internal allegation or lawyer letter to the filing of a court or administrative action.  Such information is maintained in numerous ways, across numerous different departments, depending on the nature of the allegation.  Records are maintained in emails and files across multiple JetBlue departments and, in some cases, with outside counsel.  Requiring JetBlue to collect such information (to the extent it is available) for a five-year period covering some 24,000 employees (as reflected in JetBlue's response to Specification 14) would be unreasonably burdensome.

Nevertheless, in order to make a good faith, reasonable attempt to respond to this request, on December 7, 2022, JetBlue conducted a search on the Bloomberg Law Docket database for federal labor and employment-related cases filed in the relevant period that list JetBlue as a party, the result of which is provided at JBLU-DOJ-11171214 and incorporated herein.  Moreover, to the extent that Specification 15(c) is intended to cover workplace safety laws, JetBlue conducted a search of the Department of Labor's Data Enforcement website (https://enforcedata.dol.gov/views/search.php) for "JetBlue Airways Corporation," the result of which is provided at JBLU-DOJ-11171224 and incorporated herein.  In addition, in order to make a good faith and reasonable attempt to respond, JetBlue has compiled a list (spreadsheet) of instances where a JetBlue employee filed a complaint with the Department of Labor – OSHA, which is provided for completeness as **Attachment 15-2** and incorporated herein.

Finally, for completeness, JetBlue notes that, to the extent that Specification 15(c) is intended to encompass administrative proceedings filed regarding alleged retaliation, e.g., where an employee allegedly experienced an adverse employment action after internally reporting a safety concern,  it is aware of seven such instances in the relevant period, three of which remain open.  JetBlue further notes that it operates a Business Integrity Hotline where any crewmember can submit an anonymous complaint or concern regarding any employee relation issue, not limited to allegations of violations of worker protection laws (e.g., it would include concerns regarding what television station is being broadcast in a breakroom).  These submissions are recorded by JetBlue in the "Nav-X" database and reviewed and investigated, as necessary.  There is no way to discern from the database which complaints rise to an allegation of a violation of a worker protection law; instead, an individual review of each situation would be required.

**JetBlue's Response to Specification 15(d)**

JetBlue does not have any layoffs or location changes planned as part of the proposed Transaction.  Indeed, JetBlue has committed to extend its "no furlough" policy to incoming Spirit Team Members after the transaction closes.  For plans related to the transaction, *see* JetBlue's response to Specification 41 and Specification 44, which are incorporated herein.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**JetBlue's Response to Specification 15(e)**

JetBlue does not believe that there are any barriers to relocation or changing employment to another airline or to another employer in any industry aside from any educational and/or technical/occupational qualification requirements that might be required by the position.

JETBLUE AIRWAYS CORPORATION                CONFIDENTIAL TREATMENT REQUESTED

## Specification 16

Identify all third-party firms retained by the Company to supply airline workers and, separately for each, submit:

    a.  one copy of all agreements entered into or in effect between the Company and each third party;

    b.  all documents relating to the drafting of, consideration of, terms of, or agreement to such agreements by the Company or any other person; and

    c.  all documents relating to plans to increase or decrease the use by the Company of such third-party firms.

## JetBlue's Response to Specification 16

As modified by the Division's letter dated October 10, 2022, this Specification is limited to persons in JetBlue's airport operations, customer support, ground operations, inflight crew (including pilots), system operations, and technical operations work groups, which includes workers at aircraft maintenance facilities.

Please refer to **Attachment 16** for a list of the third-party firms retained by JetBlue to supply airline workers.  To the extent reasonably available, information responsive to Specification 16 subparts (a)-(c) is provided further below.

## JetBlue's Response to Specification 16(a)

Copies of responsive agreements in the possession, custody and control of JetBlue that were entered into or in effect between JetBlue and each third-party firm retained by JetBlue to supply airline workers between September 12, 2019 and September 12, 2022 are produced with this response at JBLU-DOJ-11146310 – JBLU-DOJ-11153275.

JetBlue has made a good faith and reasonable effort to locate all agreements entered into or in effect between it and third-party firms retained by JetBlue to supply airline workers during the relevant period, although not all agreements were located. A list of the Business Partners who provide(d) services during the relevant period but whose Agreements with JetBlue have not been located and/or who did not have written Agreements with JetBlue are supplied in **Attachment 16** for completeness.

## JetBlue's Response to Specification 16(b)-(c)

Non-privileged documents responsive to Specification 16(b) and 16(c), if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 17

Submit:

    a.  one copy of all agreements entered into or in effect between the Company and any union representing airline workers; and

    b.  all documents relating to the drafting of, consideration of, terms of, or agreement to, by the Company or any other person, such agreements.

## JetBlue's Response to Specification 17

Non-privileged documents responsive to this Specification, if any, (1) have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference or (2) are being produced in the materials enclosed with this response and are located at JBLU-DOJ-11171216 – JBLU-DOJ-11171661.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 18

Describe and submit documents sufficient to show:

a. any noncompete or non-solicitation provisions contained in the Company's employment agreements, including any provisions that limit the ability of the Company's employees to seek employment or be employed by any of the Company's competitors; and

b. any circumstances where any noncompete or non-solicitation provision resulted in a dispute between the Company and any employee or any other company.

## JetBlue's Response to Specification 18

JetBlue does not have individual employment agreements with most of its domestic U.S. Crewmembers.[10]  The only exceptions are employment agreements with Federal Aviation Administration-licensed employees, such as pilots, dispatchers, technicians, and air traffic controllers, and JetBlue's Chief Executive Officer, Robin Hayes.

Only JetBlue's agreement with Robin Hayes contains any noncompete or non-solicitation provisions.  These provisions are laid out below, and Mr. Hayes' full agreement is publicly available through JetBlue's filings with the U.S. Securities and Exchange Commission.

- Noncompetition. The Executive agrees that, for a period commencing on the Effective Date and ending one (1) year after his termination of employment for any reason (the "Restricted Period"), the Executive shall not, without the prior written consent of the Company, directly or indirectly, and whether as principal or investor or as an employee, officer, director, manager, partner, consultant, agent or otherwise, alone or in association with any other person, firm, corporation or other business organization, carry on a Competing Business (as hereinafter defined) in any geographic area in which the Company Group has engaged or in which the Company has publically announced it will engage (including, without limitation, any area in which any customer of the Company Group may be located). For purposes of this Section 6, a "Competing Business" is defined as a commercial airline; provided, however, that nothing herein shall limit the Executive's right to own not more than 1% of any of the debt or equity securities of any business organization that is then filing reports with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended.

- Non-Solicitation. The Executive agrees that, during the Restricted Period, the Executive shall not, directly or indirectly, (a) interfere with or attempt to interfere with the relationship between any person who is, or was during the then most recent twelve-month period, an employee, officer, representative or agent of the Company Group and any member of the Company Group, or solicit, induce or attempt to solicit or induce any of them to leave the employ of any member of the Company Group or violate the terms of their respective contracts, or any employment arrangements, with such entities; or (b)

---

[10]   Outside the United States, JetBlue has employment agreements as required by specific labor laws in each jurisdiction.

induce or attempt to induce any customer, client, supplier, licensee or other business relation of any member of the Company Group to cease doing business with any member of the Company Group, or in any way interfere with the relationship between any member of the Company Group and any customer, client, supplier, licensee or other business relation of any member of the Company Group. As used herein, the term underlined indirectly shall include, without limitation, the Executive's permitting the use of the Executive's name by any competitor of any member of the Company Group to induce or interfere with any employee or business relationship of any member of the Company Group.

For completeness, there are instances where JetBlue may enter into a separation agreement (known as Separation Agreement and General Release ("SAGR")) with members of the senior leadership team when they depart JetBlue.  These SAGRs may contain a non-compete and/or non-solicitation provision, both of which follow form language.  Any such non-compete and non-solicitation provisions are always appropriately limited in scope and duration.

Please see enclosed (Bates numbers JBLU-DOJ-11171662 – JBLU-DOJ-11171723) for copies of sample SAGRs with non-compete and/or non-solicitation provisions for reference.

There have been no circumstances where any noncompete or non-solicitation provision in Mr. Hayes' employment agreement or in a SAGR resulted in a dispute between JetBlue and any employee or other company.

JETBLUE AIRWAYS CORPORATION          CONFIDENTIAL TREATMENT REQUESTED

**Specification 19**

Describe all methods the Company uses to determine airline worker compensation, benefits, and other terms of employment, including a description of the factors that affect workers' terms of employment, and submit all documents relating to the determination of worker compensation, benefits, and other terms of employment.

**JetBlue's Response to Specification 19**

As modified by the Division's letter dated October 10, 2022, this Specification is limited to persons in JetBlue's airport operations, customer support, ground operations, inflight crew (including pilots), system operations, and technical operations work groups, which includes workers at aircraft maintenance facilities.

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents are incorporated herein by reference.  Please also see JetBlue's response to Specification 20, which is incorporated herein.

JetBlue's method for determining airline worker compensation, benefits, and other terms of employment generally consists of internal information gathering and external benchmarking, including compensation data for similarly situated employees, local labor costs, current demand for airline workers, as well as consideration of prior experience, tenure, and performance.  Please also see JetBlue's current and historical Position Explanations provided in response to Specification 14 Bates stamped JBLU-DOJ-11142316 – JBLU-DOJ-11144283 for detailed information about position requirements considered by JetBlue.

JetBlue focuses on providing a comprehensive and competitive total compensation package that includes a broad range of benefits.  JetBlue's benefits include, for example, healthcare insurance (including medical, dental, and vision), long-term disability insurance, short-term disability insurance, 401k, life insurance, paid time off accrual (for sick and other leave), holiday pay, Crewmember Assistance Program, leave of absence policies, and employee discounts (such as free standby flights for the Crewmember and eligible dependents).

The process for determining compensation and other terms of employment for airline workers involves a compensation advisory team (CAT) for each workgroup with non-represented airline workers (*i.e.*, airport operations, customer support, flight operations, inflight, system operations, and technical operations).  The respective CATs are made up of frontline Crewmembers from the relevant business unit.  The CAT process occurs every two years on a rolling basis.  The members of a CAT are nominated by their respective frontline colleagues and are selected by leadership.  The CAT meets to review relevant workgroup feedback, survey information, and internal and external data to come up with a proposal.  The respective workgroup leadership, along with JetBlue's Total Rewards team, meets with the CAT to review their proposal and aims to come up with a joint recommendation.  The joint recommendation (or the separate proposals in case a joint recommendation is not agreed on) are reviewed and approved by executive leadership, which includes JetBlue's CEO, President/COO, CFO, CPO, and the Senior Leadership Team member for the relevant workgroup.  If a joint recommendation cannot be

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

agreed to, JetBlue's Total Rewards team puts forward a final compensation package that includes elements of the different proposals for the executive leadership to review and approve.

*Unionized Airline Workers*

JetBlue's pilots and inflight crew are unionized; therefore, their compensation, benefits, and other terms of employment are determined through the respective collective bargaining agreements (enclosed at JBLU-DOJ-11171216 – JBLU-DOJ-11171661). Third parties, such as FordHarrison LLP (a law firm based in the United States that is specialized in labor and employment law), provide aggregated publicly available data that the relevant compensation advisory teams consider when they discuss compensation and employment terms for unionized Crewmembers.

*Non-unionized Federal Aviation Administration Licensed Airline Workers*

For non-unionized Federal Aviation Administration licensed Crewmembers, which consist of dispatchers, technicians, inspectors, and air traffic controllers, JetBlue has individual employment agreements that are for a term of five years and that automatically renew for an additional five-year term. The CAT process described above applies to the non-unionized Federal Aviation Administration licensed Crewmembers, and their employment agreements are amended after each CAT process as necessary.

*Factors Affecting Terms of Employment*

External benchmarking is one of the factors that JetBlue considers when determining compensation packages for airline workers. JetBlue receives aggregated, historic information about compensation and other terms of employment from third party providers (such as FordHarrison). JetBlue also receives information about general market trends for compensation and benefits from its business partners and advisors, such as: Anthem and UnitedHealthcare (JetBlue's medical plan providers); Willis Towers Watson (JetBlue's primary advisor in relation to health and welfare plans); Mercer (for consulting); Morgan, Lewis & Bockius LLP (for ERISA legal advice); and Empower (JetBlue's 401(k) administrator).

In addition to external benchmarking sources, JetBlue also considers internal data from Crewmember surveys. JetBlue conducts an annual Speak Up survey to obtain input about perceptions regarding Crewmember engagement, rewards and recognition, and other terms of employment.

JetBlue also considers and complies with all applicable federal and state laws when determining its compensation, benefits, and other terms of employment. For example, there are many city or state ordinances that affect employment terms and with which JetBlue complies.

JetBlue is an equal opportunity employer, and all qualified applicants receive consideration for employment without regard to race, color, religion, sex, national origin, age, marital status, veteran status, sexual orientation, gender identity or expression, disability status, pregnancy, genetic information, citizenship status or any other characteristic protected by law. This policy applies to all terms and conditions of employment, including recruiting, hiring, placement, promotion, termination, layoff, recall, transfer, leaves of absence, compensation, and training.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

JetBlue's commitment to fair employment practices and equal employment opportunities for all individuals are set out in the JetBlue Code of Business Conduct (enclosed and bates stamped at JBLU-DOJ-11145924).

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 20

Separately for each category of airline worker, describe all factors relevant to the Company's hiring or recruiting of airline workers, including prior work experience or employment with another airline; prior training; prior employment in other types of jobs; and education level.

## JetBlue's Response to Specification 20

As modified by the Division's letter dated October 10, 2022, this Specification is limited to persons in JetBlue's airport operations, customer support, ground operations, inflight crew (including pilots), system operations, and technical operations work groups, which includes workers at aircraft maintenance facilities.

JetBlue considers certain overarching factors that are generally relevant to the hiring or recruiting of all airline workers, namely, the ability to perform the applicable responsibilities, past employment/professional experience, educational/professional/technical qualifications, equipment experience (as applicable), and ability to perform physical effort requirements, if any. The specific factors relevant to JetBlue's hiring or recruiting of airline workers are provided in the relevant Position Explanation (job description), Bates stamped at JBLU-DOJ-11142316 – JBLU-DOJ-11144283 and provided with JetBlue's response to Specification 14.

JETBLUE AIRWAYS CORPORATION                CONFIDENTIAL TREATMENT REQUESTED

## Specification 21

Submit all documents relating to competition for recruiting, soliciting, or hiring workers for airlines; recruiting, soliciting, or hiring airline workers from other airlines; and other firms' recruiting, soliciting, or hiring of airline workers from the Company.

## JetBlue's Response to Specification 21

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 22

Identify the Company's competitors (including any person that has competed or has attempted to compete with the Company for the past ten years) for the provision of the Relevant Service, and for each such competitor, submit all documents relating to that competitor's efforts to compete in the provision of the Relevant Service, including:

   a.  pricing, including ancillary fees;

   b.  sales;

   c.  features or quality;

   d.  expansion or retrenchment plans;

   e.  plans to exit (or actual exit of) the provision of the Relevant Service to or from any airport listed in Appendix A;

   f.  market shares; and

   g.  relative strengths and weaknesses.

## JetBlue's Response to Specification 22

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

Below is a list of JetBlue's competitors by year, which includes all U.S. airlines and carriers offering nonstop service to JetBlue's international destinations and/or, for 2021 and 2022, nonstop transatlantic service to London.

| Airline | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Aer Lingus | X | X | | | | | | | | | |
| Aeromexico | X | X | X | X | X | X | X | X | X | X | X |
| Alaska Airlines | X | X | X | X | X | X | X | X | X | X | X |
| Allegiant Air | X | X | X | X | X | X | X | X | X | X | X |
| American Airlines | X | X | X | X | X | X | X | X | X | X | X |
| Avelo Airlines | X | X | | | | | | | | | |
| Avianca Airlines | X | X | X | X | X | X | X | X | X | X | X |
| Breeze Airways | X | X | | | | | | | | | |
| British Airways | X | X | | | | | | | | | |
| Cape Air | X | X | X | X | X | X | X | X | X | X | X |
| Caribbean Airlines | X | X | X | X | X | X | X | X | X | X | |
| COPA Airlines | X | X | X | X | X | X | X | X | X | X | X |
| Delta Air Lines | X | X | X | X | X | X | X | X | X | X | X |
| Eastern Airlines | X | X | X | X | X | X | X | X | X | X | X |
| ExpressJet | | | X | X | X | X | X | X | X | X | X |
| Frontier Airlines | X | X | X | X | X | X | X | X | X | X | X |
| Interjet Airlines | | | X | X | X | X | X | X | X | X | X |
| LATAM Airlines | X | X | X | X | X | X | X | X | X | X | X |
| Norse Atlantic Airways | X | | | | | | | | | | |

46

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

| Airline | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PAWA Dominicana | | | | | | X | X | X | | | |
| Silver Airways | X | X | X | X | X | X | X | X | X | X | X |
| Southwest Airlines | X | X | X | X | X | X | X | X | X | X | X |
| Spirit Airlines | X | X | X | X | X | X | X | X | X | X | X |
| Sun Country Airlines | X | X | X | X | X | X | X | X | X | X | X |
| TACA Airlines | X | X | X | X | X | X | X | X | X | X | X |
| United Airlines | X | X | X | X | X | X | X | X | X | X | X |
| US Airways | | | | | | | | | | X | X |
| Virgin America | | | | | | | X | X | X | X | X |
| Virgin Atlantic | X | X | | | | | | | | | |
| Viva Air Colombia | X | X | X | X | X | X | X | X | | | |
| Volaris | X | X | X | X | X | X | X | X | X | X | X |

In addition to other airlines, for travel between certain destinations, JetBlue also competes with other modes of transportation including buses, trains, or automobiles.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**Specification 23**

Identify each person that has plans to enter or expand output of, has entered or expanded output of, or has attempted to enter or expand output of the provision of the Relevant Service at each airport listed in Appendix A in the last 10 years, and for each such plan, entry, expansion, or attempt:

   a.  describe the plan, entry, or attempt; and

   b.  describe the Company's estimate of costs and time to enter, steps necessary to enter, and any entry barriers (including any necessary regulatory approvals and the minimum viable scale required for entry).

Submit all documents from the last 10 years relating to plans to enter or expand by any person, or for any actual or attempted entry or expansion by any person, into the Relevant Service.

**JetBlue's Response to Specification 23**

As modified by the Division's letter dated October 11, 2022 and email dated October 13, 2022, the relevant time period for the document request in this Specification is limited to January 1, 2018 to present and, for the period from January 1, 2018 to September 11, 2019, JetBlue's response is limited to documents from the email records of Dave Clark, Dave Jehn, Jonathan Weiner, Eric Friedman, Alex Harris-Hertel, Evan Jarashow, Nicolas Alemann, and Jeremy Blechman (or their applicable predecessors).

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JetBlue does not possess knowledge of all persons who have, or had, plans to enter or expand service at each of the airports listed in Appendix A. However, most of the airports listed on Appendix A have few or no entry barriers. JetBlue believes that to enter all of the airports listed, an airline would require rights to use a gate and limited terminal space. After acquiring such rights, an airline would also need to hire new Crewmembers or business partners, register with the local airport and/or government authorities, and comply with any international rules or requirements for non-U.S. airports.

Three of the airports listed in Appendix A require takeoff and landing slots to begin operations. These airports are New York LaGuardia Airport (LGA), John F. Kennedy International Airport (JFK), and Ronald Reagan Washington National Airport (DCA). Newark Liberty International Airport (EWR) is not slot constrained, but does require takeoff/landing authorizations, which are similar to slots.

Other airports, such as Austin-Bergstrom International Airport (AUS), Boston Logan International Airport (BOS), Ft. Lauderdale International Airport (FLL), Los Angeles International Airport (LAX), and Miami International Airport (MIA) may have gate limitations. JetBlue does not possess knowledge of all the potential gate limitations of each of the airports listed in Appendix A. The local airport authorities are a better source of any such limitations.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

In addition to potential slot and gate constraints, other factors relevant to any plans for entry include availability of remain overnight parking, locations of contiguous, or nearly contiguous, gates, and availability of other support space (such as maintenance facilities).  However, these operational factors are highly dependent on a potential entrant's plans and are not necessarily required at each airport.

JetBlue estimates that entering a domestic airport would require an investment of $300,000 to $600,000 and take approximately four to six months to begin operations and allow advance ticket sales.  Similarly, for an international airport, JetBlue estimates that entering would require an investment of $200,000 to $600,000 and take approximately six to eight months to begin operations and allow advance ticket sales.

For airports that do not have slot constraints, JetBlue has observed significant entry or expansion by other airlines over the past 10 years.  **Attachment 23** lists each airline serving the 48 airports listed in Appendix A for each of the last 10 years.  As evidenced by the many changes in airport service shown in Attachment 23, airlines  frequently enter and exit  to meet perceived demand.

One notable trend over the last 10 years has been the fast and rapid expansion of ultra-low-cost carriers ("ULCCs").  ULCCs do not require scale or brand recognition to meet customer expectations and can therefore rapidly enter new airports and compete effectively.  JetBlue is a aware of the following current low cost carriers that have expanded service or have plans to expand service.

- Allegiant Airlines

- Avelo Airlines

- Breeze Airways

- Frontier Airlines

- Spirit Airlines

- Sun Country Airlines

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 24

Submit all documents, from January 1, 2017 to the present, relating to any actual or potential changes in the supply, demand, cost, price (including fares and fees), capacity, or output of the Relevant Service as a result of competition, including:

    a.  competition between services, fares, or fees offered to or from any airport, including those airports listed in Appendix A, including:

        i.  documents discussing any effect of any services, fares, or fees at any airport on service, fares, traffic, or revenues for services at any other airport;

        ii.  marketing surveys or reports on passenger use and preferences; and

        iii.  studies of fare relationships between airports;

    b.  any barriers to entry or expansion of service;

    c.  the competitive effects of any actual or potential merger(s), acquisition(s), or joint marketing agreement(s) between domestic airlines;

    d.  the financial condition or long-term viability of any airline;

    e.  passenger substitution between restricted and unrestricted fares;

    f.  competition between nonstop service and connecting service;

    g.  actual or potential entry or expansion by any airline in any city pair or at any airport; and

    h.  the competitive effects of frequent flyer programs.

## JetBlue's Response to Specification 24

As modified by the Division's letter dated October 11, 2022 and email dated October 13, 2022, the relevant time period for this Specification is limited to January 1, 2018 to present and, for the period from January 1, 2018 to September 11, 2019, JetBlue's response is limited to documents from the email records of Dave Clark, Dave Jehn, Jonathan Weiner, Eric Friedman, Alex Harris-Hertel, Evan Jarashow, Nicolas Alemann, and Jeremy Blechman (or their applicable predecessors).

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 25

Submit all documents, from January 1, 2017 to the present, relating to the Company's:

a. prices, terms of sale, pricing plans, pricing strategies, or profitability, including ancillary fees;

b. business plans or short-term or long-term strategies or objectives;

c. advertising, marketing, and promotional plans, including selling aids;

d. annual budgets, financial projections, and forecasts;

e. expansion or retrenchment plans;

f. plans to reduce costs, improve service, introduce new services, or otherwise become more competitive; and

g. determination of passengers and revenue associated with leisure versus business travel.

## JetBlue's Response to Specification 25

As modified by the Division's letter dated October 11, 2022 and email dated October 13, 2022, this Specification is limited to the time period between January 1, 2018 to present and, for the period from January 1, 2018 to September 11, 2019, JetBlue's response is limited to documents from the email records of Dave Clark, Dave Jehn, Jonathan Weiner, Eric Friedman, Alex Harris-Hertel, Evan Jarashow, Nicolas Alemann, and Jeremy Blechman (or their applicable predecessors).

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 26

Describe each incident since January 1, 2017, in which the Company or any other airline increased domestic fares, any class of domestic fares, or ancillary fees, where the increase impacted all or most domestic fares or impacted any of the airports listed in Appendix A, and separately for each such incident:

    a.  identify the airline making the increases;

    b.  state the date of the increase;

    c.  state the amount of the increase in dollar or percentage terms;

    d.  state the reason for the increase;

    e.  state the fare classes affected by the increase;

    f.  state the city pairs covered by the increase;

    g.  identify each airline, including the Company, that matched the increase, in whole or in part, and if the increase was only partially matched describe extent; and

    h.  if any airline decreased the affected fares within seven days of the date of the increase, identify that airline and state the date of the decrease.

## JetBlue's Response to Specification 26

As modified by the Division's letter dated October 11, 2022, this Specification is limited to the to time period between January 1, 2018 to present.

JetBlue monitors both third-party airline domestic fare changes through ATPCO and public announcements of ancillary fee changes through its ordinary course emails.  Non-privileged emails regarding such changes, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JetBlue does not systematically catalog third-party airline domestic fare changes, changes to ancillary fees, or reactions, if any, from JetBlue or other airlines.  As part of its quarterly earnings preparation processes, JetBlue tracks meaningful JetBlue-initiated system level fare increases by month and geography (domestic, international, Puerto Rico) within the context of quarterly revenue dynamics.  As a general matter, JetBlue considers a meaningful "system level" fare increase to be an increase of at least $5 one-way that is initiated by JetBlue and that results in higher JetBlue fares across at least 20 market in a single tariff, but there may be exceptions based on the context of the quarter.  A summary of the information compiled for the quarterly planning reports is attached as **Attachment 26**.  The quarterly earnings preparation materials this summary is derived from are located at JBLU-DOJ-11165276 – JBLU-DOJ-11171198 and JBLU-DOJ-11171822 – JBLU-DOJ-11173050.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

Beyond this, it would be unduly burdensome for JetBlue to attempt to provide the information requested by this Specification.  JetBlue has provided data regarding its own fares in response to Specification 2 and non-privileged documents responsive to Specifications 24 and 25.

JETBLUE AIRWAYS CORPORATION                CONFIDENTIAL TREATMENT REQUESTED

## Specification 27

Submit all documents relating to any bid for the provision of the Relevant Service to any governmental entity in the United States, or any decision by your company not to bid for the provision of such service, and all documents discussing any non-contract fares for U.S. government personnel traveling on official business.

## JetBlue's Response to Specification 27

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JETBLUE AIRWAYS CORPORATION                CONFIDENTIAL TREATMENT REQUESTED

**Specification 28**

List by title and submit copies of all analyst reports, market studies, forecasts, surveys, and regularly produced reports relating to output levels, pricing, sales, or marketing of the Relevant Service.

**JetBlue's Response to Specification 28**

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

A list of responsive analyst reports, market studies, forecasts, surveys, and regularly produced reports is below, along with a Bates number of a representative example for each.

| Analyst Report, Market Study, Forecast, Survey, or Regularly Produced Report | Example Bates Number |
|---|---|
| 3 PM Revenue Report | JBLU-DOJ-00005620 |
| A4A SmartBrief | JBLU-DOJ-00001832 |
| Airline Partnerships Monthly Newsletter | JBLU-DOJ-00134553 |
| ATPCO Load Report | JBLU-DOJ-00002762 |
| Bank of America Global Research Reports | JBLU-DOJ-00213168 |
| Barclays North American Airlines Reports | JBLU-DOJ-06068947 |
| Blue Chip Economic Indicators | JBLU-DOJ-10654707 |
| Commercial Calendar Updates | JBLU-DOJ-02956850 |
| Competitive Schedule Change Summary | JBLU-DOJ-00139374 |
| Corporate Sales Revenue Update | JBLU-DOJ-05324452 |
| Cowen Insight Reports | JBLU-DOJ-00183246 |
| Cranky Network Weekly Report | JBLU-DOJ-00402237 |
| Daily P&L | JBLU-DOJ-00160533 |
| Daily Report | JBLU-DOJ-00010900 |
| Daily Revenue Report | JBLU-DOJ-00045244 |
| Deutsche Bank Research – Airline Industry Update | JBLU-DOJ-06250152 |
| Earnings Call Preparation Materials | JBLU-DOJ-11165276 |
| Fare Options 2.0 Weekly Status Report | JBLU-DOJ-00117884 |
| Final Monthly Numbers | JBLU-DOJ-00070536 |
| Flash Changes Weekly | JBLU-DOJ-00030905 |
| Foil Reports | JBLU-DOJ-00051376 |
| Historical Fares | JBLU-DOJ-00000502 |
| Innisfree Weekly Report | JBLU-DOJ-00820028 |
| JP Morgan North America Corporate Research Reports | JBLU-DOJ-06021065 |
| Loyalty Program P&L Monthly | JBLU-DOJ-10363591 |
| Loyalty Program P&L Quarterly | JBLU-DOJ-10445295 |
| Loyalty Program P&L Yearly | JBLU-DOJ-10448547 |
| Monthly Market Seats | JBLU-DOJ-00009459 |
| Monthly P&L Reports | JBLU-DOJ-00000013 |
| Morning Consult | JBLU-DOJ-04173929 |

CONFIDENTIAL TREATMENT REQUESTED

| Analyst Report, Market Study, Forecast, Survey, or Regularly Produced Report | Example Bates Number |
| --- | --- |
| Northeast Alliance Daily News Clips | JBLU-DOJ-11108949 |
| P&L Region Forecast | JBLU-DOJ-00031522 |
| Preliminary Weekly Flash Report | JBLU-DOJ-00500107 |
| Sales Manager Monthly Report | JBLU-DOJ-08161679 |
| Revenue Management Daily Preview | JBLU-DOJ-00011012 |
| Revenue Management Daily Update | JBLU-DOJ-00010900 |
| Revenue Management Forecasts | JBLU-DOJ-00011574 |
| Revenue Management Weekly Market Summaries | JBLU-DOJ-00135738 |
| Revenue & Operations Report ("RoR") | JBLU-DOJ-00247909 |
| Quarterly Brand Tracker Report | JBLU-DOJ-10483394 |
| Quarterly P&L Report | JBLU-DOJ-00000013 |
| Steifel Corporate Research Reports | JBLU-DOJ-06021087 |
| US Airlines - JP Morgan North American Corporate Research | JBLU-DOJ-06250124 |
| Wall Street Journal Airline Rankings | JBLU-DOJ-00507227 |
| Weekly Revenue Dashboard | JBLU-DOJ-00005661 |
| Weekly Slot Status Reports | JBLU-DOJ-02069305 |
| Wolfe Research Reports | JBLU-DOJ-00201841 |

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 29

Describe all quality of service index or other models used by the Company to estimate or project the market share of existing or additional Relevant Service in a city pair, and submit all documents describing or discussing any such model, including all instructions, software, data sets, or other materials necessary to run any such model.

## JetBlue's Response to Specification 29

JetBlue uses a third-party quality of service model called Seabury APG to roughly estimate or project market share of existing or additional capacity in a city pair, albeit with certain limitations.  For example, JetBlue believes Seabury APG may not accurately reflect improvements in frequency patterns and competitive frequency levels and can require manual adjustments.

As described in JetBlue's response to Specification 1(f), JetBlue does not possess the background data used by Seabury APG because it is proprietary to the third-party consultant. JetBlue inputs certain proposed schedules and/or frequency plans along with a set of assumptions (e.g., fare discounts, elasticity, and share gaps) into the tool, which then estimates the potential impact of the proposed changes to JetBlue's estimated share.

Please see JBLU-DOJ-00000266 and JBLU-DOJ-00000361 for JetBlue's ordinary course training materials for Seabury APG, which provides an overview of the model, the queries that can be run, and the reports that can be generated by Seabury APG.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 30

Submit all documents relating to any allegation that the Company, its employees, or any of its current or potential competitors is behaving, or has behaved, in an anticompetitive manner, including customer and competitor complaints; threatened, pending, or completed lawsuits; or federal or state investigations.

## JetBlue's Response to Specification 30

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 31

Identify all employees, officers, or directors who have discussed pricing or capacity with any employee, officer, director, or agent of any other airline; identify the persons with whom they discussed these topics; and submit all documents relating to these discussions.

## JetBlue's Response to Specification 31

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

As part of the Northeast Alliance, the JetBlue Crewmembers listed below have discussed capacity with American Airlines, specifically the American representatives listed below.  Such discussions with American are typically directly supervised by counsel.  In all cases, they are consistent with guidance from counsel and have been limited to the scope of the Northeast Alliance agreements, any amendments thereto, and the Agreement with the U.S. Department of Transportation regarding Northeast Alliance between American Airlines, Inc. and JetBlue Airways Corporation.

| JetBlue Crewmembers | American Representatives |
| --- | --- |
| James Chung | Michael Barich |
| Dave Fintzen | Vince Canini |
| Brian Friedman | Michael Eng |
| Eric Friedman | Ryan Isemeyer |
| Josh Grafman | James Kaleigh |
| Alex Harris-Hertel | Kevin Lindorfer |
| Dave Jehn | Dymetre Mallory |
| Scott Laurence | Philippe Pueche |
| Andrea Lusso | Vasu Raja |
| Jack Massey | Chad Rachubinski |
| Griffin Powe | Austin Sagan |
| Andrew Uzenoff | Shashank Saket |
|  | Kara Terry |

The JetBlue Crewmembers listed below have discussed the Northeast Alliance codeshare fulfillment process with American Airlines, specifically the American representatives listed below.  This process involves the technical aspects of how codeshare pricing needs to be filed with ATPCO.  Under this process, there have been no discussions of future, non-public pricing.

| JetBlue Crewmembers | American Representatives |
| --- | --- |
| Michelle de Vera | Michael Barich |
| Thomas Connelly | Anmol Bhargava |
| Dave Fintzen | Avery Dale |
| Brian Friedman | Deborah Davis |
| Irene Gilder | Jeffrey Deleon |
| Michelle Girkinger | Rosemary Dimock |

59

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

| JetBlue Crewmembers | American Representatives |
|---------------------|-------------------------|
| Anthony Irwin | Katherine Hall |
| Evan Jarashow | James Kaleigh |
| Derek Klinka | Joseph Maloney |
| Kimberly Parker | Stephanie Montgomery |
| Griffin Powe | Sanjana Ram |
| Claire Roeschke | Chad Schweinzger |
| Jonathan Weiner | |
| Andrew Uzenoff | |

In addition to communications with American under the Northeast Alliance, JetBlue also regularly has technical, arms-length discussions with its other codeshare partners. These discussions may relate to capacity. For example, JetBlue may need to discuss with a codeshare partner a publicly announced new or ceased route, changes in aircraft made to publicly available schedules, and capacity for rebooking disrupted customers. In addition, these discussions may relate to pricing. For example, JetBlue may need to discuss settlement rates for frequent flier point transactions, joint corporate sales efforts, terms of special prorate agreements, and settlement of disrupted customers.

The JetBlue Crewmembers[11] who have communicated with codeshare partners include the following:

- David Jehn – Vice President, Network Planning and Partnerships
- Jeff Goodell – Former Vice President, Partnerships
- Michelle Girkinger – Director, Alliances and Partnerships
- Tom Connolly – Manager, Airline Partnerships
- Irene Gilder – Manager, Airline Partnerships
- Steve Sherrill – Manager, Airline Partnerships
- Michelle de Vera – Former Manager, Airline Partnerships
- Jacob Kriegler – Former Manager, Airline Partnerships
- Anuar Baddach – Senior Analyst, Airline Partnerships
- Laurie Fox – Senior Analyst, Airline Partnerships
- Alex Carbone – Former Senior Analyst, Airline Partnerships
- Marie Cristol – Former Senior Analyst, Airline Partnerships
- Susan Reyes – Former Intern, Airline Partnerships

Please see **Attachment 31** for a listing of JetBlue's primary contacts at each partner airline.

---

[11]   JetBlue notes that Crewmembers from other teams including (e.g., Airports, Baggage, Crew Travel, Customer Support, Loyalty, Pricing, and Sales) may have been copied on various emails for convenience purposes in fulfilling codeshare functions, but the primary communication with partner airlines is conducted through the partnerships team members listed.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 32

Describe in detail whether and, if so, at which airports, on which routes, in which ways, and to what extent, Spirit or any other ultra-low-cost carrier competes with or otherwise acts as a competitive constraint on the Company, including with respect to pricing, marketing, quality of service, innovation, or any other dimension of competition; and submit all documents relied on in support of this description.

## JetBlue's Response to Specification 32

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

Just as it does with other carriers, JetBlue competes with Spirit and any other ultra-low-cost carrier ("ULCC") through its unique offering of high quality service and low fares that stimulates demand anywhere JetBlue is present.  JetBlue's high quality service includes the most legroom in coach, free brand-name snacks and drinks, free wi-fi, and live TV for every seat.  This sets JetBlue apart from all competitors, including ULCCs.

Specifically as to pricing, JetBlue evaluates the dynamics of the various routes it flies taking into account many factors including, but not limited to:

- Expected demand;
- Booking trends;
- Other carriers offering service;
- Recent capacity changes;
- Seasonality;
- Advance purchase timing;
- Departure times;
- Day of the week;
- Holidays;
- Recent JetBlue performance on the route; and
- Whether it is a new route.

No one factor is determinative of the fare offered to customers, but rather a wholistic approach focused on maintaining high load factors is followed.  The presence of competitors, including any ULCC, on a route is considered.  JetBlue will make an independent decision whether to alter its pricing based on the presence of a ULCC or any other competitor after full consideration of the factors listed above and whether a pricing change makes sense with JetBlue's broader strategy for that particular route.

**Attachment 32-1** contains a list of the non-stop airport-pair routes offered by both JetBlue and Spirit or any other ultra-low-cost carrier for each of the calendar years from 2019 through 2022.

**Attachment 32-2** contains a list of the non-stop city-pair routes (as defined by the Department of Transportation) offered by both JetBlue and Spirit or any other ultra-low-cost carrier for each of the calendar years from 2019 through 2022.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**Attachment 32-3** contains a list of the airports where both JetBlue and Spirit or any other ultra-low-cost carrier offered service for each of the calendar years from 2019 through 2022.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**Specification 33**

Describe in detail every instance in which an action by Spirit or any other ultra-low-cost carrier has caused the Company to alter a business strategy, plan, or policy, whether with respect to pricing, marketing, quality of service, innovation, or any other dimension of competition.  For each such instance, identify (a) what action Spirit took; (b) when Spirit took that action; (c) what the Company's business strategy, plan, or policy was prior to Spirit's action; (d) how the Company's business strategy, plan, or policy changed following Spirit's action; and (e) why the Company changed its business strategy, plan, or policy.  Submit all documents relating to these instances.

**JetBlue's Response to Specification 33**

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

No individual action by Spirit, any other ultra-low-cost carrier ("ULCC"), or any other competitor has caused JetBlue to alter its business strategies, plans, or policies.  Rather, JetBlue considers many factors in forming its business strategies, plans, or policies.  These factors include, among many others, the general competitive landscape, JetBlue's business model, and JetBlue's revenue targets.

In 2019, JetBlue began offering "Blue Basic" fares.  This change to JetBlue's business strategy was partly in response to a trend in the airline industry, originally initiated by ULCCs, to allow customers to further choose the specific features of their travel experience.  While there have been a number of changes since its inception in 2019, a Blue Basic fare currently has the following attributes:

- Lower fares than Blue or Blue Plus fares;
- Customers cannot have a carry-on bag (only one personal item);
- There is a change/cancellation fee that is not imposed on other JetBlue fares;
- There is an additional fee to choose a seat;
- Customers board in the final boarding group; and
- Customers receive fewer TrueBlue points for their travel.

ULCCs, including Spirit, originated this model during the period between roughly 2005 and 2010, but JetBlue did not take action during that time.  As more carriers decided to offer "basic economy" fares with similar product segmentation to ULCC fares beginning in 2013, and customers expressed desire for this kind of product segmentation, JetBlue ultimately decided to offer its Blue Basic fares.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 34

Submit all documents relating to the Northeast Alliance, including:

a.  documents relating to the implementation of the Northeast Alliance;

b.  documents relating to any amendment or modification (or potential amendment or modification) of the Northeast Alliance agreement or related agreements;

c.  documents relating to the potential termination of the Northeast Alliance or any aspect of it, including any requests or efforts by Spirit to condition the Transaction on the termination of the Northeast Alliance, and any consideration by the Company of those or similar requests or efforts;

d.  documents relating to capacity, revenue sharing, or joint businesses, or American's or the Company's networks;

e.  documents relating to any impact or effect that the Transaction has had, will have, or may have on the Northeast Alliance;

f.  documents relating to any impact or effect that Frontier Group Holdings, Inc.'s proposed acquisition of Spirit has had, will have, or may have on the Northeast Alliance;

g.  documents relating to capacity, the Quality of Service Index, or market share on routes or at airports where Spirit operates; and

h.  communications with third parties about the Northeast Alliance, including communications with customers, investors, airport authorities, other airlines, or governmental entities.

## JetBlue's Response to Specification 34

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 35

Submit all communications with American discussing or otherwise relating to the Transaction or any similar proposed transaction between the Company and Spirit.

## JetBlue's Response to Specification 35

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 36

Submit all communications with American discussing or otherwise relating to Frontier Group Holdings, Inc.'s proposed acquisition of Spirit.

## JetBlue's Response to Specification 36

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 37

Submit all documents, from January 1, 2016 to the present, relating to any plans of, interest in, or efforts undertaken by the Company or any other person for any combination, acquisition, code-share or joint marketing agreement, divestiture, joint venture, or merger of any kind involving the provision of the Relevant Service other than the Transaction, including any documents discussing the effect of any such transaction on any other airline.

## JetBlue's Response to Specification 37

As modified by the Division's letter dated October 11, 2022, JetBlue's response to this Specification is limited to "submit documents sufficient to show" for the period between January 1, 2016 and September 11, 2019.

For the period between January 1, 2016 and September 11, 2019, non-privileged documents responsive to this Specification, are being produced in the materials enclosed with this response and are located at JBLU-DOJ-11145988 – JBLU-DOJ-11146309.

For the period from September 12, 2019 to present, non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**Specification 38**

State each city pair in which the Transaction will result in new service, more capacity or additional frequencies, and separately for each city pair:

 a. state the number of additional frequencies and additional seats (per day, if applicable, or per week);

 b. describe the additional service that will be provided, i.e., number of stops, number of added seats, substitution of larger aircraft, number of connections, and the itinerary(ies);

 c. state the estimated number of additional passengers that the Company will carry per year;

 d. state the estimated percentage of all passengers that the Company will carry in that city pair; and

 e. state whether the service will require the Company to (i) start serving an airport that it had not previously served; (ii) add additional flights to a segment; (iii) increase the size of aircraft serving a segment; or (iv) re-time existing flights in order to facilitate connections.

**JetBlue's Response to Specification 38**

JetBlue expects the Transaction will result in growth of JetBlue's unique high-quality, low-fare product as Spirit planes are retrofitted to be consistent with JetBlue's planes.[12]  JetBlue would then deploy retrofitted planes consistent with its network strategy at the time.  This may include additional departures at existing focus cities, such as Fort Lauderdale, Orlando, San Juan, and Los Angeles, and in cities where American Airlines, Delta Air Lines, Southwest Airlines, and United Airlines have hubs, such as Las Vegas, Dallas, Houston, Chicago, Detroit, Atlanta, and Miami; it may also result in the creation of new focus cities.

In late April/early May 2022, members of JetBlue's Strategy and Business Development and Network Planning teams prepared a preliminary combined network overview.  The preliminary network overview was quickly put together in a couple weeks in an effort to provide a basic understanding of potential network opportunities and provide a preliminary synergies analysis. This preliminary network overview relied only on JetBlue's information and public information about Spirit and did not incorporate any internal information from Spirit.  The usual time and processes for creating an actual network plan were not followed given various constraints, including lack of time and information.  JetBlue leadership did not review the specific details behind possible route-level changes or approve the preliminary network overview.

Later in May 2022, this preliminary network overview was updated to account for the divestitures commitments JetBlue made in public statements shortly thereafter.  Again, JetBlue

---

[12]   In the ordinary course of business, JetBlue constantly evaluates its seating configurations and, while it expects to retrofit Spirit's planes, no final decisions have been made regarding the exact seat configuration.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

leadership did not review the specific details behind possible route-level changes or approve the preliminary network overview.

The preliminary network overview included proposed new service or increased frequencies on the routes listed below.  More detailed information on the proposed changes included in the preliminary network overview, including the proposed number of frequencies, can be found in JBLU-DOJ-10840850, which has been produced in response to Specification 40.

New Routes[13]

| | | | | |
|---|---|---|---|---|
| ALBPBI | BNADFW | CVGSLC | LASSFO | PSPSFO |
| ALBTPA | BNADTW | DCATPA | LASSTL | PUJTPA |
| ATLAUS | BNAIAH | DENFLL | LAXOGG | PVDRSW |
| ATLBNA | BNAMCI | DENRSW | LAXTPA | PVDTPA |
| ATLCUN | BNAMIA | DENSFO | MBJMIA | PVRSFO |
| ATLRDU | BNAMSP | DENSLC | MBJRDU | PVRSLC |
| ATLRSW | BNAMSY | DENTPA | MBJTPA | RDURSW |
| ATLSFO | BNAORD | DFWRDU | MCIRSW | RDUSFO |
| ATLSJU | BNAPHL | DFWRSW | MCISLC | RDUSJU |
| ATLSLC | BNAPHX | DFWSFO | MCITPA | RDUSLC |
| AUSBNA | BNAPIT | DFWSLC | MCOSMF | RDUTPA |
| AUSCLT | BNARDU | DTWRDU | MEMTPA | RICTPA |
| AUSDEN | BNARSW | DTWSFO | MIAPAP | RNOSLC |
| AUSDFW | BNASLC | DTWSLC | MIAPUJ | SANSFO |
| AUSDTW | BOISLC | FLLGSO | MIASFO | SANSLC |
| AUSMCI | BOSBUR | FLLMCI | MKERSW | SDFTPA |
| AUSMSP | BOSRNO | FLLMEM | MKETPA | SEASFO |
| AUSORD | CLECUN | FLLMSP | MSPSLC | SEASLC |
| AUSPHL | CLTFLL | FLLORF | OGGSFO | SFOSJD |
| AUSPHX | CLTRSW | FLLROC | ORDRDU | SFOSLC |
| AUSRDU | CUNLAS | FLLSAT | ORDSFO | SFOTPA |
| AUSSFO | CUNMCI | FLLSMF | ORDSJU | SJDSLC |
| AUSSLC | CUNMIA | FLLSYR | ORDSLC | SLCSMF |
| AUSTPA | CUNMSP | HNLLAS | PBIPHL | SLCTPA |
| BDLRDU | CUNRDU | HNLSFO | PDXSLC | STLTPA |
| BNACHS | CUNSFO | IAHRDU | PHLRDU | |
| BNACLE | CUNSLC | IAHSLC | PHLSFO | |
| BNACLT | CUNSMF | INDSLC | PHLSLC | |
| BNACUN | CVGFLL | LASMKE | PHXSLC | |

Routes with Increased Frequencies

| | | | | |
|---|---|---|---|---|
| ACKBOS | AUSBOS | BNAFLL | BNAMCO | BOSBWI |
| ATLBOS | AUSMCO | BNALAS | BNATPA | BOSCHS |
| ATLMIA | BNABOS | BNALAX | BOSBUF | BOSDEN |

---

[13]   Please note the preliminary plan was restricted to just existing airports.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

| | | | | |
|---|---|---|---|---|
| BOSDTW | BOSSAN | DENMIA | FLLRDU | MIAORD |
| BOSEWR | BOSSDQ | DFWMIA | FLLSEA | MIAPHL |
| BOSIAH | BOSSFO | DTWMIA | FLLSTL | MIARDU |
| BOSJAX | BOSSJU | EWRRSW | IAHMIA | MIASJU |
| BOSMCI | BOSSLC | EWRSFO | LASMIA | MSPRSW |
| BOSORD | BOSSMF | FLLIND | LAXMCO | MSPTPA |
| BOSPDX | BOSSTI | FLLMKE | LAXMIA | ORDRSW |
| BOSPIT | BWIMIA | FLLPDX | MCORDU | PHLRSW |
| BOSPUJ | CHSFLL | FLLPHX | MCOSFO | PHLTPA |
| BOSRDU | CUNDTW | FLLPIT | MCOSLC | RSWSTL |

It will take JetBlue several months, devoting significant resources, to generate a combined network plan that will be presented to JetBlue leadership for approval.  The ultimate plan for the combined network will need to account for changes in route-level supply and demand conditions that will have occurred and various other factors including any changes to JetBlue's network strategy.  Therefore, it is premature to provide any of the specific details requested in parts (a) through (e) of this Specification given the changing conditions present on each potential route and the fact that no combined network plan has been prepared.  At this time, JetBlue cannot predict with any certainty the estimated number of additional passengers JetBlue will carry per year for any given route or the estimated percentage of all passengers on such a route that JetBlue will carry, but overall, JetBlue expects that it will be stimulating demand.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**Specification 39**

State each city pair in which the Transaction will result in a loss of service, less capacity or fewer frequencies, and separately for each such city pair:

    a.   state the number of fewer frequencies and fewer seats (per day, if applicable, or per week);

    b.   describe the nature of the service reductions that will be implemented, i.e., number of stops, number of connections, substitution of smaller aircraft, and the itinerary(ies); and

    c.   state the estimated percentage of all passengers that the Company will carry in that city pair.

**JetBlue's Response to Specification 39**

As stated in JetBlue's response to Specification 38, JetBlue has not developed a network plan for a combined JetBlue and Spirit at this time.  Therefore, it is premature to state with specificity the city pairs in which the Transaction will result in a loss of service, less capacity, or fewer frequencies.  It is also premature to provide any of the specific details requested in parts (a) through (c) of this Specification given the changing conditions present on each potential route and the fact that no combined network plan has been prepared.

As described in more detail in JetBlue's response to Specification 38, in the April/May 2022 timeframe, members of JetBlue's Strategy and Business Development and Network Planning teams prepared a preliminary combined network overview.  JetBlue leadership did not review the specific details behind possible route-level changes or approve the preliminary network overview.

The preliminary network overview did identify opportunities for potential reduction of service on the routes listed below.  JetBlue notes that, given the limited functionality of the modeling exercise that was done, any reduction in service was modeled as a route exit; however, JetBlue has not made any decisions about whether it would reduce frequencies rather than exit any routes

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

as a result of the Transaction. More detailed information on the proposed changes[14] included in the preliminary network overview can be found in JBLU-DOJ-10840850, which has been produced in response to Specification 40.

Identified for Potential Reductions

| | | | | |
|---|---|---|---|---|
| ACYATL | BOSLAS[15] | CMHMYR | EWRMSY[15] | IAHSEA |
| ACYFLL[15] | BOSMCO[15] | CMHRSW | EWRMYR[15] | IAHTPA |
| ACYRSW | BOSMSY[15] | DENDFW | EWRRSW[15] | INDMYR |
| ATLAUS | BOSMYR[15] | DENDTW | EWRSDQ[15] | JAXORD |
| ATLBOS[15] | BOSORD[15] | DENFLL[15] | EWRTPA[15] | LASPIT |
| ATLDEN | BOSPBI[15] | DENIAH | FLLGSO[15] | LBEMYR |
| ATLEWR[15] | BOSRDU[15] | DENMSP | FLLGYE[15] | LBERSW |
| ATLIAH | BOSRSW[15] | DENMSY | FLLIAG[15] | LBETPA |
| ATLMSP | BOSTPA[15] | DFWLGA[15] | FLLJAX[15] | LGAMCO[15] |
| AUSBWI | BWICLT | DFWMSP | FLLLAS[15] | LGAMYR[15] |
| AUSDEN | BWIDEN | DFWMYR | FLLLAX[15] | LGAORD[15] |
| AUSDTW | BWIIAH | DFWPHL | FLLLBE[15] | LGATPA[15] |
| AUSFLL[15] | BWIJAX | DFWSAN | FLLLGA[15] | MSPMSY |
| AUSMSY | BWIMSP | DFWSEA | FLLLIM[15] | MSPMYR |
| AUSORD | BWIMSY | DTWJAX | FLLMCI[15] | MSPPHX |
| AVLFLL[15] | BWIRDU | DTWLGA[15] | FLLMSP[15] | MSYPHL |
| AVLTPA | BWISEA | DTWMBJ | FLLPBG[15] | MSYRDU |
| BDLFLL[15] | CAKMCO | DTWMCI | FLLPTY[15] | OAKORD |
| BNABWI | CAKRSW | DTWOAK | FLLRDU[15] | ORDPHX |
| BNAFLL[15] | CAKTPA | DTWPBI | FLLRIC[15] | ORDRDU |
| BNAMSY | CAPFLL[15] | DTWRDU | GSOTPA | ORDSAN |
| BOSBWI[15] | CLEMSY | DTWSAN | GUAIAH | ORDSEA |
| BOSCLE[15] | CLTEWR[15] | EWRFLL[15] | IAGMYR | PHXSEA |
| BOSDFW[15] | CLTFLL[15] | EWRIAH[15] | IAHMSP | |
| BOSDTW[15] | CMHLAS | EWRLAS[15] | IAHORD | |
| BOSFLL[15] | CMHMSY | EWRMCO[15] | IAHSAN | |

It will take JetBlue several months, devoting significant resources, to generate a combined network plan that will be presented to JetBlue leadership for approval. The ultimate plan for the combined network will need to account for changes in route-level supply and demand conditions that will have occurred and various other factors including any changes to JetBlue's network strategy. At this time, JetBlue cannot predict with any certainty the nature of any service reductions or estimated percentage of all passengers on the routes that JetBlue will carry.

---

[14]   JetBlue notes that several routes are identified for both potential reductions and increased service. This is due to the fact that different approaches were used to identify potential reductions versus opportunities for increased service. No final decisions have been made on whether to increase or decrease service on these routes.

[15]   Consistent with JetBlue's upfront divestiture commitment at BOS, EWR, FLL, and LGA and airport restrictions, JetBlue assumed that there would be the potential reductions from the combined company after the Transaction but notes that it also assumes that new ULCC entrant(s) will pick up flying on routes from these airports.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**Specification 40**

Provide a copy of, and submit all documents relating to, any actual or proposed operating schedule that is the basis of your response to Specifications 38 and 39.  Provide all outputs of your fleet assignment or profitability models that were generated in developing any such schedule.

**JetBlue's Response to Specification 40**

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JetBlue did not run any fleet assignment or profitability models using the preliminary network overview described in response to Specifications 38 and 39.

JETBLUE AIRWAYS CORPORATION               CONFIDENTIAL TREATMENT REQUESTED

**Specification 41**

Describe the reasons for the Transaction and the costs to complete it; all plans for any change in the Company's or Spirit's business as a result of the Transaction (including changes to (a) pricing policies or strategies, including any changes to ancillary fees, (b) flight schedules, the frequency of flights on any route, or the type of aircraft operating on a route, (c) code-share or other joint-marketing arrangements, (d) frequent flyer programs, (e) policies or practices regarding corporate contract fares, (f) the scope or nature of any aspect of the Northeast Alliance, including capacity coordination, revenue sharing, code-sharing, network planning, and frequent flyer program reciprocity); and (g) the configuration of aircraft in the combined fleet, including the number and class of seats; the rationales for any such changes, and the costs to achieve them; and all risks associated with the Transaction.

**JetBlue's Response to Specification 41**

*Reasons for the Transaction*

JetBlue considered acquiring Spirit before the COVID-19 pandemic and then again earlier this year when it had entered into an agreement to sell its business to Frontier, thus accelerating the timeline over which JetBlue could act if it wanted to acquire Spirit.  Combining Spirit with JetBlue will increase JetBlue's presence and ability to offer its low fares and unique customer value proposition to more customers on more routes (including by complementing the growth initiatives being pursued under the Northeast Alliance ("NEA") with American Airlines).  More generally, the Transaction will also increase competition by enabling JetBlue to become a national challenger to the dominant four airlines.  The Transaction also will benefit employees of both JetBlue and Spirit (referred to as "Crewmembers" and "Team Members" respectively) by providing them with more opportunities and higher overall compensation. *See* JetBlue's response to Specification 44, which is incorporated herein for further details.

The Transaction materially increases and diversifies JetBlue's network, enhances its ability to scale, and will enable JetBlue to offer consumers more choices.  By leveraging the airlines' complementary networks and fleets, JetBlue will be able to create more competitive schedules (including with increased breadth and depth) and improve customer service for more customers.  With its increased offering, JetBlue expects that its relevance to customers will increase.  JetBlue will ultimately bring Spirit aircraft and employees under the superior JetBlue umbrella, bringing the JetBlue experience to all aircraft and offering JetBlue's unique combination of low fares and award-winning service to more customers.  For example, JetBlue will ultimately provide its award-winning cabin offerings on all flights, including free Wi-Fi, and free premium brand-name snack and drink options.

The Transaction complements the NEA with American Airlines, which unlocks growth in New York City and Boston, by significantly expanding JetBlue's capabilities in the rest of the country.  As discussed below, in connection with the Transaction, JetBlue has made the upfront commitment to divest Spirit's holdings at the airports covered by the Northeast Alliance and five gates at Fort Lauderdale Airport and related ground facilities, which will ensure that JetBlue does not increase its presence at any of the NEA airports as a result of the Transaction and will allow for allocation of those holdings to other ultra-low-cost carriers.

JETBLUE AIRWAYS CORPORATION                CONFIDENTIAL TREATMENT REQUESTED

Significantly, since 2005, the U.S. airline industry has been allowed to drastically consolidate leaving just four dominant carriers (American, Delta, United, and Southwest, collectively the "Big Four") that currently account for approximately 80% of capacity.  The Transaction will enable JetBlue to expand into a national low-fare challenger and truly compete against these significantly larger airlines.  Without the Transaction, JetBlue will continue to be a relatively small, niche player (with approximately 5% market share) without the scale or means to challenge the dominant carriers and transform the airline industry as a whole.  And no other airline, other than JetBlue if this transaction is approved, has the means to challenge the dominant carriers nationwide in the foreseeable future.

JetBlue is uniquely disruptive and has a significant impact on legacy fares.  The Transaction will magnify the "JetBlue Effect" – a longstanding phenomenon widely recognized (including by the DOJ) by which legacy carriers significantly lower their fares and often improve service on routes that JetBlue enters.  Based on preliminary network planning, the Transaction will result in the introduction of JetBlue services to new destinations, including St. Louis, Memphis, Louisville, Atlantic City, Myrtle Beach, and four additional destinations in Colombia, as well as enhance services in Big Four airline hubs (such as Las Vegas, Dallas, Houston, Chicago, Detroit, Atlanta, and Miami).

The Transaction will bring together the best of both airlines' cultures and values to create job growth and career opportunities for JetBlue and Spirit employees.  Airline workers currently employed by Spirit will be employed by JetBlue after the Transaction closes.  The combined airline will train all incoming Spirit Team Members and provide opportunities such as more career growth options and broader travel benefits.  Further, JetBlue also intends to directly employ many airline workers in a number of cities, where Spirit currently outsources, including Orlando, Las Vegas, and Los Angeles.

JetBlue and Spirit remain two independent companies until closing.  For that reason, JetBlue has not made any definitive decisions regarding changes to its business and will not do so until after closing.  JetBlue made preliminary assessments of the potential benefits, synergies, and costs that might arise from the Transaction.  These preliminary assessments were done in a relatively short time given the quickly evolving transaction environment and with the understanding that additional analysis would be done.  Therefore, specific plans, considerations, and assessments described within this response and JetBlue's overall response to the Second Request should be read with the understanding that additional assessments and considerations will be made that may affect and/or alter the plans and calculations described.

*Network*

 JetBlue believes that the Transaction will accelerate JetBlue's organic growth plan and its preliminary assessment of this growth includes being able to offer 1,700+ daily flights to more than 125 destinations in 30 countries[16] with additional growth anticipated by combining the two companies' order books. JetBlue expects to serve around 77 million customers annually.  JetBlue has considered the following strategies for a post-closing combined network that JetBlue:

---

[16] Based on December 2022 schedules.

- Growing JetBlue's presence in the middle of the U.S.  The combined airline will play to its strengths in Big Four hubs, such as Detroit Metropolitan Wayne County Airport (DTW), Chicago O'Hare International Airport (ORD), Hartsfield-Jackson Atlanta International Airport (ATL), George Bush Intercontinental Airport Houston (IAH) and Dallas Fort Worth (DFW), boosted by service to its highly relevant focus cities in the northeast, Florida and West Coast.

- Growing Fort Lauderdale International Airport (FLL) to 200+ daily departures, thereby offering a competitive origin and destination connective alternative to American Airlines in Miami and Delta in Atlanta.  In addition, JetBlue has considered expanding in Miami International Airport (MIA). JetBlue also anticipates material growth beyond its current levels in Orlando, West Palm Beach, Tampa Bay, and other cities.

- Amplifying competition along the West Coast, including considering exceeding the current combined daily departures at each of San Francisco International Airport (SFO) and Los Angeles International Airport (LAX) and offering a more robust schedule at Las Vegas Airport (LAS).

- Becoming the largest U.S. carrier serving Cancun International Airport (CUN), Puerto Rico, the Dominican Republic, and Jamaica, for example by bolstering service to approximately 30 daily departures to various U.S. destinations.

*Fleet*

- The Transaction will combine JetBlue's and Spirit's order books, with the potential to double the current JetBlue growth rate and provide a platform for growth given original equipment manufacturers' constraints. This provides increased flexibility and efficiency, as well as helps mitigate the risk of limited availability in a constrained market for aircraft.  JetBlue expects that the combined airline will have a fleet of 675 aircraft within approximately four years of closing and will transition to an all-Airbus fleet by no later than 2026, including nearly 400 Airbus aircraft with fuel efficient, lower carbon new engines that offer nearly 30% lower direct operating costs per seat compared to the fleet it will replace.  This will assist JetBlue in reaching its target to achieve net zero carbon emissions by 2040, which is ten years ahead of the broader U.S. airline industry's goal.

*Costs to Complete the Transaction*

The costs to complete the Transaction include significant internal resources and external advisor expenses and certain one-off costs. Specifically, JetBlue anticipates the following approximate costs to complete the Transaction:

- $30 million in banking advisory fees
- $100+ million in loan financing fees
- $45 million in legal advisory fees
- $100 million in IT / consulting fees

In addition, there will post-closing costs associated with the Transaction, including:

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

- Increasing pay to incoming Spirit Team Members
- Training of incoming Spirit Team Members
- Capital expenditures in support of retrofitting Spirit aircraft to JetBlue configuration
- Additional infrastructure investment in growth cities like Las Vegas

*Plans for Changes in JetBlue's Business*

As described above, the Transaction will integrate Spirit's existing all-Airbus fleet, order book, airport facilities, and Team Members into JetBlue.  The combined airline will be based in New York City and will be called JetBlue; JetBlue will sunset the Spirit brand.  The specifics of how the combined airline will function and the aspects concerning the sub-parts enumerated in Specification 41(a)-(e) and (g)[17] are still being considered by JetBlue.  While plans for the post-close combined airline continue to evolve to reflect, among other things, changing industry dynamics, the following preliminary strategies are contemplated by JetBlue:

- JetBlue plans to use Spirit's headquarters building near Fort Lauderdale International Airport as a JetBlue support center and training center; it will be in addition to JetBlue's other support centers.  Further, JetBlue plans to insource Spirit's outsourced operations in cities where JetBlue has Crewmembers (e.g., in Fort Meyers, Los Angeles, Miami, Orlando, San Juan, Tampa, and West Palm Beach).

- JetBlue plans to apply its employment policies to Spirit employees after closing and will migrate Spirit employees to JetBlue terms of employment.  JetBlue also plans to extend its "no furlough" commitment to incoming Spirit Team Members after closing.

- JetBlue plans to extend its industry-leading climate commitments to the combined airline, including its target to achieve net zero carbon emissions by 2040, which is ten years ahead of the broader U.S. airline industry's goal.  After closing, JetBlue will leverage the order book for the combined airline to accelerate the fleet transition to next-generation, fuel-efficient aircraft.  Further, JetBlue will extend its goal to convert 10% of jet fuel to sustainable aviation fuel ("SAF") by 2030 to the combined airline, with plans to introduce regular use of SAF into Spirit's West Coast operations after closing.

- Further, and as discussed in JetBlue's response to Specification 44, after the Transaction closes, JetBlue plans to systematically retrofit Spirit-owned aircraft, but no final decisions have been made regarding the exact seat configuration.  Consistent with how it has operated in the ordinary course, JetBlue continues to evaluate cabin configurations best suited to customers' needs, including different models of hybrid cabin configurations in the future to ensure it continues to deliver low fares and great service to customers, consistent with its long history.

---

[17] Regarding Specification 41(f), JetBlue has made the upfront commitment to divest Spirit's holdings at the airports covered by the Northeast Alliance, which will ensure that JetBlue does not increase its presence at any of the NEA airports as a result of the Transaction and will allow for entry and/or expansion of other ultra-low-cost carriers.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

*Risks Associated with the Transaction*

JetBlue has devoted considerable internal and external resources to the completion of the Transaction because it believes that the Transaction is in the best interests of JetBlue and its Crewmembers, stakeholders, and, most importantly, in the best interests of airline passengers. With respect to further risks associated with the Transaction, please see JetBlue's Response to Specifications 42 and 44, which are incorporated herein.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 42

Describe the timetable for the Transaction and submit documents sufficient to show:

a. all actions that must be taken before its completion, including each domestic or foreign regulatory, competition, or antitrust authority that the Company has notified (or expects to notify) of the Transaction;

b. the timing for each such action, including for each authority notified, the dates (or expected dates) the authority was (or is expected to be) notified and did or will complete its review;

c. any harm that would result if the Transaction is delayed or not completed; and

d. any terms or conditions of the Transaction that are not reflected in the merger or sale agreement between the parties.

## JetBlue's Response to Specification 42

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

## JetBlue's Response to Specification 42(a)

Prior to the consummation of the Transaction, the applicable waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and any timing agreement with any governmental entity, must have expired or have been terminated.  The closing is also conditioned upon satisfaction of the closing conditions set forth in Article 6 of the Merger Agreement produced as Attachment 3(b)-1 to JetBlue's HSR Notification and Report Form filed on August 12, 2022 ("HSR Filing"), Section 5.5 of the accompanying Parent Disclosure Schedule and Section 6.1 of the accompanying Company Disclosure Schedule, both dated July 28, 2022.

## JetBlue's Response to Specification 42(b)

JetBlue has notified certain foreign competition authorities about the Transaction. The timing of notification and clearance or expected clearance by each authority is listed in the table below.

| Jurisdiction | Filing Date | Clearance Granted or Expected Clearance |
|---|---|---|
| Colombia | October 24, 2022 | Expected in first half of 2023 |
| Costa Rica | November 15, 2022 | Expected Q2 2023 |
| Ecuador | August 5, 2022 | October 17, 2022 |
| Honduras | November 3, 2022 | Expected Q1 2023 |
| Trinidad and Tobago | September 16, 2022 | October 19, 2022 |

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

JetBlue and Spirit plan to file with the U.S. Department of Transportation ("DOT") a joint application for an exemption pursuant to 49 U.S.C. § 40109, and a joint application for approval of transfer of international route authorities pursuant to 49 U.S.C. § 41105.  JetBlue and Spirit expect the DOT to complete its review and adjudication of these two applications sometime in 2023.

**JetBlue's Response to Specification 42(c)**

If the Transaction is not completed, JetBlue, Spirit, and their customers will be harmed because they will be unable to achieve the substantial synergies, cost savings, and other benefits expected from the Transaction.

In addition, if the Transaction is not completed, JetBlue will be subject to a number of harms including, among other things, the following:

- JetBlue would be harmed by having committed substantial management time, as well as financial and other resources, to matters relating to the Transaction that could otherwise have been devoted to pursuing other opportunities;

- JetBlue will be required to pay its costs relating to the Transaction, such as legal and accounting costs, whether or not the Transaction is completed; and

- JetBlue will be required to pay Spirit a reverse break-up fee of $70 million and shareholders of Spirit a reverse break-up fee of $400 million less any amounts prepaid to shareholders of Spirit prior to termination.

Similarly, delays in the completion of the Transaction could result in distractions, additional transaction costs, loss of revenue, reputational issues, and employee retention uncertainty.

There will also be significant costs incurred by the banks who have financed the deal if the Transaction is not completed.

**JetBlue's Response to Specification 42(d)**

All of the terms and conditions of the Transaction are reflected in the Merger Agreement (together with the Exhibits, Parent Disclosure Schedule and Company Disclosure Schedule and the other documents delivered pursuant thereto).

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 43

Submit all documents relating to the Transaction, including:

a.  documents relating to all statements or actions by any person in support of or in opposition to the Transaction, or otherwise expressing any view about the Transaction or its likely effects;

b.  documents relating to efforts by persons, other than the Company, to acquire Spirit;

c.  documents relating to any divestiture (including related implementation plans) or other action contemplated as a means of obtaining regulatory approval of the Transaction or any alternative to the Transaction;

d.  documents discussing the Transaction, including any documents discussing alternatives to the Transaction;

e.  documents submitted or to be submitted (whether in draft or final form) to any domestic or foreign regulatory, competition, or antitrust authority in connection with its review of the Transaction, including notifications and appendices, actual or potential remedies submitted to a reviewing authority, white papers, responses to requests for information, and competitive impact submissions;

f.  draft or final orders, decisions, or other statements or formal objections (whether public or nonpublic, final or interim) by any domestic or foreign regulatory, competition, or antitrust authority in connection with its review of the Transaction, including any decision to enter a new phase of investigation or request additional information; and

g.  communications between the Company and any agency or representative of the U.S. government other than the Antitrust Division, or between the Company and any agent or representative of any federal, state, or local government agency.

## JetBlue's Response to Specification 43

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JETBLUE AIRWAYS CORPORATION          CONFIDENTIAL TREATMENT REQUESTED

## Specification 44

Describe any benefits that the Company anticipates will result from the Transaction including all costs savings, economies, new products, product improvements, or other efficiencies or synergies) relating to the Relevant Service, including:

    a.   all steps the Company expects to take in achieving each benefit, the risks involved in achieving each benefit, and the time and costs required to achieve each benefit;

    b.   a quantification of each benefit and of the costs to achieve each benefit, an explanation of how the quantification was calculated, the source and identity of all assumptions and inputs to the calculation of the quantification, and separate quantifications of the one-time fixed cost savings, recurring fixed cost savings, and variable costs savings (in dollars per unit and dollars per year) of each benefit;

    c.   how the Transaction would allow the Company to achieve each benefit, each alternative to the Transaction by which the Company could achieve each benefit, and why the Company could not achieve each benefit without the Transaction;

    d.   how each benefit would accrue to consumers or customers; and

    e.   the identity of each person (including title and contact information) employed or retained by the Company with any responsibility for achieving, analyzing, or quantifying each benefit.

Submit all documents relating to any benefit, risk, quantification, timing, cost, or alternative identified or described in response to this Specification or any other efficiency or synergy that will or is expected to arise from the Transaction.

## JetBlue's Response to Specification 44

Non-privileged documents responsive to Specification 44, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JetBlue made assessments of the potential benefits, synergies, and costs that could arise from the Transaction. These assessments were done in a confined time period with the understanding that additional analysis would be done, including as new information is available. Therefore, specific plans, considerations, and assessments described within this response, and JetBlue's overall response to the Second Request, should be read with the understanding that additional assessments and considerations will be made that may affect and/or alter the plans and calculations described.

## JetBlue's Response to Specification 44(a)-(b)

Overall, the Transaction allows JetBlue to more effectively deliver on its foundational goal to bring more low fares to more customers. Through the Transaction, JetBlue will be able to offer its unique and disruptive product and services on an increased scale with more connectivity, creating a true national competitor to the dominant "Big Four" airlines, which control

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

approximately 80% of the domestic airline passenger travel market today.  As discussed further in JetBlue's response to Specification 41, which is incorporated herein, the Transaction will enable JetBlue to offer enhanced customer relevance through more competitive schedules, increased network breadth, and depth and improved quality of service.

JetBlue has devoted considerable internal and external resources to the completion of the Transaction because it believes that the Transaction is in the best interests of JetBlue and its Crewmembers, stakeholders, and, most importantly, in the best interests of airline passengers.  If the Transaction is not completed, JetBlue will be subject to a number of risks, including that the disruption and uncertainty imposed on Crewmembers, airline passengers, and business partners would likely increase.  JetBlue would also face the business risk of having committed substantial management time, as well as financial and other resources, to matters relating to the Transaction that could otherwise have been devoted to pursuing other opportunities.  Uncertainty around the Transaction may also lead to an increased risk of Crewmembers seeking employment elsewhere.

Beyond its ability to bring lower fares and improved offerings to more customers and all of the other customer benefits of a larger, stronger JetBlue (including when customers choose to fly another airline), JetBlue expects to achieve financial synergies through the Transaction.  While the calculations will evolve, as described above, JetBlue has spent substantial time performing due diligence on the Transaction and is highly confident it will be able to realize these synergies.  Specific dollar amounts associated with the approximate realization rates described below are representative and assume divestiture of Spirit's holdings at the airports covered by the Northeast alliance and five gates at Fort Lauderdale Airport and related ground facilities.

At the time of Board approval, Transaction-specific annual net synergies were reasonably estimated to be approximately $800+ million ($600-700 million taking account of divestitures) once integration of the two airlines is complete, which is currently estimated to occur within five years of closing.  This is inclusive of approximately $350 million in fixed cost removal to be fully realized within three years of closing and assumes divestitures of Spirit's holdings at the airports covered by the Northeast Alliance and the five gates, and related ground facilities, at Fort Lauderdale airport.

The overall synergies contemplated are driven in large part by the expanded customer offerings and greater breadth and depth of network JetBlue will be able to offer.  At present, total revenue synergies are expected to be fully realized within five years of closing (by the end of 2028) at an overall rate of approximately 12% in 2024, 37% in 2025, 58% in 2026, 79% in 2027, and 100% by the end of 2028.

The overall net synergies expected reflect approximately $300-350 million in fixed cost savings as well as approximately $700-800 million of cost dis-synergies, driven in large part by planned increases in employee wages and other employment benefits to incoming Spirit Team Members, as well as retrofitting Spirit aircraft and offering customers those JetBlue products which it currently provides free of charge (e.g., free WiFi, premium snack and drink options).  Based on assessments, total cost synergies and dis-synergies are also currently expected to be fully realized within five years of closing (by the end of 2028) at a rate of approximately 0% in 2024, 68% in 2025, 80% in 2026, 91% in 2027, and 100% by the end of 2028.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

Further details about these benefits, synergies, and cost calculations are provided below[18] with the caveat that the precise quantification and expected timetable for realization is an evolving assessment.

**Improved Network Breadth and Relevance** – As described in further detail in JetBlue's response to Specification 41, the Transaction will improve network breadth and JetBlue's customer relevance by accelerating JetBlue's organic growth plan, including being able to offer 1,700+ daily flights to more than 125 destinations in 30 countries.[19] JetBlue expects to serve around 77 million customers annually as a combined airline, with additional growth made possible by access to the combined company's larger order book.  JetBlue has quantified these benefits as follows but notes that it continues to update its assessments to reflect, among other things, changing business and airline industry dynamics:

- Network optimization and new routes – approximately $356-$393 million in revenue synergies realized incrementally over 2024-2028 at an approximate rate of $34 million in 2024, $103 million in 2025, $172 million in 2026, $241 million in 2027, and $310 million in 2028, excluding the cost of divesting Spirit's holdings at the airports covered by the Northeast Alliance and five gates, and related ground facilities, at Fort Lauderdale Airport.

- Competitive origin and destination network improvements – approximately $150 million in revenue synergies realized incrementally over 2025-2028, at an approximate rate of $38 million in 2025, $75 million in 2026, $113 million in 2027, and $150 million in 2028, excluding the cost of divesting Spirit's holdings at the airports covered by the Northeast Alliance and five gates, and related ground facilities, at Fort Lauderdale Airport.

- Increased customer relevance – approximately $140 million in revenue synergies realized incrementally over 2025-2028 at an approximate rate of $35 million in 2025, $70 million in 2026, $105 million in 2027, and $140 million in 2028, excluding the cost of divesting Spirit's holdings at the airports covered by the Northeast Alliance and five gates, and related ground facilities, at Fort Lauderdale Airport.

- Improved aircraft fleet – JetBlue customers, and airline passengers more generally, will benefit from changes to the combined fleet that will ensure environmentally improved planes are flying earlier than they otherwise would be, supporting JetBlue's target of achieving net zero carbon emissions by 2040, 10 years ahead of the broader industry's goal.  In addition, the combined order book will create natural synergies, including by protecting growth and availability when there are aircraft shortages and original equipment manufacturers' order books are constrained.  This also provides flexibility,

---

[18] The specific dollar amounts associated with the approximate realization rates are representative and assume divestiture of Spirit's holdings at the airports covered by the Northeast alliance and five gates, and related ground facilties, at Fort Lauderdale Airport.  JetBlue did not assume or allocate such dollar amounts across all its modeling of overall synergy calculations, which accounts for the differences in the dollar amounts.

[19] Based on December 2022 schedules.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

including exercising options to increase A220 and A320neo aircraft deliveries.  JetBlue also expects to achieve some cost synergies from consolidating maintenance and engine contracts, which is included in the overall fixed-costs calculations. Please see JetBlue's response to Specification 41 for further details regarding aircraft plans.

**Improved Customer Experience** – Airline passengers will benefit greatly from greater access to JetBlue's customer experience resulting from the Transaction.  As discussed in JetBlue's response to Specification 41, JetBlue will bring its unique and high-quality service and products to the combined airline.  Specifically, Spirit aircraft will be retrofitted to enable distinctly JetBlue features (e.g., WiFi and premium snack and drink options) in addition to the exceptional inflight customer service for which JetBlue is known.  Further, the Transaction will enable JetBlue to offer its JetBlue Travel Products, including discounted vacation packages, and award-winning loyalty program ("TrueBlue"), which includes no blackout dates on redemption flight options, to more customers on more routes, further improving the range of services and products offered and the ability to cross-sell within these categories. JetBlue has quantified these factors as follows:

- Provision of premium offerings (e.g., free WiFi and premium snack and drink options) – approximately $350 million in cost dis-synergies, realized incrementally over 2025-2028, with fleet retrofitting, IT integration, and premium offerings beginning in 2025 and completing by the end of 2028.

- JetBlue travel products offerings – approximately $50 million in revenue synergies realized incrementally over 2025-2028 at an approximate rate of $42 million in 2025 and $60 million in each of 2026-2028, achieving run rate by 2026, excluding the cost of divesting Spirit's holdings at the airports covered by the Northeast Alliance and five gates, and related ground facilities, at Fort Lauderdale Airport.

- JetBlue loyalty products offerings – approximately $80 million in revenue synergies realized incrementally 2025-2028 at an approximate rate of $64 million in 2025 and $90 million in each of 2026-2028, achieving run rate by 2026, excluding the cost of divesting Spirit's holdings at the airports covered by the Northeast Alliance and five gates, and related ground facilities, at Fort Lauderdale Airport.

**Improved Employee Opportunities and Benefits** – Both JetBlue and Spirit employees will benefit from increased opportunities and employment benefits as a result of the Transaction.  As discussed in detail in JetBlue's response to Specification 41, after the Transaction closes, JetBlue will extend its terms of employment, which include higher compensation to all Spirit employees. Further, JetBlue will create new employment opportunities by insourcing Spirit's outsourced operations in cities where JetBlue Crewmembers are located, creating even more jobs in at least the following locations:  Fort Meyers, Los Angeles, Miami, Orlando, San Juan, Tampa, and West Palm Beach.  Extension of JetBlue terms of employment to incoming Spirit employees – approximately $420 million in cost dis-synergies realized incrementally beginning as soon as possible and likely to be fully realized within 12-15 months post-closing.

**Lower Fares from Increased Competition with Legacy Carriers** – Airline passengers in general will benefit from increased competition leading to, among other things, lower fares.  All of the financial benefits listed above are a product of a larger JetBlue, made possible by the

combination with Spirit, and JetBlue's ability to grow its presence throughout the country and bring the "JetBlue Effect" to more customers.  Even customers that do not fly on JetBlue will benefit from the JetBlue Effect because other carriers often lower their fares and improve their services when JetBlue enters a route, as evidenced by the independent public data supporting the JetBlue Effect.

### JetBlue's Response to Specification 44(c)

JetBlue is unable to achieve these benefits without the Transaction as it cannot organically grow to the same extent without Spirit's assets and employees.  Without the Transaction, JetBlue could not become a national challenger and would instead be relegated to being a relatively small, niche player (with approximately 5% share) without the scale or means to challenge the dominant carriers, which also continue to grow.

Further, JetBlue's ability to purchase additional aircraft is significantly limited by constraints on Airbus's order book, which remains overbooked.  As a result, the acquisition of a large number additional aircraft from Airbus is not available until at least 2027.  Even JetBlue's current order book is subject to delays.  This is exacerbated by pandemic-related parts and labor shortages.

While there is some very limited ability to lease aircraft or purchase secondary aircraft, doing so would have higher maintenance requirements and associated costs, additionally eliminating many of the benefits to consumers described above and would likely lead to higher airfares overall.  Nor would it even be possible to lease or buy aircraft at the same scale as provided for by the Transaction.

### JetBlue's Response to Specification 44(d)

As described above in response to Specification 44(a)-(b), as well as in JetBlue's response to Specification 41, customers will benefit greatly from lower fares, more convenient travel, and more award-winning service and products from a larger JetBlue.  JetBlue's clear impact on legacy carrier fares broadly benefits consumers, and the combination of JetBlue and Spirit will make that benefit available to even more consumers nationwide.  JetBlue and Spirit share a passion for disrupting the industry and believe that a JetBlue-Spirit combination will create a national challenger to the dominant "Big Four" airlines. *See* also JetBlue's response to Specification 41

### JetBlue's Response to Specification 44(e)

The primary persons employed or retained by JetBlue who are knowledgeable about JetBlue's efforts to achieve, analyze, or quantify the synergies discussed above are listed below.  They may be contacted through counsel at Shearman & Sterling.  Achieving the benefits of the Transaction will rely on the efforts and execution of various employees at JetBlue and Spirit and their advisors who are assisting with analyzing the Transaction and the benefits that will result.

| Name | JetBlue Title |
|------|---------------|
| Dave Clark | Head of Revenue and Planning |

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

| | |
|---|---|
| Eric Friedman | Director, Route Planning |
| Joanna Geraghty | President & Chief Operating Officer |
| Alla Gorelik | Manager, Strategy & Business Development |
| Nicholas Han | Manager, Route Planning |
| Robin Hayes | Chief Executive Officer |
| Ursula Hurley | Chief Financial Officer |
| Dave Jehn | Vice President, Network Planning |
| Derek Klinka | Director, Strategy & Business Development |
| Tracy Lawlor | Chief Strategy & Business Development Officer |
| Brandon Nelson | General Counsel & Corporate Secretary |
| Claire Roeschke | Manager, Strategy & Business Development |
| **Third Parties** | |
| Bates White | |
| Goldman Sachs | |

## Specification 45

Submit all documents relating to the following webpage, publicly accessible until July 28, 2022, including its creation, content, and purpose:  https://jetblueoffersmore.com/.

## JetBlue's Response to Specification 45

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

**Specification 46**

Submit all documents that support or otherwise relate to the following statement by the Company:  "JetBlue's entry into new routes triggers fare decreases from legacy airlines that are more significant than those resulting from ultra-low-cost carriers."   *See* https://jetblueoffersmore.com/wp-content/uploads/2022/05/An_Open_Letter_to_Spirit_ Shareholders_From_JetBlue.pdf

**JetBlue's Response to Specification 46**

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JETBLUE AIRWAYS CORPORATION                CONFIDENTIAL TREATMENT REQUESTED

**Specification 47**

Provide the economic analysis referenced in the following Company statement:  "Our recent economic analysis, using Department of Transportation Data, shows JetBlue's presence on a nonstop route decreases legacy fares by ~16%, about three times as much as the presence of an ultra-low-cost carrier."  *See* https://jetblueoffersmore.com/wp-content/uploads/2022/05/An_Open_Letter_to_Spirit_Shareholders_From_JetBlue.pdf.    In addition, provide all documents supporting or otherwise relating to this economic analysis.

**JetBlue's Response to Specification 47**

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JetBlue objects to this Specification as it requests economic analysis that is protected from disclosure by the attorney work product protection.  The economic analysis referenced in this Specification was prepared at the request of counsel in anticipation of regulatory investigation and potential litigation.

JETBLUE AIRWAYS CORPORATION                    CONFIDENTIAL TREATMENT REQUESTED

## Specification 48

List all consulting firms, investment banks, or other third parties engaged by the Company or on the Company's behalf to analyze the Transaction or the Relevant Service, including the Transaction's benefits, and submit all documents relating to such engagements.

## JetBlue's Response to Specification 48

As modified by the Division's letter dated November 7, 2022, this Specification is limited to agents and representatives retained by JetBlue in relation to (i) the Transaction or (ii) any other proposed acquisition of Spirit by JetBlue.

Non-privileged documents responsive to this Specification, if any, have been submitted with JetBlue's submissions of custodial documents and are incorporated herein by reference.

JetBlue objects to the automatic characterization of individuals identified in response to this Specification as agents and representatives of JetBlue in all circumstances. Subject to and without waiving JetBlue's objections, the following is a list of agents, representatives, and advisors retained by JetBlue in relation to the Transaction:

- Bank of America
- Bates White
- Bloom Strategic Counsel
- Cooley LLP
- DDC Public Affairs
- Deloitte
- Epiq
- FleishmanHillard
- Goldman Sachs
- Innisfree
- Kekst CNC
- McKinsey & Company
- Munger, Tolles & Olson LLP
- Polaris Consulting
- Shearman & Sterling LLP
- White & Case LLP

Subject to the same objection, the following is a list of agents, representatives, and advisors retained by JetBlue in relation to JetBlue's proposed acquisition of Spirit by the Company as described in the Tender Offer Statement on Schedule TO filed by the Company with U.S. Securities and Exchange Commission on May 16, 2022:

- Bank of America
- Bates White
- Deloitte
- Epiq
- Goldman Sachs
- Innisfree
- Kekst CNC
- Munger, Tolles & Olson LLP
- Shearman & Sterling LLP
- White & Case LLP

Subject to the same objection, the following is a list of agents, representatives, and advisors retained by JetBlue in relation to any other proposed acquisition of Spirit by JetBlue:

- Compass Lexecon
- Shearman & Sterling LLP
- UBS

## CERTIFICATION

As required by § 803.6 of the implementing rules for the Hart-Scott-Rodino Antitrust Improvements Act of 1976, this response to the Request for Additional Information and Documentary Material, together with any and all appendices and attachments thereto, was prepared and assembled under my supervision in accordance with instructions issued by the Department of Justice. Subject to the recognition that, where so indicated, reasonable estimates have been made because books and records do not provide the required information, the information is, to the best of my knowledge, true, correct, and complete in accordance with the statute and rules.

Where copies rather than original documents have been submitted, the copies are true, correct, and complete. If the Department uses such copies in any court or administrative proceeding, the Company will not object based on the Department not offering the original document.

**Option 1:**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____

| | |
|---|---|
| Type or print name and title | Signature |

**Option 2, notarized signature:**

| | |
|---|---|
| *Brand Nels* | *Brandon Nelson* *General Counsel JetBlue* |
| Type or print name and title | Signature |

Subscribed and sworn to before me at the City of *New York*, State of *New York*, this *12th* day of *December*, 20*22*

*Zoraida Polanco*
(Notary Public)

Zoraida Polanco
Notary Public, State of New York
Commission No.01PO4740055
Qualified in New York County
Commission Expires March 14, 2026

My Commission Expires: *March 14, 2026*

24