# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| GABRIEL GARAVANIAN, *et al.*, | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | )   Civil Action No. 1:23-cv-10678-WGY |
| | ) |
| JETBLUE AIRWAYS CORPORATION and | ) |
| SPIRIT AIRLINES, INC., | ) |
| | ) |
| *Defendants*. | ) |
| | ) |

## JOINT PRETRIAL MEMORANDUM

1

I.        **Summary of Evidence**

**_Plaintiffs' Summary of Evidence_**

The evidence will show that the proposed acquisition threatens consumers, including the Plaintiffs, with loss and damage, and is anticompetitive under Section 7 of the Clayton Act, 15 U.S.C. 18.  The evidence will show that Defendants themselves have admitted the proposed merger will result in anticompetitive effects.  In April 2022, JetBlue made an unsolicited hostile takeover bid to acquire Spirit while Spirit was engaged to merge with Frontier Airlines. Spirit encouraged its shareholders to proceed with the Frontier merger and reject JetBlue's offer because it would reduce ULCC capacity by 50% and increase costs to consumers. For those reasons, Spirit conceded the merger would likely not obtain regulatory approval. Spirit changed course and advocated accepting JetBlue's offer only after JetBlue increased the transaction price and included a substantial $400 Million termination fee paid to Spirit shareholders in the event the transaction did not proceed.

The evidence will show that Spirit had good reason to be concerned with JetBlue's offer: JetBlue has made it clear they intend to convert all Spirit high-density seating configurations to the lower-density JetBlue configurations.  JetBlue also plans to replace Spirit's ultra-low-cost model with JetBlue's higher cost model, resulting in significant price increases for consumers. As a result of evidence such as this, the proposed acquisition is presumptively unlawful.

The evidence will also show, as Defendants acknowledge, that when Spirit enters a market, fares in the market generally decrease as competitors try to match Spirit's low fares. This is commonly referred to as the "Spirit Effect."  Because JetBlue plans to eliminate Spirit's higher capacity and lower fares from the market, other airlines will no longer be compelled to lower their fares to match Spirit's, making prices for all travelers on all airlines in a market

significantly higher.  Moreover, the evidence will show that the proposed acquisition will result in unacceptable increases in concentration in already highly concentrated markets.

The evidence will show that JetBlue's divestitures at four airports where Spirit and JetBlue currently compete are illusory and do not address the anticompetitive effects that will occur as a result of the merger.  JetBlue's claim that the acquisition is not anticompetitive because it will result in efficiencies is not a viable defense.  As JetBlue acknowledges, the alleged "efficiencies" are not efficiencies at all, but are revenue increases obtained by charging higher prices to consumers, like Plaintiffs.

Furthermore, the evidence will show JetBlue's plan to backfill the loss of Spirit capacity – May 2023 "Combined Network Plan" – is illusory.  The Combined Network Plan was prepared in conjunction with JetBlue attorneys solely for the purpose of this litigation.  And JetBlue admits that this Combined Network Plan has not undergone the typical network plan scrutiny to ensure that the plan is feasible, including financial and fleeting analyses.

### ***Defendants' Summary of Evidence***

As the evidence will show, this is a merger of two small airlines – JetBlue and Spirit – that together account for less than 10% of the domestic airline market on a revenue basis.  As the United States proclaimed in this Court less than a year ago, JetBlue is a low cost carrier ("LCC") that, through a combination of low fares and superior service, uniquely disciplines the prices charged by the dominant legacy airlines (American, Delta, and United).  This disciplining effect – coined the "JetBlue Effect" by MIT researchers – has generated *billions* of dollars in consumer savings.  Through its acquisition of Spirit, JetBlue will double its size, spreading the JetBlue Effect to many more routes across the country, generating even more consumer savings, and supercharging a maverick that thwarts anticompetitive coordination in the airline industry.

The evidence will further show that JetBlue and Spirit are limited competitors; by far, their biggest competitors are the "Big Four" airlines (the legacies and Southwest) that control 80% of the domestic airline market.  In fact, Spirit (an "ultra-low-cost carrier" or "ULCC") offers nonstop service on only about 30% of routes flown by JetBlue.  To ensure the transaction presents no competitive concern, JetBlue nevertheless has agreed to divest slots and gates at key airports where JetBlue and Spirit overlap (Boston, the New York airports, and Fort Lauderdale) to other ULCCs.  Moreover, there are low or no barriers to entry, expansion, or repositioning across routes, meaning other ULCCs can compete in these routes when Spirit no longer exists.  These ULCCs have massive aircraft order books and are well-positioned to "backfill" any demand for customers seeking a ULCC option.  In short, after the transaction, the ULCC segment of the domestic airline market (less than 10% of the market as whole) will remain healthy and strong, and the vast majority of Americans (particularly those flying the dominant legacies) will benefit from a magnified JetBlue Effect.

II.     **Facts**

   A. **Defendants' Position on Facts Established by Pleadings or by Stipulations or Admissions of Counsel**

1.     The parties have not yet stipulated to any facts for the purposes of trial.  Plaintiffs have proposed uncontested facts below, some of which are inaccurate as of the date of this filing, irrelevant, or will be the subject of planned motion(s) *in limine*.

   B. **Plaintiffs' Proposed Facts established by pleadings or by stipulations or admissions of counsel**

   Defendants have admitted the following facts in their Answers to the Complaint:

1.  JetBlue Airways Corporation is a Delaware corporation founded in 1998 and headquartered in Long Island City, New York with corporate offices also in Utah and Florida.

2.  In February 2000, JetBlue began operations out of JFK Airport in New York City with service to Buffalo and Fort Lauderdale .

3.  JetBlue operates over 1,000 flights daily and serves 100 domestic and international network destinations in the United States, Canada, Mexico, the Caribbean, Central America, South America, and Europe.

4.  JetBlue sold up to 19% of the company to Lufthansa in 2007, which Lufthansa sold in 2015.

5.  JetBlue entered into the Northeast Alliance Agreement effective July 15, 2020.

6.  The Northeast Alliance allows for code-sharing on certain flights to and from Boston and New York.

7.  The Department of Justice filed a lawsuit to enjoin the NEA.

8.  At the time of the filing of its 10-K in 2021, JetBlue conceded that "there have been numerous mergers and acquisitions within the airline industry over the years."

9.  At the time of the filing of its 2021 10-K,  JetBlue conceded that "In February 2022, Frontier Airlines and Spirit Airlines announced an intention to merge. If the proposed merger meets regulatory and stockholder approval, the combined airline is expected to be a larger competitor to JetBlue, which may affect [JetBlue's] competitiveness."

10. At the time of the filing of its 2021 10-K, JetBlue conceded that "if [JetBlue] were to experience increased competition from low cost carriers or new entrants, [JetBlue's] business could be materially adversely affected.

11.     JetBlue is not a failing company.

12.     Spirit Airlines, Inc. is a Delaware corporation and a major American ultra-lowcost airline with its headquarters and principal place of business in Miramar, Florida, in the Miami Metropolitan Area.

13.     Spirit changed its name from Charter One Airlines to Spirit Airlines on May 29, 1992.

14.     In 2007 Spirit Plus was rebranded as the "Big Front Seat" and Spirit discontinued business class service, and in 2010 Spirit started to charge passengers for carry-on bags

15.     In May 2018, Spirit announced plans to fit its aircraft with Wi-Fi starting in the fall of 2018.

16.     In December 2019, Spirit announced its intention to order 100 Airbus A320neo aircraft.

17.     In 2020 Spirit was the largest ultra-low-cost carrier in North America.

18.     Spirit's annual operating revenue in 2021 was $3.231 billion

19.     More than 30.77 million passengers flew on Spirit in 2021

20.     Spirit has operations in Fort Lauderdale, Detroit, Chicago, Dallas/Fort Worth, Houston, Las Vegas, and Newark.

21.     Spirit's fleet consisted of 65 aircraft and 145 aircraft in 2014 and 2019, respectively.

22.     Spirit admits that it is an ultra-low-cost carrier (ULCC).

23.     Spirit operates scheduled flights throughout the United States and in the Caribbean and Latin America.

24.     Spirit's ontime performance as measured by USDOT was second in the country in November 2017

25.     Spirit was included in the Jet Airliner Crash Data Evaluation Centre (CACDEC) top 10 safest airlines list in February 2018

26.     Spirit's passenger base includes younger flyers and budget-minded flyers

27.     JetBlue made a tender offer for Spirit on April 5, 2022, for $3.6 billion.

28.     The Board of Spirit issued a press release on May 2, 2022; those materials are available

        in their entirety at https://ir.spirit.com/news-releases/news-details/2022/Spirit-Airlines-

        Board-of-Directors-Reiterates-Support-for-Merger-with-Frontier-Airlines/default.aspx.

29.     On May 5, 2022, Spirit made statements in a presentation to its investors regarding

        JetBlue's initial tender offer as memorialized at

        https://s24.q4cdn.com/507316502/files/doc_presentations/2022/2022.05.05-

        Presentation.pdf.

30.     Spirit rejected JetBlue's first tender offer to purchase Spirit

31.     On May 23, 2022 Spirit made statements in a presentation to its investors regarding

        JetBlue's initial tender offer as memorialized at

        https://www.sec.gov/Archives/edgar/data/1498710/000149871022000187/secfiling-

        jetblueoffersz.htm.

32.     On July 28, 2022, JetBlue agreed to acquire Spirit in a transaction valued at $3.8 billion.

33.     The offer accepted by Spirit in July 2022 included a $400 million reverse break-up fee to

        Spirit shareholders under some circumstances.

34.     The proposed acquisition price is not trivial: $3.8 billion ($3,800,000,000.00)

35.     The proposed acquisition will affect interstate commerce of the United States

36.     The combined airline will operate under the JetBlue name.

37.     In the past 15 years, Delta and Northwest merged, United and Continental merged,

        Southwest and AirTran merged, and American and US Airways merged.

**C. Contested Issues of Fact: Plaintiffs' Submission**

1.  Whether the relevant product market is scheduled air passenger service.

2.  Whether the relevant geographic markets are "Origin and Destination" pairs ("O/D pairs") where actual and potential competition is impacted as a result of Spirit's elimination.

3.  Whether there has been a trend toward concentration in the airline industry.

4.  Whether JetBlue's acquisition of Spirit constitutes the elimination of a significant rival.

5.  Whether the merger is likely to have anticompetitive effects, such as higher prices, reduced capacity, reduced consumer choice, reduced quality of service, and reduced product innovation.

6.  Whether the airline industry, and various relevant markets within it, are currently highly concentrated.

7.  Whether the merger will increase concentration in the relevant markets to unlawful levels.

8.  Whether the merger will facilitate collusion among remaining market participants.

9.  Whether Plaintiffs are threatened with loss or harm resulting from defendants' violation of the antitrust laws.

**D. Contested Issues of Facts: Defendants' Submission**

As will be set forth in more detail in Defendants' forthcoming Pretrial Brief, Defendants have identified the following issues of fact and law, including mixed issues of fact and law, for resolution at trial:

1.  Whether, considering the totality of circumstances and the specific context of the airline industry, the merger of JetBlue and Spirit is likely to substantially lessen competition.

2.      Whether origin and destination pairs and/or the national market for air passenger service are relevant geographic market(s) for purposes of assessing the effects of the merger.

3.      Whether Plaintiffs can satisfy a presumption that the merger is likely to substantially lessen competition through proof of sufficiently high market shares in relevant markets.

4.      If Plaintiffs establish a presumption, whether Plaintiffs' proposed market shares and market concentration statistics accurately predict the merger's probable effect on competition or whether they are misleading, considering a variety of factors, including, *inter alia*, the dynamic nature of the industry, the movement of planes across routes and fluctuating frequencies within routes, ease of entry, the agreements to divest JetBlue and Spirit assets in New York, Boston, and Fort Lauderdale, and the benefits of the transaction (including the "JetBlue Effect").

5.      Whether barriers are high enough to impede future entrants, or whether entry, expansion, and repositioning is sufficiently easy for ULCCs and other airlines following the merger.

6.      Whether the divestitures, combined with the other consumer benefits of the merger, are sufficient to offset any potential harms.

7.      Whether and to what extent the elimination of the Spirit product is, itself, an anticompetitive harm.

8.      Whether Plaintiffs have proven that the merger makes it more likely that the combined entity will engage in coordination with other airlines.

9.      If Plaintiffs establish a prima facie case and Defendants successfully rebut that that case, whether Plaintiffs can adduce additional evidence sufficient to meet their ultimate burden of persuasion that the merger is anticompetitive.

**III.      Jurisdictional Questions**

1.      The Parties are not currently aware of any jurisdictional questions.

## IV.      Questions Raised By Pending/Anticipated Motions

1.      Defendants have filed the following motions which are pending with the Court:

- •      Motion for summary judgment filed on August 1, 2023, raising the question of whether Plaintiffs have standing and whether the merger will cause Plaintiffs irreparable injury (ECF. No. 172).

- •      Motion for sanctions or, in the alternative, to show cause regarding Plaintiffs' repeated violations of court orders and local rules filed on August 28, 2023 (ECF No. 209).

- •      Plaintiffs' opposition to Defendant's Motion for Sanctions raises the issue whether Defendant should be sanctioned for violating the Local Rules, Federal Rules of Civil Procedure, and Rules of Professional Responsibility in the filing of its motion for sanctions that inaccurately and inappropriately accuses Plaintiffs of rule violations.

In addition, the Parties anticipate they may file motions *in limine*.

## V.      Issues of Law, Including Evidentiary Questions, Together With Supporting Authority

1.      Pursuant to Local Rule 16.3(c)(5), the parties submit the issues of law that they believe remain to be litigated.

### A.  Plaintiffs' Submission

Issues of law, including evidentiary questions, include those incorporated into Plaintiffs' Statement of Contested Facts (*see supra* Section II.C) as well as at least the following issues:

1.       Defendants are legally estopped from rebutting Plaintiffs' prima facie case with evidence the merger may increase JetBlue's ability to compete against the Big Four – by bringing the "JetBlue Effect" to new markets , by bringing the JetBlue Effect  in outside markets. *Philadelphia Nat'l Bank*, 374 U.S. 321 (1963); *RSR Corp. v. FTC*, 602 F.2d 1317 (9th Cir. 1979).

2.       The efficiencies defense is unavailable as a matter of law. *Brown Shoe*, 370 U.S. 294 (1962); *Philadelphia Nat'l Bank*, 374 U.S. 321 (1963); *FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967); *United States v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017).

3.       Even if the "efficiencies defense" were available, the efficiencies JetBlue purports will stem from the merger do not meet the legal standards of cognizable efficiencies.  *Fed. Trade Comm'n v. Hackensack Meridian Health, Inc.*, 30 F.4th 160 (3d Cir. 2022); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016); *St. Alphonsus Medical Center v. St. Luke's Health System, Ltd.*, 778 F.3d 775 (9th Cir. 2015).

4.       The proposed divestitures do not meet the legal standards of legally cognizable merger remedies. *Philadelphia Nat'l Bank*, 374 U.S. 321 (1963); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017); *FTC v. Sysco*, 113 F. Supp. 3d. 1 (D.D.C. 2015).

**B.       Defendants' Submission**

1.       The issues of law on which the parties disagree are incorporated into Defendants' Statement of Contested Facts (*see supra* Section II.D) and will be examined in more depth in Defendants' Pretrial Brief.[1]

**VI.       Amendments to Pleadings**

---

[1] This list of issues of law does not include evidentiary issues that will be raised through motions in limine, other evidentiary objections, or other legal issues raised by pretrial motions.

1.      The Parties are not currently seeking to amend any pleadings.

**VII.      Trial**

1.      As the Court stated at the April 13, 2023 status conference, the Court will determine the trial date at the pretrial conference.

2.      Plaintiffs will be ready to try this case by the October 16, 2023 trial date set in the Government Action, *United States, et al. v. JetBlue Airways Corporation*, et al., 1:23-cv-10511-WGY. Plaintiffs believe that trying this case to the Court in a consolidated trial with the government will be the most efficient way to present the evidence to the Court. As long as Plaintiffs are not restricted in the manner in which they may examine witnesses and present evidence in support of their case, Plaintiffs respectfully request consolidation of the private and government actions. Plaintiffs will be prepared to argue this position at the upcoming October 4 conference.

3.      Defendants' position is that trial of this matter should not be consolidated with trial in *United States, et al. v. JetBlue Airways Corporation*, et al., 1:23-cv-10511-WGY, which is scheduled for October 16, 2023.

**VIII.      Witnesses**

**A.  List of Witnesses Plaintiffs May Call**

**(1)  Expert Witnesses Plaintiffs May Call**

1.      Plaintiffs may call Hal J. Singer, an economist, for expert testimony live at trial regarding his economic analyses, including the anti-competitive effects of the proposed merger.

2.      Plaintiffs may call Ted P. Tatos, an economist, for expert testimony live at trial regarding his economic analyses, including the anti-competitive effects of the proposed merger.

**(2)  Non-Expert Witnesses Plaintiffs May Call**

1.      Plaintiffs may call the following fact witnesses to testify live at trial:

          (1)      Carolyn Fjord, Plaintiff

          (2)      Len Morazzo, Plaintiff

          (3)      Brenda Davis, Plaintiff

          (4)      David Clark, JetBlue Airways Corp.

          (5)      Eric Friedman, JetBlue Airways Corp.

          (6)      Robin Hayes, JetBlue Airways Corp.

          (7)      Ursula Hurley, JetBlue Airways Corp.

          (8)      Evan Jarashow, JetBlue Airways Corp.

          (9)      Jonathan Weiner, JetBlue Airways Corp.

          (10)      Derek Klinka, JetBlue Airways Corp.

          (11)      Michael Hillyard, JetBlue Airways Corp.

          (12)      Claire Roeschke, JetBlue Airways Corp.

          (13)      Nicholas Bartolotta, Spirit Airlines, Inc.

          (14)      Edward Christie, Spirit Airlines, Inc.

          (15)      John Kirby, Spirit Airlines, Inc.

          (16)      Matthew Klein, Spirit Airlines, Inc.

          (17)      Leonardo Lage, Spirit Airlines, Inc.

          (18)      Eric Monaghan, Spirit Airlines, Inc.

          (19)      John Bendoraitis, Spirit Airlines, Inc.

          (20)      H. McIntyre Gardner, Chairman of Spirit Airlines, Inc.

**(3)  Plaintiffs' Position on the Adjustments to the Case Management Order**

**Provisions Concerning Witness List**

1.      The Court has limited the parties to calling 20 witnesses per side. Dkt. No. 96 (Case

Mgmt Order) at 26. Because the evidence Plaintiffs need to prove the violation is largely

in the hands of the Defendants, the lion's share of Plaintiffs' witness list contains

Defendants' employees and representatives. Due to the 20-witness limit, Plaintiffs were

only able to list three Plaintiffs on the witness list.  However, as of the filing of their

Motion for Summary Judgment on August 1, 2023, it is now apparent that Defendants

intend to challenge the standing of each of the Plaintiffs at trial. There are 24 Plaintiffs.

The 20-witness limitation has therefore prevented all of the Plaintiffs from testifying in

their own trial, which is their right to do.

2.      Plaintiffs therefore request that they be permitted to ensure the testimony of each Plaintiff

is received by the Court. This can be accomplished in one of two ways, either all 24 of

the Plaintiffs should be permitted to testify, or in the alternative, the parties can stipulate

to the admissibility of Plaintiffs' deposition testimony. Finally, because it is now clear

that Defendants seek to challenge Plaintiffs' standing at trial, Plaintiffs request the

opportunity to substitute the three Plaintiffs currently listed on the witness list. Plaintiffs

will agree to extend whatever deadlines necessary to allow Defendants to accommodate

this change.

(4)  **Defendants' Position on the Adjustments to the Case Management Order**

      **Provisions Concerning Witness List**

1.      The Case Management Order (ECF No. 96 at page 26-27) states that each party is limited

to 20 trial witnesses apiece and sets the dates by which Plaintiffs and Defendants alike

had to disclose their witnesses to the opposing party.  Plaintiffs themselves proposed 20

witnesses in the proposed order.  *Id.*  Defendants do not agree that all 24 individual

Plaintiffs should be permitted to testify.  Nor do Defendants agree that Plaintiffs should be allowed to strategically change the witnesses they selected, or to submit deposition testimony from all of the Plaintiffs for affirmative use by Plaintiffs.  However, in the event the Court dismisses a witness on Plaintiffs' trial witness list, Defendants would not object to Plaintiffs substituting another Plaintiff for the dismissed Plaintiff.

**B.  List of Witnesses Defendants Expect to Call**

**(1) Expert Witnesses**

1.      Defendants will call Dr. Nicholas Hill, an economist, for expert testimony regarding his economic analyses, including the transaction's competitive effects.

2.      Defendants' expert witness is expected to testify live at trial.

**C.  <u>Fact Witnesses</u>**

1.      Defendants may call the following fact witnesses to testify live at trial:

      (1)  Dave Clark, JetBlue

      (2)  Eric Friedman, JetBlue

      (3)  Robin Hayes, JetBlue

      (4)  Mike Hillyard, JetBlue

      (5)  Ursula Hurley, JetBlue

      (6)  Richard Johns, JetBlue

      (7)  Derek Klinka, JetBlue

      (8)  Edward Christie, Spirit

      (9)  Matthew Klein, Spirit

      (10) Drew Wells, Allegiant

      (11) Brian Znotins, American Airlines

(12) Sara Nelson, Association of Flight Attendants

(13) Trevor Yealy, Avelo Airlines

(14) David Neeleman, Breeze Aviation Group

(15) Eric Beck, Delta Airlines

(16) Barry Biffle, Frontier Airlines

(17) Vicki Jaramillo, Greater Orlando Aviation Authority

(18) Andrew Nocella, United Airlines

**D.  Identifying Witnesses and Order of Presentation**

1.  Except as noted above with respect to Plaintiffs' position regarding the requested testimony of the Plaintiffs (VIII.A.(3)), any witness not listed in the prior Section will be precluded from testifying live at trial, unless such witness is used solely for impeachment purposes, or otherwise for good cause shown.

2.  Unless otherwise agreed to by the parties, by no later than 4:00 p.m. two calendar days before each day of trial, Plaintiffs and Defendants shall provide each other with the list and order of witnesses to be presented each day of trial. Any change to the list and order of witnesses presented pursuant to this paragraph may not be modified without prior consent of the opposing part(ies) or for good cause shown upon oral application to the Court.

3.  For the convenience of party and non-party witnesses, and for efficiency, any witness who is testifying live and called by both sides will only testify once and will be questioned by both sides at that time.  A party conducting a non-adverse cross-examination will be permitted to go beyond the scope of the direct examination for witnesses on that party's final witness list.

4. Fact witnesses shall remain outside the courtroom unless testifying, until such time as they are excused. Fact witnesses cannot discuss the substance of their testimony with counsel after having been sworn in until they are excused. Expert witnesses cannot discuss the substance of their testimony while under cross-examination.

**E. Testimony by Deposition**

1. Pursuant to the Scheduling and Case Management Order (ECF No. 96 at 28), the parties may offer into evidence designations and counter-designations from deposition testimony.  As set forth in the Scheduling and Case Management Order (ECF No. 96 at 28), the parties will submit the deposition designation packages to the Court on the first day of trial.  The parties will endeavor to resolve objections to designated testimony before the first day of trial.  A party may use any and all deposition testimony, whether or not designated, for impeachment purposes.

**IX.   Exhibits**

**A. Exhibit Lists**

1. Exhibit A is the parties' current list of exhibits.  The parties anticipate being able to resolve some objections prior to trial, and the parties will file revised exhibit lists with the Court (one list of agreed-to exhibits and one list of objected-to exhibits) at a date to be agreed upon prior to trial or in accordance with an order from the Court.

2. Exhibits to be used or offered into evidence solely for impeachment need not be included on the list of trial exhibits or disclosed in advance of being used or offered at trial.

3. Subject to the remaining provisions of this Pretrial Order or agreement of the parties, exhibits not listed will not be admitted or shown at trial unless good cause is shown or unless agreed to by the parties.

4.      The listing of a document on the exhibit list is not an admission that such document is relevant or admissible for all purposes. Each party reserves the right to object to the propriety of any evidence under the Federal Rules of Evidence at the time such evidence is used at trial in view of the specific context in which such evidence is used.

5.      Each party reserves the right to use exhibits listed on the other side's trial exhibit list at trial.  Any exhibit, once admitted, may be used equally by any party for any proper purpose in accordance with the Federal Rules of Evidence.

6.      Exhibits that are documents created by a party or non-party and produced by that party or non-party from its own files will be presumed to be authentic within the meaning of Federal Rule of Evidence 901 unless a party can make a good faith objection to the exhibit's authenticity.

7.      Complete legible copies of documents may be offered and received in evidence to the same extent as an original unless a genuine question is raised as to the authenticity of the original, or in the circumstances it would be unfair to admit the copy in lieu of the original.

**B.  Demonstratives and FRE 1006 Summary Exhibits**

1.      Unless otherwise agreed by the parties, the parties will provide each other with electronic, color copies of all demonstratives and FRE 1006 exhibits to be used in connection with the examination of a witness at trial to the other side's counsel of record no later than 5:00 p.m. two calendar days before any such demonstrative may be introduced or otherwise used at trial.  The parties will promptly meet and confer regarding any objections. If any of the demonstratives change after the deadline, the party intending to use the exhibit will promptly notify the opposing side of the change(s).  Any

remaining disputes will be raised with the Court as appropriate before trial resumes on the day of their anticipated use.

2.     The parties will provide each other with electronic, color copies of all graphics, slides, animations, board, and any other form of demonstratives they plan to use during opening statement(s) to the other side's counsel of record no later than 5:00 p.m. one calendar day before their intended use.  The parties will promptly meet and confer regarding any objections, and any remaining disputes will be raised with the Court as appropriate.

3.     A party need not pre-disclose demonstrative and FRE 1006 summary exhibits that will be (i) used by an expert and were disclosed in any expert's report, if the exhibit has not been materially changed; (ii) used at any hearing other than trial; and (iii) created in court during a witness's examination.

4.     Demonstratives and FRE 1006 summary exhibits that the parties intend to use at trial need not be included on the trial exhibit list and the notice provisions of Sections IX.B.1 and 2 shall not apply to the enlargement, highlighting, ballooning, or excerpting of trial exhibits or testimony.

5.     If any demonstrative changes after the deadline(s), the party intending to use the demonstrative will promptly notify the opposing side of the change(s).  Any remaining disputes as to demonstratives shall be raised with the Court as appropriate.

6.     The party seeking to use a demonstrative or FRE 1006 summary exhibit will provide a color representation of the demonstrative to the other side in (OCR) PDF form. However, for demonstratives or FRE 1006 summary exhibits with video or animations, the party seeking to use the demonstrative or FRE 1006 summary exhibit will provide it to the other side via electronic mail in native format.  It is the disclosing party's obligation to

ensure the receiving party is able to view the demonstrative by, for example, including software that allows its viewing.  For irregularly sized physical exhibits, the party seeking to use the physical exhibit will provide a color representation as a (OCR) PDF of 8.5 x 11 copies of the exhibits and will make the physical exhibit available for inspection at a mutually convenient time and place before the commencement of trial.

**X.       The Parties' Respective Positions On Any Remaining Objections To Trial Exhibits**

1.       The parties have exchanged witness lists and deposition designations with objections noted in accordance with FRCP 26(a)(3).  The parties have begun, but have not yet completed, exchanging objections to trial exhibits.  The parties will endeavor in good faith to resolve any objections before involving the Court.

**XI.      Confidentiality Procedures**

1.       On August 21, 2023, the parties filed a Joint Proposed Confidentiality Protocol (ECF No. 183) that addresses confidentiality procedures with respect to non-party evidence at trial.

2.       The parties are continuing to discuss a protocol for party documents. .

**XII.     Additional Matters to Aid in the Disposition of the Action**

**A.  Electronic Equipment**

**1.**       Each party will be permitted to use electronic equipment for the presentation of evidence and will be permitted to have a technician in the courtroom to operate such system. No later than five days before trial, the parties will present to the Court a list of all audio and video equipment that will be used to present evidence during the trial and the names of the persons who will be responsible for delivering and setting up the equipment on the equipment set-up date, which will be provided by the Court.

**2.**     The parties request that the Court grant access to the courtroom on the business day

before trial for the purposes of setting up electronic and computer devices.

**XIII.**     **Settlement**

1.     The parties have nothing to report with respect to potential settlement.

Dated: September 15, 2023                                      Respectfully submitted,

*/s/ Elizabeth M. Wright*
Zachary R. Hafer (MA BBO #569389)
Elizabeth M. Wright (MA BBO #569387)
Zachary Sisko
Cooley LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Tel: 617-937-2300
zhafer@cooley.com
ewright@cooley.com
zsisko@cooley.com

Ethan Glass (*Pro Hac Vice*)
Deepti Bansal (*Pro Hac Vice forthcoming*)
Matt K. Nguyen (*Pro Hac Vice*)
Cooley LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 2004-2400
Tel: 202-842-7800
Fax: 202-842-7899
eglass@cooley.com
dbansal@cooley.com
mnguyen@cooley.com

Beatriz Mejia (*Pro Hac Vice*)
Cooley LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111
Tel: 415-693-2000
Fax: 415-693-2222
bmejia@cooley.com

Jessica K. Delbaum
Leila R. Siddiky
Richard F. Schwed

Shearman & Sterling LLP
599 Lexington Avenue
New York, NY 10022
(212) 848-4000
jessica.delbaum@shearman.com
leila.siddiky@shearman.com
richard.schwed@shearman.com

Michael Mitchell
Shearman & Sterling LLP
401 9th St. NW
Suite 800
Washington, DC 20004
(202) 508-8000
michael.mitchell@shearman.com

Rachel Mossman Zieminski
Shearman & Sterling LLP
2601 Olive St, 17th Floor
Dallas, TX 75201
(214) 271-5777
Rachel.Zieminski@Shearman.com

Ryan A. Shores
David I Gelfand
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 974-1876
Fax: (202) 974-1999
rshores@cgsh.com
dgelfand@cgsh.com

Daniel P. Culley
Cleary, Gottlieb, Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000
dculley@cgsh.com

*Attorneys for JetBlue Airways Corporation*

/s/ Samuel N. Rudman
Samuel N. Rudman (MA BBO #698018)
Choate, Hall & Stewart LLP
Two International Place

Boston, MA  02110
Telephone:   +1 617 248 4034
srudman@choate.com

/s/ Andrew C. Finch
Andrew C. Finch (*Pro Hac Vice*)
Eyitayo St. Matthew-Daniel (*Pro Hac Vice*)
Jay Cohen (*Pro Hac Vice*)
Jared P. Nagley (*Pro Hac Vice*)
Kate Wald (*Pro Hac Vice*)
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: 212-373-3000
Fax: 212-757-3990
afinch@paulweiss.com
tstmatthewdaniel@paulweiss.com
jcohen@paulweiss.com
jnagley@paulweiss.com
kwald@paulweiss.com

Meredith R. Dearborn (*Pro Hac Vice*)
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105
Tel: 628-432-5100
Fax: 628-232-3101
mdearborn@paulweiss.com

Attorneys for Defendant
Spirit Airlines, Inc.

*Attorneys for Defendant Spirit Airlines, Inc.*

/s/ Joseph M. Alioto Jr.
Joseph M. Alioto Jr.
ALIOTO LEGAL
100 Pine Street, Suite 1250
San Francisco, California 94111
joseph@aliotolegal.com

/s/ Stephen G. Larson
Stephen G. Larson
LARSON LLP

555 South Flower Street, Suite 4400
Los Angeles, California 90071
slarson@larsonllp.com

Robert Ruyak
S. Gregory Herrman
LARSON LLP
900 17th Street NW, Suite 320
Washington, DC 20006
rruyak@larsonllp.com
gherrman@larsonllp.com

*Attorneys for Plaintiffs*
*Gabriel Garavanian, et al.*

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was sent electronically to all attorneys of record via the

Court's ECF system on September 15, 2023.

*/s/ Elizabeth Wright*
Elizabeth Wright