UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GABRIEL GARAVANIAN et al., *Plaintiffs*, v. JETBLUE AIRWAYS CORPORATION and SPIRIT AIRLINES, INC., *Defendants*. | Civil Action No. 1:23-cv-10678-WGY |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS'
MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF OUT-OF-MARKET BENEFITS**

**TABLE OF CONTENTS**

Page

I. PLAINTIFFS' MOTION IS PREMATURE BECAUSE THE RELEVANT MARKETS ARE A FACTUAL ISSUE FOR TRIAL ...................................................... 4

    A. The Economic and Qualitative Evidence Will Support a Broader Market than Assumed in Plaintiffs' Motion .................................................................. 5

    B. Supply-Side Substitution Can Be Part of Market Definition .............................. 7

    C. A Broader View of the Relevant Market Is Appropriate Because Consumers Fly on Multiple Routes ....................................................................... 8

II. EVEN IF THE COURT ACCEPTS PLAINTIFFS' MARKET DEFINITION, DEFENDANTS' EVIDENCE IS RELEVANT TO ITS REBUTTAL CASE AT STEP TWO .................................................................................................................. 10

III. PLAINTIFFS OVERSTATE THE VITALITY AND IMPACT OF PHILADELPHIA NATIONAL BANK ........................................................................ 12

CONCLUSION ................................................................................................................ 13

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*,
    65 F.3d 1406 (7th Cir. 1995) ................................................................................................ 7

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) .................................................................................................... 2, 3, 7

*FTC v. RAG-Stiftung*,
    436 F. Supp. 3d 278 (D.D.C. 2020) ....................................................................................... 7

*FTC v. Tenet Health Care Corp.*,
    186 F.3d 1045 (8th Cir. 1999) ............................................................................................ 4, 7

*Gulf States Reorg. v. Nucor Corp.*,
    822 F. Supp. 2d 1201 (N.D. Ala. 2011) ................................................................................. 7

*Kottaras v. Whole Foods Mkt., Inc.*,
    281 F.R.D. 16 (D.D.C. 2012) ............................................................................... 3, 9, 12, 13

*New York v. Deutsche Telekom AG*,
    439 F. Supp. 3d 179 (S.D.N.Y. 2020) ............................................................................... 4, 6

*RSR Corp. v. FTC*,
    602 F.2d 1317 (9th Cir. 1979) ............................................................................................. 13

*SBC Commc'ns v. FCC*,
    56 F.3d 1484 (D.D.C. 1995) ................................................................................................. 7

*United States v. Anthem, Inc.*,
    236 F. Supp. 3d 171 (D.D.C. 2017) ...................................................................................... 4

*United States v. Baker Hughes, Inc.*,
    908 F.2d 981 (D.C. Cir. 1990) ..................................................................................... *passim*

*United States v. Gen. Dynamics Corp.*,
    415 U.S. 486 (1974) ........................................................................................................ 3, 13

*United States v. Grinnell*,
    384 U.S. 563 (1966) .......................................................................................................... 2, 7

*United States v. Philadelphia National Bank*,
    374 U.S. 321 (1963) ................................................................................................... *passim*

*United States v. Standard Oil Co. (N.J.)*,
    253 F. Supp. 196 (D.N.J. 1966) ................................................................................ 10

*United States v. U.S. Sugar*,
    73 F.4th 197 (3d Cir. 2023) ................................................................................... 2, 5

*United States v. U.S. Sugar Corp.*,
    2022 WL 4544025 (D. Del. Sept. 28, 2022),
    *aff'd* 73 F.4th 197 (3d Cir. 2023) ............................................................................. 6

*United States v. Waste Mgmt., Inc.*,
    747 F.2d 976 (1984) ............................................................................................... 11

*Virtual Maint., Inc. v. Prime Computer, Inc.*,
    11 F.3d 660 (6th Cir. 1993) ...................................................................................... 7

**Statutes**

Clayton Act § 7 .......................................................................................................... *passim*

**Other Authorities**

Daniel A. Crane, *Balancing Effects Across Markets*,
    80 Antitrust L. J. 397 (2015) ..................................................................................... 9

Dept. of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines (2010) ....................... 11

Gregory J. Werden, *Cross-Market Balancing of Competitive Effects: What is the
    Law, and What Should It Be?*, 43 J. Corp. L. 120 (2017) ........................................ 7

Today, the "Big Four" carriers (United, American, Delta, and Southwest) collectively control approximately 80% of domestic airline travel. Declaration of Elizabeth M. Wright ("Wright Decl."), Ex. 1 (Rebuttal Expert Report of Nicholas Hill ¶ 12 (Aug. 24, 2023)) ("Hill Rebuttal Rep.") (calculating shares based on revenue). Through its purchase of Spirit, JetBlue will expand its disruptive business model, creating a fifth national challenger to these airlines and enhancing competition throughout the United States. This is no empty hypothesis. As the Government recently explained, JetBlue's "unique" offering allows it to compete "effectively against the legacy airlines in ways other LCCs and ULCCs" cannot, and its competitive pressure has saved consumers billions of dollars and improved the quality of air travel. Plaintiffs' Proposed Findings of Fact ¶¶ 27, 28, *United States v. Am. Airlines Grp. Inc.*, No. 1:21-cv-11558 (D. Mass. Dec. 2, 2022), ECF No. 332.[1] Plaintiffs request that this Court ignore these benefits that JetBlue, as a more robust nationwide competitor, will bring to the airline industry without considering *a single piece of evidence* at trial. Plaintiffs' request to prejudge the merger is misguided for multiple reasons.

As a threshold matter, Plaintiffs motion *in limine* ignores their own pleading: Plaintiffs have *affirmatively pled* a national market here. *See, e.g.*, Compl. ¶ 35 ("Unless this merger of the sixth and seventh largest competitors in the national airline market is prohibited, the unified

---

[1] Numerous witnesses, including the parties' competitors, recognize the same. *See, e.g.*, Wright Decl., Ex. 2 (Trevor Yealy (Avelo) Dep. Tr. at 124:4–19 (June 27, 2023)) ("Q. In your view, would a combined JetBlue-Spirit be a stronger competitor for the legacy airlines? . . . THE WITNESS: At the end of the day, a combined JetBlue-Spirit, I think, would be a stronger competitor to the legacy airlines, yes … Q. And why do you think that? A. It gives the combined entity more size and scale with which to operate out of their airports where they do run into a number of the legacy airlines. It provides them more assets to compete in a much faster manner than they would otherwise have organically."); Wright Decl., Ex. 3 (Drew Wells (Allegiant) Dep. Tr. at 244:8–13 (June 22, 2023)) ("Wells Dep. Tr.") ("Q. And I believe you testified earlier that the merger will help JetBlue gain the scales necessary to better compete against the Big Four; correct? . . . THE WITNESS: I – I'd believe that to be true.").

1

company will become the fifth-largest airline by revenue based in the United States with a national market share of 10.2%; and Spirit, the seventh largest airline by revenue, with a national market share of 4.9%, will be eliminated."); *id.* ¶ 73 ("The proposed acquisition will eliminate Spirit as a substantial 'price disruptor' in the national and local relevant markets."). Plaintiffs' motion also mistakes their current articulation of the relevant "markets"—the "city-pair markets in which JetBlue and Spirit currently compete" and the "city-pair markets in which Spirit competes or intends to compete with other airlines absent JetBlue" (Mot. at 2)—(and thus what benefits are "out of market") as settled facts. But it is for this Court, not Plaintiffs, to decide the relevant markets.

      The evidence will show that competition in the airline industry occurs at many levels, including at the national level, at the city level, and at the route level. After hearing the evidence, the Court need not choose the narrowest market "where such 'division does not aid [the court] in analyzing the effects of [a] merger.'" *United States v. U.S. Sugar Corp.*, 73 F.4th 197, 207 (3d Cir. 2023) (alterations in original) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 327 (1962)). Indeed, even where some aspects of competition are local, the Supreme Court has not hesitated to find a broader geographic market where the record reflected competition at the regional and national level. *See United States v. Grinnell, Corp.*, 384 U.S. 563, 575 (1966) (finding a national market notwithstanding 25-mile catchment area for local facilities where the evidence at trial showed "national planning," agreements "cover[ing] activities in many [s]tates," and a "national schedule of prices, rates, and terms, though the rates may be varied to meet local conditions.").

      But even if the Court were to take that highly unusual step of adopting route-only market definitions as a matter of law before trial, the motion still must be denied. In the

modern burden-shifting framework of a Section 7 case, Plaintiffs must start by showing increased concentration levels in relevant markets; after that, Defendants need only show these concentration statistics "inaccurately predict[] the relevant transaction's probable effect on future competition." *United States v. Baker Hughes Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990). Here, the evidence will show that an enhanced JetBlue will increase network-wide competition, and that enhanced competition will ripple through the fluid airline industry, where carriers constantly adjust the routes they fly in response to ever-changing competitive dynamics. *See also* ECF No. 251, Defs. Opp. to Pls. Mot. in Limine Regarding an Efficiencies Defense. Particularly in this evolving competitive environment, there is no requirement that Defendants trace the flow of benefits from this enhanced network-wide competition to particular routes with exactitude. That would incorrectly "forc[e] a defendant to rebut a probability with a certainty," contrary to Section 7. *Baker Hughes*, 908 F.2d at 992.

Against this backdrop, Plaintiffs' reliance on *United States v. Philadelphia National Bank*, 374 U.S. 321 (1963), is misplaced. In the sixty years since it was decided, *Philadelphia Nat'l Bank* has been "cut [] back sharply" by later Supreme Court cases. *Baker Hughes*, 908 F.2d at 990. As courts have repeatedly made clear over the last half century, a merger must "'be functionally viewed, in the context of its particular industry'" as a whole, *United States v. General Dynamics Corp.*, 415 U.S. 486, 498 (1974) (quoting *Brown Shoe*, 370 U.S. at 321–22), considering the "totality-of the-circumstances." *Baker Hughes*, 908 F.2d at 984. Following this command, courts have distinguished *Philadelphia National Bank* based on its unique facts, including in cases like this one where the same group of customers—like customers for air travel—purchase across multiple alleged markets. *See Kottaras v. Whole Foods Mkt., Inc.*, 281 F.R.D. 16, 24–25 (D.D.C. 2012). In short, given the competitive realities

of the airline industry and the context of this merger, the case law not only allows—but *requires*—this Court to analyze the merger's impact on competition *as a whole*, not myopically and mechanically as to individual routes as Plaintiffs request.  The motion should be rejected.

## I.     PLAINTIFFS' MOTION IS PREMATURE BECAUSE THE RELEVANT MARKETS ARE A FACTUAL ISSUE FOR TRIAL

The fallacy of Plaintiffs' motion can only be understood against the backdrop of the legal standard Plaintiffs omit.  There is a three-step burden-shifting framework for analyzing the likely competitive effects of a merger in a challenge under Section 7 of the Clayton Act.  *See generally Baker Hughes*, 908 F.2d at 981.[2]  At step one, Plaintiffs must start by properly identifying a relevant product and geographic market and showing the transaction will lead to increased concentration levels in the relevant market.  *FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1051 (8th Cir. 1999).  This "[e]vidence of market concentration simply provides a convenient starting point for a broader inquiry into future competitiveness." *Baker Hughes*, 908 F.2d at 984.

If Plaintiffs satisfy their initial burden, then at step two, the "burden of producing evidence to rebut this presumption then shifts to the defendant." *Id.* at 982.  "A defendant can make the required showing by [(1)] affirmatively showing why a given transaction is unlikely to substantially lessen competition, or [(2)] by discrediting the data underlying the initial presumption in the government's favor." *Id*. at 991.  The "quantum of evidence defendants must produce to shift the burden back is relatively low." *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 213 (D.D.C. 2017).  "[D]efendants are not required to 'clearly disprove

---

[2] Though the First Circuit has not specifically adopted or applied *Baker Hughes*, it is well-established that "[c]ourts generally assess Section 7 cases through [this] three-part burden-shifting framework." *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 198–99 (S.D.N.Y. 2020) (citation omitted).

4

anticompetitive effect,' but rather to make 'a showing.'" *Id.* (quoting *Baker Hughes*, 908 F.2d at 991). And a district court must consider all of a defendant's rebuttal evidence in a "totality-of-the-circumstances approach," not separately considering the individual impact of, for example, entry or efficiencies. *See Baker Hughes*, 908 F.2d at 984. Finally, if a defendant "rebuts the presumption," then at step three, "the burden of producing additional evidence of anticompetitive effect shifts to the government, and merges with the ultimate burden of persuasion, which remains with the government at all times." *Id.* at 983.

Plaintiffs' motion simply assumes that they have already proven their newly proposed route-level market definitions are the appropriate lens through which to examine the impact of this merger, the initial step in the analysis, and thus which benefits are "out of market." The motion should be denied as premature for that reason alone. As described further below, the motion also ignores that the evidence Plaintiffs deem "out of market" is relevant to the final two stages of the Section 7 inquiry.

> **A.    The Economic and Qualitative Evidence Will Support a Broader Market than Assumed in Plaintiffs' Motion**

Market definition is a fact-specific inquiry. *See U.S. Sugar*, 73 F.4th at 203. The Court should wait until hearing that evidence to decide on the appropriate market in which to evaluate the competitive effects of the merger.

The evidence at trial—economic and qualitative—will demonstrate the error in Plaintiffs' unduly narrow focus on route-level competition. Plaintiffs' own economic expert, Hal Singer, asserts that the relevant geographic market for assessing potential competition "spans the entirety of the nation." Wright Decl., Ex. 4 (Expert Report of Hal J. Singer ¶ 41 (Aug. 16, 2023)). Mr. Singer's articulation of the geographic market is consistent with Plaintiffs' own pleading of a "national market" in the Complaint. *See* Compl. ¶¶ 35, 73. The

qualitive evidence at trial likewise will show that important aspects of the airline competition go beyond the route level and, instead, are national or regional in nature. For example:

- ***Network Design and Adjustments***: Airlines design and frequently adjust their networks, entering and exiting individual routes or increasing or decreasing frequencies in routes, in response to changes in prices and demand across their network. *Cf. United States v. U.S. Sugar Corp.*, 2022 WL 4544025, at *24 (D. Del. Sept. 28, 2022), *aff'd* 73 F.4th 197 (3d Cir. 2023) ("Here, the economic reality is that sugar flows easily across the country from areas of surplus to deficit in response to prices and demand.").

- ***Business Model and Strategy***: Airlines design and promote their business model at the national level. For example, JetBlue utilizes a "low-cost carrier" model throughout the country, primarily flying point-to-point with limited connections and undercutting the legacies (with large connecting networks) on price while offering better quality (like the most legroom in coach). Spirit and other airlines utilize an "ultra-low cost carrier" model, which offers a stripped down, completely unbundled offering. Notably, airlines change models; Frontier, for example, transitioned to a ULCC. Hill Rebuttal Rep.¶ 27.

- ***Loyalty and Frequent Flyer Programs***: Airlines compete for customers nationwide through loyalty and frequent flyer programs that are national and influence consumer choice. Wright Decl., Ex. 5 (Jayne. O'Brien Dep. Tr. at 90:6–91:21, 93:11–94:5 (June 9, 2023)) (explaining that JetBlue considers "general market knowledge" of all competitors' loyalty program offerings when making loyalty-related product decisions).

- ***Fare Offerings and Pricing***: Airlines design their fare offerings at the national level. For example, JetBlue offers several fare products (called Blue Basic, Blue, Blue Extra, and Mint) to its customers throughout the country. Carriers also make pricing adjustments at a network level by optimizing their ancillary fees, such as those for checked bags, and by making other systemwide price adjustments that influence consumer choice. Carriers also sometimes implement systemwide or regional fare decreases or increases, depending on supply and demand.

- ***Airport and City Presence***: Airlines compete for customers in specific geographies. For example, JetBlue has long sought to be the number one carrier to Bostonians (Wright Decl., Ex. 6 (JBLU-DOJ-01045588)), and to increase its "relevance" to customers in various cities so it can gain passenger loyalty.

In the end, the Court will need to determine after trial the scope of competition and, thus, the relevant geographic markets. That inquiry will be driven by the dynamics and the context of this transaction. *See Deutsche Telekom*, 439 F. Supp. 3d at 232. (holding that courts must evaluate "each merger . . . in the context of its particular industry and unique circumstances"). Even if the Court were to be skeptical that a fully nationwide market

6

definition were appropriate, all that is required for Defendants to prevail is that Plaintiffs fail to carry their burden of proof on the only geographic markets that they have alleged. *See Tenet Health*, 186 F.3d at 1051.

### B. Supply-Side Substitution Can Be Part of Market Definition

Plaintiffs' proposed route-based markets also ignore a critical aspect of market definition: supply-side substitution. But courts recognize that flexibility on the supply side is also relevant to market definition. *See Grinnell*, 384 U.S. at 575–76 (finding that relevant geographic market was national because, even though fire and services were provided on a local basis, they were planned, and fees were set, on a national basis); *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 293 (D.D.C. 2020) ("supply side substitution may be used to aggregate products that are not demand substitutes into one market" and "the cross-elasticity of production facilities may also be an important factor in defining a market.") (citing *Brown Shoe*, 370 U.S. at 325 n.42 (cleaned up)); *SBC Commc'ns Inc. v. FCC*, 56 F.3d 1484, 1493 (D.D.C. 1995) ("Supply substitutability is a well-accepted consideration in market definition."); *see also Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1410–11 (7th Cir. 1995) ("the definition of market depends on substitutability on the supply side as well as the demand side"); *Virtual Maint., Inc. v. Prime Computer, Inc.*, 11 F.3d 660, 665 (6th Cir. 1993) ("The relevant product market cannot be determined without considering the cross-elasticity of supply."); *Gulf States Reorg. Grp., Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1235 (N.D. Ala. 2011) (discussing need to consider supply-side substitution in defining relevant markets). Indeed, at the time of *Philadelphia Nat'l Bank*, it was common to consider supply-side substitution in the practice of market delineation. *See* Wright Decl., Ex. 7 (Gregory J. Werden, *Cross-Market Balancing of Competitive Effects: What is the Law, and What Should It Be?*, 43 J. Corp. L. 119, 122 (2017)). Thus, courts at the time *Philadelphia*

7

*Nat'l Bank* was issued would have understood what common sense suggests: that airlines operating national networks are in the same relevant market because of their substitutability of supply.

The evidence presented at trial will show a high degree of supply substitution in the airline industry. As noted above, airline networks are fluid. Airlines maintain network planning teams that regularly evaluate entry, expansion, and exit opportunities across their respective networks. Airlines move capacity to new markets and exit markets to capture margin. *E.g.*, Wright Decl., Ex. 8 (Barry Biffle (Frontier) CID Dep. Tr. at 82:2–7 (Mar. 2, 2023)); Wright Decl., Ex. 9 (Barry Biffle (Frontier) Lit. Dep. Tr. at 120:18–121:10) ("[I]f fares do rise disproportionately, you're going to see a market response to that. You'll see capacity chase that—those higher prices sooner rather than later."); Wright Decl., Ex. 10 (John Patrick Kirby (Spirit) CID Dep. Tr. at 62:17–22 (Jan. 12, 2023)) ("And then we keep a list of opportunities, because the environment is very fluid, very dynamic and what may be an opportunity today may not be—or there may be an opportunity that's new that you maybe shift your plans to because—it may be a fleeting opportunity."). Defendants will show that this leads to a "dynamic industry" with "entry being a persistent and commonplace event in the airline industry." Wright Decl., Ex. 11 (Nicholas Hill Dep. Tr. at 109:20–21, 130: 13–15 (Sept. 11, 2023)).

### C. A Broader View of the Relevant Market Is Appropriate Because Consumers Fly on Multiple Routes

Finally, it would make no sense to review competitive effects as to each route in isolation when the same purchasers are buying tickets across different routes at different times. Artificially segmenting the consideration of positive and negative effects at rigidly drawn route boundaries would harm the interests of the very consumers antitrust law is intended to protect.

*Philadelphia Nat'l Bank* does not compel that odd result. In *Kottaras*, for example, the court rejected the same argument that Plaintiffs advance here. In that case, plaintiffs relied on *Philadelphia Nat'l Bank* to argue that lowered prices on certain grocery items could not negate the harm caused by increased prices on other items. *Kottaras*, 281 F.R.D. at 24. Rejecting this argument, the court concluded that the facts were distinguishable because *Philadelphia Nat'l Bank* concerned the weighing of harms and benefits between two classes of customers with no substantial interaction (retail and commercial banking customers), whereas in *Kottaras*, each customer would experience the aggregate impact of the merger (the increases and offsetting decreases of grocery items). In *Kottaras*, then, the question was not "whether to offset harms in one market with benefits in another, but whether to count benefits against harms in the *same* market—indeed the same shopping basket." *Id*. at 25 (emphasis in original).

Here, too, the evidence at trial will show that air travel presents a situation that is very different from *Philadelphia Nat'l Bank* because the relevant consumers fly on different routes for different reasons at different times. Thus, the competitive effects of this merger must be viewed holistically and account for the *full* impact on effected consumers instead of focusing atomistically and narrowly on the impact to a single consumer in a single transaction at a particular moment in time. Put differently, considering the net effect on air travelers would not pit the interests of one group of consumers against another, but would instead maximize the interests of consumers as a whole. Wright Decl., Ex. 12 (Daniel A. Crane, *Balancing Effects Across Markets*, 80 Antitrust L. J. 397, 405–07 (2015)) (noting that balancing across multiple markets in which the same customers participate does not raise the concerns animating *Philadelphia Nat'l Bank*). This feature of the airline industry—that consumers fly many

9

different routes at different times—likewise supports looking at the relevant market and effects of the merger more holistically, not in the cramped fashion proposed by Plaintiffs.

## II. EVEN IF THE COURT ACCEPTS PLAINTIFFS' MARKET DEFINITION, DEFENDANTS' EVIDENCE IS RELEVANT TO ITS REBUTTAL CASE AT STEP TWO

Even if the Court were to accept Plaintiffs' origin-destination pair markets, which would be premature, the motion *in limine* should be denied because much of the same evidence that will support a national market also demonstrates that market shares within individual routes "inaccurately predict[] the relevant transaction's probable effect on future competition" and thus that the merger will not substantially lessen competition. *Baker Hughes*, 908 F.2d at 991. Defendants intend to do so using evidence of, among other things, frequent entry, divestitures, and other evidence that Plaintiffs may intend to exclude here.

Evidence of JetBlue's enhanced national competitive effect flowing from the merger is relevant to show that the concentration metrics are not accurate predictors of the transaction's probable effects. The merger will enable JetBlue to mount a national challenge to the Big Four airlines and spread its "JetBlue Effect" across an expanded network, encouraging other airlines to offer more competitive offerings (*e.g.*, better service, expanded loyalty and travel benefits, etc.) that will benefit consumers across individual routes. Moreover, as noted above, Defendants will show at trial that airlines regularly redeploy their assets to enter and exit routes in response to prices and demand. Hill Rebuttal Rep. ¶ 181. As a bigger JetBlue takes hold throughout the country, other airlines will inevitably exit and enter routes based on the new competitive dynamics. That this reallocation process may take some time is no reason to ignore it. *United States v. Standard Oil Co. (N.J.)*, 253 F. Supp. 196, 227 (D.N.J. 1966) ("[S]hort term evaluation of anticompetitive effect on [the market at issue] is not consistent

with the objectives of Section 7."). Overall, this greater competition across routes will benefit *all* consumers, including by encouraging new entrants on routes around the country.

Indeed, the Horizontal Merger Guidelines recognize that market share should be assessed for firms that are not currently participating in a market when those firms can enter a route in response to a small but significant non-transitory increase in price (a "rapid entrant"). Dept. of Justice & Fed. Trade Comm'n, Horizontal Merger Guidelines § 5.1 (2010); *see also United States v. Waste Mgmt., Inc.*, 743 F.2d 976, 983 (2d Cir. 1984) ("Ease of entry constrains not only WMI, but every firm in the market" despite the fact that "such entry has not happened more frequently."); *id.* ("If the Department of Justice routinely considers ease of entry as relevant to determining the competitive impact of a merger, it may not argue to a court addressing the same issue that ease of entry is irrelevant."). In arguing that it is "legally irrelevant" (Mot. at 5) if Defendants "bring the JetBlue Effect to new markets," Plaintiffs ignore the well-established principle that even "a firm that *never* enters a given market can nevertheless exert competitive pressure on that market" and seek to require what courts have consistently rejected, "a degree of clairvoyance alien to section 7" that would "forc[e] a defendant to rebut a probability with a certainty." *Baker Hughes*, 908 F.2d at 987, 988, 992 (emphasis in original).

A recent decision rejecting a Section 7 merger challenge is instructive. In *Deutsche Telekom*, the court found that the relevant geographic market was cellular market areas defined by the FCC. 439 F. Supp. 3d at 204–06. Nonetheless, in evaluating the transaction's efficiencies, it looked at the impact on T-Mobile's marginal costs and increased quality at a national level, *id.* at 206–07, and imposed no requirement of traceability to individual cellular market areas, *id.* at 216 (noting "[a]s a practical matter, the model almost certainly cannot

11

exactly quantify the extent to which each specific aspect of the Proposed Merger would benefit consumers," but "the predictive exercises demanded by Section 7 are not 'susceptible of a ready and precise answer in most cases.' . . . To expect otherwise in the dynamic and rapidly changing RMWTS Market is to invite almost certain disappointment." (quoting *Philadelphia Nat'l Bank*, 374 U.S. at 362)).

### III. PLAINTIFFS OVERSTATE THE VITALITY AND IMPACT OF *PHILADELPHIA NATIONAL BANK*

Although Plaintiffs make much of the sixty-year old decision in *Philadelphia Nat'l Bank*, they fail to acknowledge the erosion of that era of case law. As *Baker Hughes* explained of that era's cases: "Although the Supreme Court has not overruled these section 7 precedents, it has cut them back sharply." 908 F.2d at 990. Noting that "*General Dynamics* began a line of decisions differing markedly in emphasis from the Court's antitrust cases of the 1960s," that court observed that "[w]ithout overruling *Philadelphia Bank,* then, the Supreme Court has at the very least lightened the evidentiary burden on a section 7 defendant." *Baker Hughes*, 908 F.2d at 990–91.

Courts since have sought to confine *Philadelphia Nat'l Bank* to its facts where that has suited the needs of cases with differing economic realities. As noted above, *Kottaras* is one such example, where applying the Plaintiffs' single-minded focus on demand substitution to market definition and rejecting of out-of-market benefits would have produced absurd results. 281 F.R.D. at 24–25. The court resolved that tension by defining a market around "the same shopping basket," notwithstanding the lack of demand-side substitution for individual products to avoid an application of *Philadelphia Nat'l Bank* that would have been against the interest of consumers. *Id*. at 25.

12

Plaintiffs' reliance on *RSR Corp. v. FTC*, 602 F.2d 1317 (9th Cir. 1979) is likewise misplaced. In *RSR Corp.*, the FTC had found that a consummated merger violated Section 7 in a particular submarket and ordered specific divestitures. *Id.* at 1320. Although *RSR Corp.* was decided after *General Dynamics*, the Ninth Circuit cited the Supreme Court precedent only for the proposition that post-acquisition evidence was of "extremely limited" probative value. *Id.* at 1322. Instead of following the more recent line of Supreme Court case law, the Ninth Circuit relied heavily on *Philadelphia National Bank* in holding that substantial evidence supported the FTC's finding that the merger was anticompetitive. *Id.* at 1325. Thus, the holding in *RSR Corp.* should be viewed in the same light as *Philadelphia National Bank*.

The modern case law applying Section 7 demands an analysis "in the context of its particular industry," *United States v. General Dynamics Corp.*, 415 U.S. 486, 498 (1974) (citation omitted), considering the "totality-of the-circumstances." *Baker Hughes*, 908 F.2d at 984. That means taking a holistic approach that addresses each transaction's specific facts. *Kottaras*, 281 F.R.D. at 25. Applying those settled principles, this Court should evaluate the airline merger here based on its impact on competition as a whole. The motion should be rejected.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion *in Limine* to Exclude Evidence of Out-of-Market Benefits.

Dated: September 25, 2023         Respectfully submitted,

                                  */s/ Elizabeth M. Wright*
                                  Zachary R. Hafer (MA BBO #569389)
                                  Elizabeth M. Wright (MA BBO #569387)
                                  Zachary Sisko (MA BBO #705883)

13

Cooley LLP
500 Boylston Street, 14th Floor
Boston, MA 02116-3736
Tel: 617-937-2300
zhafer@cooley.com
ewright@cooley.com
zsisko@cooley.com

Ethan Glass (*Pro Hac Vice*)
Deepti Bansal (*Pro Hac Vice*)
Matt K. Nguyen (*Pro Hac Vice*)
Cooley LLP
1299 Pennsylvania Avenue NW, Suite 700
Washington, DC 2004-2400
Tel: 202-842-7800
Fax: 202-842-7899
eglass@cooley.com
dbansal@cooley.com
mnguyen@cooley.com

Joyce Rodriguez-Luna (*Pro Hac Vice*)
Cooley LLP
55 Hudson Yards
New York, NY 10001-2157
Tel: 212 479 6895
Fax: 2124796275
jrodriguez-luna@cooley.com

*Attorneys for Defendant JetBlue Airways Corporation*

Andrew C. Finch (*Pro Hac Vice*)
Eyitayo St. Matthew-Daniel (*Pro Hac Vice*)
Jay Cohen (*Pro Hac Vice*)
Jared P. Nagley (*Pro Hac Vice*)
Kate Wald (*Pro Hac Vice*)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Tel: 212-373-3000
Fax: 212-757-3990
afinch@paulweiss.com
tstmatthewdaniel@paulweiss.com
jcohen@paulweiss.com
jnagley@paulweiss.com
kwald@paulweiss.com

Meredith R. Dearborn (*Pro Hac Vice*)
Paul, Weiss, Rifkind, Wharton & Garrison LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105
Tel: 628-432-5100
Fax: 628-232-3101
mdearborn@paulweiss.com

*Attorneys for Defendant
Spirit Airlines, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system on September 25, 2023, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Elizabeth M. Wright*
