UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GABRIEL GARAVANIAN, *et al.*,

            *Plaintiffs*,

v.

JETBLUE AIRWAYS CORPORATION and SPIRIT AIRLINES, INC.,

           *Defendants*.

Civil Action No.: 1:23-cv-10678-WGY

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE EXPERT OPINIONS AND TESTIMONY OF TED P. TATOS**

Defendants attempt to exclude expert opinions and testimony of Ted P. Tatos is unfounded and constitutes an improper request for this Court to weigh Mr. Tatos' opinions prior to the commencement of trial. Although this Court's role is as gatekeeper, it "is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (1996). Defendants' concerns are more properly raised during cross-examination, the presentation of contrary evidence, and objections to testimony at trial. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993).

## I. LEGAL STANDARD

Rule 702 generally authorizes the use of sufficiently reliable expert testimony that will "assist the trier of fact to understand the evidence or the determine a fact in issue." Fed. R. Evid. 702. "In determining whether expert testimony is admissible under Federal Rule 702, this Court must keep in mind Rule 702's broad parameters of reliability, relevancy, and assistance to the trier of fact." *Sementilli v. Trinidad Corp.,* 155 F.3d 1130, 1134 (1998). Defendants point to this Court's Daubert duty to evaluate whether there is a sufficient fit between the proffered evidence and the facts at issue. Dkt no. 235 (hereinafter "Defs.' Motion"), p. 3, citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.579, 591 (1993). But the *Daubert* gatekeeper role is not unlimited. "Judges in jury trials should not exclude expert testimony simply because they disagree with the conclusions of the expert." *Kennedy v. Collagen Corporation*, 161 F.3d 1226, 1230 (1998).

## II. ARGUMENT

### A. The Tatos Report is Directly Relevant to the Issues in This Case.

Defendants contend that Mr. Tatos' opinions regarding harm to Plaintiffs should the proposed merger occur are somehow irrelevant because Plaintiffs are not seeking monetary compensation. Def. Motion, p. 3. Mr. Tatos specifically opines: "Post-merger, when flying on

1

JetBlue on routes where Spirit and JetBlue currently overlap, Plaintiffs would pay the JetBlue fare, which is higher than Spirit's in approximately 95 percent of the routes; Post-merger, when flying on JetBlue on routes that Spirit currently serves but Jet Blue does not, ████████████ ██████████████████████████████████████████████████████████████ ; Post merger, when flying another airline, Plaintiffs would incur the additional cost of the reverse of the Spirit effect…." Defs. Ex. 1 (Tatos Report) ¶ 26.  Mr. Tatos is opining that Plaintiffs are "threatened" with "imminent" and "concrete" harm, he is not calculating monetary damages, nor was he calculating non-price related harms, which Plaintiffs will also suffer post-merger.

"'[A]ntitrust injury' … means injury from higher prices or lower output, the principal vices of the antitrust laws." *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (1986). Whether Defendants' merger will increase prices and reduce capacity is directly material to whether Plaintiffs will suffer antitrust injury.[1]  Mr. Tatos testified at length why his calculation focuses on the quantification of the threatened harm only to the extent that could be quantified in pecuniary terms through higher prices.[2] As such, his calculation is directly relevant to the harms that Plaintiffs are threatened with as a result of the merger. Indeed, Mr. Tatos explained repeatedly that his methodology ties directly to the very same approach ███ ██████████████████████████████████████

---

[1] In his deposition, Mr. Tatos explained, "In this case the challenged conduct hasn't occurred. We're talking about the future. So this is the likelihood of harm or the -- or threatened harm that consumers face and – and certainly if -- if I could use that to -- to show that on Spirit fares, whatever --price on – on Spirit only routes, whatever price that consumers would -- have paid, right, ████████████████████████████████████████████████." Declaration of Josephine L. Alioto in Support of Plaintiffs' Opposition to Defendants' Motion in Limine to Exclude Expert Opinion and Testimony of Ted P. Tatos (hereinafter "J. L. Alioto Decl."), Ex. 1 (Tatos Dep.) 56:1-13.
[2] *Id.* at 182:14-16 ("So my analysis again contemplates threatened harm, not previous --  not prior economic damages.")

2

███████████████████████████████████.³ Defendants concede the weakness of their argument by failing to present any substantive rationale for the hollow claim that Mr. Tatos' opinions are not relevant to Plaintiffs' threatened injuries.

### B. The Materials Relied Upon by Mr. Tatos Are Appropriate

Defendants claim that Mr. Tatos failed to independently review or verify data and methodologies of both third parties and *Defendants themselves.* This is without basis in law or fact. Rule 703 permits an expert to base opinion testimony on personal knowledge, evidence admitted at trial, or evidence not admitted so long as it supplies the kind of facts or data that experts in the field "reasonably rely" on in forming an opinion. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, supra, 509 U.S. at 591; Fed. R. Evid. 703. First, Mr. Tatos relied on a wide variety of documents in forming his opinions, not only the documents that are being challenged in Defendants' Motion including Defendants' own admissions.⁴ Second, the documents Defendants take issue with are a Hopper article, an MIT report, and Defendants' own document production – all of which are properly relied upon. Third, any reliance on Dr. Singer's Report is founded because Mr. Tatos assisted in preparing Dr. Singer's report and is directly familiar with the analysis conducted.

---

⁴ *See* e.g. Exhibit 1 to the Expert Report of Ted P. Tatos (J. L. Alioto Decl., Ex. 2); J. L. Alioto Decl., Ex. 1 (Tatos Dep.) 13:5-16, 77:13-15, 87:1-6 (relied on a study by Bachwhich and Whitman); 39:21-22, 65:17-24, 72:5-15 (relied on a study by Brad Shrago); 198:16-21, 24-25 (relied on JetBlue's own testimony).

3

### Hopper and MIT Publications

In forming his opinions, Mr. Tatos reviewed an article by Hopper as well as a report created by MIT. Hopper is a website/travel agency that regularly analyzes and publishes data about travel trends.[5] Mr. Tatos testified that he cited to a Hopper article[6] as an example of the kind of pricing pressure that LLCs and ULCCs can exert.[7] "So long as an expert's scientific testimony rests upon 'good grounds,' based on what is known,' [] it should be tested by the adversarial process, rather than excluded for fear that jurors will not be able to handle the scientific complexities." *Milward v. Acuity Specialty Prod. Grp., Inc.*, 639 F.3d 11, 15 (1st Cir. 2011), *citing Daubert*, *supra,* 509 U.S. at 590, 596. In drafting the article, the author worked with Hopper's chief data scientist in analyzing 5,000 domestic nonstop routes.[8] Nevertheless, it is Defendants position that Mr. Tatos somehow had to reproduce and validate Hopper's findings. No requirement exists that an expert must reproduce every source on which the expert relies – if this were the standard then expert testimony would nearly grind to a halt as experts frequently rely on a wide array of literature.

Ironically, Defendants similarly criticize Mr. Tatos for relying on a 2013 article by Michael D. Wittman and William S. Swelbar (Evolving Trends of US Domestic Airfares: The Impacts of Competition, Consolidation, and Low-Cost Carriers, MIT Small Community Air Service White

---

[5] *See* https://media.hopper.com/research.

[6] *See* Nicholas Young, *Forecasting Vulnerability in an Ultra-Low-Cost World*, Hopper (December 2, 2015), https://www.linkedin.com/pulse/forecasting-vulnerability-ultra-low-cost-world-nicholas-young/.

[7] J. L. Alioto Decl. Ex. 1 (Tatos Dep.) 170:6-17 ("I'm citing this is an example of -- of the kind of pricing pressure that LLCs and ULCCs can exert. Again, this draws a distinction between de novo entry and what's going on in -- and the facts of this case which is JetBlue acquiring a competitor and raising its price.").

[8] J. L. Alioto Decl, Ex. 1 (Tatos Dep.) 35:22-36:1 ("It's seldom that one would have the data to independently verify findings like this. I don't think these data are publicly available.").

Paper No. 3. Report No. ICAT-2013-07, August 2013). However, as Mr. Tatos testified, JetBlue relied on this very same study to tout its "JetBlue Effect".[9] Defendants' own expert, Dr. Hill's "Entry Intensity Model" analyzes the exact same underlying data. J. L. Alioto Decl., Ex. 3 (Hill Report), p. 61-66. The MIT report uses data from the U.S. Department of Transportation (DOT) Bureau of Transportation Statistics (BTS), entitled DB1B, which Mr. Tatos also relied in performing his fare comparison.[10] Defendants again do not attempt to attack the underlying data and instead utilize it to their benefit as they see fit.

Both the Hopper article and the MIT report are "Market Reports and Similar Commercial Publication" and contain the kind of facts and data that experts in the field reasonably rely on in forming an opinion. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, supra, 509 U.S. at 591; Fed. R. Evid. 703; 803. There is no genuine dispute as to the reliability of the data used by any of the sources in Mr. Tatos' Report.[11] Moreover, JetBlue has no reason to attack Mr. Tatos on this point as JetBlue adopted, and indeed touted, the findings of the very same report with no indication that it somehow reproduced or "blessed" the results.[12]

---

[9] *Id.* at 46:19-23 (Well, so just to be clear, when you say the data that JetBlue analyzed, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[10] *Id.* at 47:2-9, ("Q. Did you have access to the underlying data in the MIT study? A. I understand that they used the same DB1B data that I think the literature uses, ▮▮▮▮▮, that almost everyone who does any empirical analysis in this field relies upon….")

[11] Alioto Decl, Ex. 1 (Tatos Dep.) 197:25-198:13, ("[T]here's no -- dispute that the DB1B data are reliable ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. The literature relies on the same data. And it's certainly data collected by the -- by the Department of Transportation. So -- everyone in this -- in this litigation understand is relying on the same data. Certainly Dr. Hill relied on the very same data. Right? So --if you're asking me did I confirm the -- reliability of the data, I confirmed it in the sense that everyone's always relied on it. The DOJ's relied on it in previous cases. So – so this gives me comfort that the -- that the DB1 data -- the DB1B data are reliable.").

[12] J. L. Alioto Decl., Ex. 1 (Tatos Dep.) 46:19-23; Defs.' Motion, fn 5; J. L. Alioto Decl., Ex. 3 (Hill Report), p. 61-66.

**JetBlue Documents**

Remarkably, Defendants then attack Mr. Tatos' reliance on Defendants' own documents. Defs' Motion, p.5. Indeed, to the extent that Defendants argue that JetBlue's own calculations and testimony are unreliable, they only serve to proffer additional evidence why the merger should be enjoined. Defendants have no plausible basis on which to claim that Mr. Tatos should have somehow reproduced JetBlue's analysis, without having access to the universe of internal discussions and assumptions of its team. Mr. Tatos explained that, ▮▮▮▮▮ ▮▮▮▮▮, ▮▮▮▮▮.[13] Harm in the form of higher prices and the loss of service that most closely satisfies their preferences are particular types of injury that are expressly recognized by the antitrust laws. This is precisely the role of the expert – to review calculations and discuss their economic implications, which Mr. Tatos did. There is no requirement for Mr. Tatos to reinvent the wheel – experts frequently rely on existing literature and available evidence. Indeed, by doing so, Mr. Tatos demonstrates that he ties his options to the facts of the case.

**Dr. Singer Report**

Defendants attack the Tatos report as "lean[ing] heavily" and "wholly rely[ing]" on the Singer Report in forming his opinions on the economic impact of the merger. This is not supported by Mr. Tatos' report or testimony. Mr. Tatos identified a plethora of documents he reviewed in forming his opinions in his report and during his deposition. Mr. Tatos reviewed the literature, the relevant data, and JetBlue's own testimony on this matter. *See, supra,* fn. 3. Defendants' own

---

[13] J. L. Alioto Decl., Ex. 1 (Tatos Dep.) 146:9-17, (I'm relying on their own statements and their own analysis. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

expert, Dr. Hill, relied on the same source data for his analysis. J. L. Alioto Decl., Ex. 3 (Hill Report).

The analysis of Plaintiffs' itineraries only appears in Mr. Tatos' report, which nullifies Defendants' claims that Mr. Tatos' analysis duplicates that of Dr. Singer. Indeed, Defendants' own expert offers no criticism of Mr. Tatos' analysis of Plaintiffs' itineraries. Mr. Tatos relies on Dr. Singer's analysis for route calculations, but he also assisted in preparing Dr. Singer's report and is thus directly familiar with that analysis. Defs' Ex. 1 (Tatos Report) ¶2. Had Mr. Tatos presented another calculation of routes, Defendants would have claimed that such analysis was indeed duplicative; in this case, Mr. Tatos did not. Indeed, Mr. Tatos noted in his deposition that he sought to avoid duplicating analysis that appears in Dr. Singer's report.[14]

Mr. Tatos appropriately utilized all available sources and data in forming his opinions. Any concerns raised by the Defendants can be effectively addressed through cross-examination, allowing the trier of fact to assess the opinions and evidence thoroughly. This process ensures a fair and just evaluation of the case.

### C. Mr. Tatos' Opinions are Reliable.

Not surprisingly, Defendants criticize Mr. Tatos' opinions as unreliable. But, the trial judge has the discretion "both to avoid unnecessary 'reliability' proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises." *Kumho Tire Co. v. Carmichael*, 119 S.Ct.1167, 1176 (1999).

---

[14] J. L. Alioto Decl., Ex. 1 (Tatos Dep.) 77:22-23, ("I didn't want to be duplicative."). Should Defendants' believe Mr. Tatos' testimony is duplicative, they can object to the testimony at trial pursuant to Rule 403.

1. **Mr. Tatos' Opinion on Overlap and Spirit-Only routes is Reliable.**

Mr. Tatos' opinions that Spirit typically offers lower fares than JetBlue and that ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.[15] Moreover, Defendants' expert, Dr. Hill, also implicitly admits as much, ████████████████ ██████████████████████████████████ J. L. Alioto Decl., Ex. 3 (Hill Report) at ¶139. More importantly, ████████████████████████████████████████████████████████████ ████████. Defs. Ex. 1 (Tatos Report) ¶15, J. L. Alioto Decl., Ex.5-6. Thus, there is no dispute that some consumers, particularly those who only purchase the airfare and no ancillary products will be harmed. Indeed, such low base fares have allowed ULCCs to succeed not only in attracting customers but also in lowering overall fares on routes they serve.

In comparing the fares, the DB1B data permits fare comparison by route. Mr. Tatos performed these calculations in his working papers, which were provided to Defendants. Defendants can clearly observe that Mr. Tatos calculated the fares differences by route. Indeed, Mr. Tatos explains in his report that "I found that Spirit offered lower fares than Jet Blue on 97 percent of the routes where they both offered non-stop/direct service." Defs. Ex. 1 (Tatos Report) ¶21.

Defendants also criticize Mr. Tatos for not accounting for ancillary fees. Defendants erroneously claim that "[I]n arbitrarily asserting that JetBlue offers higher fares, Mr. Tatos failed to take into account Spirit's ancillary fees and instead only relied on Spirit's base fares." Defs.' Motion, p. 7. As noted above, Mr. Tatos' conclusion that JetBlue charges higher fares is far from

---

[15] J. L. Alioto Decl. Ex. 2 (Tatos Report), fn. 6 (citing to citing to 30(b)(6) Deposition of Derek Klinka (1/12/2023) 54:11-12, 55:6-7).

8

"arbitrary". ███████████████████████████████████████

███████ With respect to Defendants' claim that Mr. Tatos ████████████

████████████████████████████████████████████████████████.

████████████████████████████████████████████████████████

███████████████████████████████████████████████████.[16] Further, JetBlue

testified that ████████████████████████████████████████.[17] Mr. Tatos

again took a similar approach to ████████████████████████████████████.

In his deposition, Mr. Tatos explained, with regard to the Department of Transportation DB1B on which he relied for calculating fare differences, that "My understanding is that it does not include all of the ancillary fees."[18] Mr. Tatos' opinions are firmly rooted in the facts of this case, consider the necessary variables, and are reliable. Whatever Defendants' concerns, they can all be addressed during cross-examination.

### 2. Mr. Tatos' "Reverse Spirit Effect" Formula is Relevant.

Defendants erroneously conclude that Mr. Tatos' reverse Spirit effect formula is tethered to a variable that the fact finder must establish "from scratch". Defendants are incorrect. Mr. Tatos explained throughout his deposition that he based his analysis of the Spirit Effect and its reversal on: 1) the literature; 2) JetBlue's own testimony; and 3) his own comparison of the relative fares that Spirit and JetBlue charged. *See, supra,* fn 3.

The literature notes the existence of the Spirit Effect, which Mr. Tatos explains as "the price

---

[16] J. L. Alioto Decl., Ex. 4 (Klinka CID Dep.) 156: 8-12, ████████████████████████
████████████████████████████████████████████████████████

[17] J. L. Alioto Decl., Ex. 4 (Klinka CID Dep.) 155: 7-14, ████████████████████████
████████████████████████████████████████████████████████

[18] J. L. Alioto Decl., Ex. 1 (Tatos Dep.) 50:1-2.

discipline that Spirit exercises on other competitors." J. L. Alioto Decl. Ex. 1 (Tatos Dep.) 156: 17-19. Mr. Tatos is not conducting a damages calculation. This injunctive relief action does not involve damages. Mr. Tatos' report demonstrates the *existence* of the reverse Spirit Effect, not its specific quantification, and it shows that Plaintiffs will pay higher prices as a result of the merger. They are therefore "threatened" with "loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. A demonstration of that "threat" is all Plaintiffs are required to show. There is no need to specifically quantify the reverse Spirit Effect or the "damages" that will flow from it. *This is not a damages calculation* that requires an analysis of the size of the effect or effect on each route, it is simply true that the reverse Spirit effect *exists* and that Plaintiffs are threatened with a loss or damage by a violation of the antitrust laws." 15 U.S.C. §26.

Mr. Tatos not only cites literature but also JetBlue's own documents in formulating his opinion. Indeed, the evidence in this case supports the existence of price-disciplining effect that ULCCs have on average fares.[19] In his report Mr. Tatos cited again to JetBlue's testimony  Indeed, as JetBlue itself explained, Mr. Tatos explained throughout his deposition that he relied on all of these sources

---

[19] J. L. Alioto Decl., Ex. 4 (Derek Klinka 30(b)(6) Dep.) 150:7-21,

[20] (Friedman CID Dep. Ex. 8) at 1.

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *See* e.g. J. L. Alioto Decl., Ex. 1 (Tatos Dep.) 61:2-62:24; 63:1-25; 69:14-70:5. Mr. Tatos has provided a framework to quantify Plaintiffs' threatened harm, but a specific quantification is unnecessary. The fact finder can rely on Mr. Tatos's formula to assess the existence of threatened harm without necessarily computing it to a mathematical certainty. The reversal of the Spirit Effect itself evinces the threat of harm to Plaintiffs – an exact quantification of the reversal of the Spirit effect speaks to the amount of harm (in percentage terms), not to its existence.

Defendants also criticize Mr. Tatos for not performing a "route-by-route" analysis. First, Mr. Tatos explained in his report that he found that Spirit offered lower fares on 97 percent of the non-stop direct flights on routes where they competed with JetBlue. Defs.' Ex.1 ¶21. He provided his work product in which Defendants could confirm that his analysis compared route-level rates. Second, a route-by-route analysis of threatened Plaintiff harm is unnecessary. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. Indeed, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬[21] Moreover, to the extent that Defendants seek to impose the standard of metaphysical certainty, they improperly elevate the burden. Mr. Tatos demonstrated the threatened harm that Plaintiffs face by pointing to the average fare increase that would ensue, by JetBlue's own admission.[22] Mr. Tatos' testimony is exactly consistent ▬▬▬▬▬▬▬. Mr.

---

[21] J. L. Alioto Decl., Ex. 4 (Klinka Dep.) 152:11-20, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

[22] J. L. Alioto Decl., Ex. 4 (Klinka Dep.) 163:6-10, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *See also Id.* at 164:1-15, (▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

11

Tatos testified that "I relied on the numbers that JetBlue provided, ███████ ████." J. L. Alioto Decl., Ex. 1 (Tatos Dep.) 64:14-15. Moreover, JetBlue's own agents testified ████████████████████████████████████████████████████████████.[23]

Far from relying "on mere conjecture" as Defendants falsely claim, Mr. Tatos grounds his opinions on JetBlue's own findings and testimony, those of the literature, his own comparison of the fares of Spirit and JetBlue on routes they both serve, and JetBlue's own admissions ██████.

### III. CONCLUSION

Defendants' motion to exclude the expert opinions and testimony of Ted P. Tatos is without merit and runs counter to the proper procedural course. This Court's role as a gatekeeper is not intended to substitute the adversary system, as Defendants are demanding. Mr. Tatos' opinions are relevant, appropriately supported by materials, and reliable. Any concerns regarding their validity can be addressed through cross-examination, rebuttal testimony by Defendants' own experts, and evidence, ensuring a fair and just evaluation of the case.

Dated: September 25, 2023

Respectfully submitted,

ALIOTO LEGAL

By  /s/ Joseph M. Alioto Sr.
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104
Telephone: (415) 434-8900
(*Admitted pro hac vice*)

*Additional Plaintiffs' counsel listed below.*

---

[23] J. L. Alioto Decl., Ex. 6 (Friedman 30(b)(6) Dep.) 45:4-25, ("████████████████████████████████████████████████████████████").

Robert F. Ruyak
Stephen G. Larson
Scott Gregory Herrman
LARSON LLP
555 South Flower Street, Suite 4400
Los Angeles, California 90071
Tel: (213) 436-4888
Fax: (213) 623-2000
Email:slarson@larsonllp.com
Email:rruyak@larsonllp.com
Email:gherrman@larsonllp.com
(*Admitted Pro Hac Vice*)

Jeffery K. Perkins
LAW OFFICES OF JEFFERY K. PERKINS
1550-G Tiburon Blvd., Box 344
Tiburon, California 94920
Telephone: (415) 302-1115

Lingel H. Winters
LAW OFFICES OF LINGEL H. WINTERS
275 Battery Street, Suite 2600
San Francisco, California 94111
Telephone: (415) 398-2941

Christopher A. Nedeau
NEDEAU LAW PC
154 Baker Street
San Francisco, CA 94117-2111
Telephone: (415) 516-4010
Email: cnedeau@nedeaulaw.net

Joseph M. Alioto Jr.
ALIOTO LEGAL
100 Pine Street, Suite 1250
San Francisco, California 94111
(*Admitted pro hac vice*)

Josephine Alioto
THE VEEN FIRM
20 Haight Street
San Francisco, CA 94102
Telephone: (415) 673-4800
Email: j.alioto@veenfirm.com
(*Admitted pro hac vice*)

Lawrence G. Papale
LAW OFFICES OF LAWRENCE G. PAPALE
The Cornerstone Building
1308 Main Street, Suite 117
St. Helena, California 94574
Telephone: (707) 963-1704
(*Admitted pro hac vice*)

Robert J. Bonsignore, Esq.
BONSIGNORE TRIAL LAWYERS, PLLC
23 Forest Street
Medford, MA 02155
Phone: 781-856-7650
Email: rbonsignore@classactions.us

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system on September 25, 2023, and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

>  */s/ Joseph M. Alioto, Jr.*
> Joseph M. Alioto, Jr.