# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

GABRIEL GARAVANIAN, *et al.*,

              *Plaintiffs*,

v.

JETBLUE AIRWAYS CORPORATION and
SPIRIT AIRLINES, INC.,

              *Defendants*.

Civil Action No.: 1:23-cv-10678-WGY

## PLAINTIFFS' TRIAL BRIEF

## <u>TABLE OF CONTENTS</u>

Page

I. INTRODUCTION ...................................................................................... 1

II. BACKGROUND .................................................................................... 5

  A. Industry Overview ........................................................................... 5

  B. Based on Its Unique Business Model, Even Among ULCCs, Spirit Is The Largest ULCC in The U.S. .................................................... 6

    1. Spirit's Unique ULCC Business Model.......................................... 6

    2. Spirit Is Unique Even Among ULCCs........................................... 7

  C. JetBlue's Pursuit of Spirit ............................................................... 9

III. LEGAL FRAMEWORK ....................................................................... 13

IV. ARGUMENT ...................................................................................... 16

  A. Plaintiffs Have Properly Defined Relevant Markets ........................ 16

    1. The Relevant Product Market Is Scheduled Air Passenger Service ............. 16

    2. The Relevant Geographic Markets Are Origin and Destination City-Pair Routes ....... 18

  B. The Merger Is Presumptively Unlawful .......................................... 19

    1. The Airline Industry Has Experienced A Steady Trend Toward Concentration .......... 19

    2. Undisputed Direct Evidence At Trial Will Show The Merger Will Increase Prices .... 21

    3. Undisputed Direct Evidence At Trial Will Show The Merger Will Reduce Capacity . 23

    3. The Merger Will Drastically Increase Concentration In Markets Already Highly Concentrated........................................................................... 24

    4. The Merger Will Eliminate a Maverick Price-Cutter That Disrupts Oligopolist Airlines From Coordinating Prices ................................................... 27

  C. The Purported "Benefits" of the Merger Cannot Rebut Plaintiffs' Prima Facie Case...... 29

    1. Defendants Are Legally Estopped From Arguing That The Merger Will Increase Competition Against The "Big Four" and Bring The JetBlue Effect To More Consumers in New Markets ...................................................... 30

    2. Defendants' Purported "Efficiencies Defense" Cannot Rebut Plaintiffs' Prima Facie Case .......................................................................... 31

  D. Defendants' Proposed Divestitures Are wholly Inadequate and Will not Address the Anti-Competitive Effects of the Merger ................................... 40

  E. Plaintiffs Are Threatened With Loss And Damage By The Proposed Acquisition.......... 42

V. CONCLUSION.................................................................................... 44

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Am. Passage Media Corp. v. Cass Commc'ns, Inc.*,
750 F.2d 1470 (9th Cir. 1985) ................................................................................................43

*Anago, Inc. v. Tecnol Med. Prod., Inc.*,
976 F.2d 248 (5th Cir. 1992) .............................................................................................2, 21

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
784 F.2d 1325 (7th Cir. 1986) ................................................................................................43

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) ....................................................................................................... *passim*

*California v. Am. Stores Co.*,
492 U.S. 1301 (1989) ...............................................................................................................43

*California v. Am. Stores Co.*,
495 U.S. 271 (1990) .................................................................................................................13

*Chicago Bridge & Iron Co. v. FTC*,
534 F.3d 410 (5th Cir. 2008) ..................................................................................................16

*Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*,
754 F.2d 404 (1st Cir. 1985) ...................................................................................................43

*Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*,
79 F.3d 182 (1st Cir. 1996) .....................................................................................................18

*Fed. Trade Comm'n v. Elders Grain, Inc.*,
868 F.2d 901 (7th Cir. 1989) .......................................................................................1, 14, 41

*Fed. Trade Comm'n v. Hackensack Meridian Health, Inc.*,
30 F.4th 160 (3d Cir. 2022) ..............................................................................23, 31, 32, 35

*Fed. Trade Comm'n v. Sanford Health*,
926 F.3d 959 (8th Cir. 2019) ..................................................................................................36

*Fed. Trade Comm'n v. Staples, Inc.*,
190 F.Supp.3d 100 (D.D.C. 2016) .........................................................................................41

*Fed. Trade Comm'n v. Sysco*,
113 F. Supp. 3d 1 (D.D.C. 2015) ...........................................................................................41

*Fed. Trade Comm'n v. Univ. Health, Inc.,*
    938 F.2d 1206 (11th Cir. 1991) ...............................................................16, 32, 33, 35

*Hospital Corp. of Am. v. FTC,*
    807 F.2d 1381 (7th Cir. 1986) .......................................................................................27

*Madison v. Cruz,*
    393 F. Supp. 3d 135 (D. Mass. 2019) .............................................................................9

*Magee v. United States,*
    121 F.3d 1 (1st Cir. 1997)..............................................................................................24

*Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.,*
    604 F.3d 1291 (11th Cir. 2010) ....................................................................................44

*R.C. Bigelow, Inc. v. Unilever N.V.,*
    867 F.2d 102 (2d Cir. 1989)...........................................................................................16

*RSR Corp. v. FTC,*
    602 F.2d 1317 (9th Cir. 1979) .......................................................................................31

*St. Alphonsus Medical Center v. St. Luke's Health System, Ltd.,*
    778 F.3d 775 (9th Cir. 2015) ...............................................................16, 18, 31, 32

*Steves & Sons, Inc. v. JELD-WEN, Inc.,*
    988 F.3d 690 (4th Cir. 2020) .........................................................................................16

*United States v. Anthem,*
    Case no. 16-cv-1493, 2017 WL 527923 at *3 (D.C. Dist. Feb. 8, 2017) .........................32, 33

*United States v. Aetna Inc.,*
    240 F. Supp. 3d 1 (D.D.C. 2017) ..................................................................................41

*United States v. Aluminum Co. of America,*
    377 U.S. 271 (1964)...............................................................................14, 27, 29

*United States v. Citizens & Southern Nat'l Bank*
    422 U.S. 86 (1975).........................................................................................................15

*United States v. Continental Can Co.,*
    378 U.S. 441 (1964)........................................................................................................14

*United States v. Falstaff Brewing Corp.,*
    410 U.S. 526 (1973).................................................................................................19, 26

*United States v. General Dynamics Corp.,*
    415 U.S. 486 (1974)........................................................................................................15

*United States v. H & R Block, Inc.*,
   833 F. Supp. 2d 36 (D.D.C. 2011) ..................................................................36

*United States v. Pabst Brewing Co.*,
   384 U.S. 546 (1966) ................................................................................15, 19

*United States v. Philadelphia Nat'l Bank*,
   374 U.S. 321 (1963) ........................................................................15, 27, 31

*United States v. Von's Grocery Co.*,
   384 U.S. 270 (1966) ..........................................................................................14

*Vazquez-Ramos v. Triple-S Salud, Inc.*,
   55 F.4th 286 (1st Cir. 2022) ..............................................................................17

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
   395 U.S. 100 (1969) ................................................................................13, 42

**Federal Statutes**

15 U.S.C. § 18 ....................................................................................1, 13, 16

15 U.S.C. § 26 ..................................................................................13, 42

iv

## I.      INTRODUCTION

In the mid-1980s, the airlines industry consisted of some 34 airlines. Today, all of those airlines have been absorbed and consolidated – entirely through mergers and acquisitions – into just four.  If the proposed merger of JetBlue and Spirit is allowed to proceed, the Top 5 airlines in the nation will control over 90% of all capacity. Market concentration evidence, unrebutted, is enough on its own to demonstrate under binding Supreme Court authority that the merger violates Section 7 of the Clayton Act, 15 U.S.C. § 18. But, this case provides an astonishing level of unrebutted evidence – stunning admissions by Chief Executive Officers, and blatant concessions of high level executives of anticompetitive intent and effect – that compels the conclusion that JetBlue's acquisition of Spirit violates Section 7.

Section 7 proscribes mergers whose effect "*may be*" substantially to lessen competition. Congress "indicate[d] that its concern was with probabilities, not certainties," *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962), and courts are to find violations where "the *probable* future effect of the merger*" is to lessen competition, *id*. at 332 (emphasis added). In other words, Section 7 requires merely a "prediction" as to whether competition may be lessened, and "doubts are to be resolved against the transaction." *F.T.C. v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989). But here, the undisputed evidence made up almost entirely of Defendants' own admissions is that the merger is not just "likely" to negatively impact competition, it is certain to.

Spirit itself admitted in presentations to its Board of Directors that the acquisition "would substantially raise fares for consumers," and therefore "have lasting negative impacts on consumers." One of JetBlue's senior executives conceded that "Spirit's key weapon is its very low costs and the very low fares they enable." But, the merger, according to Spirit itself, is "a high-fare carrier trying to buy a low-fare carrier" that "will reduce capacity and raise fares on Spirit routes."

Aside from these admissions, the undisputed evidence shows the merger *will* have anticompetitive effects – increased prices and reduced capacity – and thus easily meets Plaintiffs' burden of showing the merger "may" lessen competition. For instance, JetBlue admits the merger will allow it to increase revenues by 24% on routes now flown by Spirit. These increased revenues necessarily include charging higher JetBlue prices in markets where Spirit has heretofore kept prices in check through its intense low-cost pricing strategies. On those routes – hundreds of them across the country – consumers will no longer have the option of Spirit's low fares and will be forced to pay JetBlue fares, even higher legacy fares, or forego flying altogether.

JetBlue also intends to use the merger to decrease capacity. "Typical anticompetitive effects include increased prices and decreased output." *Anago, Inc. v. Tecnol Med. Prod., Inc.*, 976 F.2d 248, 249 (5th Cir. 1992). It admits that it intends to remove 24 seats on average from each of the roughly 200 Spirit aircraft it seeks to acquire, resulting in the reduction of approximately 4,800 seats worth of capacity on an on-going basis. While JetBlue attempts to argue that the merger will allow it to "increase utilization" of its aircraft, it is forced to admit that such "increased utilization" alone *will not* offset the loss of capacity resulting from stripping so many seats from Spirit aircraft. Nor can JetBlue contend with the undisputed fact that Spirit is one of the most efficient airlines in the nation, utilizing its planes over 13 hours a day, substantially greater than JetBlue's utilization rate.

The merger will also result in the elimination of an aggressive maverick price-cutter that provides 50% of the nation's lowest cost airline tickets and provides essential competition against the dominant legacy carriers in markets throughout the country. In fact, the low fares enabled by Spirit's low-cost model has spurred intense competition by all airlines, including

JetBlue and the "Big Four" (American, United, Delta, and Southwest), who invented entirely new classes of extra-low cost airline fares – "basic economy" or, in JetBlue's case, "Blue Basic" – just to confront the intense competition of the "Ultra-Low-Cost-Carriers" ("ULCCs") among whom Spirit is the fastest growing and largest, with 50% of the nation's ULCC capacity. But, all JetBlue really wants is Spirit's airplanes, facilities and employees. JetBlue intends to "sunset the Spirit brand," scrap its low-cost business model founded on the "key weapon" of low costs that enable low fares, and turn Spirit planes into lower-density, higher-priced JetBlue planes that will replace low fares with high fares across the board. This will ruin the ability of Spirit to check JetBlue prices and the prices of the Big Four, both in markets in which JetBlue and Spirit compete head-to-head, but also in markets where Spirit is the sole ULCC competitor to the Big Four.

To prove a prima facie case that the effects of the merger "may be" substantially to lessen competition, Plaintiffs can rest on market concentration data alone to show the merger will further increase concentration in markets Defendants admit are already highly concentrated. But here, based on undisputed direct evidence of anticompetitive effects, there is no genuine issue of material fact that the merger violates Section 7.

Defendants seek to rebut Plaintiffs' prima facie case by first arguing that the merger will allow the combined entity to better compete against the Big Four. But, binding Supreme Court law holds that a merger which lessens competition in *one* set of markets cannot be saved because it has procompetitive effects in *other* markets. Therefore, when JetBlue claims that the merger will bring the benefits of the "JetBlue Effect" to markets across the country and allow the combined company to better compete with the Big Four, that argument and its supporting evidence is irrelevant and inadmissible.

Defendants also claim that a series of "benefits" purportedly resulting from the merger may be taken into account to show the merger will not have anticompetitive effects. But, binding Supreme Court authority has repeatedly rejected this "efficiencies defense" as a matter of law. Yet, even assuming the defense were available, JetBlue's purported "benefits" of the transaction only benefit *JetBlue* – not consumers, and not competition. Thus, they are not legally cognizable "efficiencies" at all. They do not purport to generate efficiencies resulting in lower costs that benefit consumers through the lowering of prices. On the contrary, the merger will *increase* JetBlue's on-going annual costs. ███████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████. Why would JetBlue pay so much for just 200 airplanes? Because by eliminating Spirit as a competitive threat, the merger will allow JetBlue to charge higher prices, reduce capacity, and increase its revenues – to the direct detriment of consumers – by $1.150 billion annually. Thus, Defendants' purported "benefits" are, in fact, direct evidence of anticompetitive effects. These efficiencies do not meet any of the legal standards set forth by various circuit courts and are not cognizable. There is thus no genuine dispute that Defendants' "benefits" or "efficiencies" or "synergies" cannot be considered in rebuttal of Plaintiffs' prima facie case as a matter of law.

Finally, neither can Defendants' proposed divestitures rebut Plaintiffs' prima facie case, because the law requires that any such divestitures leave the competitive balance of the markets intact. Here, roughly three-quarters of the divested assets will be purchased by Allegiant, a ULCC whose entire business model seeks to avoid competition with other airlines. The remaining quarter of divested assets (a mere 6 gates) will go to Frontier, and even if it is assumed Frontier would backfill 100% of former-Spirit flights from those gates, this cannot feasibly make

up the significant loss of 50% of the ULCC capacity in the United States.

In short, the relevant markets are concentrated, the merger will lead to unacceptably high levels of concentration, and the merger will result in demonstrable and admitted anticompetitive effects.  Plaintiffs have, therefore, established a prima facie case, and none of Defendants' purported justifications can rebut it as a matter of law or fact.

## II.    BACKGROUND

### A.    Industry Overview

The airline passenger industry is large and, since deregulation, is dependent on healthy competition between and among airlines to provide reasonable and affordable fares, capacity, quality of services, availability of origins and destinations ("O&Ds"), and innovation in offerings and amenities. There are three recognized classes of airline carriers: Legacy carriers ("Legacies"), Low Cost carriers ("LCCs"), and Ultra-low Cost carriers ("ULCCs"). Bartolotta 6-13-23 DOJ Dep. at 69:2-25.

Legacies include United, American and Delta, and have large scale national and international operations with significant "hub" airport facilities in multiple selected major cities for passenger multi-city connections and transfers, and a substantial number of gates, slots and/or authorizations. Hayes Dep. (CID) 29:6-19. Legacies' business strategy is to ticket and carry large numbers of business passengers and premium leisure passengers; have several classes of service (such as basic economy, economy, premium economy, business and first class;) and use a variety of "bundled fares" in which ticket prices generally cover a seat and one or more related ancillary services such as baggage, carry-ons, seat selection, refreshments, entertainment, meals, cancellation refunds, and the like. Christie CID Dep. 21:11-23:16; 25:6-27:4.

LCCs are characterized by lower cost operations than Legacies (Christie CID Dep.186:12-187:16 ), primarily use point-to-point city routes with multiple "focus cities"

(Christie CID Dep. 21:13-22:9), and principally operate domestically with some limited international and overwater destinations. The LCC's business strategy is to target markets of both business and leisure travelers concentrating on more cost conscious travelers; offer only one or two classes of service (all economy, or economy and business); use bundled fare ticket pricing, but with fewer ancillary services included; and have significant, but far less substantial, investments in ground operations and airport infrastructure. *See* Christie Dep. (CID) at 25:6-16 (low cost carriers lack the same level of infrastructure as network airlines so they are not naturally marketing to businesses, but still carry business traffic in addition to leisure traffic), Johns Dep. (LIT) at 110:2-15 (JetBlue targets both business and leisure travelers). JetBlue is considered an LCC. Clark CID at 97:16-19.

ULCCs, such as Spirit, are characterized by lower cost operations than both Legacies and LCCs. *See* Hayes (CID) Dep. at 120:11-19.  ULCCs concentrate on marketing primarily to cost-sensitive leisure passengers, *e.g.*, passengers on vacation or Visiting Friends and Relatives ("VLFs"), as well as infrequent and first-time travelers. (Kirby Dep. (CID 30(b)(6)) at 23:21-24:3, Wells Dep. (Allegiant/Third Party) at 176:5-8, Christie Dep. (CID) 34:16-20)). ULCCs offer only a single class of service on high-density aircraft and use unbundled fares in which the purchased ticket covers only the seat and not ancillary services, which are alternatively provided at an extra passenger-discretionary charge.  ULCCs have minimal investments in airport ground operations and infrastructure.  Christie CID Dep. at 28:5-29:18.

**B.  Based on Its Unique Business Model, Even Among ULCCs, Spirit Is The Largest ULCC in The U.S.**

     1.  <u>Spirit's Unique ULCC Business Model</u>

Spirit is the largest and fastest growing ULCC in the United States.  Friedman Lit. DOJ Dep. Ex. 3 at slide 12; Kirby Dep. 30(b)(6) (CID) at 32:10-14. Spirit's success is a result of its

unique business model that focuses on low costs which enable low fares.  Clark CID Ex. 11 at 1.

Spirit's low fares attract cost-conscious travelers.  Kirby 30(b)(6) CID at 23:21-24:3; 25:7-13;

Christie Dep. (CID) 34:16-35:1.

Spirit's ability to offer low fares is the result of several innovative cost-reduction

strategies.  For example, Spirit uses contract service providers, and many of its employees are

unionized with lower pay scales than other airlines. Christie Dep. (CID) 39:15-41:13.  In

addition, Spirit's planes have some of the highest seating density in the industry, and

significantly higher than those of JetBlue and the Big Four.  Haralson DOJ Lit. Dep. 332:9-21;

Kirby LIT 30(b)(6) at 10:11-17.  Spirit also minimizes its costs by maximizing the utilization of

planes and gates. Kirby CID at 47:4-13; Kirby DOJ Lit. Dep. at 19:21-20:4.  Such high

utilization also allows Spirit to maximize its revenue.  Bartolotta (DOJ) Dep. 186:9-15.

Employing these strategies has allowed Spirit to maintain some of the lowest operating

costs in the industry; costs that are significantly lower than those of JetBlue, Southwest or the

Legacies.  Monaghan CID Depo 41:16-19; Haralson DOJ Lit. Dep. 335:7-8; Bartolotta DOJ Lit.

Dep. at 61:10-13; Christie DOJ Lit. Dep. at 195:14-196:2. In fact, one of JetBlue's top

executives admitted that "Spirit's key weapon is its very low costs and the very low fares they

enable." Clark CID Dep. 227:12-228:7. In addition, Spirit's innovative unbundled fares empower

cost conscious travelers to prioritize aspects of flying experience and avoid paying for products

(e.g., bags, food, advanced seat assignment) that they may not need. Kirby DOJ Lit. at 18:7-17;

Christie  Dep. (CID) 35:20-21, 36:6-8; Gardner Dep. (Private Plaintiffs) 11:7-11.

2.    Spirit Is Unique Even Among ULCCs

While other ULCCs have adopted some of Spirit's innovations, Spirit is unique even

among other ULCCs.  For example, Spirit is 3 times more likely than Frontier and 7 times more

likely than Allegiant to have at least one daily departure on each route it flies.  Kirby DOJ Lit.

Dep. Ex. 7, page 10.  Also, Spirit generally stays in a market longer than other ULCCs.  Kirby 30(b)(6) CID at 72:22-73:3; 74:2-7; Kirby DOJ Lit. at 21:25-22:12; 59:11-13; 266:16-22; Bartolotta Dep. (CID individual) 44:19-45:5; 114:6-12; Bartolotta (DOJ Lit.) Dep. 61:2-13; 66:11-23.  Spirt also offers substantial international service; other ULCCs either do not offer international flights at all, or offer far fewer than Spirit.  Bartolotta Dep. (CID individual) 114:6-1; Wells Dep. (Allegiant) 18:8-21.  Frontier is the only other ULCC with significant international service, but Spirit services twice as many international destinations as Frontier. Bartolotta Dep. (CID individual) 114:6-1; Wells Dep. (Allegiant) 18:8-21.  In addition, while many ULCCs avoid competition with the Big Four, Spirit competes directly with them, including at Big Four hub airports. Lage Dep. (DOJ) 77:8-25; Bartolotta Dep. (CID individual) 84:22-85:17; Kirby DOJ Lit at 122:7-133:2, 166:20-23; Bartolotta (DOJ) Dep. 61:14-62:1; Christie Dep. (CID) 38:10-12.

Known as the "Spirit Effect," Spirit's entry into a market reduces fares in that market up to 50%.  Kirby CID at 39:21-40:2. While JetBlue's entry into a market may also reduce fares, those fare reductions are generally less than those caused by Spirit's entry, and the "JetBlue Effect" does not last as long as the "Spirit Effect."  Bartolotta Dep. (CID 30(b)(6)) Ex. 20, p. 28; Bartolotta Dep. (CID 30(b)(6)) 16:12-17:5, Bartolotta Dep. (CID 30(b)(6)) Ex. 20, p. 15/31.  By stimulating demand, the "Spirit Effect" also increases the number of passengers in a market by about 30% (Christie DOJ Lit at 129:11-131-11; Christie DOJ Lit. Ex.7 at NK-2R-00460731), which means that Spirit's operation allows people to fly who would otherwise have foregone flying.

C.     **JetBlue's Pursuit of Spirit**

In February 2022, Spirit and Frontier announced plans to merge.[1] The merger of the two largest ULCCs concerned JetBlue so much that it began investigating how to break up the Spirit/Frontier merger by acquiring Spirit.  P0472 at 21; P0444 at 34; Klinka CID 30(b)(6) at 37:22-38:19; 317:19-318:2; Hayes Dep. (DOJ) 235:23-236:12. ███████████████████ ███████████████████████████████████████████████████ JetBlue also believed it had to disrupt the Spirit/Frontier merger quickly to avoid being "materially adversely affected" by it.  P0472 at 21; *see also* P0444 at 35. ██████████████████████ ███████████████████████████████████████████████ ███████████████████████

On April 5, 2022, just a few weeks after the announcement of the Spirit/Frontier merger, JetBlue announced its unsolicited hostile tender offer proposal to acquire Spirit. P0035 at 5 of 16.  Spirit accurately believed that JetBlue's "real motivation" was "to break up the Spirt/Frontier merger" (P0372 at 21 of 45; P0149 at 5), which Spirit says JetBlue confirmed (Gardner (Private Plaintiffs) Dep. at 20:5-14).

JetBlue announced that the combined airline would operate under the JetBlue name and would involve retrofitting Spirit's fleet as JetBlue. P0471 at 5 ; P0483 at 12. Spirit's

---

[1] *Frontier Airlines and Spirit Airlines to Combine, Creating America's Most Competitive Ultra-Low Fare Airline*, Feb. 7, 2022, *available from Spirit.com* at https://s24.q4cdn.com/507316502/files/doc_downloads/2022/FINAL-Frontier-Spirit-Transaction-Press-Release.pdf. *See also Frontier Airlines and Spirit Airlines Announce Amended Merger Agreement*, June 2, 2022, *available at* https://ir.spirit.com/news-releases/news-details/2022/Frontier-Airlines-and-Spirit-Airlines-Announce-Amended-Merger-Agreement/default.aspx (announcement of amended deal with Frontier); *Spirit SEC Form 8-K*, February 7, 2022, *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001498710/495e3a62-322b-4775-9efd-cb9bd26dba90.html (announcing merger with Frontier); *Madison* v. *Cruz*, 393 F. Supp. 3d 135, 137 (D. Mass. 2019) (taking judicial notice of press release).

contemporaneous documents show that JetBlue stated that this included reducing capacity and raising fares on Spirit routes.  P0372 at 11 of 45.  Indeed, the retrofitting of the Spirit fleet will result in the removal of about 10-15% of the seats in each plane.  Gardner (Private Plaintiffs) Dep. at 47:24-48:10.

Spirit's contemporaneous documents show that, over the next month, Spirit performed a "rigorous review" of the JetBlue offer.  Spirit's primary concern was whether the merger would survive any antitrust challenges.  P0035 at 5 of 16; P0372 at 28-31 of 45.  Spirit involved several trusted advisors in its "rigorous review."  For example, Spirit's antitrust lawyers worked with JetBlue's antitrust counsel to conduct an "extensive analysis" of JetBlue's offer.  P0372 at 30-31 of 45.  Spirit also engaged "prominent economic consultants" and "an experienced aviation economist," at least some of whom spent "hundreds of hours assessing" the antitrust legality of a JetBlue/Spirit combination, "including assessing the validity and merits of JetBlue's own analysis."  P0372 at 30-31 of 45; P0149 at 3; 5-6.  At the time of its "rigorous review," Spirit "engaged consistently and constructively" with JetBlue to discuss the potential acquisition. P0372 at 31 of 45; P0149 at 5-6.

After concluding this month-long "rigorous review," Spirit announced its conclusions to the public, its shareholders and the SEC in several press releases and SEC filings discussed in this brief.  Spirit's board concluded that JetBlue's proposed acquisition of Spirit was unlikely to survive any antitrust challenges because it was anticompetitive; it thus voted unanimously to reject the offer.  P0372 at 30, 31, 33 of 45. Spirit stated that "JetBlue is a high-fare airline acquiring a low-fare airline and vowing to reduce capacity and increase prices to consumers." P0372 at 29 of 45. Spirit further concluded that the proposed acquisition "Will Have Lasting Negative Impacts on Consumers," "Raises Spirit's ticket prices," "Removes ~50% of the ULCC

capacity in the U.S." and "removes the largest low-fare competitor, affecting millions of consumers across the U.S." P0372 at 7 of 45. Spirit noted that "JetBlue has stated it will reduce capacity and raise fares on Spirit routes ... how will regulators approve that transaction?" P0372 at 11 of 45. It wondered "Is JetBlue Purposefully Downplaying the Substantial Regulatory Risk?" P0372 at 7 of 45. Spirit's rigorous review further concluded that "JetBlue's regulatory case is weak and defies common sense – the JetBlue 'offer' is illusory and it is not reasonably capable of being consummated." P0372 at 5 of 45.

While Spirit believed the Northeast Alliance Agreement ("NEA") made the proposed acquisition even more anticompetitive, the evidence shows that Spirit was independently concerned that the proposed acquisition was anticompetitive because it would reduce capacity and raise prices. Spirit concluded in May 2022 that, "[e]ven putting aside the NEA, Spirit believes the DOJ – and a court – will be very concerned that a JetBlue-Spirit combination will result in a higher-cost/higher-fare airline and remove about half of the ULCC capacity in the United States." P0147 at 3 of 9[2]. JetBlue CEO Ted Christie confirmed in his deposition that Spirit believed this statement to be accurate when it was made. Christie Dep. (DOJ) Tr. at 243:9-244:2. In addition, Spirit stated that regardless of whether a Court invalidated the NEA, "[n]either outcome changes the fact that JetBlue is a high-fare airline trying to buy a low-fare airline and raise fares. In all cases, Spirit shareholders lose with JetBlue's proposal as it is not reasonably capable of being consummated." P0372 at 10 of 45.

Spirit continued to negotiate with JetBlue and Frontier between May and July 2022, and

---

[2] *Spirit Airlines Board of Directors Urges Stockholders to Reject JetBlue Tender Offer*, May 19, 2022, *available from Spirit.com* at https://www.prnewswire.com/news-releases/spirit-airlines-board-of-directors-urges-stockholders-to-reject-jetblue-tender-offer-301550872.html.

on July 28, 2022, JetBlue announced an agreement to purchase Spirit for $3.8 billion.[3]   The only differences between the JetBlue offer Spirit rejected as anticompetitive and the offer it eventually accepted are (1) an increased termination fee of $470 million, which requires JetBlue to pay $400 million to Spirit shareholders and $70 million to Spirit if the acquisition is not consummated, and (2) that JetBlue commit to divestitures "up to a material adverse effect on" the combined entity. P0156 at 4.  But Spirit's CEO testified in his deposition that Spirit had doubts that the divestitures would be sufficient to address the regulatory concerns. Christie 1-24-23 Dep. Tr. at 228:18-229:5. JetBlue's accepted proposal did not address Spirit's concern that the merger would result in higher fares and lower capacity. It only increased the termination fee, which will be paid to Spirit and its shareholders in the event this Court invalidates Defendants' unlawful merger. P0156 at 4 of 48; Christie Dep. (DOJ) Tr. at 301:11-14 ("Q  Okay. And then the – so in this regulatory analysis, there is no analysis of how the deal could benefit Spirit customers; right? A  We didn't do analysis on that, no."); Christie 6-19-23 Depo. Tr. at 337:1-17. Spirit also wondered whether JetBlue also questioned the likelihood of the merger surviving a Clayton Act lawsuit, but was willing to pay a termination fee just to prevent the Spirit-Frontier merger.  P0149 at 5.

While Defendants claim that the admissions were "designed in part to elicit commitments from JetBlue to make regulatory concessions to get a transaction closed" (Dkt. No. 233 at 2), this is not what the evidence shows, and Defendants point to none.  The evidence instead shows that these admissions were accurate at the time and, in many cases,  are still accurate today.  For example, nearly all of these Spirit admissions were made in SEC filings, which Spirit's CEO Ted

---

[3] *Spirit Airlines, Inc. SEC Form 8-K* at 4, July 28, 2022, *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001498710/f037bf53-da6f-4cb7-a92c-959f6d589fbc.html.

Christie confirmed contain accurate information.  Christie Dep. (DOJ) Tr. at 18:25-19:14.

Indeed, Spirit's executives have a fiduciary duty to the company and the shareholders to speak

the truth. In addition, Spirit's Chairman of the Board confirmed in his deposition Spirit's belief

that the proposed acquisition "removes the largest low-fare competitor, affecting millions of

consumers across the US."  Gardner Dep. (DOJ) Tr. at 168:19-169:2.

## III.    LEGAL FRAMEWORK

Plaintiffs are authorized under Section 16 of the Clayton Act to sue for and obtain

injunctive relief for any "threatened loss or damage" resulting from a violation of the antitrust

laws. 15 U.S.C. § 26. The Supreme Court has recognized that Section 16 "was enacted 'not

merely to provide private relief, but … to serve as well the high purpose of enforcing the

antitrust laws.'" *California v. Am. Stores Co.*, 495 U.S. 271 (1990), quoting *Zenith Radio Corp.*

*v. Hazeltine Research, Inc.*, 395 U.S. 100, 130-31 (1969). The Clayton Act's provisions

"manifest a clear intent to encourage vigorous private litigation against anticompetitive

mergers." *Am. Stores*, 495 U.S. at 284. In fact, "[p]rivate enforcement of the Act was in no sense

an afterthought; it was an integral part of the congressional plan for protecting competition." *Id*.

Therefore, "Section 16 … fits well in a statutory scheme that favors private enforcement [and]

subjects mergers to searching scrutiny." *Id*. at 285.

Section 7 of the Clayton Act prohibits all mergers and acquisitions whose effect "may be

substantially to lessen competition … in any line of commerce … in any section of the country."

15 U.S.C. § 18. "Section 7 itself creates a relatively expansive definition of antitrust liability: To

show that a merger is unlawful, a plaintiff need only prove that its effect '*may be* substantially to

lessen competition.'" *Am. Stores*,  495 U.S. at 284 (emphasis in original). By prohibiting mergers

that *may* substantially lessen competition, Congress "indicate[d] that its concern was with

probabilities, not certainties," *Brown Shoe*, 370 U.S. at 323, and courts are to find violations

where "the probable future effect of the merger" is to lessen competition, *id*. at 332 (emphasis added).

As set forth in long line of Supreme Court decisions, the Clayton Act reflects Congress's intent to prevent mergers in industries marked by trends toward concentration. A "keystone" of the Clayton Act was the "provision of authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency." *Brown Shoe*, 370 U.S. at 317; *see also, id.* at 323 n.39. Requiring a Clayton Act plaintiff to show "certainty and actuality of injury to competition" would be "incompatible" with Section 7's aim to "reach[] incipient restraints." *Id*. For that reason, Section 7 requires merely a "prediction" as to whether competition may be lessened, and "doubts are to be resolved against the transaction." *Fed. Trade Comm'n  v. Elders Grain, Inc*., 868 F.2d 901, 906 (7th Cir. 1989).

The Supreme Court has repeatedly invalidated mergers in highly concentrated markets, such as the airline industry, regardless of the size of the acquired firm. *See, e.g., Brown Shoe*, 370 U.S. at 345 (invalidating merger between 3rd and 8th largest shoe sellers, even though acquired firm had less than 2% market share since market already highly concentrated); *United States v. Aluminum Co. of America*, 377 U.S. 271 (1964) ("*ALCOA*") (acquisition violated Section 7 where Alcoa had 27.8% market share and sought to acquire company with just 1.3% market share because "small but significant" competitors are vital to "thwart" coordinated behavior among oligopolists); *United States v. Continental Can Co.*, 378 U.S. 441, 461 (1964) (acquisition by firm with 21.9% market share of firm with 3.1% market share held unlawful because "where there has been a 'history of tendency toward concentration in the industry' tendencies toward further concentration are to be curbed in their incipiency'"); *United States v. Von's Grocery Co.*, 384 U.S. 270, 272 (1966) (acquisition by 3rd largest producer of 6th largest

producer held unlawful where combined firm would control just 7.5% of the market, since "Congress decided to clamp down with vigor on mergers" in concentrated markets); *United States v. Pabst Brewing Co.*, 384 U.S. 546, 550 (1966) (acquisition of 18th largest brewer by 10th largest brewer, resulting in 5th largest brewer with 4.49% market share held unlawful because of steady trend toward concentration in beer market).

The Supreme Court outlined a definitive test for judging the legality of a merger in *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 363 (1963): "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effect."

The Supreme Court has only recognized a narrow category of evidence that can support a defendant's "clear showing" that the merger is not likely to have anticompetitive effects. *See United States v. General Dynamics Corp.*, 415 U.S. 486, 499-501 (1974) (government's market share data in the coal industry did not accurately predict the probable future anticompetitive effect of merger given unique attributes of coal industry); *United States v. Citizens & Southern Nat'l Bank* 422 U.S. 86 (1975) (acquisition by bank of branches it already controlled through a holding company as result of archaic Georgia banking regulation did not violate Section 7 where acquired branches were already de facto branches of the acquiring bank). These exceptions are narrow, as the Court explained in *General Dynamics*: "[i]n markets involving groceries or beer, as in *Von's Grocery* and *Pabst*, statistics involving annual sales naturally indicate the power of each company to compete in the future." 415 U.S. at 501. The narrow exceptions carved out in *General Dynamics* and *Citizens & Southern Nat'l Bank* are not present in this case.

There are no First Circuit decisions that apply the substantive elements of a Section 7 violation. Other circuits have generally described a burden-shifting regime whereby the plaintiff's prima facie case is based on inferences drawn from market share statistics alone. The defendant can only rebut this proof with evidence that the market share statistics give an "inaccurate account of the acquisition's probable effects on competition." *See, R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 108 (2d Cir. 1989) (market share data creates a "presumption of illegality" which "can be overcome only by evidence that the market share data gives an 'inaccurate account of the probable effects on competition'"); *Fed. Trade Comm'n v. Univ. Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991) (same); *Chicago Bridge & Iron Co. v. FTC*, 534 F.3d 410, 425 (5th Cir. 2008); *St. Alphonsus Medical Center v. St. Luke's Health System, Ltd.*, 778 F.3d 775, 785 (9th Cir. 2015) ("prima facie case can be established simply by showing high market share"); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 988 F.3d 690, 703-704 (4th Cir. 2020) (defendant can rebut prima facie case only by "discrediting [the] market share evidence … or showing that, even if [plaintiff's] market-concentration evidence is credible, it inaccurately predicts the merger's probable effect on competition").

## IV.    ARGUMENT

### A.    Plaintiffs Have Properly Defined Relevant Markets

#### 1.    The Relevant Product Market Is Scheduled Air Passenger Service

The Clayton Act prohibits mergers which may substantially lessen competition "in any line of commerce … in any section of the country." 15 U.S.C. § 18.   Thus, to assess the merger's likely impact on competition, the relevant product market ("line of commerce") and the relevant geographic markets ("sections of the country") must be identified. The "outer boundaries of a product market are determined by the reasonable interchangeability of use . . . between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325. Within a broad

market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Id.*; *see also Vazquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 297 (1st Cir. 2022).

In this case, "scheduled air passenger service" constitutes the relevant product market for assessing the anticompetitive effects of the merger. Applying *Brown Shoe*'s framework, consumers will not generally substitute the time savings and convenience of airline travel for other forms of travel. To put it in economic terms, a hypothetical monopolist of all domestic air passenger service could profitably raise prices by a small but significant and non-transitory amount without a corresponding lose of customers to other forms of transportation, like long-distance bus rides or trains. *See*, Plaintiffs' Expert Report of Hal J. Singer ("Singer Report") ¶¶ 35-37. For example, a flight between New York and Miami takes just over three hours. Driving between the two cities would take 19 hours or more, and travel by train between these same two locations is scheduled to take 27 hours. Customers will not readily stop flying, even in the face of small increases in airfares.

In the Northeast Alliance litigation that concluded this past Spring, Judge Sorokin issued an injunction preventing JetBlue and American Airlines from continuing with their anticompetitive Northeast Alliance agreement. There, JetBlue agreed that the relevant product market was "scheduled air passenger service" and there is no basis for JetBlue to dispute that definition here. *United States v. American Airlines Group, Inc. and JetBlue Airways Corp.*, Case No. 21-11558-LTS, 2023 WL 3560430 at *36 (D. Mass, May 19, 2023) ("the parties agree, and the Court finds, that the relevant product market is 'scheduled air passenger service,' and the relevant geographic markets are O&Ds").

2.      The Relevant Geographic Markets Are Origin and Destination City-Pair Routes

The geographic market must "correspond to the commercial realities of the industry and be economically significant." *Brown Shoe*, 370 U.S. at 336-37 (citations omitted). It is defined as "the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product." *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196 (1st Cir. 1996). In other words, "a market is the group of sellers or producers who have the actual or potential ability to deprive each other of significant levels of business." *St. Alphonsus*, 778 F.3d at 784.

Here, the evidence will show that there are three groups of relevant geographic markets that must be considered when assessing the anticompetitive effects of the merger. The first and most obvious is the "origin and destination" (O&D) city-pair routes where JetBlue and Spirit compete head-to-head, the so-called "Overlap Routes." Singer Report ¶¶ 38-39. There are some 400 such routes in the United States. Singer Report, Appendix 3, Tables A3.1-A3.7. Market realities support this definition. Singer Report ¶¶ 38-39. Airline passengers have predetermined destinations in mind, and they will not generally change flight destinations just because the airfares to their preferred destination has increased. *Id*.

A second group of geographic markets for assessing the anticompetitive effects of the merger is the O&D routes where Spirit competes but neither JetBlue nor any other ULCC competes. Singer Report ¶ 42. The evidence will show there are 283 of these "Spirit Only Routes." Within these routes, the elimination of Spirit will result in increases in the prices of *all other airlines* that compete in these routes, since post-merger, no other ULCC will be present place downward pressure on competing airlines' prices.

The third and final group of geographic markets is the O&D routes where the merger will impact "potential competition" (the "Potential Competition Routes"). These include Spirit routes that JetBlue planned to enter absent the merger, JetBlue routes that Spirit planned to enter absent the merger, and routes where neither currently copetes but which Spirit planned to enter absent the merger. Singer Report. ¶¶ 40-41. JetBlue and Spirit operate from 159 airports across the nation. Singer Report ¶¶ 103-116. Spirit plans to acquire 171 new aircraft and expand into 30 new airports over the next five years. Singer Report ¶¶ 109-111; Christie CID Ex. 25 at 28-29; NK-MERGERLIT-0003152235. The elimination of Spirit's potential competition in these markets redners the merger unlawful. *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 557-62 (1973).

Critically, there is no requirement that it be shown the merger may impact competition in all the geographic markets. On the contrary, the Supreme Court has made plain that Plaintiffs need only prove that competition may be substantially lessened in *one* city-pair O&D route. Section 7 "requires merely" that the plaintiff "prove the merger may have a substantial anticompetitive effect somewhere in the United States – 'in any section' of the United States." *Pabst*, 384 U.S. at 549-550. Therefore, "[t]he [plaintiff] may introduce evidence" that the merger may lessen competition "throughout the country, or on the other hand it may prove that competition may be substantially lessened only in one or more sections of the country." *Id*. "In either event a violation of 7 would be proved." *Id*.

**B.    The Merger Is Presumptively Unlawful**

1.    <u>The Airline Industry Has Experienced A Steady Trend Toward Concentration</u>

Congress's intent in passing the Clayton Act was to prevent mergers in industries marked by trends toward concentration. As the Supreme Court in *Brown Shoe* explained: "the dominant

theme pervading congressional consideration of [the Clayton Act]," "was a fear of what was considered to be a rising tide of economic concentration in the American economy." 370 U.S. at 315. A "keystone" of Section 7 is "its provision of authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency." *Id*. at 317. Therefore, outlawing mergers with a "reasonable probability of lessening competition" was considered necessary "to arrest restraints of trade in their incipiency and before they develop into full-fledged restraints [of trade]." *Id* at 323 n.39. The Supreme Court had mergers like this one in mind when it concluded that the "mandate of Congress" to curb tendencies toward concentration in industry "in their incipiency" is "particularly [necessary] when those tendencies are being accelearated through giant steps striding across a hundred cities at a time." *Id*. at 346.

The undisputed evidence at trial will show that the trend toward consolidation in the airline industry has resulted in a drastically consolidated market. Defendants do not contest this. In a pre-merger filing with the government, Defendants concede that the airline industry "has been allowed to drastically consolidate" since 2005, "leaving just four dominant carriers (American, Delta, United and Southwest, collectively the 'Big Four') that currently account for approximately 80% of capacity." Klinka CID 30(b)(6) Ex. 2 at 75.

The rapid consolidation in the airline industry between 2001 and present has resulted in an oligopoly market created by the following mergers:

- American and TWA 2001

- USAir and America West 2005

- Delta and Northwest 2008

- United and Continental  2010

- Southwest and AirTran 2011

- American and USAir 2013

The currently proposed merger would continue this consolidation trend. The combination of JetBlue, with a 5.3% market share with Spirit's 4.8% share would make JetBlue the fifth largest US airline with a market share in excess of 10%, and would create a supra-concentrated national market in which the five largest airlines would command in excess of 90% of the market. These undisputed facts, taken alone, satisfy a *prima facie* case that the effects of the proposed JetBlue/Spirit merger "may be to substantially lessen competition."

2. <u>Undisputed Direct Evidence At Trial Will Show The Merger Will Increase Prices</u>

It is undisputed that JetBlue's acquisition of Spirit will result in increased prices and decreased output. Defendants concede these facts. "Typical anticompetitive effects include increased prices and decreased output." *Anago, Inc. v. Tecnol Med. Prod., Inc.*, 976 F.2d 248, 249 (5th Cir. 1992). Since JetBlue has announced its intentions to create these anticompetitive effects, the effect of the merger not only "may be" substantially to lessen competition; it appears guaranteed to have such effect.

First, Defendants do not dispute, and indeed readily admit, that the merger will result in increased fares. Spirit made the following stunning admissions in a presentation to its shareholders: "JetBlue is a high-fare airline acquiring a low-fare airline and vowing to reduce capacity and increase prices to consumers." (Christie CID Ex. 18 at 21.) In another admission, Spirit conceded that in, "a JetBlue acquisition of Spirit will have lasting negative impacts on consumers," it will "raise[] Spirit's ticket prices," and will "remove ~50% of the ULCC capacity in the U.S." (Christie CID Ex. 18 at 8.)

Plaintiffs will present evidence at trial that JetBlue is clear that it plans to increase

revenues (which is dependent on fare price) on the reconfigured Spirit aircraft by at least 24%. [4]



"Mergers with a probable anticompetitive effect [are] to be proscribed by the

[Clayton] Act." *Brown Shoe*, 370 U.S. at 323. Anticompetitive effects include "price increases and reduced product quality, product variety, service, or innovation." *Fed. Trade Comm'n v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 172 (3d Cir. 2022).

> 3.    Undisputed Direct Evidence At Trial Will Show The Merger Will Reduce Capacity

There is no dispute that Spirit planes have more seats than JetBlue planes.[7] There is also no dispute that, after the merger, JetBlue plans to remove seats from every Spirit planes to match JetBlue's configuration.[8] The evidence will further show that this reconfiguration will result in a reduction of 10-15% (or approximately 20-28) of the seats on Spirit's planes.[9] Originally Spirit expressed grave concern about this reduction in capacity,[10] stating that "JetBlue is a high-fare

---

[7] ███████████████████████████████████████████████████████████████████

[8] JB Response to DOJ Rog 1 (Friedman DOJ 30(b)(6) Ex. 10) at 11 ("The Transaction will also enable JetBlue to bring its award-winning in-flight customer experience to more consumers. To achieve this experience across the combined fleet, JetBlue plans to retrofit the current Spirit aircraft and the aircraft to be delivered in the near-term after closing to provide more legroom, free Wifi,seatback television, and other amenities that are the hallmark of the JetBlue experience. For the remaining aircraft in Spirit's orderbook, JetBlue intends to have them delivered in the JetBlue layout. Consumers will benefit from improved quality on any route on which these planes are flown."); ████████████████████████████████████████████

██████████████████████████████████████████████████████████

[9] Gardner (PL) Dep. 47:24-48:2 (Q: You knew that they were going to reduce capacity?  A: They said they were going to take 10 to 15% of the seats off our aircraft.); ████████████████

[10] "JetBlue is a high-fare airline acquiring a low-fare airline and vowing to reduce capacity and increase prices to consumers" Christie CID Ex. 18 at 21; Christie Exhibit 18 (May 18 2022 email send by Christie to members of the Spirit Board) states in the third paragraph of a copy of the press release published May 19 2022 that "[e]ven putting aside the NEA, spirit believes the DOJ—and a court—will be very concerned that a JetBlue-Spirit combination will result in a higher-cost/lower fare airline and remove about half of the ULCC capacity in the United States." See Christie Dep. (LIT/DOJ) 243:9-18; (a)   Gardner Exhibit 12 (press release dated May 2 2022 titled "Spirit Airlines Board of Directors reiterates support for merger with Frontier Airlines")

airline acquiring a low-fare airline and vowing to reduce capacity and increase prices to consumers." (Christie CID Ex. 18 at 21.)

JetBlue claims to have a fix for this dramatic loss of capacity – "increased utilization."[11] This claim, however, is unsupported and illusory.



JetBlue's claim of "increase utilization" is therefore illusory and unsubstantiated. *Magee v. United States*, 121 F.3d 1, 3 (1st Cir. 1997) (stating that "conclusory allegations or unsubstantiated denials" cannot be relied on). As these admissions indicate, there is no dispute that the merger is likely to reduce capacity – direct evidence that the effect of the merger may be substantially to lessen competition.

3.   The Merger Will Drastically Increase Concentration In Markets Already Highly Concentrated

---

states the combination of JetBlue and Spirit "would remove about half of the ULCC capacity in the United States." See Gardner Dep. (Spirit/DOJ) 113:4-10; Gardner (PL) Dep. 48:14-49:20 (Q: You mean that when Spirit would become over time an LLC rather than a ULLC, that means it would be operating at higher fares? A. We thought that that was likely, yes.  Q. And it would be operating at less capacity?  A. Some less capacity, yes.)

[11] May 13, 2023 JetBlue Response to Interrogatory No. 1 at 11. ("Thus, due to the Transaction, the merged entity will be able to meaningfully increase its aircraft utilization and increase capacity.").

[12]

[13]              *See also* Christie 6-6-23 (DOJ) at 290:3-11 ("Q  So sitting here today, are you aware of any concrete plans by the merged firm to increase aircraft utilization? A I'm aware that they intend to increase aircraft utilization by reducing their sparing levels and being more efficient with their scheduling. That's what they've said. Q  Okay. But you've seen no plans? A  I have not seen any network plans.").

The proposed merger between Spirit and JetBlue will result in further concentration in the airline industry.  This potential combination of the 6th largest airline (JetBue) with the 7th (Spirit) would create the 5th largest airline having 10.3% of the market in revenue. This means that, on a national level, five airlines would then control over 90% of the market, leaving only two small legacy carriers, Alaska and Hawaii, and two small regional ULCCs, Frontier (about one-half the size of Spirit) and Allegiant (about one-third the size of Spirit).

First, within the Overlap Routes in which JetBlue and Spirit compete head-to-head, about 100 markets will become so concentrated post-merger as to create a presumption that the merger is unlawful or, at the very least, raise "significant competitive concerns." Singer Report ¶¶ 54-62. Using the industry standard database for assessing competitive effects of mergers in the airline industry, there are 302 non-stop and one-stop Overlap Markets. Approximately eleven percent (34/302) of the Overlap Markets would result in a post-merger monopoly for JetBlue. An additional ten percent (30/302) would leave just Jet Blue and only one other airline post-merger.

The Department of Justice's and Federal Trade Commission's *Horizontal Merger Guidelines* delineate HHI levels that amplify the likelihood of market power and address the central question of whether a merger may substantially lessen competition:

> Mergers resulting in moderately concentrated markets [HHI between 1,500 and 2,500] that involve an increase in the HHI of more than 100 points *potentially raise significant competitive concerns* and often warrant scrutiny. Mergers resulting in highly concentrated markets [HHI above 2500] that involve an increase in the HHI of between 100 points and 200 points potentially raise significant competitive concerns and often warrant scrutiny. Mergers resulting in highly concentrated markets that involve an increase in the HHI of more than 200 points *will be presumed to be likely to enhance market power*.

*Id.* at 19.

Plaintiffs will introduce expert testimony at trial that the Overlap Markets are highly concentrated based upon the standards set forth in the *Horizontal Merger Guidelines*, and the

merger would substantially increase concentration in those markets. Of the 302 Overlap Markets, 162 (54 percent) would result in a post-merger HHI in excess of 2,500 *and* would experience an increase in HHI in excess of 200 points. When limiting the inquiry to the 112 non-stop Overlapping Markets affected by the proposed merger, 68 (61 percent) would result in a post-merger HHI in excess of 2,500 *and* would experience an increase in HHI in excess of 200 points. Under the *Merger Guidelines*, the merger is likely to enhance monopoly power in those markets.

Second, the concentration increases in the Spirit-Only Routes would destroy competition in the roughly 283 city-pair relevant markets in which Spirit currently competes as a ULCC carrier against Legacy carriers by offering its highly competitive lower unbundled fares. In these markets, as soon as Spirit is eliminated, prices of all other airlines within these markets will increase by 30%. Friedman 1-19-23 CID Ex. 8 at 1; Friedman 1-19-23 CID Dep. at 210:3-211:24.

Finally, the proposed merger will have a negative impact in the "potential competition" markets: hundreds of highly concentrated city-pair markets. Section 7 proscribes mergers that lessen "potential competition." *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 557-62 (1973) (discussing "perceived potential competition" and "actual potential competition" theories of liability). Because the two carriers operate from 159 airports across the nation, the potential range of routes affected under the potential harm to competition spans the entirety of the nation. Singer Report ¶¶ 41, 103-116. Spirit is the fastest growing U.S. airline. Absent the merger, Spirit plans to acquire 171 new aircraft and expand into 30 new airports over the next 5 years, leading to hundreds of new future routes. Singer Report ¶¶ 109-111; Christie CID Ex. 25 at 28-29; NK-MERGERLIT-0003152235. These future plans will allow Spirit to effectively double in size by 2027 (18-20% growth per annum).

4.    The Merger Will Eliminate a Maverick Price-Cutter That Disrupts
Oligopolist Airlines From Coordinating Prices

One significant concern with mergers is that they may facilitate collusion among the

post-merger participants. In the Supreme Court's *ALCOA* decision, the acquired company

(Rome) held only a 1.3% market share, and Alcoa's acquisition of Rome would have resulted in

concentration figures well below those held "significant" in *Philadelphia Nat'l Bank*, 374 U.S. at

370. Yet, that small increase in concentration was nevertheless held unlawful because the

aluminum industry was oligopolistic and there was a "likelihood that parallel policies of mutual

advantage, not competition, will emerge." *ALCOA*, 377 U.S. at 280. The presence of "small but

significant competitors" like Rome "may well … thwart[]" the tendency of oligopolists to

coordinate among themselves. *Id*. Rome "may have seemed small," but it ranked ninth in the

industry, fourth among independents, "was an aggressive competitor," and "Rome's competition

was therefore substantial." *Id*. at 281; s*ee also, Hospital Corp. of Am. v. FTC*, 807 F.2d 1381,

1386 (7th Cir. 1986) ("the worry is that [the merger] may enable the acquiring firm to cooperate

(or cooperate better) with other leading competitors on reducing or limiting output, thereby

pushing up the market price").

Substantial unrebutted evidence in this case shows that eliminating Spirit will allow

JetBlue to better coordinate with its remaining competitors, especially the legacy carriers, using

an airline fare clearinghouse called ATPCO.



███████████████████████

Since airlines can see one another's fares as they are changed, they are able to respond by matching those fares – including price increases – resulting in parallel pricing behavior. In fact, airlines use ATPCO to signal pricing moves and, in some instances, to threaten other airlines that have lowered prices in key markets. ███████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████

Spirit is therefore a maverick price-cutter that refuses to play along with the ATPCO price signaling occurring between the other airlines, including JetBlue. Removing Spirit from the

competitive landscape will only further facilitate the other airlines to utilize ATPCO to price signal using techniques like "cross-market initiatives" to create "parallel policies of mutual advantage, not competition." *ALCOA*, 377 U.S. at 280.

**C.** **The Purported "Benefits" of the Merger Cannot Rebut Plaintiffs' Prima Facie Case**

Defendants have argued that various "benefits" of the JetBlue/Spirit combination rebut the substantial evidence supporting plaintiffs' prima facie case that the effect of the merger "may be substantially to lessen competition." None of these so-called benefits or efficiencies, however, is cognizable as a matter of law.

According to Defendants, the purported benefits of the merger are as follows:

1. "Enhanced JetBlue Network" –the merger will increase the "size and diversity" of JetBlue's network, which will "benefit consumers" and "increase JetBlue's ability to broadly and effectively compete with other airlines." (Resp. to Interrog. 1) ("Benefit No. 1").

2. "Increased Utilization" – JetBlue contends the merger will allow it to "more fully utilize its planes." (Resp. to Interrog. 1) ("Benefit No. 2").

3. "Improved In-Flight Customer Experience" – the merger will purportedly allow JetBlue to "bring its award-winning in-flight customer experience to more consumers," who will "benefit from improved quality." (Resp. to Interrog. 1) ("Benefit No. 3").

4. "Improved Loyalty Program" – JetBlue contends the merger will increase the value of its frequent flyer program since consumers will have "more opportunities to earn miles" as a result of JetBlue's "larger network." (Resp. to Interrog. 1) ("Benefit No. 4").

5. "More Consumers Will Benefit From the 'JetBlue Effect'" – JetBlue contends that a "widely-observed phenomenon" it calls "the JetBlue Effect" occurs "when JetBlue enters a route," which results in lower prices and better service among the other airlines competing on that route. JetBlue contends the merger will "bring the JetBlue Effect" to more markets, benefitting consumers "of other airlines," since "those airlines – particularly the Big Four who dominate the airline industry --  lower their fares and improve their service offerings in response to JetBlue's increased competitive reach."  (Resp. to Interrog. 1) ("Benefit No. 5").

6. "Synergies" – Finally, JetBlue contends the merger will result in various "synergies." (JetBlue Resp. to Interrog. 1.)

These "benefits" cannot be offered to rebut Plaintiffs' prima facie case for at least three reasons. First, the Supreme Court has held that procompetitive effects in one market cannot as a matter of law offset the anticompetitive effects in another market. Thus, the acquisition's destruction of competition in markets where Spirit actually and potentially competes cannot be saved because the merger helps JetBlue better compete with the Big Four in other markets or brings the "JetBlue Effect" to new markets, even if true. Second, the efficiencies defense is unavailable as a matter law under binding Supreme Court precedent. Finally, even if the Court were to consider defendants' efficiencies defense, none of them meets the strict standards applied by those courts that have analyzed the efficiencies defense.

    1.    <u>Defendants Are Legally Estopped From Arguing That The Merger Will Increase Competition Against The "Big Four" and Bring The JetBlue Effect To More Consumers in New Markets</u>

As described in detail in Plaintiffs' Motion in Limine (Dkt. Nos. 240, 241), binding Supreme Court precedent forbids defendants from arguing that the merger's anticompetitive effects can be outweighed by the merger's procompetitive effects in a *different* market. In

30

*Philadelphia Nat'l Bank*, the merging Philadelphia banks argued that "the increased lending limit of the resulting [merged] bank will enable it to compete with the large out-of-state banks, particularly the New York banks." *Id*. The Supreme Court "reject[ed]" the argument as a matter of law, holding "anticompetitive effects in one market [cannot] be justified by procompetitive consequences in another." *Philadelphia Nat'l Bank*, 374 U.S. at 370. *Id*. Later, in *RSR Corp. v. FTC*, the Ninth Circuit "similarly rejected" as a matter of law the argument that, notwithstanding the anticompetitive effects in the market, the merged company "will be better able to compete against the industry giant." 602 F.2d 1317, 1325 (9th Cir. 1979). It held, "anticompetitive effects in one market cannot be offset by procompetitive effects in another market." *Id*. (citing *Philadelphia Nat'l Bank*, 374 U.S. at 370).

        2.    <u>Defendants' Purported "Efficiencies Defense" Cannot Rebut Plaintiffs'</u>
                <u>Prima Facie Case</u>

As described in detail in Plaintiffs' Motion in Limine (Dkt. Nos. 239, 243), Supreme Court precedent bars Defendants from rebutting Plaintiffs' prima facie case by presenting evidence of post-merger efficiencies. Even assuming *arguendo* that the efficiencies defense were available, Defendants' purported benefits do not meet the parameters of the putative defense.

The circuits that have described the efficiencies defense have set forth the following parameters. "For the efficiency defense to be cognizable": (1) defendant must show "extraordinary efficiencies" to "offset the anticompetitive concerns in highly concentrated markets;" (2) the efficiencies must be "merger-specific," *i.e.*, "the efficiencies cannot be achieved by either party alone;" (3) the efficiencies must "be verifiable, not speculative;" and (4) the efficiencies must "not arise from anticompetitive reductions in output or service." *Hackensack Meridian Health*, 30 F.4th at 176; *Hershey*, 838 F.3d at 348-349; *see also*, *St. Alphonsus*, 778 F.3d at 775.

Notably, no appellate decision has ever held that a defendant successfully rebutted a prima facie case with an efficiencies defense, even in those circuits that have suggested it might be available. *St. Alphonsus*, 778 F.3d at 789; *see also Hackensack Meridian Health*, 30 F.4th at 176 (no circuit "ha[s] held [the defense] was successfully invoked," and as of 2022, "we have yet to see an efficiency so great as to justify a presumptively anticompetitive merger").

*First*, only one of the five alleged benefits – Benefit No. 2, addressed separately below – can even properly be called an "efficiency." Benefits Nos. 1, 3, 4, and 5 are merely restatements of the fact that post-merger, JetBlue will be bigger. That is, the merger will increase the size of JetBlue's network (Benefit No. 1), allow it to bring JetBlue's product to more consumers (Benefit No. 3), allow more consumers to redeem frequent flier miles (Benefit No. 4), and allow JetBlue to bring the JetBlue Effect to new markets (Benefit No. 5).

No doubt, these post-merger effects benefit JetBlue. But, to qualify as an "efficiency" they must result in a lowering of cost that ultimately inures to the benefit of consumers. An "efficiency" is "something that would enable the combined firm to achieve lower costs for a given quantity and quality of product." *United States v. Anthem*, Case no. 16-cv-1493, 2017 WL 527923 at *3 (D.C. Dist. Feb. 8, 2017), *affirmed*, *Anthem*, 855 F.3d 345. If "cost savings will not be accomplished by streamlining the two firms' operations, creating a better product that neither carrier can offer alone, or … enabling the providers to operate more efficiently, they do not represent any 'efficiency' that will be introduced into the marketplace." *Id*. Defendants "must demonstrate that the intended acquisition would result in significant economies and that these economies ultimately would benefit competition [in the relevant market] and, hence, consumers." *Univ. Health*, 938 F.2d at 1223; *see also Hackensack Meridian Health*, 30 F.4th at 177 (efficiencies not cognizable because "[w]hatever savings the merging entities may have

cashed in on, there was no evidence the savings ever flowed through to patients").

Here, Benefits Nos. 1, 3, 4, and 5 have nothing whatever to do with lowering costs through synergistic combination with Spirit. These "benefits" reflect that the merger will make JetBlue bigger, and nothing more. In fact, *Defendants admit* that these benefits "do not reflect a specific quantification of lower prices," and instead, only reflect "increases in the size and diversity of JetBlue's network" which allows it to reach "more customers." (Admission Nos. 8 and 9.) And, since JetBlue's purported Benefits do not create any cost savings, of course no cost savings will be passed on to consumers as a result of any efficiency. *Univ. Health*, 938 F.2d at 1223. JetBlue's Benefits Nos. 1, 3, 4, and 5 are therefore not cognizable "efficiencies" that can be considered in an efficiencies defense, because they are not "efficiencies" at all. To put it another way, if getting bigger to reach "more consumers" alone were a cognizable efficiency, then every merger among direct competitors would be considered efficient on the specious grounds that all the acquired company's customers would become the acquiring company's customers since those customers have nowhere else to turn. *See*, *Anthem*, 2017 WL 527923 at *4 ("Anthem is encouraging the Court" to accept its efficiencies "on the grounds that consumers might benefit from the large size of the new company .... But this is not a cognizable defense to an antitrust case").

In addition to the five purported "benefits" of the transaction, JetBlue also posits that various "synergies" will result from the merger (Benefit No. 6). In fact, like Benefits Nos. 1, 3, 4, and 5, these "synergies" are not synergies at all. They are audaciously misnamed descriptions of anticompetitive effects that will result from the market power JetBlue will yield if it succeeds in eliminating Spirit's competition.

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

       ███████████████████████████

       ████

       ███████████████████████████

       ██████████████████████████

██████████████████

    ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████

Other JetBlue "revenue synergies" tell the same story. ████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ – another patently

anticompetitive effect of the merger. In total, JetBlue anticipates the merger will generate $1.150

*billion* in "revenue synergies" annually by 2028. ███████████████████ No doubt,

these increased revenues are a "benefit" of the merger – for JetBlue. ███████████████

████████████████████████████████████████████

████████████████████████████ They are therefore not cognizable

"synergies" at all. *See, Univ. Health*, 938 F.2d at 1223; *see also Hackensack Meridian Health*, 30

F.4th at 177 (efficiencies not cognizable because "[w]hatever savings the merging entities may

have cashed in on, there was no evidence the savings ever flowed through to patients").

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████ The dis-

synergies associated with the merger include, for example, that JetBlue will be required to pay

higher wages to pilots and flight attendants.

    In addition to the "dis-synergies," the merger's one-time costs are also extraordinary.

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████████████

To sum up, and based exclusively on admissions by the Defendants, among all JetBlue's purported "synergies," the only arguably cognizable "efficiency" created by the merger is the ████████████████████████████████ That efficiency is far outweighed by the "dissynergies" of the merger, ███████████████████████. Therefore, from an annual cost perspective, JetBlue ████████████████████████████████████ ███████████████████████████████████████████

Why would JetBlue pay so much to acquire a company that yields so little in efficiency or complementariness? Because with Spirit out of the way, JetBlue will reap the benefits of its resulting market power – to the tune of $1.150 billion in annual "revenue synergies" – that can only be achieved in the absence of Spirit's competitive pressure. JetBlue's mislabeled "synergies" are a ruse. They cannot be offered as a cognizable defense and, indeed, they are damning admissions of the merger's anticompetitive effects.

*Second*, none of the purported benefits (Nos. 1, 2, 3, 4, and 5) is merger-specific. "[A] 'cognizable' efficiency claim must represent a type of cost saving that could not be achieved without the merger." *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 89 (D.D.C. 2011). "[T]he relevant issue [is] whether [the defendant] is *capable* of developing [the efficiencies] without the merger." *Fed. Trade Comm'n v. Sanford Health*, 926 F.3d 959, 966 (8th Cir. 2019). Benefits nos. 1, 2, 3, 4, and 5 are merely different ways of saying that JetBlue will get bigger. They do not contemplate any type of synergistic combination that makes the combined entity greater than the sum of its separate parts. All JetBlue wants from Spirit (other than to eliminate it as a maverick price-cutting competitor) is its aircraft, facilities, and employees. (Resp. to Sec. Req. at 76.) The trait that makes Spirit truly different – its low cost business model – will be

extinguished. As Defendants admit, "JetBlue will sunset the Spirit brand." (Klinka CID 30(b)(6) Ex. at 76.) Thus, the post-merger JetBlue will be nothing more than JetBlue-now plus Spirit's airplanes. But, JetBlue can get bigger without destroying the most competitively disruptive airline in the nation and one of JetBlue's most significant competitors. None of the alleged benefits is merger-specific, and therefore, none is a cognizable efficiency.

*Third*, to be cognizable, the purported efficiency must be "verifiable and not speculative." JetBlue's purported Benefit No. 2 of the transaction is that "a larger network" will give JetBlue "more options to fly a plane from any given location and therefore has the ability to more fully utilize its planes." This "increased utilization" efficiency is a new, after-the-fact justification that JetBlue only very recently proposed. JetBlue admits that when it sought approval of the transaction from its board of directors in 2022, it did not present an analysis of "increased utilization" as a potential synergy or efficiency created by the merger. (JetBlue Resp. to Request for Admission No. 7.)







But, whether "other ULCCs" decide to enter the market is rank speculation. When asked whether removing seats from Spirit aircraft would reduce market capacity if "JetBlue is wrong about ULCCs entering or expanding service after the acquisition," JetBlue answered with yet another layer of speculation.

JetBlue's 11th hour "increased utilization" efficiency is unstudied, unverified, and based on rank speculation.

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ In

short, JetBlue's "increased utilization" efficiency is unverifiable and speculative. It is not

cognizable as a matter of law and must be rejected.

In sum, none of Defendants' purported "benefits" of the merger can be relied upon, as a

matter of law, to rebut Plaintiffs' prima facie case. Any benefit that purports to increase

competition between JetBlue and the Big Four and which proposes to bring the JetBlue Effect to

markets other than those impacted by the merger is not legally cognizable. The efficiencies

defense is unavailable as a matter of law. And, even if it were not, none of Defendants' proffered

"benefits" is even an "efficiency," let alone one that meets any of the requirements of cognizable

efficiencies.

> **D.     Defendants' Proposed Divestitures Are wholly Inadequate and Will not
> Address the Anti-Competitive Effects of the Merger**

In an attempt to remedy the anticompetitive effects of the proposed merger, JetBlue has

signed contingent agreements to divest certain airport assets to two ULCCs, Frontier and

Allegiant. These divestitures are extremely limited in scope. They cover just 15 gates total at

four airport facilities: Boston Logan (2 gates), Newark (2 gates), New York La Guardia (6 gates

and 22 slots), and Ft. Lauderdale (5 gates). (Land 30(b)(6) at 15, 25-27, 38-39, 45.) Of the four

divested airport assets, three of them – Boston, Newark, and Ft. Lauderdale – will go to

Allegiant, a ULCC that is one-third the size of Spirit and whose business model aggressively

*avoids* competition. (Land 30(b)(6) at 15, 25-27, 45; Wells/Allegiant (DOJ) at 37-38) The fourth

divestiture – a mere 6 gates at LaGuardia – will go to Frontier.  (Land 30(b)(6) at 38-39.) These

proposed remedies are inadequate as a matter of law.

"Defendants bear the burden of showing that any proposed [divestiture] remedy would negate any anticompetitive effects of the merger." *Fed. Trade Comm'n v. Staples, Inc.,* 190 F.Supp.3d 100, 137, n.15 (D.D.C. 2016). A divestiture must "effectively preserve competition in the relevant market[s]." *Fed. Trade Comm'n v. Sysco*, 113 F. Supp. 3d 1, 72–73 (D.D.C. 2015) (citing U.S. Dep't of Justice, Antitrust Division Policy Guide to Merger Remedies 1 (2011) ("Remedies Guide"). In other words, the divestiture must "replac[e] the *competitive intensity* lost as a result of the merger." *Id.* at 72–73 (emphasis in original); *id*. at 73 ("divestiture assets must be substantial enough to enable the purchaser to maintain the premerger level of competition") (internal quotations and citations omitted); *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 60 (D.D.C. 2017) (proposed divestitures must "restore [the] competition lost by the merger, and "effectively preserve competition in the relevant market[s]"); Remedies Guide at 1 ("The divestiture assets must be substantial enough to enable the purchaser to *maintain the premerger level of competition,* and should be sufficiently comprehensive that the purchaser will use them in the relevant market and be unlikely to liquidate or redeploy them"). "[D]oubts are to be resolved against the transaction." *Fed. Trade Comm'n v. Elders Grain, Inc*., 868 F.2d 901, 906 (7th Cir. 1989).

There is no genuine issue of material fact that the proposed divestitures are illusory and inadequate as a matter of law. JetBlue concedes that neither Allegiant nor Frontier has made any commitment post-merger to fly and compete on any of the city-pair markets currently flown by either Spirit or JetBlue from the divested gates. (Land (Private Plaintiff) at 7-9.) JetBlue admits it has not sought approval of the FAA and respective airport authorities for the proposed transfer of assets at *any* of the four divestiture airports. (Land 30(b)(6) at 22-24, 41, 43).

Allegiant is merely one-third the size of Spirit and has stated clearly that its business strategy is to *avoid* competition with other airlines, and that about 75-80% of its current routes are free of other competing airlines. (Wells/Allegiant (DOJ) at 37-38) So, there is *no* reasonable likelihood that Allegiant's presence will "maintain premerger competition levels."

With Allegiant's commitment to *avoiding* competition, that leaves Frontier's purchase of *just six* divested gates as the sole remedy to "maintain competitive levels" after Spirit, the largest ULCC in the nation by a wide margin, is entirely eliminated from the market. But, ████

████████████████████████████████████████████████████

████████████████████████████████████ None of these divestitures can feasibly maintain the premerger level of competition, and JetBlue admits as much. (Land 30(b)(6) at 24; 33; 43; Land Ex. 4; Christie Dep. (CID) at 292-293.)

Even assuming Allegiant and Frontier successfully backfilled all the vacancies in routes created by Spirit's elimination, these divestitures would only account for a tiny fraction of the hundreds of city-pair markets impacted by Spirit's demise. The divested assets therefore cannot, as a matter of law, save Defendants' unlawful merger.

E.     **Plaintiffs Are Threatened With Loss And Damage By The Proposed Acquisition**

Section 16 of the Clayton Act authorizes private plaintiffs to obtain injunctive relief for any "threatened loss or damage" resulting from a violation of the antitrust laws. 15 U.S.C. § 26. Since Section 16 requires only "'threatened' injury," an injunction is available "even though the plaintiff has not yet suffered actual injury." *Zenith*, 395 U.S. at 130. To win an injunction, a private plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws." *Id*. (citations omitted); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1473 (9th Cir. 1985) (to demonstrate "irreparable harm"

justifying the injunction of an unlawful merger under Section 7, "[r]easonable apprehension of threatened injury will suffice"); *California v. Am. Stores Co.*, 492 U.S. 1301, 1304 (1989) (O'Connor, J., Circuit Justice) (a "lessening of competition 'is precisely the kind of irreparable injury that injunctive relief under section 16 of the Clayton Act was intended to prevent'").

This Court has concluded that Plaintiffs Gabriel Garavanian and Timothy Nieboer "[e]ach has standing to bring an antitrust claim because they are 'the type of person[s] the law intends to protect against the harm of which [they] complain." Dkt. No. 310 (Order Denying In Part and Granting In Part Defendants' Motion for Summary Judgment) at 2 (quoting *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 408 (1st Cir. 1985)). Mr. Garavanian and Mr. Nieboer "both fly Spirit Airlines [] regularly and allege they will be harmed by the lower output and higher prices that may result from Spirits's acquisition by [JetBlue]." *Id.*

The evidence will show that Plaintiffs are not only "threatened" with injury from the proposed merger; their injury is certain if the merger is allowed to proceed. Defendants concede they will use the elimination of Spirit to increase prices and reduce output, "the principal vices proscribed by the antitrust laws," *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.,* 784 F.2d 1325, 1334 (7th Cir. 1986) (citing *Brunswick*, 429 U.S. 477). Defendants have assured that Spirit will be eliminated in its entirety. The evidence will show that JetBlue intends to "sunset the Spirit brand," scrap its low-cost business model founded on Spirit's "key weapon" of low costs that enable low fares, and turn Spirit planes into lower-density, higher-priced JetBlue planes that will replace low fares with high fares across the board. The elimination of Spirit will result in "fewer choices for consumers … *precisely the type of harm that we allow plaintiffs to vindicate through the antitrust laws*." *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1303 (11th Cir. 2010) (emphasis added).

Evidence at trial will show that Plaintiffs are "threatened" with harm from the merger pursuant to Section 16 of the Clayton Act, and that the merger must be enjoined.

## V.     CONCLUSION

The evidence presented at trial will demonstrate that the proposed merger of JetBlue and Spirit violates Section 7 of the Clayton Act and should be enjoined.

Dated: October 27, 2023                              Respectfully submitted,


_/s/_ Scott Gregory Herrman
Robert F. Ruyak
Stephen G. Larson
Scott Gregory Herrman
LARSON LLP
555 South Flower Street, Suite 4400
Los Angeles, California 90071
Tel: (213) 436-4888
Fax: (213) 623-2000
Email:slarson@larsonllp.com
Email:rruyak@larsonllp.com
Email:gherrman@larsonllp.com
(_Admitted Pro Hac Vice_)

Joseph M. Alioto                                    Joseph Michelangelo Alioto, Jr
ALIOTO LAW FIRM                                     ALIOTO LEGAL
One Sansome Street, 35th Floor                      100 Pine Street
San Francisco, California 94104                     Suite 1250
Telephone: (415) 434-8900                           San Francisco, CA 94111
(_Admitted pro hac vice_)                           Tel.: 415-398-3800
                                                    Email: joseph@aliotolegal.com
                                                    (Admitted Pro Hac Vice)


Jeffery K. Perkins                                  Josephine Alioto
LAW OFFICES OF JEFFERY K. PERKINS                   THE VEEN FIRM
1550-G Tiburon Blvd., Box 344                        20 Haight Street
Tiburon, California 94920                           San Francisco, CA 94102
Telephone: (415) 302-1115                           Telephone: (415) 673-4800
                                                    Email: j.alioto@veenfirm.com
                                                    (_Admitted pro hac vice_)

Lingel H. Winters
LAW OFFICES OF LINGEL H. WINTERS
275 Battery Street, Suite 2600
San Francisco, California 94111
Telephone: (415) 398-2941

Christopher A. Nedeau
NEDEAU LAW PC
154 Baker Street
San Francisco, CA 94117-2111
Telephone: (415) 516-4010
Email: cnedeau@nedeaulaw.net

Lawrence G. Papale
LAW OFFICES OF LAWRENCE G.
PAPALE
The Cornerstone Building
1308 Main Street, Suite 117
St. Helena, California 94574
Telephone: (707) 963-1704
(*Admitted pro hac vice*)

Robert J. Bonsignore, Esq.
BONSIGNORE TRIAL LAWYERS,
PLLC
23 Forest Street
Medford, MA 02155
Phone: 781-856-7650
Email: rbonsignore@classactions.us

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify that this document was filed through the ECF system in redacted form on October 27, 2023 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

I further certify that this document, in unredacted form, was served on the defendants on October 27, 2023 by transmitting it by email to counsel for defendants.

_/s/_ Scott Gregory Herrman

Scott Gregory Herrman