# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GABRIEL GARAVANIAN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 1:23-cv-10678-WGY |
| | ) |
| JETBLUE AIRWAYS CORPORATION and | ) |
| SPIRIT AIRLINES, INC., | ) |
| | ) |
| Defendants, | ) |
| | ) |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO**
**DISMISS THE COMPLAINT AND STAY FURTHER BRIEFING**

The only proposed merger that the two remaining private Plaintiffs challenge—the July 2022 merger agreement (the "2022 Merger Agreement") between JetBlue Airways Corp. ("JetBlue") and Spirit Airlines, Inc. ("Spirit") (together, "Defendants")—has been permanently enjoined by this Court and abandoned by the Defendants via a legally binding termination agreement.  Plaintiffs' action to enjoin the 2022 Merger Agreement is therefore moot, and this Court is without jurisdiction to proceed under Article III of the Constitution. (*See* Motion to Dismiss, Dkt. 346 ("Motion" or "Mot.")).  In their Opposition to Defendants' Motion to Dismiss (Dkt. 354) ("Opposition" or "Opp."), Plaintiffs do not contend that they face any concrete harm from the 2022 Merger Agreement today, or that they require different or greater relief than has already been granted by this Court.  Instead, Plaintiffs make two meritless arguments, both of which the Court should reject.

First, Plaintiffs suggest that Defendants may reverse their termination and unequivocal abandonment of the 2022 Merger Agreement and could resurrect their proposed merger at some future date.  Their argument is pure speculation and ignores both practical reality and the permanent injunction issued by this Court.  Moreover, the record indisputably reflects that Defendants (1) did not terminate the 2022 Merger Agreement for the purpose of mooting Plaintiffs' case, and (2) that there is no "reasonable expectation" that Defendants will resume their proposed merger after their case is dismissed.  Plaintiffs have nothing but conjecture to rebut this evidence, and it is the law in this Circuit that litigation does not proceed on the basis of speculation about future, contingent allegations of harm.

To be clear: Defendants' decision to abandon this hard-fought, multi-billion-dollar deal had nothing whatsoever to do with private Plaintiffs.  Nor did Defendants abandon

their deal in a "non-binding announcement in a press release" that can be reversed, as Plaintiffs suggest.  (Opp at 2.)  To the contrary, the Court permanently enjoined the proposed merger, the 2022 Merger Agreement was subsequently terminated by <u>binding agreement of the parties</u>, and that agreement was publicly filed with the Securities and Exchange Commission, along with an explanation for the termination.  The decision to terminate the 2022 Merger Agreement is not something that can be "undone" at a whim.  Nor is there any basis to conclude that the parties intend to do so.  Indeed, JetBlue has paid Spirit $69 million in connection with the termination.  The 2022 Merger Agreement cannot possibly be revived.

The Court, in enjoining the merger, took pains to note that it enjoined only the specific merger as set forth in the 2022 Merger Agreement, and not "any other transaction in any form that would combine JetBlue and Spirit." *United States* v. *JetBlue Airways Corp.*, --- F. Supp. 3d ---, 2024 WL 162876, at *37 (D. Mass. Jan. 16, 2024).  If Defendants were to reach another agreement to merge sometime in the future, Defendants—as publicly traded companies—would need to disclose such an agreement publicly, and submit a pre-merger notification pursuant to the Hart-Scott-Rodino Act.  Assuming (based on recent experience) that the Department of Justice were to challenge that transaction, this (or another) Court would have to evaluate that new and different merger in the "context of the unique and dynamic market forces of the airline industry" (*Id.*)—in other words, embark on new and different litigation, after appropriate regulatory review.  The record clearly establishes that Defendants have no such intent, and there is no reason to conclude otherwise, but this case would not be capable of enjoining a new and different merger in any event.

<u>Second</u>, Plaintiffs argue that private plaintiffs and the Government have different kinds of interests in enforcing the antitrust laws, and that the private case is therefore

not moot despite the permanent injunction granted in the Government action.  This argument misses the point.  In order to invoke the jurisdiction of this Court, Plaintiffs must demonstrate a threat of concrete, individualized harm at every stage of the litigation.  The relief that Plaintiffs seek is not just duplicative; it is entirely pointless under the circumstances.  Notably, none of the cases that Plaintiffs cite involve a merger that the parties have permanently abandoned and a request for relief identical to what has already been awarded.

Defendants respectfully request that the Court grant their Motion.

## I.    **Defendants Cannot, and Will Not, Resurrect the 2022 Merger Agreement**

The Defendants terminated the 2022 Merger Agreement following a permanent injunction issued by this Court, in a legally executed agreement that was subsequently filed with the Securities and Exchange Commission.  Wright Decl. Ex. 1 at 5.  The Defendants agreed to a substantial termination payment of $69 million, which JetBlue has paid in full to Spirit, and attested in their binding agreement that there is no other agreement of the parties, oral or written, regarding the transaction.  *Id.* at 4, ¶ 2; 7, ¶ 8.  The Defendants explained the reasons for the termination:  "current regulatory obstacles will not permit us to close this transaction in a timely fashion under the merger agreement," and "both airlines' interests are better served by moving forward independently."  Wright Decl. Ex. 1 at 10; Ex. 2 at 17.  These binding documents clearly establish that Defendants have abandoned and terminated the 2022 Merger Agreement for reasons entirely unrelated to this private suit.

Plaintiffs' argument that Defendants might someday reverse their decision is unfounded speculation. Plaintiffs cannot "avoid[] mootness" through "speculation about some future potential event." *Harris* v. *Univ. of Mass. Lowell*, 43 F.4th 187, 195 (1st Cir. 2022) (internal quotation marks omitted).  The so-called "voluntary cessation" doctrine is a narrow exception to a finding of mootness, based on the principle that a "manipulative

3

litigant" should not be permitted to "immuniz[e] itself indefinitely, altering its behavior long enough to secure a dismissal and then reinstat[e] it immediately after." *Am. Civil Liberties Union* v. *U.S. Conf. of Catholic Bishops*, 705 F.3d 44, 54-55 (1st Cir. 2013).  It applies <u>only</u> where (1) the defendant voluntarily abandoned its conduct "in order to moot the plaintiff's case," <u>and</u> (2) there is a "reasonable expectation that the challenged conduct will be repeated following dismissal." *Town of Portsmouth* v. *Lewis*, 813 F.3d 54, 59 (1st Cir. 2016).  The exception "turns on the circumstances of the particular case."  *Calvary Chapel of Bangor* v. *Mills*, 52 F.4th 40, 49 (1st Cir. 2022).

The "voluntary cessation" doctrine is not applicable here.  First, Defendants did not abandon their merger in order to moot private Plaintiffs' case or manipulate the legal system, and there is nothing before the Court that would allow a finding otherwise.  Plaintiffs' conjecture that Defendants "abandoned" the proposed merger to avoid an adverse ruling in their summary judgment motion in this private litigation is just that:  pure conjecture.  This Court need not entertain such baseless speculation, because all the "circumstances suggest that [Defendants terminated their proposed merger] not to avoid a court judgment, but in response to" changed circumstances and in pursuit of their business interests.  *Bos. Bit Labs, Inc.* v. *Baker*, 11 F.4th 3, 10 (1st Cir. 2021).[1]  *See* Wright Ex. 1 at 10.  Indeed, the 2022 Merger Agreement was terminated following a permanent injunction issued by this Court preventing the proposed merger.  Private Plaintiffs' suggestion that the abandonment of the merger was

---

[1] Plaintiffs' argument also mischaracterizes their position in the framework of the antitrust laws.  Although this Court found that Defendants' proposed merger would violate the Clayton Act, that is no guarantee that *Plaintiffs* would prevail at trial, where they (unlike the government) would again have to prove that *they themselves* have standing to pursue their claims based on a showing of concrete, individualized harm.  *Lujan*, 504 U.S. at 561–562.

somehow a result of <u>their</u> summary judgment motion (which was—after all—based on collateral estoppel), is entitled to no weight whatsoever.

Second, there is no "reasonable expectation" that Defendants could consummate the permanently enjoined merger following dismissal of Plaintiffs' case. *Town of Portsmouth*, 813 F.3d at 59. The injunction remains in place, preventing the merger contemplated in the 2022 Merger Agreement. In order to merge, Defendants would need to negotiate a <u>new</u> merger agreement, and then comply with the time-consuming regulatory process required under the Hart-Scott-Rodino Act, as Plaintiffs' Opposition acknowledges. (Opp. at 8.) Moreover, if Defendants at some point in the future were to decide to merge, that new and <u>different</u> agreement would not be subject to Plaintiffs' current lawsuit. Plaintiffs' challenge, like the Government's challenge (Case No. 23-cv-10511), is only to the 2022 Merger Agreement. *See* Dkt. 1. As the Court explained in declining to enjoin <u>any</u> merger between the parties in the DOJ's case, in reasoning that applies with equal force here:

> To rule in such a way … would be prospectively to interfere with the free market with unknown, and perhaps harmful, competitive effects. Indeed, the Defendant Airlines and others in the market, in the context of the unique and dynamic market forces of the airline industry may decide to take another run at a merger at any time. The Government will no doubt make its determination – as it is duty-bound to do – as to whether such a proposed merger sufficiently protects competition. Of course, while the Court always encourages parties to resolve their differences without judicial intervention, the courthouse doors remain open should the Defendant Airlines decide to try again, and the Government then wishes to prevent such an attempt.

*JetBlue Airways Corp.*, --- F. Supp. 3d ---, 2024 WL 162876, at *37. That Defendants have the theoretical "power" to pursue a different, hypothetical merger in the future, under different circumstances, "cannot itself be enough to skirt mootness." *Boston Bit.*, 11 F.4th at 10-11; *accord Harris*, 43 F.4th at 195. Plaintiffs cannot pursue a lawsuit to enjoin a hypothetical future merger, as courts in similar circumstances have held. *See Mercy Health*, 107 F.3d at 636; *Heinz*, 164 F. Supp. 2d at 660.

Plaintiffs attempt to distinguish *Mercy Health* and *Heinz* on the ground that, in those cases, there was no injunction barring the abandoned mergers.  But that distinction cuts in Defendants' favor, not private Plaintiffs':  a defendant has <u>more</u> power to revive an abandoned merger—not <u>less</u>—if the merger is not already subject to a permanent injunction. If the courts in *Mercy Health* and *Heinz* concluded that the abandoned mergers there were not likely to recur even in the absence of a permanent injunction, the merger here is even less likely to recur.  *Mercy Health*, 107 F.3d at 637 & n.5; *Heinz*, 164 F. Supp. 2d at 660.  And Plaintiffs' challenge to *Harris* (at 10) on the grounds that Plaintiffs are still "future passengers of Spirit Airlines" makes no sense at all:  Here, as in *Harris*, Plaintiffs are "no longer subject to the [challenged conduct]" because the challenged conduct has been enjoined and abandoned.  43 F.4th at 191.[2]

## II.     The Merger Has Been Both Permanently Enjoined And Abandoned, Mooting Plaintiffs' Claims

This Court permanently enjoined JetBlue and Spirit from consummating the merger contemplated in the 2022 Merger Agreement following a full bench trial in the Government action.  *JetBlue Airways Corp.*, --- F. Supp. 3d ---, 2024 WL 162876, at *37. After that ruling, the Defendants abandoned their efforts to merge, executed the Termination Agreement, and dismissed their appeal in the Government action, which rendered the injunction against the 2022 Merger Agreement permanent.  Mot. at 2.  Plaintiffs thus remarkably seek to enjoin a merger that has been <u>both</u> enjoined and abandoned. Dkt. 1.

---

[2] Plaintiffs' other cited cases do not help them. In each, the parties showed clear reasons why the challenged conduct may immediately recur and, notably, none of the cases featured a prior permanent injunction.  *See City of Mesquite* v. *Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *Walling* v. *Helmerich & Payne*, 323 U.S. 37, 43 (1944); *United States* v. *W. T. Grant Co.*, 345 U.S. 629, 633 (1953); *R.C. Bigelow, Inc.* v. *Unilever N.V.*, 867 F.2d 102, 105 (2d Cir. 1989).

Because the challenged conduct no longer poses any "immediate and real effect" on the Plaintiffs, the Court cannot "grant any effectual relief," and the case is moot. *Harris*, 43 F.4th at 192 (quotation omitted).

In their Opposition, Plaintiffs do not identify any specific harms that they would experience if they do not obtain their own injunction, nor do they argue that they seek different relief from that the Government obtained.[3]  Instead, they insist that "private and public actions were designed to be cumulative, not mutually exclusive," and speculate that the Department of Justice may fail to enforce the injunction at some point in the future.  (Opp. at 3, 4.)  This argument misses the mark and would result in an unnecessary waste of judicial resources.  As the cases that Plaintiffs cite reflect, a private plaintiff's mere assertion that they are a "more effective antitrust policeman than the government" is insufficient to avoid dismissal for mootness.  *Howard Hess Dental Labs., Inc.* v. *Dentsply Int'l, Inc.*, 602 F.3d 237, 250 (3d Cir. 2010).  Instead, the relevant question is whether Plaintiffs maintain the requisite "threat of concrete, individualized harm" that is required at every stage of the litigation. *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *United States* v. *Mercy Health Services*, 107 F.3d 632, 636 (8th Cir. 1997).  The abstract assertion that private Plaintiffs may have different interests in antitrust enforcement from the Government does not establish the requisite concrete harm, and Plaintiffs make no serious effort to explain that they have a continuing threat of harm from the 2022 Merger Agreement, which has been enjoined, terminated, and abandoned.

---

[3] Plaintiffs do not make any argument concerning the other relief sought by their Complaint (Dkt. 1 at Prayer).  Defendants explained why that relief is irrelevant in their Motion (Mot. at 3–4), which Plaintiffs did not contest.  Defendants consider this issue abandoned and therefore do not address it further.

Plaintiffs' cited cases do not require a different result.  In *United States* v. *Borden*, the Supreme Court held that the federal government was not barred from pursuing an injunction of an anticompetitive merger where a private litigant had already received such an injunction pursuant to a consent decree.  The Court reasoned that the Department of Justice was "primarily charged by Congress" with enforcing the antitrust laws, so barring the government from proceeding would prevent the government from ensuring "the continuing protection of the public." 347 U.S. 514, 518 (1954).  That rationale does not work in reverse. Here, the two remaining private individual Plaintiffs are not "primarily charged by Congress" with enforcing the antitrust laws.  Their interests are fully protected by the permanent injunction that the Court has entered (23-cv-10511, Dkt. 461).  Moreover, *Borden* reiterated the requirement that there must "exist[] some cognizable danger of recurrent violation." *Id.* at 520.  Notably, the parties had not publicly and contractually abandoned their merger efforts in that case, unlike here.

Plaintiffs' reliance on *Dentsply* and *Sam Fox* is also misplaced.  (Opp. at 3–4.) In both cases, courts reasoned that plaintiffs who sought <u>different</u> remedies than the government could bring subsequent claims.  In *Sam Fox Publishing Co.* v. *United States*, a group of members of the American Society of Composers, Authors and Publishers ("ASCAP") sought to intervene as of right in a suit involving a consent decree entered into between the Department of Justice and ASCAP, on the grounds that the government's modifications to the consent decree "did not go far enough."  366 U.S. 683, 687 (1961).  The Supreme Court held that intervenors were not bound by the government's consent decree, but could proceed separately to the extent that the relief sought by the government was "inadequate." *Id.* at 688.  In *Dentsply Int'l, Inc.*, the Third Circuit suggested that a private

8

antitrust plaintiff could proceed with a monopolization case following the government's injunction. 602 F.3d at 250.  But it did so where the private plaintiffs had argued, among other things, that the government's injunction was "not long enough to ensure that they will not suffer harm." *Id.*  Moreover, the *Dentsply* court ruled <u>against</u> plaintiffs because they failed to "fulfill their burden" of "demonstrating injury even where another injunction is already in place." *Id.*  Neither *Sam Fox* nor *Dentsply* stands for the proposition that a private plaintiff can pursue an <u>identical</u> remedy that has already been granted in a parallel government lawsuit. Nor do they lend any support for granting injunctive relief when a merger has been permanently abandoned by the parties.

Plaintiffs finally speculate that the Department of Justice may someday fail to enforce this Court's injunction.  (Opp. at 4–5.)  Plaintiffs cite no support for the proposition that a private injunction may be sought on supposition.[4]  In fact, *Dentsply* held the opposite, holding that a private plaintiff cannot maintain a duplicative private antitrust lawsuit following a government injunction on the mere speculation that they are a "more effective antitrust policeman than the government," and that (as here), if they were later "threatened with antitrust injury," would have the opportunity to "petition[] a court for relief at that point." *Id.* at 250.  In other words, even if Plaintiffs are right that the government may one day choose not to enforce the injunction issued by this Court, that does not warrant proceeding with this case when Plaintiffs cannot show any concrete, imminent harm.  *Lujan*, 504 U.S. at 560-61.

---

[4] In any event, that purported threat is nowhere near concrete enough to satisfy Plaintiffs' burden to establish standing.  *See Transunion LLC* v. *Ramirez*, 141 S. Ct. 2190, 2203 (2021).

**Conclusion**

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiffs' case with prejudice, and defer ruling on Plaintiffs' Motion for Leave to File a Motion for Summary Judgment until issuing a decision on this jurisdictional motion.

Dated: April 5, 2024                            Respectfully submitted,

                                                */s/ Elizabeth M. Wright*

                                                Elizabeth M. Wright (MA BBO #569387)
                                                Cooley LLP
                                                500 Boylston Street, 14th Floor
                                                Boston, MA 02116-3736
                                                Tel: 617-937-2300
                                                ewright@cooley.com

                                                Ethan Glass (*Pro Hac Vice*)
                                                Cooley LLP
                                                1299 Pennsylvania Avenue NW, Suite 700
                                                Washington, DC 2004-2400
                                                Tel: 202-842-7800
                                                Fax: 202-842-7899
                                                eglass@cooley.com

                                                *Attorneys for Defendant JetBlue Airways*
                                                *Corporation*

                                                Andrew C. Finch (*Pro Hac Vice*)
                                                Jay Cohen (*Pro Hac Vice*)
                                                Yoav Gaffney (*Pro Hac Vice*)
                                                Paul, Weiss, Rifkind, Wharton & Garrison
                                                LLP
                                                1285 Avenue of the Americas
                                                New York, NY 10019
                                                Tel: 212-373-3000
                                                Fax: 212-757-3990
                                                afinch@paulweiss.com
                                                jcohen@paulweiss.com
                                                ygaffney@paulweiss.com

                                                Meredith R. Dearborn (*Pro Hac Vice*)

10

Cole A. Rabinowitz (*Pro Hac Vice*)
Paul, Weiss, Rifkind, Wharton & Garrison
LLP
535 Mission Street, 24th Floor
San Francisco, CA 94105
Tel: 628-432-5100
Fax: 628-232-3101
mdearborn@paulweiss.com
crabinowitz@paulweiss.com

*Attorneys for Defendant*
*Spirit Airlines, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system on April 5, 2024 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Elizabeth M. Wright*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| GABRIEL GARAVANIAN, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 1:23-cv-10678-WGY ) |
| JETBLUE AIRWAYS CORPORATION and SPIRIT AIRLINES, INC., | ) ) ) |
| Defendants, | ) ) ) ) |

**DECLARATION OF ELIZABETH M. WRIGHT**

I, ELIZABETH M. WRIGHT, declare pursuant to 28 U.S.C. § 1746, as follows:

1.      I am an attorney admitted to practice before this Court and Special Counsel at the law firm of Cooley LLP, counsel of record for Defendant JetBlue Airways Corporation ("JetBlue") in this action.  I make this declaration of my own personal knowledge and, if called to do so, could testify competently to the facts stated herein under oath.  I submit this Declaration in support of Defendants' Reply Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint and Stay Further Briefing.

2.      Attached as Exhibit 1 is a true and correct copy of a Form 8-K filed by JetBlue with the Securities and Exchange Commission on March 4, 2024, including all exhibits.

3.      Attached as Exhibit 2 is a true and correct copy of a Form 8-K filed by Spirit Airlines, Inc. on March 4, 2024, including all exhibits.

4.      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 5, 2024

*/s/ Elizabeth M. Wright*
Elizabeth M. Wright

3

## **CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system on April 5, 2024 and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

*/s/ Elizabeth M. Wright*

# EXHIBIT 1

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 8-K

## CURRENT REPORT
### PURSUANT TO SECTION 13 OR 15(d) OF THE
### SECURITIES EXCHANGE ACT OF 1934

Date of Report (Date of earliest event reported): March 1, 2024

**jetBlue**

# JETBLUE AIRWAYS CORPORATION
(Exact name of registrant as specified in its charter)

| **Delaware** | **000-49728** | **87-0617894** |
|:---:|:---:|:---:|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (I.R.S. Employer Identification No.) |

| **27-01 Queens Plaza North** | **Long Island City** | **New York** | **11101** |
|:---:|:---:|:---:|:---:|
| (Address of principal executive offices) | | | (Zip Code) |

**(718) 286-7900**
(Registrant's telephone number, including area code)

**N/A**
(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol | Name of each exchange on which registered |
|:---:|:---:|:---:|
| **Common Stock, $0.01 par value** | **JBLU** | **The NASDAQ Stock Market LLC** |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR 230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR 240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01 Entry into a Material Definitive Agreement.**

The disclosure set forth below under Item 1.02 of this Current Report on Form 8-K is incorporated by reference herein.

**Item 1.02 Termination of a Material Definitive Agreement.**

As previously disclosed, on July 28, 2022, JetBlue Airways Corporation, ("JetBlue"), Sundown Acquisition Corp., a direct wholly owned subsidiary of JetBlue ("Merger Sub") and Spirit Airlines, Inc. ("Spirit" and, together with JetBlue and Merger Sub, the "Parties") entered into an Agreement and Plan of Merger (the "Merger Agreement"), pursuant to which and subject to the terms and conditions therein, Merger Sub would be merged with and into Spirit, with Spirit continuing as the surviving corporation.

On March 1, 2024, the Parties entered into a Termination Agreement (the "Termination Agreement"), pursuant to which the Parties agreed that the Merger Agreement, including all schedules and exhibits thereto, was terminated, effective immediately, subject to limited exceptions related to JetBlue's previously agreed indemnification obligations. Pursuant to the Termination Agreement, JetBlue agreed to pay Spirit $69 million in cash on March 5, 2024. The Parties also agreed to release each other from claims, demands, damages, actions, causes of action and liability relating to or arising out of the Merger Agreement and the transactions contemplated therein or thereby.

The foregoing descriptions of the Merger Agreement and the Termination Agreement do not purport to be complete and are qualified in their entirety by reference to the full text of the Merger Agreement, which was filed as an exhibit to JetBlue's Current Report on Form 8-K filed on July 28, 2022, and the Termination Agreement, which is attached hereto as Exhibit 10.1, each of which is incorporated by reference herein.

**Item 7.01 Regulation FD Disclosure.**

On March 4, 2024, JetBlue issued a press release announcing the termination of the Merger Agreement and the entry into the Termination Agreement. A copy of the press release is furnished herewith as Exhibit 99.1.

The information included under this Item 7.01 (including Exhibit 99.1) shall not be deemed "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), or otherwise subject to the liabilities of that section, nor shall it be deemed incorporated by reference in any filing under the Securities Act of 1933, as amended (the "Securities Act"), or the Exchange Act, except as may be expressly set forth by specific reference in such filing.

**Forward Looking Statements**

This Current Report on Form 8-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. We intend such forward-looking statements to be covered by the safe harbor provisions for forward-looking statements contained in Section 27A of the Securities Act and Section 21E of the Exchange Act. All statements other than statements of historical facts contained in this Current Report on Form 8-K are forward-looking statements. In some cases, you can identify forward-looking statements by terms such as "expects," "plans," "intends," "anticipates," "indicates," "remains," "believes," "estimates," "forecast," "guidance," "outlook," "may," "will," "should," "seeks," "goals," "targets" or the negative of these terms or other similar expressions. Additionally, forward-looking statements include statements that do not relate solely to historical facts, such as statements which identify uncertainties or trends, discuss the possible future effects of current known trends or uncertainties, or which indicate that the future effects of known trends or uncertainties cannot be predicted, guaranteed, or assured. Forward-looking statements involve risks, uncertainties and assumptions, and are based on information currently available to us. Actual results may differ materially from those expressed in the forward-looking statements due to many factors, including, without limitation, the risk associated with the execution of our strategic operating plans in the near-term and long-term; our extremely competitive industry; risks related to the long-term nature of our fleet order book; volatility in fuel prices and availability of fuel; increased maintenance costs associated with fleet age; costs associated with salaries, wages and benefits; risks associated with a potential material reduction in the rate of interchange reimbursement fees; risks associated with doing business internationally; our reliance on high daily aircraft utilization; our dependence on the New York metropolitan market; risks associated with extended interruptions or disruptions in service at our focus cities; risks associated with airport expenses; risks associated with seasonality and weather; our reliance on a limited number of suppliers for our aircraft, engines, and our Fly-Fi® product; risks related to new or increased tariffs imposed on commercial aircraft and related parts imported from outside the United States; the outcome of legal proceedings with respect to our Northeast Alliance with American Airlines Group Inc. and our wind-down of the Northeast Alliance; risks associated with cybersecurity and privacy, including information security breaches; heightened regulatory requirements concerning data security compliance; risks associated with reliance on, and potential failure of, automated systems to operate our business; our inability to attract and retain qualified crewmembers; our being subject to potential unionization, work stoppages, slowdowns or increased labor costs;

reputational and business risk from an accident or incident involving our aircraft; risks associated with damage to our reputation and the JetBlue brand name; our significant amount of fixed obligations and the ability to service such obligations; our substantial indebtedness and impact on our ability to meet future financing needs; financial risks associated with credit card processors; restrictions as a result of our participation in governmental support programs under the CARES Act, the Consolidated Appropriations Act, and the American Rescue Plan Act; risks associated with seeking short-term additional financing liquidity; failure to realize the full value of intangible or long-lived assets, causing us to record impairments; risks associated with disease outbreaks or environmental disasters affecting travel behavior; compliance with environmental laws and regulations, which may cause us to incur substantial costs; the impacts of federal budget constraints or federally imposed furloughs; impact of global climate change and legal, regulatory or market response to such change; increasing attention to, and evolving expectations regarding, environmental, social and governance matters; changes in government regulations in our industry; acts of war or terrorism; and changes in global economic conditions or an economic downturn leading to a continuing or accelerated decrease in demand for air travel.

Given the risks and uncertainties surrounding forward-looking statements, you should not place undue reliance on these statements. You should understand that many important factors, in addition to those discussed or incorporated by reference in this Current Report on Form 8-K, could cause our results to differ materially from those expressed in the forward-looking statements. Further information concerning these and other factors is contained in JetBlue's filings with the U.S. Securities and Exchange Commission, including but not limited to, in our Annual Report on Form 10-K for the year ended December 31, 2023. In light of these risks and uncertainties, the forward-looking events discussed in this Current Report on Form 8-K might not occur. Our forward-looking statements speak only as of the date of this Current Report on Form 8-K. Other than as required by law, we undertake no obligation to update or revise forward-looking statements, whether as a result of new information, future events, or otherwise.

**Item 9.01 Financial Statements and Exhibits.**

**(d) Exhibits**

| Exhibit Number | Description |
| --- | --- |
| 10.1 | Termination Agreement, dated March 1, 2024, by and among JetBlue Airways Corporation, Sundown Acquisition Corp., and Spirit Airlines, Inc. |
| 99.1 | Press Release of JetBlue, dated March 4, 2024 |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document) |

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**JETBLUE AIRWAYS CORPORATION**

(Registrant)

Date:   March 4, 2024                    By: /s/ Brandon Nelson

Brandon Nelson

General Counsel and Corporate Secretary

*Exhibit 10.1*

*Execution Copy*

# TERMINATION AGREEMENT

THIS TERMINATION AGREEMENT (this "Agreement") is entered into effective as of March 1, 2024, by and among JetBlue Airways Corporation, a Delaware corporation ("Parent"), Sundown Acquisition Corp., a Delaware corporation and a direct wholly owned Subsidiary of Parent ("Merger Sub"), and Spirit Airlines, Inc., a Delaware corporation (the "Company" and, together with Parent and Merger Sub, the "Parties").

All capitalized terms used but not otherwise defined herein shall have the respective meanings assigned to them in that certain Agreement and Plan of Merger, dated as of July 28, 2022 (the "Merger Agreement"), by and among the Parties.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

1.    **Termination of Merger Agreement.** Effective immediately upon the execution and delivery by the Parties of this Agreement, and in accordance with Section 7.1(a) of the Merger Agreement, the Parties hereby terminate the Merger Agreement, including all schedules and exhibits thereto, and agree to abandon the transactions contemplated thereby; provided that Sections 5.18(e) and 5.18(f), including any defined terms referred to therein, of the Merger Agreement (the "Surviving Provisions") shall continue in effect in accordance with their terms.

2.    **Termination Payment.** Not later than 5:00 p.m. Eastern time on March 5, 2024, Parent will pay or cause to be paid to the Company the amount of $69,000,000 (sixty-nine million US dollars) (the "Termination Payment") in cash by wire transfer of immediately available funds in accordance with Company's wire instructions set forth on Section 7.2(g) of the Company Disclosure Schedule. The payment of the Termination Payment shall be the sole and exclusive remedy of the Company, its Affiliates and its Representatives against Parent and any of its Representatives and Affiliates for any loss or damage suffered as a result of the failure of the Merger or for a breach of, or failure to perform under, the Merger Agreement (including all schedules and exhibits thereto) or otherwise or in respect of any oral representation made or alleged to have been made in connection therewith, and upon payment of such amount, none of Parent, Merger Sub or their respective Representatives or Affiliates shall have any further liability or obligation relating to or arising out of the Merger Agreement (including all schedules and exhibits thereto), whether in equity or at law, in contract, in tort or otherwise, except in respect of the Surviving Provisions.

3.    **Mutual Release.** Subject only to the payment of the amount contemplated by Section 2 of this Agreement, each of the Parties, on behalf of itself and each of its respective past, present or future assigns, officers, directors, affiliates, subsidiaries, members, managers, predecessors in interest and successors (the "Releasors") does to the fullest extent permitted by Law, hereby fully release, quitclaim, discharge and hold harmless each other and their respective past, present or future assigns, officers, directors, employees, affiliates, subsidiaries, parents, shareholders, members, managers, attorneys, accountants, representatives, advisors, agents, predecessors in interest and successors (the "Releasees") of and from any and all claims, demands, damages, actions, causes of action or liability of every kind or nature whatsoever for, on account of or growing out of any matters pertaining to, relating to or arising out of (a) the Merger Agreement (including all schedules and exhibits thereto) and the transactions contemplated therein or thereby (including, for the avoidance of doubt, the negotiation thereof and all due diligence activities undertaken in connection therewith) and (b) any public statements made prior to the date hereof relating to the foregoing (collectively, "Claims"). Nothing in this Section 3 shall (i) apply to any action by any Party to enforce the rights and obligations pursuant to this Agreement or the Surviving Provisions or (ii) constitute a release by any Party for any Claim arising under this Agreement or in respect of the Surviving Provisions.

4.    **Covenant Note to Sue.** Each of Parent and the Company on behalf of itself and its Releasors covenants not to bring any Claim before any court, arbitrator, or other tribunal in any jurisdiction, whether as a claim, a cross claim, or counterclaim, in respect of the Merger Agreement (other than in respect of the Surviving Provisions). Any Releasee may plead this Agreement as a complete bar to any such Claim brought in

derogation of this covenant not to sue. The covenants contained in this Section 4 shall become effective on the date hereof and shall survive this Agreement indefinitely regardless of any statute of limitations.

5.    **Non-solicitation**. For a period of six months following the date hereof, neither Parent nor the Company will, and each of them will cause its respective Affiliates not to, solicit or cause to be solicited for employment any officer, employee or consultant of the other Party (or any of its Affiliates) who was involved in the integration planning process engaged in by the Parties in respect of the proposed Merger; provided that this Section 5 shall not prevent either Party (or any of its Affiliates) from (x) soliciting for employment any person who has not been employed by the other Party (or any of its Affiliates) or, in the case of consultants, engaged as a consultant by the other Party, as the case may be, for at least six months prior to such solicitation or (y) engaging in any general solicitation of employment not specifically directed at employees of the other Party (or any of its Affiliates), or, in the case of consultants, consultant of the other Party. If any of the time or activity limitations set forth herein are determined to be unreasonable by a court or other tribunal of competent jurisdiction, the Parties agree to the modification and/or reduction of such time or activity limitations (including the imposition of such a limitation if it is missing) to such a period or scope of activity as said court or tribunal shall deem reasonable under the circumstances.

6.    **Non-Disparagement.** For a period of six months following the date of this Agreement, except as required by applicable Law or the rules or regulations of any Governmental Entity or by the order of any court of competent jurisdiction, none of the Parties shall, directly or indirectly, make any public statements or any private statements to third parties (in each case, oral or written) in respect of the Merger Agreement or the transactions contemplated thereby that could reasonably be understood as disparaging the other Parties or their respective affiliates.

7.    **Governing Law; Consent to Jurisdiction; Waiver of Trial by Jury**. This Agreement will be governed by, and construed in accordance with, the Laws of the State of Delaware, without regard to laws that may be applicable under conflicts of laws principles (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware. Each of the Parties hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Court of Chancery of the State of Delaware (the "Chancery Court"), or, if the Chancery Court lacks subject matter jurisdiction of the action or proceeding, any Federal court of the United States of America sitting in Delaware, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby or for recognition or enforcement of any judgment relating thereto, and each of Parties hereby irrevocably and unconditionally (i) agrees not to commence any such action or proceeding, except in such court, (ii) agrees that any claim in respect of any such action or proceeding may be heard and determined in such court, (iii) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in any such court and (iv) waives, to the fullest extent permitted by Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each of the Parties agrees that a final judgment in any such action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Each Party irrevocably consents to service of process in the manner provided for notices in Section 8.3 of the Merger Agreement. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by Law. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (III) IT MAKES SUCH WAIVERS VOLUNTARILY AND (IV)

IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 7</u>.

8.    **Entire Agreement**. This Agreement constitutes the entire agreement of the Parties and supersedes all prior agreements and undertakings, both written and oral, among the Parties, or any of them, with respect to the subject matter hereof.

9.    **Severability**. Any term or provision of this Agreement that is deemed or determined by a court of competent jurisdiction to be invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction. If a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making such determination shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified. In the event such court does not exercise the power granted to it in the prior sentence, the Parties agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the maximum extent possible, the economic, business and other purposes of such invalid or unenforceable term and the overall purpose of this Agreement as expressly described herein.

10.    **Notices**. The provisions of Section 8.3 of the Merger Agreement are incorporated herein by reference.

11.    **Counterparts.** This Agreement may be executed in one or more counterparts, and by the different Parties in separate counterparts, each of which when executed will be deemed to be an original but all of which taken together will constitute one and the same agreement.

12.    **Third-Party Beneficiaries.** Except for the provisions of Section 3, with respect to which each Releasee is an expressly intended third-party beneficiary thereof, this Agreement is not intended to (and does not) confer on any Person other than the Parties any rights or remedies or impose on any Person other than the Parties any obligations.

*[Signature Pages Follow]*

3

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

### JETBLUE AIRWAYS CORPORATION

By:     /s/ Brandon Nelson
Name:   Brandon Nelson
Title:  General Counsel and Secretary


### SUNDOWN ACQUISITION CORPORATION

By:     /s/ Brandon Nelson
Name:   Brandon Nelson
Title:  General Counsel and Secretary


[*Signature Page to Termination Agreement*]

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**SPIRIT AIRLINES, INC.**

By:     /s/ Edward Christie

Name:     Edward Christie

Title:     President & CEO

[*Signature Page to Termination Agreement*]

### JetBlue Announces Termination of Merger Agreement with Spirit

*Positions JetBlue to focus on organic strategy and return to profitability*

NEW YORK, March 4, 2024 – JetBlue (NASDAQ: JBLU) today announced that it has reached an agreement with Spirit Airlines (NYSE: SAVE) to terminate their July 2022 merger agreement.

Although both companies continue to believe in the procompetitive benefits of the combination, JetBlue and Spirit mutually agreed that terminating is the best path forward for both companies as required closing conditions, including receiving necessary legal and regulatory approvals, were unlikely to be met by the merger agreement's outside date of July 24, 2024.

"We believed this merger was worth pursuing because it would have unleashed a national low-fare, high-value competitor to the Big Four airlines," said Joanna Geraghty, chief executive officer, JetBlue. "We are proud of the work we did with Spirit to lay out a vision to challenge the status quo, but given the hurdles to closing that remain, we decided together that both airlines' interests are better served by moving forward independently. We wish the very best going forward to the entire Spirit team."

Under the agreement, JetBlue will pay Spirit $69 million and the termination resolves all outstanding matters related to the transaction and under which any claims between them will be mutually released.

"JetBlue has a strong organic plan and unique competitive advantages, including a beloved brand, a unique value proposition, and high-value geographies," Geraghty continued. "We have already begun to advance our plan to restore profitability. We look forward to sharing more on our progress in the coming months."

As outlined on the company's fourth quarter earnings call, JetBlue is taking decisive action to return to sustained profitability and drive shareholder value. As part of this work, the company is refocusing on its core strengths – deepening its network relevance in proven geographies and better segmenting its product offerings to enhance its competitive position – while delivering meaningful cost savings.

To date, JetBlue has identified multiple near-term revenue initiatives for 2024, including increased distribution and partnerships, expanded loyalty program functionality, network initiatives, and ancillary initiatives, which will deliver over $300 million in revenue benefits. JetBlue also remains on track to deliver $175-200 million in cost savings from its structural cost program and $75 million in maintenance savings from its fleet modernization, as well as incremental savings from targeted fixed cost base reductions, positioning the company to approach breakeven operating margins in 2024. These initiatives are just the starting point as JetBlue rebuilds its long-term organic strategy with a renewed focus on driving sustained profitability for its crewmembers and investors.

JetBlue will hold an Investor Day on Thursday, May 30, 2024, to provide additional detail on its long-term strategy and ongoing revenue and cost initiatives. Further information regarding Investor Day will be shared with analysts and investors in the coming weeks.

#### About JetBlue

JetBlue is New York's Hometown Airline®, and a leading carrier in Boston, Fort Lauderdale-Hollywood, Los Angeles, Orlando, and San Juan. JetBlue carries customers to more than 100 destinations throughout the United States, Latin America, Caribbean, Canada, and Europe. For more information and the best fares, visit jetblue.com.

#### Forward Looking Statements

This press release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. We intend such forward-looking statements to be covered by the safe harbor provisions for forward-looking statements contained in Section 27A of the Securities Act and Section 21E of the Exchange Act. All statements other than statements of historical facts contained in this press release are forward-looking statements. In some cases, you can identify forward-looking statements by terms such as "expects," "plans," "intends," "anticipates," "indicates," "remains," "believes," "estimates," "forecast," "guidance," "outlook," "may," "will," "should," "seeks," "goals," "targets" or the negative of these terms or other similar expressions. Additionally, forward-looking statements include statements that do not relate solely to historical facts, such as statements which identify uncertainties or trends, discuss the possible future effects of current known trends or uncertainties, or which indicate that the future effects of known trends or uncertainties cannot be predicted, guaranteed, or assured.

Forward-looking statements involve risks, uncertainties and assumptions, and are based on information currently available to us. Actual results may differ materially from those expressed in the forward-looking statements due to many factors, including, without limitation, the risk associated with the execution of our strategic operating plans in the near-term and long-term; our extremely competitive industry; risks related to the long-term nature of our fleet order book; volatility in fuel prices and availability of fuel; increased maintenance costs associated with fleet age; costs associated with salaries, wages and benefits; risks associated with a potential material reduction in the rate of interchange reimbursement fees; risks associated with doing business internationally; our reliance on high daily aircraft utilization; our dependence on the New York metropolitan market; risks associated with extended interruptions or disruptions in service at our focus cities; risks associated with airport expenses; risks associated with seasonality and weather; our reliance on a limited number of suppliers for our aircraft, engines, and our Fly-Fi® product; risks related to new or increased tariffs imposed on commercial aircraft and related parts imported from outside the United States; the outcome of legal proceedings with respect to our Northeast Alliance with American Airlines Group Inc. and our wind-down of the Northeast Alliance; risks associated with cybersecurity and privacy, including information security breaches; heightened regulatory requirements concerning data security compliance; risks associated with reliance on, and potential failure of, automated systems to operate our business; our inability to attract and retain qualified crewmembers; our being subject to potential unionization, work stoppages, slowdowns or increased labor costs; reputational and business risk from an accident or incident involving our aircraft; risks associated with damage to our reputation and the JetBlue brand name; our significant amount of fixed obligations and the ability to service such obligations; our substantial indebtedness and impact on our ability to meet future financing needs; financial risks associated with credit card processors; restrictions as a result of our participation in governmental support programs under the CARES Act, the Consolidated Appropriations Act, and the American Rescue Plan Act; risks associated with seeking short-term additional financing liquidity; failure to realize the full value of intangible or long-lived assets, causing us to record impairments; risks associated with disease outbreaks or environmental disasters affecting travel behavior; compliance with environmental laws and regulations, which may cause us to incur substantial costs; the impacts of federal budget constraints or federally imposed furloughs; impact of global climate change and legal, regulatory or market response to such change; increasing attention to, and evolving expectations regarding, environmental, social and governance matters; changes in government regulations in our industry; acts of war or terrorism; and changes in global economic conditions or an economic downturn leading to a continuing or accelerated decrease in demand for air travel.

Given the risks and uncertainties surrounding forward-looking statements, you should not place undue reliance on these statements. You should understand that many important factors, in addition to those discussed or incorporated by reference in this press release, could cause our results to differ materially from those expressed in the forward-looking statements. Further information concerning these and other factors is contained in JetBlue's filings with the U.S. Securities and Exchange Commission, including but not limited to, in our Annual Report on Form 10-K for the year ended December 31, 2023. In light of these risks and uncertainties, the forward-looking events discussed in this press release might not occur. Our forward-looking statements speak only as of the date of this press release. Other than as required by law, we undertake no obligation to update or revise forward-looking statements, whether as a result of new information, future events, or otherwise.

**Contacts:**

JetBlue Corporate Communications
Tel: +1.718.709.3089
corpcomm@jetblue.com

JetBlue Investor Relations
Tel: +1.718.709.2202
ir@jetblue.com

# EXHIBIT 2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## FORM 8-K

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

Date of Report (date of earliest event reported) March 4, 2024 (March 1, 2024)

# SPIRIT AIRLINES, INC.
**(Exact name of registrant as specified in its charter)**

| | | |
|---|---|---|
| **Delaware** | **001-35186** | **38-1747023** |
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification Number) |
| **2800 Executive Way** | **Miramar,          Florida** | **33025** |
| (Address of Principal Executive) | | (Zip Code) |

**(954) 447-7920**
(Registrant's telephone number, including area code)

N/A

(Former name or former address, if changed since last report.)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐     Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐     Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐     Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐     Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Common Stock, $0.0001 par value** | **SAVE** | **New York Stock Exchange** |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 1.01.    Entry into a Material Definitive Agreement.**

The disclosure set forth below under Item 1.02 of this Current Report on Form 8-K is incorporated by reference herein.

**Item 1.02.    Termination of a Material Definitive Agreement.**

As previously disclosed in our Current Report on Form 8-K filed with the Securities and Exchange Commission on July 28, 2022, Spirit Airlines, Inc. ("Spirit") entered into an Agreement and Plan of Merger on July 28, 2022 (the "Merger Agreement"), with JetBlue Airways Corporation, a Delaware corporation ("JetBlue"), and Sundown Acquisition Corp., a Delaware corporation and a direct, wholly owned subsidiary of JetBlue ("Merger Sub" and, together with Spirit and JetBlue, the "Parties"), pursuant to which and subject to the terms and conditions therein, Merger Sub would be merged with and into Spirit, with Spirit continuing as the surviving entity (the "Merger").

On March 4, 2024, the Parties entered into a Termination Agreement (the "Termination Agreement"), pursuant to which the Merger Agreement was terminated effective immediately. Under the terms of the Termination Agreement, JetBlue will, no later than 5:00 p.m. ET on March 5, 2024, pay or cause to be paid $69 million in cash to Spirit.

The Parties agreed to certain non-solicitation and non-disparagement covenants for six months following the date of the Termination Agreement. The Parties also agreed to mutual releases of claims in connection with the Merger Agreement and the Merger.

The foregoing description of the Termination Agreement does not purport to be complete and is subject to, and qualified in its entirety by reference to, the full text of the Termination Agreement, which is attached as Exhibit 10.1 and is incorporated herein by reference, and by the terms and conditions of the full text of the Merger Agreement, which was previously filed by Spirit as Exhibit 2.1 to its Current Report on Form 8-K with the SEC on July 28, 2022 which is incorporated herein by reference.

**Item 8.01    Other Events.**

On March 4, 2024, Spirit issued a press release announcing the termination of the Merger Agreement. A copy of the press release is furnished as Exhibit 99.1 hereto and is incorporated by reference herein.

**Item 9.01    Financial Statements and Exhibits.**

**(d)    Exhibits**

The following is furnished as an exhibit to this report and shall not be deemed "filed" for purposes of Section 18 of the Exchange Act:

| Exhibit No. | Description |
|---|---|
| 10.1 | Termination Agreement, dated March 1, 2024, by and among JetBlue Airways Corporation, Sundown Acquisition Corp. and Spirit Airlines, Inc. |
| 99.1 | Press Release March 4, 2024 |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL Document) |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: March 4, 2024

SPIRIT AIRLINES, INC.

By: /s/ Thomas Canfield
Name: Thomas Canfield
Title: Senior Vice President and General Counsel

Exhibit 10.1
*EXECUTION COPY*

## TERMINATION AGREEMENT

THIS TERMINATION AGREEMENT (this "<u>Agreement</u>") is entered into effective as of March 1, 2024, by and among JetBlue Airways Corporation, a Delaware corporation ("<u>Parent</u>"), Sundown Acquisition Corp., a Delaware corporation and a direct wholly owned Subsidiary of Parent ("<u>Merger Sub</u>"), and Spirit Airlines, Inc., a Delaware corporation (the "<u>Company</u>" and, together with Parent and Merger Sub, the "<u>Parties</u>").

All capitalized terms used but not otherwise defined herein shall have the respective meanings assigned to them in that certain Agreement and Plan of Merger, dated as of July 28, 2022 (the "<u>Merger Agreement</u>"), by and among the Parties.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereby agree as follows:

**1.**     **Termination of Merger Agreement**.  Effective immediately upon the execution and delivery by the Parties of this Agreement, and in accordance with Section 7.1(a) of the Merger Agreement, the Parties hereby terminate the Merger Agreement, including all schedules and exhibits thereto, and agree to abandon the transactions contemplated thereby; <u>provided</u> that Sections 5.18(e) and 5.18(f), including any defined terms referred to therein, of the Merger Agreement (the "<u>Surviving Provisions</u>") shall continue in effect in accordance with their terms.

**2.**     **Termination Payment**.  Not later than 5:00 p.m. Eastern time on March 5, 2024, Parent will pay or cause to be paid to the Company the amount of $69,000,000 (sixty-nine million US dollars) (the "<u>Termination Payment</u>") in cash by wire transfer of immediately available funds in accordance with Company's wire instructions set forth on Section 7.2(g) of the Company Disclosure Schedule.  The payment of the Termination Payment shall be the sole and exclusive remedy of the Company, its Affiliates and its Representatives against Parent and any of its Representatives and Affiliates for any loss or damage suffered as a result of the failure of the Merger or for a breach of, or failure to perform under, the Merger Agreement (including all schedules and exhibits thereto) or otherwise or in respect of any oral representation made or alleged to have been made in connection therewith, and upon payment of such amount, none of Parent, Merger Sub or their respective Representatives or Affiliates shall have any further liability or obligation relating to or arising out of the Merger Agreement (including all schedules and exhibits thereto), whether in equity or at law, in contract, in tort or otherwise, except in respect of the Surviving Provisions.

**3.**     **Mutual Release**.  Subject only to the payment of the amount contemplated by Section 2 of this Agreement, each of the Parties, on behalf of itself and each of its respective past, present or future assigns, officers, directors, affiliates, subsidiaries, members, managers, predecessors in interest and successors (the "<u>Releasors</u>") does to the fullest extent permitted by Law, hereby fully release, quitclaim, discharge and hold harmless each other and their respective past, present or future assigns, officers, directors, employees, affiliates, subsidiaries, parents,

shareholders, members, managers, attorneys, accountants, representatives, advisors, agents, predecessors in interest and successors (the "Releasees") of and from any and all claims, demands, damages, actions, causes of action or liability of every kind or nature whatsoever for, on account of or growing out of any matters pertaining to, relating to or arising out of (a) the Merger Agreement (including all schedules and exhibits thereto) and the transactions contemplated therein or thereby (including, for the avoidance of doubt, the negotiation thereof and all due diligence activities undertaken in connection therewith) and (b) any public statements made prior to the date hereof relating to the foregoing (collectively, "Claims"). Nothing in this Section 3 shall (i) apply to any action by any Party to enforce the rights and obligations pursuant to this Agreement or the Surviving Provisions or (ii) constitute a release by any Party for any Claim arising under this Agreement or in respect of the Surviving Provisions.

      **4.**    **Covenant Note to Sue**.  Each of Parent and the Company on behalf of itself and its Releasors covenants not to bring any Claim before any court, arbitrator, or other tribunal in any jurisdiction, whether as a claim, a cross claim, or counterclaim, in respect of the Merger Agreement (other than in respect of the Surviving Provisions).  Any Releasee may plead this Agreement as a complete bar to any such Claim brought in derogation of this covenant not to sue.  The covenants contained in this Section 4 shall become effective on the date hereof and shall survive this Agreement indefinitely regardless of any statute of limitations.

      **5.**    **Non-solicitation**.  For a period of six months following the date hereof, neither Parent nor the Company will, and each of them will cause its respective Affiliates not to, solicit or cause to be solicited for employment any officer, employee or consultant of the other Party (or any of its Affiliates) who was involved in the integration planning process engaged in by the Parties in respect of the proposed Merger; provided that this Section 5 shall not prevent either Party (or any of its Affiliates) from (x) soliciting for employment any person who has not been employed by the other Party (or any of its Affiliates) or, in the case of consultants, engaged as a consultant by the other Party, as the case may be, for at least six months prior to such solicitation or (y) engaging in any general solicitation of employment not specifically directed at employees of the other Party (or any of its Affiliates), or, in the case of consultants, consultant of the other Party.  If any of the time or activity limitations set forth herein are determined to be unreasonable by a court or other tribunal of competent jurisdiction, the Parties agree to the modification and/or reduction of such time or activity limitations (including the imposition of such a limitation if it is missing) to such a period or scope of activity as said court or tribunal shall deem reasonable under the circumstances.

      **6.**    **Non-Disparagement**.  For a period of six months following the date of this Agreement, except as required by applicable Law or the rules or regulations of any Governmental Entity or by the order of any court of competent jurisdiction, none of the Parties shall, directly or indirectly, make any public statements or any private statements to third parties (in each case, oral or written) in respect of the Merger Agreement or the transactions contemplated thereby that could reasonably be understood as disparaging the other Parties or their respective affiliates.

7.    **Governing Law; Consent to Jurisdiction; Waiver of Trial by Jury**.  This Agreement will be governed by, and construed in accordance with, the Laws of the State of Delaware, without regard to laws that may be applicable under conflicts of laws principles (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.  Each of the Parties hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Court of Chancery of the State of Delaware (the "Chancery Court"), or, if the Chancery Court lacks subject matter jurisdiction of the action or proceeding, any Federal court of the United States of America sitting in Delaware, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby or for recognition or enforcement of any judgment relating thereto, and each of Parties hereby irrevocably and unconditionally (i) agrees not to commence any such action or proceeding, except in such court, (ii) agrees that any claim in respect of any such action or proceeding may be heard and determined in such court, (iii) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in any such court and (iv) waives, to the fullest extent permitted by Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.  Each of the Parties agrees that a final judgment in any such action or proceeding will be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  Each Party irrevocably consents to service of process in the manner provided for notices in Section 8.3 of the Merger Agreement.  Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by Law.  EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.  EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (I) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE EITHER OF SUCH WAIVERS, (II) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVERS, (III) IT MAKES SUCH WAIVERS VOLUNTARILY AND (IV) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.

8.    **Entire Agreement**.  This Agreement constitutes the entire agreement of the Parties and supersedes all prior agreements and undertakings, both written and oral, among the Parties, or any of them, with respect to the subject matter hereof.

**9.**      **Severability**.  Any term or provision of this Agreement that is deemed or determined by a court of competent jurisdiction to be invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.  If a court of competent jurisdiction declares that any term or provision hereof is invalid or unenforceable, the Parties agree that the court making such determination shall have the power to limit the term or provision, to delete specific words or phrases, or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision, and this Agreement shall be enforceable as so modified.  In the event such court does not exercise the power granted to it in the prior sentence, the Parties agree to replace such invalid or unenforceable term or provision with a valid and enforceable term or provision that will achieve, to the maximum extent possible, the economic, business and other purposes of such invalid or unenforceable term and the overall purpose of this Agreement as expressly described herein.

**10.**      **Notices**.  The provisions of Section 8.3 of the Merger Agreement are incorporated herein by reference.

**11.**      **Counterparts**.  This Agreement may be executed in one or more counterparts, and by the different Parties in separate counterparts, each of which when executed will be deemed to be an original but all of which taken together will constitute one and the same agreement.

**12.**      **Third-Party Beneficiaries**.  Except for the provisions of Section 3, with respect to which each Releasee is an expressly intended third-party beneficiary thereof, this Agreement is not intended to (and does not) confer on any Person other than the Parties any rights or remedies or impose on any Person other than the Parties any obligations.

[*Signature Pages Follow*.]

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date first above written.

JETBLUE AIRWAYS CORPORATION


By: /s/ Brandon Nelson              
Name: Brandon Nelson
Title:   General Counsel & Corporate Secretary


SUNDOWN ACQUISITION CORP.


By: /s/ Brandon Nelson              
Name: Brandon Nelson
Title:   General Counsel & Corporate Secretary

[*Signature Page to Termination Agreement*]

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

SPIRIT AIRLINES, INC.

By: /s/ Edward M. Christie
Name: Edward M. Christie
Title:   President & Chief Executive Officer

Exhibit 99.1

**Spirit Announces Termination of Merger Agreement with JetBlue**

**MIRAMAR, Fla., March 4, 2024 –** Spirit Airlines, Inc. ("Spirit") (NYSE: SAVE) today announced that its merger agreement with JetBlue Airways Corporation has been terminated by mutual agreement.

"After discussing our options with our advisors and JetBlue, we concluded that current regulatory obstacles will not permit us to close this transaction in a timely fashion under the merger agreement," said Ted Christie, Spirit's President and Chief Executive Officer. "We are disappointed we cannot move forward with a deal that would save hundreds of millions for consumers and create a real challenger to the dominant "Big 4" U.S. airlines. However, we remain confident in our future as a successful independent airline. We wish the JetBlue team well."

Christie continued, "Throughout the transaction process, given the regulatory uncertainty, we have always considered the possibility of continuing to operate as a standalone business and have been evaluating and implementing several initiatives that will enable us to bolster profitability and elevate the Guest experience. As we go forward, I am certain our fantastic Spirit team will continue delivering affordable fares and great experiences to our Guests."

Spirit is confident in its strengths and is focused on returning to profitability. The Company has been taking, and will continue to take, prudent steps to ensure the strength of its balance sheet and ongoing operations, including assessing options to refinance upcoming debt maturities. In that regard, Spirit has retained Perella Weinberg & Partners L.P. and Davis Polk & Wardwell LLP as advisors. As part of the termination, JetBlue will pay Spirit $69 million. While the merger agreement was in effect, Spirit stockholders received approximately $425 million in total prepayments.

**About Spirit Airlines**

Spirit Airlines (NYSE: SAVE) is committed to delivering the best value in the sky. We are the leader in providing customizable travel options starting with an unbundled fare. This allows our Guests to pay only for the options they choose — like bags, seat assignments, refreshments and Wi-Fi — something we call À La Smarte®. Our Fit Fleet® is one of the youngest and most fuel-efficient in the United States. We serve destinations throughout the U.S., Latin America and the Caribbean, making it possible for our Guests to venture further and discover more than ever before. We are committed to inspiring positive change in the communities where we live and work through the Spirit Charitable Foundation. Come save with us at spirit.com.

Investor inquiries:

DeAnne Gabel
(954) 447-7920
investorrelations@spirit.com

Exhibit 99.1

Media inquiries:

Spirit Media Relations
Media_Relations@spirit.com

or

FGS Global
Robin Weinberg / Emily Claffey / Bridget Stephan
(212) 687-8080
Spirit@FGSGlobal.com